# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYNNE P. MALEEFF, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) ) |
| B COMMUNICATIONS LTD, DORON TURGEMAN, ITZIK TADMOR, and EHUD YAHALOM, | ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Lynne P. Maleeff ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding B Communications Ltd ("B Communications" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.       This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired B Communications securities between November 7, 2013 and June 19, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.       B Communications Ltd provides various communications services for business and private customers in Israel. The company offers fixed-line telephony, fixed-line broadband Internet infrastructure access, Internet service provider, cellular telephony, international telephony, international and domestic data transfer and network, information and communication technology, pay television, multi-channel television, television and radio broadcasts, satellite broadcasts, and customer call center services, as well as other communications infrastructures and services.

3.       Founded in 1999, the Company was formerly known as "012 Smile Communications Ltd." and changed its name to B Communications Ltd. in March 2010.  B Communications is headquartered in Ramat Gan, Israel, and its stock trades on the NASDAQ under the ticker symbol "BCOM."

4.       B Communications is a subsidiary of Internet Gold–Golden Lines, itself a subsidiary of Eurocom Communications Ltd. ("Eurocom"), owned by Shaul Elovitch ("Elovitch").

5.       At all relevant times, Bezeq The Israel Telecommunication Corporation Limited ("Bezeq") has existed as a subsidiary of B Communications.  On or around June 24, 2015, Bezeq completed a merger with its subsidiary D.B.S., Satellite Services (1998) Ltd. ("DBS"), more commonly known by its trade name "YES", a satellite television operator (the "Bezeq-YES Merger").  Prior to the merger, Bezeq held a 49.8% stake in YES, while Eurocom held a 50.2%

stake in the YES.  Pursuant to the merger, Bezeq paid Eurocom NIS 680 million to acquire its holdings in YES.

6.      Through his ownership of Eurocom, at all relevant times Elovitch has exercised control over Eurocom, B Communications, and Bezeq, and has served at all relevant times as the Chairman of the Board of Directors at each of the three companies.

7.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Elovitch had engaged in illegal conduct in connection with the Bezeq-YES Merger; (ii) discovery of the foregoing conduct would subject B Communications and/or Bezeq to heightened regulatory scrutiny and potential criminal sanctions; and (iii) as a result of the foregoing, B Communications' public statements were materially false and misleading at all relevant times.

8.      On June 20, 2017, *The Times of Israel* reported that the Israel Securities Authority ("ISA") had raided the offices of Bezeq and detained Elovitch.  The ISA advised Bezeq that it was investigating "suspicions of violations of the securities law and the penal code relating to transactions connected to" Elovitch.  The Israeli publication *Globes* reported that the ISA is investigating the Bezeq-Yes Merger, as well as payments the unit made to Eurocom under pressure from Elovitch.

9.      Following this news, B Communications' share price fell $1.00, or 4.65%, to close at $20.50 on June 20, 2017.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act.

13.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). B Communications securities trade on the NASDAQ, located within this Judicial District.

14.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.    Plaintiff, as set forth in the attached Certification, acquired B Communications securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.    Defendant B Communications is headquartered in Ramat Gan, Israel, with principal executive offices located at 2 Dov Friedman Street, Ramat Gan, 5250301.  B Communications' shares trade on the NASDAQ under the ticker symbol "BCOM."

17.    Defendant Doron Turgeman ("Turgeman") has served at all relevant times as the Company's Chief Executive Officer ("CEO").

18.     Defendant Itzik Tadmor ("Tadmor") has served as the Company's Chief Financial Officer ("CFO") since May 2015.

19.     Defendant Ehud Yahalom ("Yahalom") served as the Company's CFO from October 2011 until May 2015.

20.     The defendants referenced above in ¶¶ 17-19 are sometimes referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

21.     B Communications Ltd provides various communications services for business and private customers in Israel. The company offers fixed-line telephony, fixed-line broadband Internet infrastructure access, Internet service provider, cellular telephony, international telephony, international and domestic data transfer and network, information and communication technology, pay television, multi-channel television, television and radio broadcasts, satellite broadcasts, and customer call center services, as well as other communications infrastructures and services. At all relevant times, Bezeq has existed as a subsidiary of B Communications.

22.     Through his ownership of Eurocom, at all relevant times Shaul Elovitch has exercised control over Eurocom, B Communications, and Bezeq, and has served at all relevant times as the Chairman of the Board of Directors at each of the three companies

23.     At all relevant times until completion of the Bezeq-YES merger on or around June 24, 2015, Bezeq held a minority ownership stake in DBS, more commonly known by its trade name "YES", a satellite television operator.

**Materially False and Misleading Statements Issued During the Class Period**

24.     The Class Period begins on November 7, 2013, when Bezeq issued a press release, filed by B Communications with the SEC on Form 6-K, entitled "Israel Antitrust Authority provides draft merger terms for Bezeq and Yes".  The press release advised B Communications investors, in relevant part, that "on November 6, 2013, the Antitrust Authority released a notice to the public regarding the evaluation of the [Bezeq-YES Merger], along with a new draft of terms made available for public comment until November 28, 2013."

25.     On or around March 26, 2014, Bezeq issued a press release, subsequently filed by B Communications with the SEC on Form 6-K on March 27, 2014, entitled "Anti-Trust authority Decision Regarding Yes Merger".  The press release advised B Communications investors, in relevant part:

> Further to the Company's immediate reports of November 3, 2013, and November 7, 2013 regarding the draft terms of the Company's merger with D.B.S. Satellite Services (1998) Ltd. ("Yes"), and further to the description in section 1.1.2 of Chapter A of the 2013 periodic report in the same matter, immediate notification is hereby provided that a decision by the Antitrust Commissioner was received at the Company's offices this afternoon, a copy of which is attached hereto (the "Decision").
>
> ***Pursuant to the Decision, upon fulfillment of the terms stated therein, the restrictions imposed on the Eurocom Group on its continued holdings in Yes would be removed, and the Company's merger with Yes would be allowed.***
>
> The Company is studying the Decision and the terms specified therein.

(Emphasis added.)

26.     On April 28, 2014, B Communications filed an Annual Report on Form 20-F with the SEC, reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 20-F").  For 2013, B Communications reported net income of $137 million on revenue of $9.56 billion, compared to net income of $45 million on revenue of $10.28 billion for 2012.

27.     In the 2013 20-F, B Communications advised investors, in relevant part:

*Possible Merger with YES*

Bezeq holds approximately 49.78% of the shares of YES (and an option to purchase additional shares constituting approximately 8.6% of YES's share capital). The remaining YES shares are held by Eurocom DBS which is (indirectly) controlled by Mr. Shaul Elovitch, who indirectly controls us. Pursuant to the terms set forth in the Israeli Antitrust Commissioner's approval for our acquisition of control in Bezeq, the voting rights with respect to the shares held by Eurocom DBS were granted to a trustee, who may exercise such rights pursuant to a proxy provided to it.

In August 2009, the Israeli Supreme Court accepted the Israeli Antitrust Commissioner's objection to the contemplated merger between Bezeq and YES. In view of the Supreme Court's ruling, Bezeq determined that it would not be able to control YES. The Israeli Antitrust Commissioner's approval of our acquisition of control of Bezeq was conditioned, among other things, upon the sale by Eurocom of its holdings in YES within a defined period of time.

On March 26, 2014, the Israeli Antitrust Authority issued a decision which provides that upon the fulfillment of certain terms, the restrictions imposed on the Eurocom Group with respect to its ownership interest in YES would be removed and Bezeq's merger with YES would be allowed.

If the merger between Bezeq and YES were to occur, following the recent conditional approval by the Israeli Antitrust Authority, the Bezeq Group could benefit from potential cost savings, as well as additional revenue and marketing synergies.

In light of YES's holding structure and primarily as a result of the provisions of the Israeli Companies Law applicable to Bezeq as a public company, cooperative ventures between YES and other members of the Bezeq Group (such as agreements for mutual marketing of products and services) are currently subject to special approval procedures, mainly a requirement to approve certain transactions as a "related party transaction" under the Israeli Companies Law, including an approval by special majority of Bezeq's disinterested shareholders. These restrictions currently limit the Bezeq Group's ability to benefit fully from its relationship with YES.

28.     The 2013 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Turgeman and Yahalom, stating that the financial information contained in the 2013 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.     On or around March 26, 2015, Bezeq issued a press release entitled "Exercise of yes option warrants".  The press released advised investors, in relevant part:

> Further to the Company's report of March 24, 2015, regarding the outcome of the special General Meeting convened on March 23, 2015, the Company provides notification that on March 25, 2015, the Antitrust Commissioner announced that the merger conditions he established in his decision of March 26, 2015 for granting conditional approval for the merger by the Company and DBS Satellite Services (1998) Ltd. ("Yes") have been satisfied. Accordingly, the Company notified Yes of the exercise of the option warrants in its possession, for no consideration, for the issuance of 6,221 shares of Yes to the Company. Such shares have been issued, and the Company's shareholdings of Yes's issued capital presently aggregate to approximately 58.4%.

> The purchase transaction approved by the General Meeting on March 23, 2015, shall be consummated after the Minister of Communications' approval is received. At the present stage, the purchase agreement with Eurocom DBS Ltd. has been extended by 90 days.

30.     On April 27, 2015, B Communications filed an Annual Report on Form 20-F with the SEC, reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 20-F").  For 2014, B Communications reported a net loss of $21 million on revenue of $9.06 billion, compared to net income of $137 million on revenue of $9.56 billion for 2013.

31.     In the 2014 20-F, B Communications stated, in relevant part:

*Merger with YES*

> As a result of a decision of the Supreme Court in 2009 not to approve the merger of Bezeq and DBS, Bezeq ended its control of DBS and discontinued consolidation of its financial statements with those of DBS as of August 21, 2009 (from that date the investment in DBS shares were presented according to the equity method). Until March 25, 2015, Bezeq held 49.78% of the shares of DBS and it also held stock options which conferred a right to 8.6% of the shares of DBS. The balance of the outstanding DBS shares are held by Eurocom DBS. To the best of Bezeq's knowledge, the voting rights on account of these shares were, until March 25, 2015, held in trust under irrevocable power of attorney in accordance with the terms laid down in the transaction for acquisition of control in Bezeq which stipulates that the trustee would act as owner of the shares. To the best of our knowledge, the Commissioner made his approval of our acquisition of the control

of Bezeq conditional on Eurocom DBS selling its holdings in DBS within the period defined in the approval, which has been periodically extended.

In March 26, 2014, the Antitrust Authority determined that when certain conditions were met, the limitations that were imposed on Eurocom Group with respect to its holdings in DBS would be cancelled and the merger between Bezeq and DBS would be permitted.

A sub-committee of the Board of Directors of Bezeq was established to deal with the possible merger in October 2013 and with the help of external consultants selected by the sub-committee, Bezeq reviewed the feasibility of the merger and the options open to it in light of the Commissioner's decision, including the purchase of the DBS shares held by Eurocom.

On February 10, 2015, the sub-committee, Audit Committee and Board of Directors of Bezeq approved a transaction between Bezeq and Eurocom DBS in which Bezeq will acquire all the holdings of Eurocom DBS in DBS, which at that time constituted 50.22% of the issued share capital of DBS (41.62% fully diluted) as well as all the shareholders' loans that Eurocom provided to DBS (NIS 1,538 million as at December 31, 2014), or the Purchase Transaction. It was also decided that, prior to the Purchase Transaction, Bezeq would also exercise its option to acquire 8.6% of the issued share capital of DBS for no consideration. Under the conditions of the Purchase Transaction, Bezeq will pay Eurocom DBS NIS 680 million in cash against the purchase of the shares and the shareholders' loans. Furthermore, Eurocom D.B.S. will be entitled to two additional contingent payments: one additional payment of up to NIS 200 million will be paid contingent on the final decision by the Israeli Tax Authority with respect to periods in the settlement period as a result of the tax synergies created by the merger; and an additional payment of NIS 170 million will be paid according to the business results of DBS in the next three years.

On March 23, 2015 the general meeting of Bezeq's shareholders approved the merger conditions and the exercise of the option, as well as the Purchase Transaction. Bezeq and DBS announce their acceptance of the merger conditions and on March 25, 2015 Bezeq exercised its option to acquire 8.6% of the issued share capital of DBS, increasing its ownership interest to 58.4%. Later the same day, Bezeq received notice from the Antitrust Authority that the restrictions imposed on the Eurocom Group with regard to its holdings in DBS (held by a trustee and must sell) were rescinded. Bezeq's proposed transaction with Eurocom DBS to acquire its holdings in DBS requires approval of the Minister of Communications and is yet to be closed. The agreement with Eurocom DBS was extended by 90 days.

32.    The 2014 20-F contained signed certifications pursuant to SOX by Defendants Turgeman and Yahalom, stating that the financial information contained in the 2014 20-F was

accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.     On or around June 24, 2015, Bezeq issued a press release, subsequently filed by B Communications with the SEC on Form 6-K on June 25, 2015, entitled "Closing of yes transaction".  The press release stated, in relevant part:

> Further to the Company's reports of March 26, 2015 regarding the exercise of options in its possession into shares of D.B.S. Satellite Services (1998) Ltd. ("yes") and June 24, 2015 regarding the approval received from the Minister of Communications and the satisfaction of all the preconditions for the acquisition of yes shares and shareholder loans from Eurocom DBS Ltd. ("Eurocom"), the Company hereby provides notification that on June 24, 2015, the closing of the transaction took place whereby:

> (a) A total cash amount of NIS 680 million (six hundred and eighty million), was paid to Eurocom.

> (b) The Company acquired the entire holdings of Eurocom in Yes and acquired all the shareholder loans provided by Eurocom to Yes.

> (c) The Eurocom director in yes resigned.

> As a result of the closing the Company holds 100% of yes.

34.     On April 19, 2016, B Communications filed an Annual Report on Form 20-F with the SEC, reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 20-F").  For 2015, B Communications reported net income of $210 million on revenue of $9.99 billion, compared to a net loss of $21 million on revenue of $9.06 billion for 2014.

35.     In the 2015 20-F, B Communications stated, in relevant part:

*Merger with DBS*

> Until March 25, 2015, Bezeq held 49.78% of the shares of DBS and it also owned stock options which entitled it to acquire 8.6% of the shares of DBS. In view of a decision of the Supreme Court in 2009 not to approve the merger of Bezeq and DBS, Bezeq ended its control in DBS and from August 21, 2009, it ceased to

consolidate the operations of DBS in its financial statements and its investment in DBS was presented according to the equity method. The balance of DBS shares were held by Eurocom D.B.S. (A company controlled (indirectly) by Messrs. Shaul and Yossef Elovitch, controlling shareholders of Bezeq and our company).

On March 26, 2014, the Antitrust Authority issued a decision permitting the merger between Bezeq and DBS under certain conditions.

A sub-committee of the Board of Directors of Bezeq was appointed to deal with the topic, and the Audit Committee and Board of Directors as well as a General Meeting of the shareholders of Bezeq approved the transaction between Bezeq and Eurocom DBS to acquire all the holdings of Eurocom DBS in DBS, which represented 50.22% of the issued share capital of DBS (41.62% on a fully diluted basis) as well as all the shareholders' loans that Eurocom had provided to DBS (NIS 1,538 million as at December 31, 2014). It was also decided that prior to the purchase of the Eurocom interest, Bezeq and DBS would accept the merger conditions established by the Antitrust Authority and Bezeq would exercise its option to acquire 8.6% of the issued share capital of DBS for no consideration. On March 25, 2015, Bezeq exercised the option to acquire 8.6% of the issued share capital of DBS, resulting in its holding 58.4% of the issued share capital of DBS. Subsequently, Bezeq received notice from the Antitrust Authority of the cancellation of the limitations that were imposed on Eurocom Group with respect to its holdings in DBS.

On June 23, 2015, approval was received from the Minister of Communications to transfer the means of control in DBS in such manner that Bezeq will control DBS and will hold the entire issued and paid-up capital of DBS. On June 24, 2015, Bezeq acquired the shares of DBS held by Eurocom and Eurocom assigned to Bezeq its entire rights in the shareholders' loans that it had provided to DBS in consideration of NIS 680 million. Upon completion of the transaction, DBS became a wholly owned subsidiary (100%) of Bezeq.

In addition to the cash payment of NIS 680 million, Eurocom D.B.S. will be entitled to two additional contingent payments consisting of: one additional payment of up to NIS 200 million payable in accordance with the tax synergy that may be generated from the transaction and an additional payment of NIS 170 million that will be payable upon the business results of DBS reaching certain milestones in the next three years.

36.     The 2015 20-F contained signed certifications pursuant to SOX by Defendants Turgeman and Tadmor, stating that the financial information contained in the 2015 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     On April 26, 2017, B Communications filed an Annual Report on Form 20-F with

the SEC, reporting in full the Company's financial and operating results for the quarter and year

ended December 31, 2016 (the "2016 20-F").  For 2016, B Communications reported a net loss of

$236 million on revenue of $10.08 billion, compared to net income of $45 million on revenue of

$10.28 billion for 2015.

38.     In the 2016 20-F, B Communications stated, in part:

**Business Combination with DBS Satellite Services (1998) Ltd. ("DBS")**

As at December March 25, 2015 [sic], Bezeq held 49.78% of the share capital of
DBS and it held options to acquire 8.6% of DBS's shares, which Bezeq was unable
to exercise. Eurocom DBS Ltd. held the balance of DBS shares. On March 25,
2015, Bezeq exercised the options for no consideration and on June 24, 2016, Bezeq
completed a transaction ("the Acquisition Transaction") for the acquisition of the
entire holdings of Eurocom DBS in DBS, which at that date represented 50.22% of
the issued share capital of DBS (41.62% fully diluted) and all the shareholder loans
provided by Eurocom to DBS. On completion of the Acquisition Transaction, DBS
became a wholly owned subsidiary (100%) of Bezeq.

Bezeq consolidates the financial statements of DBS as from March 23, 2015. The
statements of income for 2014 and the first quarter of 2015 include the operating
results of DBS based on the equity method.

39.     The 2016 20-F contained signed certifications pursuant to SOX by Defendants

Turgeman and Tadmor, stating that the financial information contained in the 2016 20-F was

accurate and disclosed any material changes to the Company's internal control over financial

reporting.

40.     The statements referenced in ¶¶ 24-39 were materially false and misleading because

defendants made false and/or misleading statements, as well as failed to disclose material adverse

facts about the Company's business, operational and compliance policies. Specifically, defendants

made false and/or misleading statements and/or failed to disclose that: (i) Elovitch had engaged in

illegal conduct in connection with the Bezeq-YES Merger; (ii) discovery of the foregoing conduct

would subject B Communications and/or Bezeq to heightened regulatory scrutiny and potential criminal sanctions; and (iii) as a result of the foregoing, B Communications' public statements were materially false and misleading at all relevant times.

### The Truth Emerges

41.     On June 20, 2017, 2017, *The Times of Israel* reported that the ISA had raided the offices of Bezeq and detained Elovitch.  The ISA advised Bezeq that it was investigating "suspicions of violations of the securities law and the penal code relating to transactions connected to" Elovitch.  The Israeli publication *Globes* reported that the ISA is investigating the Bezeq-Yes Merger, as well as payments the unit made to Eurocom under pressure from Elovitch.

42.     Following this news, B Communications' share price fell $1.00, or 4.65%, to close at $20.50 on June 20, 2017.

43.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired B Communications securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, B Communications securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by B Communications or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of B Communications;

- whether the Individual Defendants caused B Communications to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of B Communications securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

50.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- B Communications securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold B Communications securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

51.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

52.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of B Communications securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire B Communications securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

16

56.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for B Communications securities.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about B Communications' finances and business prospects.

57.     By virtue of their positions at B Communications, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.   Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.   In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.   As the senior managers and/or directors of B Communications, the Individual Defendants had knowledge of the details of B Communications' internal affairs.

59.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual

Defendants were able to and did, directly or indirectly, control the content of the statements of B Communications.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to B Communications' businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of B Communications securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning B Communications's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired B Communications securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

60.     During the Class Period, B Communications securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of B Communications securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of B Communications securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of B Communications securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

18

61.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

63.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of B Communications, and conducted and participated, directly and indirectly, in the conduct of B Communications' business affairs.  Because of their senior positions, they knew the adverse non-public information about B Communications' misstatement of income and expenses and false financial statements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to B Communications' financial condition and results of operations, and to correct promptly any public statements issued by B Communications which had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which B Communications disseminated in the marketplace during the Class Period concerning B Communications' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause B Communications to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of B Communications within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of B Communications securities.

67.     Each of the Individual Defendants, therefore, acted as a controlling person of B Communications. By reason of their senior management positions and/or being directors of B Communications, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, B Communications to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of B Communications and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by B Communications.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

20

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 29, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

21

*Attorneys for Plaintiff*