**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| REX AND ROBERTA LING LIVING TRUST u/a DECEMBER 6, 1990, as AMENDED, JOHN TAYLOR JONES, and DAVID THOMAS JONES, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>-against-<br><br>B COMMUNICATIONS LTD., EUROCOM COMMUNICATIONS LTD., D.B.S. SATELLITE SERVICES (1998) LTD., SHAUL ELOVITCH, OR ELOVITCH, RON EILON, STELLA HANDLER, DAVID MIZRAHI, MICKY NEIMAN, ALLON RAVEH, ITZIK TADMOR, DORON TURGEMAN, EHUD YAHALOM, and LINOR YOCHELMAN,<br><br>Defendants. | No. 1:17-cv-04937 (JPO)<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ................................................................ 1

II.  JURISDICTION AND VENUE ......................................................... 4

III.  PARTIES ......................................................................................... 5

    1.  Lead Plaintiffs ................................................................... 5

    2.  Defendants ......................................................................... 5

IV.  SUBSTANTIVE ALLEGATIONS ................................................... 7

    A.  Defendant Elovitch and His Pyramid Empire........................ 7

    B.  The Importance of BComm's Code of Ethics......................... 9

    C.  The Fraud Orchestrated for the Bezeq-Yes Merger............... 11

    D.  False and Misleading Statements and Omissions During the Class Period.......... 15

        1.  Yes, Bezeq, and BComm's Inflated Free Cash Flows............................. 16

        2.  Additional False and Misleading Statements and Omissions in 2015...... 19

        3.  Additional False and Misleading Statements and Omissions in 2016...... 22

        4.  Additional False and Misleading Statements and Omissions in 2017...... 28

    E.  The Truth Slowly Begins to Emerge ................................... 33

    F.  ISA's Recommendation of Criminal Enforcement in November 2017................ 38

    G.  Additional Allegations Supporting Scienter ......................... 43

        1.  Defendant Elovitch's Motive to Enrich Himself From Related-Party Dealings ........ 43

        2.  ISA's Findings Against the Individual Defendants ................................. 44

        3.  High-Level Executives' Involvement in the Scheme .............................. 46

V.  CLASS ACTION ALLEGATIONS ................................................ 48

VI.  CLAIMS FOR RELIEF ................................................................. 52

COUNT I ....................................................................................... 52

COUNT II ...................................................................................... 56

VII.  PRAYER FOR RELIEF .............................................................. 57

VIII.  DEMAND FOR TRIAL BY JURY ............................................ 58

i

Lead Plaintiffs Rex and Roberta Ling Living Trust u/a December 6,1990, as Amended, John Taylor Jones, and David Thomas Jones (collectively, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by Lead Plaintiffs' undersigned attorneys, for Lead Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws against Defendants (as defined below), alleges the following based upon (i) personal knowledge as to Lead Plaintiffs' own acts and (ii) information and belief as to all other matters from the investigation conducted by and through Lead Plaintiffs' attorneys.  This investigation included a review of the following, without limitation: Defendants' public documents; conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding B Communications Ltd. ("BComm" or the "Company"); analysts' reports and advisories about the Company; documents from governmental and legal proceedings within the U.S. and abroad; information readily obtainable from public sources; and information learned from confidential sources.  Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein, as will be demonstrated after a reasonable opportunity for discovery.

## I.   <u>NATURE OF THE ACTION</u>

1.     This is a securities fraud class action ("Action") on behalf of a class of all persons and entities other than Defendants (as defined below) who purchased or otherwise acquired BComm American Depository Receipts ("ADR") between March 18, 2015 and September 6, 2017, both dates inclusive (the "Class Period"), and were damaged thereby ("Class").  This Action is brought under Sections 10(b) and 20(a)-(b) of the U.S. Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)-(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      BComm is a holding company for Bezeq The Israeli Telecommunication Corp. Ltd. ("Bezeq"), which provides various communications services for business and private customers in Israel.  It is part of a pyramid of companies controlled by Defendant Shaul Elovitch ("Elovitch").

3.      At the heart of the Action are Defendants' false and misleading statements and omissions in connection with Bezeq's substantial overpayment for the purchase of D.B.S. Satellite Services (1998) Ltd. ("Yes"), another entity within Defendant Elovitch's pyramid, thereby siphoning over a billion Israeli New Shekels ("NIS")[1] from BComm's coffers into Defendant Elovitch's pockets.

4.      In connection with this transaction, Defendants materially inflated the key metric of Yes' valuation, its reported free cash flow.  Yes' inflated free cash flow not only inflated BComm's reported results (by virtue of incorporation thereof) but also purportedly satisfied certain performance thresholds that triggered substantial payments due to Yes.  In connection therewith, Yes' chief executive officer ("CEO"), Ron Eilon ("Eilon"), amongst others, delayed substantial payments to suppliers, consequently inflating Yes' free cash flow.

5.      Investors were misled not only by Yes' reported results, which were incorporated into BComm's financials (even reaching approximately 19%[2] of Bezeq's consolidated free cash flows), but also by BComm's purported compliance with laws and deterrence of conflicts of interest with its executives, as reflected in its Code of Ethics (as defined below).  BComm trumpeted its Code of Ethics throughout the Class Period to quell minority shareholders' concerns about the dominance that Defendant Elovitch and his corporate pyramid had over BComm.  Also, BComm's investors were misled by the Company's statements about its

---

[1] All figures herein are in NIS and approximations, unless stated otherwise.
[2] All percentages herein are approximations.

disclosure controls and procedures and the individual Defendants' certifications under the Sarbanes-Oxley Act of 2002 ("SOX").

6.      Investors began learning the truth when on June 20, 2017, the Israel Securities Authority ("ISA") raided the offices of BComm, Bezeq, and Yes and detained its executives (including Defendant Elovitch) for questioning.  Following this raid and the continued investigation, BComm reported significantly lower free cash flows, indicative of the prior inflation.  Around November 6, 2017, the ISA recommended criminal indictments against several individual Defendants, including Elovitch, his son Or Elovitch ("O. Elovitch," a director at BComm and Bezeq), Eilon, Stella Handler ("Handler," Bezeq's CEO), and Micky Neiman ("Neiman," Yes' CFO), based on findings of prima facie violations of Israel Securities Law (a cognate of U.S. securities laws) and Penal Law (that requires knowledge of fraud).  Pursuant to orders of the Tel Aviv-Jaffa Magistrate Court in Israel, with the parties' consents, each of Defendants Elovitch, O. Elovitch, Eilon, Handler, Neiman, and Linor Yochelman ("Yochelman," the secretary of Bezeq's board of directors ("BoD")) were placed under house arrest at points during the Class Period, in connection with the ISA's investigation.  Defendant Elovitch has announced his resignation as BoD Chairman of both BComm and Bezeq.  At points during the Class Period, Defendants Elovitch, O. Elovitch, Eilon, Handler, Neiman, and Yochelman were banned under court orders from working at BComm, Bezeq, Yes, and their related entities.

7.      In the aftermath of these revelations, analysts expressed significant concern about the now apparent lack of real independence of BComm, Bezeq, and Yes' management and directors.  *The Times of Israel* on July 18, 2017 published an article entitled "Bezeq probe examines a web of bad connections[,]" reporting the following, in relevant part:

> "Corporate governance in Israel remains a concern for foreign investors," said Steven Schoenfeld, founder and chief investment officer of BlueStar Indexes, a

financial firm that has developed indices and exchange traded funds (ETFs) with a focus on the Israeli capital markets.

***

[Citi analyst Michael Klahr] said Bezeq now "needs to restore investor confidence by showing that senior management has independence from the controlling group."

8.     Before the revelations about the ISA's investigation, BComm's ADR price closed at $21.50 on June 19, 2017.  Through September 7, 2017, ADR price deflated to $14.49 (a dizzying drop of over 30%), following an avalanche of disclosures regarding the ISA's investigation and removal of key executives from BComm and related companies.

## II.    JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a)-(b) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)-(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  A substantial part of the conduct complained of herein and the subsequent damages occurred in this Judicial District, and BComm's ADRs are traded on NASDAQ, which is located in this Judicial District.

12.   In connection with the acts, conduct, and other wrongs alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   PARTIES

#### 1.   Lead Plaintiffs

13.   Lead Plaintiff Rex and Roberta Ling Living Trust u/a December 6, 1990, as Amended, purchased BComm's ADRs during the Class Period on the NASDAQ and was damaged upon the revelation of the alleged curative disclosures.

14.   Lead Plaintiff John Taylor Jones purchased BComm's ADRs during the Class Period on the NASDAQ and was damaged upon the revelation of the alleged curative disclosures.

15.   Lead Plaintiff David Thomas Jones purchased BComm's ADRs during the Class Period on the NASDAQ and was damaged upon the revelation of the alleged curative disclosures.

#### 2.   Defendants

16.   Defendant BComm is headquartered in Ramat Gan, Israel, with principal executive offices located at 2 Dov Friedman Street, Ramat Gan, 5250301.   BComm's ADRs trade on the NASDAQ under the ticker symbol "BCOM," and the Company's ordinary shares trade on the Tel Aviv Stock Exchange ("TASE") under the symbol "BCOM."   BComm is a holding company that owns a controlling interest, approximately 26%, of the shares of Bezeq.

a.   Bezeq is Israel's largest telecommunications operator, having generated approximately NIS 10.1 billion in revenue in 2016, and offers the following services, without limitation: fixed-line telephony; fixed-line broadband Internet infrastructure access; Internet services; cellular telephony; international telephony; international and domestic data transfer network, information, and communication technology; pay television; multi-channel television; television and radio broadcasts; satellite broadcasts; and customer call center services.

17.     Defendant Eurocom Communications Ltd. ("Eurocom") is headquartered in Ramat Gan, Israel.  Eurocom is one of Israel's largest private-holding groups and operates within three main business platforms—communications, real estate, and renewable energy.  Eurocom through its corporate entities owns a majority of BComm's shares.

18.     Defendant D.B.S. Satellite Services (1998) Ltd. ("Yes") is a satellite-television provider with a wide range of broadcasts, including approximately 140 different video channels, in addition to radio channels, music channels, and interactive services.

19.     Defendant Shaul Elovitch ("Elovitch") served as the BoD Chairman of Eurocom, BComm, and Bezeq during the Class Period, and he was the controlling shareholder of Eurocom and BComm during the Class Period.  As of November 16, 2017, he was not seeking to return as BComm nor Bezeq's BoD Chairman.

20.     Defendant Or Elovitch ("O. Elovitch") served as a director of BComm and Bezeq and Eurocom's CEO during the Class Period.  He is Elovitch's son.

21.     Defendant Ron Eilon ("Eilon") served as Yes' CEO during the Class Period.

22.     Defendant Stella Handler ("Handler") served as Bezeq's CEO during the Class Period.

23.     Defendant David Mizrahi ("Mizrahi") served as Bezeq's chief financial officer ("CFO") during the Class Period.

24.     Defendant Micky Neiman ("Neiman") served as Yes' CFO during the Class Period.

25.     Defendant Allon Raveh ("Raveh") served as Bezeq's CFO during the Class Period.  He was appointed on June 20, 2016 and quit this position after around eight months.

26.     Defendant Itzik Tadmor ("Tadmor") served as BComm's CFO during the Class Period.

27.     Defendant Doron Turgeman ("Turgeman") served as BComm's CEO during the Class Period

28.     Defendant Ehud Yahalom ("Yahalom") served as the BComm's CFO during the Class Period.

29.     Defendant Linor Yochelman ("Yochelman") served as secretary of Bezeq's BoD during the Class Period.

30.     The defendants referenced above in ¶¶19-29 are sometimes referred to herein as the "Individual Defendants."

31.     The defendants referenced above in ¶¶16-29 are sometimes referred to herein as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Defendant Elovitch and His Pyramid Empire

32.     Defendant Elovitch, his brother Yossef, and their family through a pyramid of corporate holdings control all of the companies involved in this fraudulent scheme, including, without limitation, Eurocom, BComm, Bezeq, Yes, and Space - Communication Ltd. ("Spacecom").  The following image summarily displays the ownership structure of Defendant Elovitch's empire, Eurocom.



**B.      The Importance of BComm's Code of Ethics**

33.     For several years, Israel's economy has been burdened by excessive concentration, which has been manifested by a small number of business owners who control a significant proportion of Israel's public companies.  This concentration has been achieved in many cases by means of business groups characterized by pyramid structures—such as Defendant Elovitch's Eurocom pyramid, which controls BComm and Yes.  This concentrated business ownership has raised concerns for minority shareholders of publicly traded companies.

34.     This concentration has led to several studies by Israeli regulators and academic institutions into the enactment of laws to protect minority shareholders and Israel's economy. Examples of these publications are by (i) Professor Assaf Hamdani, an Associate Professor of the Hebrew University of Jerusalem and Visiting Professor at Columbia Law School, in 2009 through The Israel Democracy Institute entitled "Concentrated Ownership and Business Groups in Israel: A Legal Analysis" and (i) Professor Lucian Bebchuk, a Professor of Law, Economics, and Finance and Director of the Program on Corporate Governance at Harvard Law School, in 2012 for the Israel Ministry of Finance, Committee on Enhancing Competitiveness, entitled "Corporate Pyramids in the Israeli Economy: Problems and Policies."

35.     An example of this movement is the Israel Antitrust Authority in 2013 helping the enactment of Israel's Law for Promotion of Competition and Reduction of Concentration. Facing findings that the Israeli economy had been characterized by excessive concentration relative to other economies, often by means of pyramidal-structured ownership groups, the Israel Antitrust Authority found adverse effects on the resilience of Israel's financial system and competition in Israel's economy and abuses against corporate bond holders and minority shareholders of public companies.  The Law for Promotion of Competition and Reduction of

Concentration sought to curb market concentration through pyramid structures, in part to protect public companies' minority shareholders from abuses of dominance by such corporate structures.

36.     Throughout the Class Period, BComm adopted a Code of Business Conduct and Ethics ("Code of Ethics") to assuage concerns that Defendant Elovitch and his cohorts would abuse their positions of control for personal benefit or otherwise run afoul of Israeli laws.

37.     BComm's Code of Ethics represented the following, in relevant part:

### General Standard of Compliance

Our employees must comply with all applicable laws and regulations and national and local governmental authority rules and procedures in every location in which we conduct our business.  Competitive factors, personal goals, and pressure from supervisors, customers or others shall never be an acceptable excuse for violating applicable laws.

*** 

Beyond legal compliance, all of our directors, officers, employees and agents are expected to observe high standards of business and personal ethics in the execution of their assigned duties and responsibilities.  This requires the practice of honesty and integrity in every aspect of dealing with other employees, the public, the business community, shareholders, customers, suppliers and governmental and regulatory authorities.  You should not be misguided by any sense of loyalty to our Company or a desire for profitability that might cause you to disobey any applicable law or Company policy.

*** 

### Conflicts of Interest

We expect all of our employees to avoid allowing their private interests to interfere, or appear to interfere, with the interests of our Company as a whole. Employees are expected to make or participate in business decisions and actions in the course of their employment with us based on the best interests of our Company as a whole, and not based on personal relationships or benefits.[3]

38.     These statements, especially those trumpeting BComm's compliance with laws and its strict forbiddance against conflicts of interest, as set forth herein, quelled minority

---

[3] All emphasis herein is in the original, unless stated otherwise.

shareholders' concerns about Defendant Elovitch and his corporate pyramid's dominance over BComm.

### C.     The Fraud Orchestrated for the Bezeq-Yes Merger

39.     The Bezeq-Yes merger was the subject of an agreement negotiated in 2015. The transaction contemplated that Bezeq would acquire the entirety of Eurocom's holdings in Yes, which around then represented 50.22% of Yes' shares. At that time, Bezeq owned the remaining shares. Bezeq agreed to pay Eurocom NIS 680 million in cash on the closing date plus additional consideration for the Yes shares of up to NIS 170 million ("Additional Contingent Consideration"). The Additional Contingent Consideration depended on Yes' compliance with free-cash-flow targets in 2015, 2016, and 2017. "Free Cash Flow" was defined as net cash from operating activities less (or plus) net cash for the purchase/sale of property, plant, and equipment and intangible assets—in other words, net cash arising from operating activities plus net cash used in investing activities.

40.     The Additional Contingent Consideration has two Free Cash Flow-based components, NIS 100 million and NIS 70 million. To be entitled to the first NIS 100 million, Yes had to generate cumulative Free Cash Flow from 2015 through 2017 meeting Level B, as reflected in the table below. To be entitled to the additional NIS 70 million (NIS 170 million in total), Yes had to generate cumulative Free Cash Flow from 2015 through 2017 meeting Level C, as reflected in the table below.

| All figures are in NIS Millions | 2015 | 2016 | 2017 | Accumulated Total 2015-2017 |
|---|---|---|---|---|
| Level B | 213 | 389 | 387 | 989  (Eurocom is entitled to 100) |
| Level C | 228 | 417 | 414 | 1,058  (Eurocom is entitled to 170) |

41.     As part of this Additional Contingent Consideration, Yes negotiated for and received advanced payments. If Yes generated Free Cash Flow meeting Level C for 2015, Bezeq agreed to advance Yes approximately NIS 56.6 million, plus 4% interest at an annual rate,

after the signing of Yes' 2015 financial statements, and Bezeq agreed to advance the same amount to Yes after the signing of Yes' 2016 financial statements if it met Level C again.  Such advance payments were a clear benefit to Yes, Eurocom, and Defendant Elovitch, since it enabled Eurocom to pay down its enormous leverage debt.

42.     On March 18, 2015, when BComm filed with the SEC a Form 6-K in advance of a special general meeting for the Company's minority shareholders to assess the merger, it was reported that a purportedly independent subcommittee of Bezeq's BoD ("Committee," "Ad Hoc Committee," "Independent Committee," and/or "Sub-Committee") approved the Bezeq-Yes merger.  The purportedly Independent Committee was not independent.  In violation of Israel Securities Law and Penal Law, there were ongoing and systematic leaks of confidential, material, and sensitive details and documents from discussions of the purportedly Independent Committee.

> a.     For example, Defendants Handler and Yochelman, along with another senior figure, acted as moles of the purportedly Independent Committees and were actively and systematically siphoning confidential information to Defendants Elovitch, O. Elovitch, and others, who should have been blocked off from discussions.  Defendant Elovitch and his conspirators instructed those carrying out the leaks on how to coerce, direct, and taint the purportedly Independent Committee and their experts' discussions.

> b.     Defendants Handler, Yochelman, and others acted according to orders from Eurocom's senior executives to initiate moves and thwart others by purportedly Independent Committee members and their retained experts in order to unlawfully promote Eurocom's interests in the framework of the transaction.  Through these actions, Defendants received a significant unlawful advantage over BComm and Bezeq.

43.     Defendant's misconduct did not cease with approval of the Yes-Bezeq merger.  To meet Yes' Free Cash Flow targets and enable Eurocom—and thus Defendant Elovitch—to obtain NIS 170 million provided by the Additional Contingent Consideration, Defendants violated Israel Securities Law and Penal Law during 2015, 2016, and 2017 by materially inflating Yes' cash flow, including, without limitation, fraudulent manipulations in Yes' payment

12

system to its suppliers and in its investments in assets.  An example of this manipulation was Defendant Eilon, who was Yes' CEO and acting at Eurocom's direction, compelling Yes to freeze or delay payments to suppliers.

44.     Yes' inflated Free Cash Flow was consolidated with BComm's and Bezeq's.  For 2015, BComm reported that Yes purportedly generated NIS 240 million in Free Cash Flow, which just eked over the NIS 228 million Level C threshold for the Additional Contingent Consideration.  This represented 10.64% of Bezeq's consolidated Free Cash Flow.  As a result, Bezeq advanced Yes the maximum permitted amount of approximately NIS 57 million in 2016.

45.     For 2016, BComm reported that Yes purportedly generated NIS 421 million in Free Cash Flow, which again just eked over the NIS 417 million Level C threshold for the Additional Contingent Consideration.  Yes' purported Free Cash Flow in 2016 represented 18.73% of Bezeq's consolidated Free Cash Flow.  As a result, Bezeq advanced Yes the maximum permitted amount of approximately NIS 57 million in 2017.

46.     The ISA's investigation into the Bezeq-Yes merger began in 2017.  Knowledge about the investigation and the approaching day of reckoning influenced Defendants in 2017 to begin attempting to cease the artificial inflation in Yes' Free Cash Flow, based, in part, on the timing of revelations about the ISA's investigation and the subsequent fallout, including the detentions and house arrests of executives, such as Defendant Elovitch (as described below in Sections IV. F. (**ISA's Recommendation of Criminal Enforcement in November 2017**) & G (**Additional Allegations Supporting Scienter**)).

47.     On May 30, 2017, BComm reported that Yes' first quarter 2017 Free Cash Flow had nose-dived to negative NIS 9 million—a loss—compared to positive Free Cash Flow of NIS 99 million in the first quarter of 2016.  Upon information and belief, Defendants learned about

the pending ISA investigation (which was publicly reported only about three weeks later on June 20, 2017) prior to reporting these results.

48.     On September 6, 2017 (after public disclosure of the ISA investigation), BComm reported that Yes's Free Cash Flow for the first six months of 2017 was only NIS 108 million, a decrease of 28.48% compared to the prior year's NIS 151 million for the first six months.

49.     On November 30, 2017, BComm reported that Yes generated Free Cash Flow of NIS 46 million in the third quarter of 2017, a decrease of 55.8% compared to the Free Cash Flow of NIS 104 million in the third quarter of 2016.  Thus, it became apparent that BComm would fall considerably short of the cumulative Free Cash Flow target needed to trigger the Additional Contingent Consideration.

50.     By this time though, Bezeq already advanced to Yes approximately NIS 114 million for the Additional Contingent Consideration—the approximately NIS 57 million advance in connection with the purported 2015 Free Cash Flow plus the approximately NIS 57 million advance in connection with the purported 2016 Free Cash Flow.

51.     But at most, Eurocom, and thus Defendant Elovitch, were entitled to less than one-third of the potential NIS 170 million of Additional Contingent Consideration, and Bezeq overpaid advances to those entities by at least 50%.  Bezeq's consolidated financial report as of June 30, 2017 (filed with the SEC on September 6, 2017), at footnote 4.2.1, acknowledged that (i) due to the "revised free cash flow forecast for [Yes] for 2017," Bezeq had eliminated NIS 84 million of Additional Contingent Consideration (of the original NIS 170 million) that remained unpaid as of that date; (ii) Bezeq was entitled to a return of a portion of the approximately NIS 113 million advanced  as of that date; (iii) the amount "expected to be recovered from the excess of the advance payments"  needed to be adjusted due to take "into consideration the solvency of

14

Eurocom[]"; and that (iv) at least half of the monies paid to date was subject to be refunded, but that this amount was being reduced based on questions regarding Eurocom's ability to pay.

52.     This change of events, whereby Yes now must repay Bezeq millions of NIS, and the ISA's recommended criminal charges against Defendant Elovitch and others implicated in the scheme, prompted serious concerns by BComm's BoD regarding its ability to recoup the improper payments. On September 6, 2017, BComm reported that the Company wrote to Yes, Eurocom, and Eurocom's bank-creditors regarding whether Eurocom or Yes will have sufficient assets to pay Bezeq for any funds that Bezeq advanced to Yes that need to be returned.  BComm requested that it be made party to ongoing discussions between Eurocom and its bank-creditors concerning restricting Eurocom's highly leveraged debt package.  Defendant Elovitch is using the proceeds that he pocketed from the Bezeq-Yes merger to pay off creditors of his Eurocom entities.

53.     Bezeq and Yes continue to operate as separate companies.

**D.      False and Misleading Statements and Omissions During the Class Period**

54.     As detailed below, throughout the Class Period, Defendants issued statements that were materially false and misleading because they misrepresented and/or failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Defendants or recklessly disregarded by them.  Specifically, and without limitation, Defendants made false and misleading statements about and/or failed to disclose the following:

> (a)      Defendants artificially and materially inflated Yes' Free Cash Flows, which were also consolidated into Bezeq's Free Cash Flows and Bezeq's financial results were consolidated into BComm's financial statements;
>
> (b)      Defendants' statements regarding the independence of the Independent Committee and their approval of the Bezeq-Yes merger were false and misleading because the Independent Committee was anything but

15

independent, as there were unlawful ongoing and systematic leaks of confidential information from their discussions, and several of the Individual Defendants instructed those carrying out the leaks to unlawfully taint their deliberations;

(c)     Defendants' statements regarding compliance with laws and BComm's Code of Ethics were false and misleading, given Defendants' violations of Israel Securities Laws and Penal Laws and BComm's Code of Ethics; and

(d)     Defendants' statements regarding the adequacy of BComm's internal controls were false and misleading in that the Company's internal controls were insufficient to insure that the Company reported accurate Free Cash Flow and compliance with Israel Securities Laws and Penal Laws and the Company's Code of Ethics.

### 1.    Yes, Bezeq, and BComm's Inflated Free Cash Flows

55.    BComm is a holding company for its controlling share ownership of Bezeq. Throughout the Class Period, BComm reported Yes' Free Cash Flow separately and as part of Bezeq's consolidated Free Cash Flow in BComm's SEC filings, which were signed throughout the Class Period collectively by the following Individual Defendants, without limitation (or included in disclosures over which these Individual Defendants had ultimate authority): Eilon, Elovitch, Handler, Mizrahi, Neiman, Raveh, Turgeman, and Tadmor.

56.    The table below reflects the quarterly and annual Free Cash Flow figures throughout the Class Period.  Unless noted otherwise, all of these figures were in NIS millions. Figures in parenthesis indicate losses.

| Period | Filing Date | Yes' Free Cash Flow | Bezeq's Free Cash Flow | Percentage of Yes' Free Cash Flow to Bezeq's Consolidated Results[4] |
|--------|-------------|---------------------|------------------------|---------------------------------------------------------------------|
| 1Q 2015 | 5/21/15; 6/5/15 | 84 | 606 | 13.86% |
| 2Q 2015 | 8/31/15; 9/21/15 | 25 | 413 | 6.05% |
| 3Q 2015 | 11/19/15; 12/3/15 | 70 | 645 | 10.85% |
| 4Q 2015 | 3/17/16 | 62 | 592 | 10.47% |
| **2015** | **3/17/16:** | **240** | **2,256** | **10.64%** |

---

[4] These calculations were performed by Lead Plaintiffs' counsel.

| | **4/5/16; 4/19/16** | | | |
|---|---|---|---|---|
| 1Q 2016 | 5/26/16; 6/3/16 | 99 | 619 | 15.99% |
| 2Q 2016 | 8/4/16; 8/8/16; 8/17/16 | 52 | 539 | 9.65% |
| 3Q 2016 | 11/23/16; 12/6/16 | 104 | 577 | 18.02% |
| 4Q 2016 | 3/30/17 | 166 | 513 | 32.36% |
| **2016** | **3/30/17; 4/20/17** | **421** | **2,248** | **18.73%** |
| 1Q 2017 | 5/18/17; 5/30/17 | (9) | 456 | - |

57.     The figures in ¶56 were materially false and misleading for the reasons set forth in ¶54(a).

58.     On June 5, 2015, BComm filed with the SEC a Form 6-K, which Defendants Turgeman and Tadmor signed and/or approved, reporting "Net increase in cash and cash equivalents" for BComm of NIS 483 million for the three months ended March 31, 2015. Yes' financial results were consolidated into Bezeq's financial results, and Bezeq's financial results were consolidated into BComm's financial statements.

59.     The reported figure for "Net increase in cash and cash equivalents" in ¶58 was materially false and misleading for the reasons set forth in ¶54(a).

60.     On August 31, 2015, BComm filed with the SEC a Form 6-K, which Defendants Turgeman and Tadmor signed and/or approved, reporting for BComm "Net increase (decrease) in cash and cash equivalents" of NIS (331) million for the three months ended June 30, 2015 and NIS 152 million for the six months ended June 30, 2015. Yes' financial results were consolidated into Bezeq's financial results, and Bezeq's financial results were consolidated into BComm's financial statements.

61.     The reported figures for "Net increase (decrease) in cash and cash equivalents" in ¶60 were materially false and misleading for the reasons set forth in ¶54(a).

62.     On November 19, 2015, BComm filed with the SEC a Form 6-K, which Defendants Turgeman and Tadmor signed and/or approved, reporting for BComm "Net increase in cash and cash equivalents" of NIS 172 million for the three months ended September 30, 2015 and NIS 324 million for the nine months ended September 30, 2015.  Yes' financial results were consolidated into Bezeq's financial results, and Bezeq's financial results were consolidated into BComm's financial statements.

63.     The reported figures for "Net increase in cash and cash equivalents" in ¶62 were materially false and misleading for the reasons set forth in ¶54(a).

64.     On April 19, 2016, BComm filed with the SEC a Form 20-F annual report for the year ended December 31, 2015, which Defendants Turgeman and Tadmor signed, reporting for BComm "Net increase (decrease) in cash and cash equivalents" of NIS (132) million for 2015. Yes' financial results were consolidated into Bezeq's financial results, and Bezeq's financial results were consolidated into BComm's financial statements.

65.     The reported figure for "Net increase (decrease) in cash and cash equivalents" in ¶64 was materially false and misleading for the reasons set forth in ¶54(a).

66.     On May 26, 2016, BComm filed with the SEC a Form 6-K, which Defendants Turgeman and Tadmor signed and/or approved, reporting for BComm "Net increase in cash and cash equivalents" of NIS 647 million for the three months ended March 31, 2016.  Yes' financial results were consolidated into Bezeq's financial results, and Bezeq's financial results were consolidated into BComm's financial statements.

67.     The reported figure for "Net increase in cash and cash equivalents" in ¶66 was materially false and misleading for the reasons set forth in ¶54(a).

68.     On August 8, 2016, BComm filed with the SEC a Form 6-K, which Defendants Turgeman and Tadmor signed and/or approved, reporting for BComm "Net increase in cash and cash equivalents" of NIS 129 million for the three months ended June 30, 2016 and NIS 776 million for the six months ended June 30, 2016.  Yes' financial results were consolidated into Bezeq's financial results, and Bezeq's financial results were consolidated into BComm's financial statements.

69.     The reported figures for "Net increase in cash and cash equivalents" in ¶68 were materially false and misleading for the reasons set forth in ¶54(a).

70.     On April 20, 2017, BComm filed with the SEC a Form 20-F annual report for the year ending December 31, 2016, which Defendants Turgeman and Tadmor signed, reporting for BComm "Net increase (decrease) in cash and cash equivalents" of NIS 181 million for 2016.  Yes' financial results were consolidated into Bezeq's financial results, and Bezeq's financial results were consolidated into BComm's financial statements.

71.     The reported figure for "Net increase (decrease) in cash and cash equivalents" in ¶70 was materially false and misleading for the reasons set forth in ¶54(a).

## 2.      Additional False and Misleading Statements and Omissions in 2015

72.     The Class Period starts on March 18, 2015, when Defendant BComm filed with the SEC a Form 6-K, which Defendant Turgeman signed, regarding a special general meeting for the Company's minority shareholders to review the merger.  With this Form 6-K, the Company filed an Exhibit ("Ex.") 99.1, which Defendant Yochelman signed and/or approved, regarding, in part, the deliberations of the directors on the purported Independent Committee—throughout Defendant BComm's filings with the SEC, the Independent Committee was referred to as "the

committee[,]" "ad hoc committee[,]" and/or "the sub-committee"—to assess and ultimately approve the Yes-Bezeq merger, stating, in relevant part:

> For this purpose, the board of directors formed a subcommittee composed of members who are all outside or independent directors, to address the matter ("the Ad Hoc Committee" or "the Committee"), since the possibility that the Acquisition Transaction would involve a transaction with the Company's controlling shareholder was taken into account.
>
>             ***
>
> After the committee reviewed the Valuation, Fairness Opinions, and summary documents submitted by the other advisors, on February 10, 2015, the committee resolved to recommend the approval of the Acquisition Transaction, under the main terms in this report, and submitted its recommendations to the audit committee and board of directors.
>
>             ***
>
> After reviewing the above alternatives, the committee concluded that for the benefit of the Company and all its shareholders, the Acquisition Transaction, meaning, acceptance of the Merger Terms, exercise of the options, acquisition of the Sale Shares and the Acquired Shareholder Loans, are in the best interest of the Company at this time, since this will allow the Company to fully merge with Yes in the future, thereby taking full advantage of the synergies (particularly the expense synergies), and since at this time, in view of the Commissioner's decision regarding the Merger Terms, there is a window of opportunity for the Company to realize this course of action.
>
>             ***
>
> The consideration to be paid by the Company for the Sale Shares and the Acquired Shareholder Loans was established in negotiations between the committee members and Eurocom DBS, taking into account the opinion of its advisors. Prior to the start of the negotiations, the committee received the essential information regarding the value components of the other matters discussed in the valuation.[5]

73.     The statements in ¶72 were materially false and misleading for the reasons set forth in ¶54(b).

---

[5] All emphasis herein, including, without limitation, bolding and underlining, is in the original, unless stated otherwise.

74.     On April 24, 2015, Defendant BComm filed with the SEC a Form 6-K, which

Defendant Turgeman signed, regarding the Company's reporting for the year-end 2014 ("4/24/15

6-K").  With the 4/24/15 6-K, Defendant BComm filed Ex. 99.1, which was Bezeq's periodic

report for the year-end 2014 and which Defendant Handler signed as Bezeq's CEO, stating the

following, in relevant part:

> Through the Board of Directors sub-committee which was set up to handle the
> issue in October 2013 (in this section - "the Sub Committee"), and with the help
> of external consultants selected by the committee, the Company worked to review
> the feasibility of the merger and the options open to it in light of the
> Commissioner's aforementioned decision and its conditions, including the
> purchase of DBS's shares that are held by Eurocom, as well as other options.  As
> part of this review, the Company conducted a due diligence of DBS with the help
> of external consultants.
>
> ***
>
> Subsequently, on February 10, 2015, the Sub-Committee, Audit Committee and
> Board of Directors approved the transaction between the Company and Eurocom
> DBS in which the Company will acquire all the holdings of Eurocom DBS in
> DBS[.]

75.     The statements in ¶74 were materially false and misleading for the reasons set

forth in ¶54(b).

76.     On April 27, 2015, Defendant BComm filed with the SEC a Form 20-F annual

report for the year ended December 31, 2014 ("2014 20-F"), which Defendants Turgeman and

Yahalom signed, reporting the following, in relevant part:

> A sub-committee of the Board of Directors of Bezeq was established to deal with
> the possible merger in October 2013 and with the help of external consultants
> selected by the sub-committee, Bezeq reviewed the feasibility of the merger and
> the options open to it in light of the Commissioner's decision, including the
> purchase of the DBS shares held by Eurocom.
>
> On February 10, 2015, the sub-committee, Audit Committee and Board of
> Directors of Bezeq approved a transaction between Bezeq and Eurocom DBS in
> which Bezeq will acquire all the holdings of Eurocom DBS in DBS[.]

77.     The statements in ¶76 were materially false and misleading for the reasons set forth in ¶54(b).

78.     The 2014 20-F incorporated by reference Defendant BComm's Code of Ethics, which throughout the Class Period included statements substantially similar in all material respects to those alleged in ¶37, including the following, without limitation:  "Our employees must comply with all applicable laws and regulations and national and local governmental authority rules and procedures in every location in which we conduct our business.  …  We expect all of our employees to avoid allowing their private interests to interfere, or appear to interfere, with the interests of our Company as a whole."  These statements served to quell minority shareholders' concerns about the dominance that Defendant Elovitch and his corporate pyramid had over Defendant BComm.

79.     The statements in ¶78 were materially false and misleading for the reasons set forth in ¶54(c).

80.     With the 2014 20-F, Defendants Turgeman and Yahalom signed certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of SOX, stating the following, without limitation: "(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."

81.     The statements in ¶80 were materially false and misleading for the reasons set forth in ¶54.

### 3.     Additional False and Misleading Statements and Omissions in 2016

82.     On April 5, 2016, Defendant BComm filed a Form 6-K with SEC regarding Bezeq's reporting for the year-end 2015, which Defendant Turgeman signed ("4/5/16 6-K").

22

With the 4/5/16 6-K, Defendant BComm filed an Ex. 99.1, Bezeq's periodic report for the year-end 2015, which Defendants Elovitch and Handler signed ("99.1"), reporting the following, in relevant part:

> A sub-committee of the Board of Directors that was set up to deal with the topic, and the Audit Committee and Board of Directors as well as a General Meeting of the shareholders (on February 10, 2015 and March 23, 2015, respectively), approved the transaction between the Company and Eurocom DBS to acquire all the holdings of Eurocom DBS in DBS[.]

83.     The statements in ¶82 were materially false and misleading for the reasons set forth in ¶54(b).

84.     In the 4/5/16 6-K, Ex. 99.6, the report concerning internal-controls effectiveness, Defendants Handler and Mizrahi signed statements about (i) disclosure controls and procedures, (ii) management's annual report on internal control over financial reporting, and (iii) changes in internal control over financial reporting, including the following, without limitation:

**Disclosure Controls and Procedures**

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our periodic report (hereinafter – "the Report") is documented, processed, summarized and reported within the time periods specified in the law, and that such information is summarized and communicated to our chief executive officer and chief financial officer to allow timely decisions regarding required disclosure. The management, including the chief executive officer and chief financial officer, conducted an evaluation of our disclosure controls and procedures, as defined under United States Rule 13a-15(e) of the Exchange Act of 1934, as of December 31, 2015. Based upon that evaluation, the chief executive officer and chief financial officer have concluded that, as of such date, our disclosure controls and procedures are effective.

**Management's Annual Report on Internal Control Over Financial Reporting**

> The management, including the chief executive officer and chief financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting, as defined under United States Rules 13a-15(f) and 15d-15(f) of the Exchange Act of 1934. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in

accordance with International Financial Reporting Standards (IFRS). Internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that the company's receipts and expenditures are being made only in accordance with appropriate authorization; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

\*\*\*

The Company's management assessed the effectiveness of the internal control over financial reporting as of December 31, 2015. In conducting its assessment of internal control over financial reporting, the management based its evaluation on the framework in "Internal Control – Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations, or the COSO, of the Treadway Commission.  Based on this assessment, the Company's management has concluded that the Company's internal control over financial reporting is effective as of December 31, 2015.

\*\*\*

**Changes in Internal Control over Financial Reporting**

[T]here were no changes in our internal control over financial reporting during the period covered by the Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

85.     The statements in ¶84 were materially false and misleading for the reasons set

forth in ¶54.

86.     In the 4/5/16 6-K, Ex. 99.6, Defendants Handler and Mizrahi signed certifications

stating the following, without limitation:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

\*\*\*

24

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

\*\*\*

The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent function[]):

\*\*\*

Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

87.     The statements in ¶86 were materially false and misleading for the reasons set forth in ¶54.

88.     On April 19, 2016, Defendant BComm filed with the SEC a Form 20-F annual report for the year ended December 31, 2015, which Defendants Turgeman and Tadmor signed ("2015 20-F"), reporting the following, in relevant part:

A sub-committee of the Board of Directors of Bezeq was appointed to deal with the topic, and the Audit Committee and Board of Directors as well as a General Meeting of the shareholders of Bezeq approved the transaction between Bezeq and Eurocom DBS to acquire all the holdings of Eurocom DBS in DBS[.]

89.     The statements in ¶88 were materially false and misleading for the reasons set forth in ¶54.

90.     The 2015 20-F incorporated by reference Defendant BComm's Code of Ethics, which throughout the Class Period included statements substantially similar in all material respects to those alleged in ¶37, including the following, without limitation: "Our employees must comply with all applicable laws and regulations and national and local governmental authority rules and procedures in every location in which we conduct our business. … We

25

expect all of our employees to avoid allowing their private interests to interfere, or appear to interfere, with the interests of our Company as a whole." These statements served to quell minority shareholders' concerns about the dominance that Defendant Elovitch and his corporate pyramid had over Defendant BComm.

91.     The statements in ¶90 were materially false and misleading for the reasons set forth in ¶54(c).

92.     In the 2015 20-F, B Communications reported statements about (i) disclosure controls and procedures, (ii) management's annual report on internal control over financial reporting, and (iii) changes in internal control over financial reporting, including the following, without limitation:

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our chief executive officer and principal financial officer to allow timely decisions regarding required disclosure. Our management, including our chief executive officer and principal financial officer, conducted an evaluation of our disclosure controls and procedures, as defined under Exchange Act Rule 13a-15(e), as of the end of the period covered by this annual report on Form 20-F. Based upon that evaluation, our chief executive officer and principal financial officer have concluded that, as of such date, our disclosure controls and procedures were effective.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management, including our chief executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting, as defined under Exchange Act Rules 13a-15(f) and 15d-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States. Internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect

the transactions and dispositions of our assets, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with appropriate authorizations; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

*** 

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2015. In conducting its assessment of internal control over financial reporting, management based its evaluation on the framework in "Internal Control – Integrated Framework" (2013) issued by the Committee of Sponsoring Organizations, or the COSO, of the Treadway Commission. Based on that assessment, our management has concluded that our internal control over financial reporting was effective as of December 31, 2015.

*** 

**Changes in Internal Control over Financial Reporting**

 [T]here were no changes in our internal control over financial reporting during the period covered by the Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

93. In the 2015 20-F, Defendants Turgeman and Tadmor signed certifications

pursuant to Rule 13a-14(a) under the Exchange Act, stating the following, without limitation:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

*** 

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

*** 

The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's

auditors and the audit committee of the company's board of directors (or persons performing the equivalent function):

***

Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

94.    With the 2015 20-F, Defendants Turgeman and Tadmor signed certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of SOX, stating the following, without limitation: "(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."

95.    The statements in ¶¶92-94 were materially false and misleading for the reasons set forth in ¶54.

### 4.    Additional False and Misleading Statements and Omissions in 2017

96.    On April 20, 2017, Defendant BComm filed with the SEC a Form 6-K regarding Bezeq's reports for the year ending December 31, 2016, which Defendant Turgeman signed ("4/20/17 6-K").  With the 4/20/17 6-K, BComm filed Ex. 99.6, the report concerning internal-controls effectiveness, in which Defendants Handler and Raveh signed statements about (i) disclosure controls and procedures, (ii) management's annual report on internal control over financial reporting, and (iii) changes in internal control over financial reporting, including the following, without limitation:

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our periodic report (hereinafter - "the Report") is recorded, processed, summarized and reported within the time periods specified in the law, and that such information is accumulated and communicated to our chief executive officer and chief financial officer to allow timely decisions

regarding required disclosure. The management, including the chief executive officer and chief financial officer, conducted an evaluation of our disclosure controls and procedures, as defined under United States Rule 13a-15(e) of the Exchange Act of 1934, as of December 31, 2016. Based upon that evaluation, the chief executive officer and chief financial officer have concluded that, as of such date, our disclosure controls and procedures are effective.

## Management's Annual Report on Internal Control Over Financial Reporting

The management, including the chief executive officer and chief financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting, as defined under United States Rules 13a-15(f) and 15d-15(f) of the Exchange Act of 1934. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with International Financial Reporting Standards (IFRS). Internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that the company's receipts and expenditures are being made only in accordance with appropriate authorization; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

\*\*\*

The Company's management assessed the effectiveness of the internal control over financial reporting as of December 31, 2016. In conducting its assessment of internal control over financial reporting, the management based its evaluation on the framework in "Internal Control – Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations, or the COSO, of the Treadway Commission. Based on this assessment, the Company's management has concluded that the Company's internal control over financial reporting is effective as of December 31, 2016.

\*\*\*

## Changes in Internal Control over Financial Reporting

There were no changes in our internal control over financial reporting during the period covered by the Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

97.     In the 4/20/17 6-K, Ex. 99.6, Defendants Handler and Raveh signed certifications of the following statements, without limitation:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> ***
>
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;
>
> ***
>
> The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent function[]):
>
> ***
>
> Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

98.     The statements in ¶¶96-97 were materially false and misleading for the reasons set forth in ¶54.

99.     On April 26, 2017, Defendant BComm filed with the SEC a Form 20-F annual report for the year ending December 20, 2016, which Defendants Turgeman and Tadmor signed ("2016 20-F").  The 2016 20-F incorporated by reference Defendant BComm's Code of Ethics, which throughout the Class Period included statements substantially similar in all material respects to those alleged in ¶37, including the following, without limitation:  "Our employees must comply with all applicable laws and regulations and national and local governmental authority rules and procedures in every location in which we conduct our business.  …  We expect all of our employees to avoid allowing their private interests to interfere, or appear to

interfere, with the interests of our Company as a whole." These statements served to quell minority shareholders' concerns about the dominance that Defendant Elovitch and his corporate pyramid had over Defendant BComm.

100. The statements in ¶99 were materially false and misleading for the reasons set forth in ¶54(c).

101. In the 2016 20-F, B Communications reported statements about (i) disclosure controls and procedures, (ii) management's annual report on internal control over financial reporting, and (iii) changes in internal control over financial reporting, including the following, without limitation:

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our chief executive officer and principal financial officer to allow timely decisions regarding required disclosure. Our management, including our chief executive officer and principal financial officer, conducted an evaluation of our disclosure controls and procedures, as defined under Exchange Act Rule 13a-15(e), as of the end of the period covered by this annual report on Form 20-F. Based upon that evaluation, our chief executive officer and principal financial officer have concluded that, as of such date, our disclosure controls and procedures were effective.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management, including our chief executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting, as defined under Exchange Act Rules 13a-15(f) and 15d-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States. Internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial

statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with appropriate authorizations; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

\*\*\*

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. In conducting its assessment of internal control over financial reporting, management based its evaluation on the framework in "Internal Control – Integrated Framework" (2013) issued by the Committee of Sponsoring Organizations, or the COSO, of the Treadway Commission. Based on that assessment, our management has concluded that our internal control over financial reporting was effective as of December 31, 2016.

\*\*\*

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting during the period covered by the Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

102.   With the 2016 20-F, Defendants Turgeman and Tadmor signed certifications pursuant to Rule 13a-14(a) under the Exchange Act, stating the following, without limitation:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

\*\*\*

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

\*\*\*

The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent function):

32

*** 

Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

103.    With the 2016 20-F, Defendants Turgeman and Tadmor signed certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of SOX, stating the following, without limitation:  "(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."

104.    The statements in ¶¶101-03 were materially false and misleading for the reasons set forth in ¶54.

### E.    The Truth Slowly Begins to Emerge

105.    On June 20, 2017, *The Times of Israel*, *Globes*, and other news sources collectively disclosed that the ISA had raided BComm, Bezeq, and Yes' offices and detained the companies' senior executives, including Defendant Elovitch, for questioning in connection with the investigation into the Bezeq-Yes transaction, as well as payments that the unit made to Eurocom under pressure from Defendant Elovitch, for "suspicions of violations of the securities law and the penal code[.]"

106.    Following this news, Defendant BComm's ADR price fell $1.00, or 4.65%, to close at $20.50 on exceptional trading volume on June 20, 2017.

107.    On June 22, 2017, Defendant BComm filed with the SEC a Form 6-K that revealed the following additional material developments about the ISA investigation, in relevant part:

[T]he Company hereby provides notification that as part of the [investigation into Defendant Elovitch and additional Yes officers], the Tel Aviv-Jaffa Magistrate

33

Court handed down a decision with the parties' consent … to release the suspects on restrictive conditions. Such conditions include, among others, restrictions on the Board chairman's appearances at the Company and his contacts with members of the Company's Board of Directors and officers of the Company until June 23, 2017, the requirement of D.B.S.'s CEO and officer to remain under house arrest until June 23, 2017, as well as additional restrictions.

108.    Following this news, Defendant BComm's ADR price fell $1.22, or 5.90%, to close at $19.47 on exceptional trading volume on June 22, 2017.

109.    On Friday, June 23, 2017 (post-market), Defendant BComm filed with the SEC a Form 6-K revealing that the ISA was investigating additional Bezeq and Yes executives for violations of Israel Penal Law and Securities Law.

110.    On Monday, June 26, 2017, Defendant BComm filed with the SEC a Form 6-K revealing that in civil litigation before the Tel Aviv District Court (Economic Department), plaintiff-shareholders moved for document discovery prior to filing derivative claims regarding Bezeq's acquisition of Yes shares, particularly regarding the Additional Contingent Consideration based on Yes' Free Cash Flow from 2015 through 2017.

111.    Following this news, Defendant BComm's ADR price fell $1.38, or 7.10%, to close at $18.06 on exceptional trading volume on June 26, 2017.

112.    On July 6, 2017, *Globes* in an article entitled "Court imposes restrictions on Or Elovitch in Bezeq probe" disclosed the following court rulings by Tel Aviv Magistrate Judge Ronit Poznanski-Katz, which the parties agreed to, in connection with the ISA investigation, without limitation: (i) Defendant O. Elovitch was barred from having any contact with Bezeq or Yes' officeholders, employees, or anyone else involved in the ISA's investigation, was not allowed to leave Israel, must have relinquished his passport to the ISA, and must have posted bond of NIS 700,000; (ii) Defendant Elovitch was barred from visiting the offices of Bezeq or

other Eurocom entities and from contacting Bezeq BoD members or Bezeq officeholders; and (iii) the house arrests of Defendants Eilon and Neiman were extended.

113.    Following this news, Defendant BComm's ADR price fell $0.61, or 3.33%, to close at $17.69 on exceptional trading volume on July 6, 2017.

114.    On Friday, July 14, 2017 (post-market), Defendant BComm filed with the SEC a Form 6-K revealing, in relevant part, that the Tel Aviv Magistrate Court ruled that Defendants Elovitch and Handler would be subject to house arrest until July 21, 2017.

115.    On July 16, 2017, *Globes* in an article entitled "Info passed freely from Bezeq to Eurocom despite warnings" disclosed further incriminating details about Defendants Handler and Yochelman in connection with their interference with the purported Independent Committee assessing the Bezeq-Yes merger.

116.    Following this news, Defendant BComm's ADR price fell $1.57, or 9.29%, to close at $15.33 on exceptional trading volume on Monday, July 17, 2017.

117.    On July 18, 2017, *The Times of Israel* in an article entitled "Bezeq probe examines a web of bad connections" disclosed incriminating details about the involvement of Shlomo Filber ("Filber"), the former Israel Minister of Communications Director-General since 2015[6], and senior executives from Defendant BComm, Bezeq, and Yes, in connection with the Bezeq-Yes merger and other related-party dealings.  The article also included the following revelations about the backlash from the ISA's investigation, in relevant part:

> "With restrictions on key personnel, the current situation is clearly sub-optimal from a management perspective and its ability to navigate the company," Roni Biron, co-head of research at Excellence Nessuah Brokerage in Petah Tikva, told The Times of Israel. "We expect Bezeq's share price to trade below its fair value until the dust settles around the ISA investigation and as the regulatory roadmap crystallizes."

---

[6] Filber was ultimately removed as a result of the ISA's investigation.

\*\*\*

"We don't know how far this investigation reaches," wrote Citi analyst Michael Klahr in a note on the company on June 26. "Key business managers may need to be replaced likely impacting operations for a short period." The board of director's attention is also "likely to be elsewhere in the interim," he wrote.

\*\*\*

"The investigation sidetracks a much-needed regulatory process toward the removal of Bezeq's structural separation [from Yes]," Excellence's Biron said. "In the absence of regulatory relief, Bezeq remains vulnerable" to growing competition from other companies that are allowed to offer triple-play deals, without being able to bundle up services of its own units, pending a merger, he said.

"While we still expect Bezeq's structural separation to be lifted at some point based on a gradual roadmap with pre-conditions, the current investigation and the recent state comptroller report add another layer of complexity to the political backdrop and limit our visibility into this event."

Corporate governance in Israel remains a concern for foreign investors, said Steven Schoenfeld, founder and chief investment officer of BlueStar Indexes, a financial firm that has developed indices and exchange traded funds (ETFs) with a focus on the Israeli capital markets.

\*\*\*

Citi's Klahr said Bezeq now "needs to restore investor confidence by showing that senior management has independence from the controlling group."

118.    Following this news, Defendant BComm's ADR price fell $0.53, or 3.46%, to close at $14.80 on exceptional trading volume on July 19, 2017.

119.    On Monday, September 4, 2017 (Labor Day), the analyst Chardan published a report about Defendant BComm, stating the following, in relevant part:

Both BCOM and BEZQ valuations continue to suffer from risks related to consequences of the ISA investigation of Eurocom, the holding company owned by Shaul Elovitch, which effectively controls BEZQ, BCOM and IGLD. The investigation started in June, 2017 with questioning satellite TV company YES's acquisition by BEZQ from Eurocom in 2015 - BCOM lost 31% of its market cap since the beginning of investigation, while BEZQ lost 19%.

\*\*\*

36

So far, a direct negative implication for BEZQ and BCOM was an announced delay in structural separation cancellation.

***

**Risks to achievement of target price:**
• Uncertainty regarding a timing of structural separation removal in BEZQ
• Other uncertainties surrounding Eurocom investigation

120.   Following this news, Defendant BComm's ADR price fell $0.78, or 5.27%, to close at $14.03 on exceptional trading volume on September 5, 2017.

121.   On September 6, 2017 (post-market), Defendant BComm filed with the SEC a Form 6-K regarding its results for the second quarter of 2017.  The Company disclosed that given the highly unlikely chances of the Bezeq-Yes merger closing in 2017 and Yes' lower anticipated Free Cash Flows, the estimation for the Additional Contingent Consideration was decreased.   Also, Defendant BComm disclosed that in light of the decreased estimate of the Additional Contingent Consideration, Defendant BComm wrote to Yes, Eurocom, and Eurocom's bank-creditors regarding whether Eurocom or Yes would have sufficient assets to pay Bezeq for any funds that Bezeq advanced to Yes that need to be returned.  Defendant BComm requested that it be made a party to discussions with Eurocom's bank-creditors about any changes in Eurocom's assets or collateral.  According to Defendant BComm, Eurocom replied that discussions with bank-creditors were under way in an effort to settle Eurocom's debt package by consent.

122.   Following this news, Defendant BComm's ADR price fell $0.67, or 4.42%, to close at $14.49 on exceptional trading volume on September 7, 2017.  BComm's ADR price of $14.49 at the close on September 7, 2017 was a $7.01, or 32.6%, drop from the ADR price of $21.50 at the close on June 19, 2017, before the truth slowly began to emerge.

123.    As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of Defendant BComm's ADRs, Lead Plaintiffs and other Class members have suffered significant losses and damages.

**F.      ISA's Recommendation of Criminal Enforcement in November 2017**

124.    In November 2017, following a covert investigation by the ISA's Department of Investigation, Intelligence, and Commerce Control, ISA director Professor Shmuel Hauser announced that the ISA possessed prima facie evidence of violations of Israel Securities Laws and Penal Laws, and the ISA recommended to government prosecutors that criminal indictments be filed against Defendant BComm, Bezeq, and Yes' senior executives, including Defendant Elovitch, in connection with Bezeq's acquisition of Yes shares.  As of November 2017, the ISA had reviewed documents from and questioned over one hundred individuals, including Defendants Elovitch, Handler, Eilon, Neiman, and several of Defendant BComm, Bezeq, and Yes' other executives and directors and Israel government officials.  Also, the ISA's findings were based, in part, on testimony from executives in the Israel production and television industry and Yes' significant suppliers in the content field.  The ISA's investigation is ongoing.

125.    In addition to the Bezeq-Yes merger, the ISA investigated related-party dealings between Yes and Space - Communication Ltd. ("Spacecom"), an entity controlled by Defendant Elovitch's Eurocom.  Yes contracted with Spacecom to lease space segments on Spacecom's Amos satellites between 2013 and 2028 for an approximated value of $263 million.

126.    Purportedly Independent Committees were formed and tasked to assess Bezeq's acquisition of Yes shares and the Yes-Spacecom dealings.  Due to Defendant Elovitch's personal interest in the related-party transactions, he and his officials were required to desist from contact with and any involvement in the activities of the purported Independent Committees.

127.   A substantial majority of the ISA's findings and evidence are confidential and under seal, but the ISA in a November 2017 press release disclosed language to the effect of the following, without limitation:

> In the context of this complex and cross-sectional investigation, the Investigations Department of the ISA concluded that there is a prima facie evidentiary basis that establishes the involvement of the suspects in the offenses [of] … commission of criminal offenses, including reporting offenses, obtaining by fraud, fraud and breach of trust in the corporation, and offenses of obstruction of justice.

***

> **Fraudulent receipt of monies** - in this context, prima facie evidence was found for criminal offenses committed by corporate officers at Bezeq and Yes, which were intended to unlawfully benefit the controlling shareholder of Bezeq in the amount of NIS 170 million. The alleged entitlement of the controlling shareholder to these amounts is derived from the provisions of Bezeq-Yes agreement, which conditioned these payments on Yes' compliance with financial targets set. The findings of the investigation show that the Company's reports regarding compliance with these targets were obtained after a long and systematic series of artificial actions in the payment system, acquisitions and investments of the Company, whose sole purpose, according to the suspicion, was to enrich the controlling shareholder.

***

> **Leakage of the Independent Commission's material to Bezeq's controlling shareholder and his associates** - as part of this matter, prima facie evidence was found for allegedly criminal offenses committed by officers of Bezeq. An evidentiary basis relating to the ongoing and systematic leaks of the discussions of Bezeq's independent committees that were required to examine Bezeq-Yes and Bezeq-Spacecom transactions.   These are transactions with a controlling shareholder which Bezeq committed itself to pay to its controlling shareholder a cumulative amount of NIS 2 billion. As part of this matter, an evidentiary basis was found for the transfer of material and confidential information from the committee's discussions, which would have exposed the committee's positions to the various stages of the negotiations, to the controlling shareholder and his close associates. The investigation also revealed that the controlling shareholder and his associates occasionally guided the parties that leaked the information, to act among the members of the committee in order to promote or thwart matters in accordance with their interests in the transaction.

128.    Also, the ISA found prima facie evidence of ongoing, deliberate, and criminal activity by Filber, during his tenure as the Israel Ministry of Communications Director-General (he was ultimately removed from this post because of the ISA's investigation), to promote the interests of Defendant BComm and Bezeq's senior executives, including, without limitation, Defendants Elovitch, O. Elovitch, and Handler.  This evidence included documents within the possession of Defendants Elovitch, Handler, Yochelman, and Filber, including, without limitation, WhatsApp messages.   The ISA's findings demonstrate that Filber acted in a systematic, intentional, and ongoing manner, while concealing information from his office's professional and legal bodies, in order to transfer confidential and extremely sensitive documents through a secret channel to Eurocom, Defendant BComm, Bezeq, and Yes' senior executives, including, without limitation, Defendants Elovitch, O. Elovitch, and Handler.  These government documents included, without limitation, documents from inter-ministerial discussions, governmental-meeting documents, internal-position papers, and documents from inter-office discussions (even those that had yet to be discussed in the authorized forums) to heads of Bezeq, amongst others.

129.    Eurocom, Defendant BComm, Bezeq, and Yes' senior executives, including, without limitation, Defendants Elovitch, O. Elovitch, and Handler, unlawfully lobbied their positions on the Yes and Spacecom transactions to Filber through comments, adjustments, and even rewriting these confidential and extremely sensitive documents.  Filber used these tainted documents as a basis to unlawfully lobby Israel's government for positions that favored these senior executives in connection with the Bezeq-Yes merger and Yes-Spacecom dealings.  These amendments were accepted and served as a basis for subsequent discussions that Filber unlawfully used to advance Eurocom's financial interests.

40

130.    Based on this prima facie evidence, the ISA has recommended criminal indictments against Defendants Elovitch, O. Elovitch, Eilon, Handler, and Neiman and also against several non-defendants, including, without limitation, Filber and Amikam Shorer ("Shorer"), who served as a Director and Strategy and Business Development Manager of Bezeq since April 2017 and also an Executive Vice President of Eurocom since 2005.   These recommended criminal indictments were cumulatively under the following violations of Israel laws, without limitation: a reporting offense under Israel Securities Law Section 53(a)(4), including providing misleading details in Defendant BComm's financial statements and reports from 2015 through 2017; interruption of legal proceedings under Israel Penal Law Section 244; offenses of acceptance by fraud under aggravated circumstances under Israel Penal Law Section 415; executives' offenses in a corporation under Israel Penal Law Section 424; and fraud and breach of trust in a corporation under Israel Penal Law Section 425.

131.    Israel Securities Law Section 53(a)(4)—a cognate of U.S. securities laws—has language to the effect of the following, without limitation:

53 Contravention of the provisions of this law

(a) A person who is convicted of having committed one of the following will be punishable by imprisonment ...

(4) … caused a report, notice, registration document or purchase offer specification, pursuant to this Law or regulations enacted hereunder and submitted to the ISA or the stock exchange to contain a misleading item - all with the intention of misleading a reasonable investor; … or a failure to submit any of the above reports or notices in accordance with an ISA requirement shall be prima facie evidence that the person upon whom the duty to submit such report or notice is imposed refrained from so doing with the intent to mislead.

132.    Israel Penal Law Section 244 has language to the effect of the following, without limitation:

Obstruction of justice

41

244. If a person does anything with the intention to prevent or foil a judicial proceeding or to cause a miscarriage of justice, whether by frustrating the summons of a witness, by concealing evidence or in some other manner, then he is liable to three years imprisonment; for this purpose, "judicial proceeding" includes a criminal investigation and the implementation of a direction by a Court.

133.    Israel Penal Law Sections 414-15 have language to the effect of the following,

without limitation:

414. In this Article [Article 6]–

... "deceit" – an assertion about any matter in the past, present or future, made in writing, orally or by conduct, which the person who makes it knows to be untrue or does not believe to be true; and "to deceive" – to induce a person by deceit to perform or to refrain from performing any act.

Obtaining anything by deceit

415. If a person obtains a thing by deceit, then he is liable to three years imprisonment; if the offense is committed under aggravating circumstances, then he is liable to five years imprisonment.

134.    Israel Penal Law Sections 424-25 have language to the effect of the following,

without limitation:

Offenses by directors or employees of a body corporate

424. If a director, a business manager or any other employee of a body corporate:

(1) knowingly does anything in the body corporate's business or assets, which impairs the body corporate's ability to meet its obligations, then he is liable to five years imprisonment or a fine of [NIS] 9,600;

(2) knowingly does anything, in the body corporate's business in a manner that impairs the proper conduct of its business, then he is liable to one year imprisonment or a fine of [NIS] 9,600 …

Deceit and breach of trust in body corporate

425. If a director, business manager or other employee of a body corporate, or a receiver, liquidator, temporary liquidator, asset manager or special manager of a

body corporate committed in connection with his position deceit or a breach of trust that injured the body corporate, then he is liable to three years imprisonment.

### G.   Additional Allegations Supporting Scienter

135.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

### 1.   Defendant Elovitch's Motive to Enrich Himself From Related-Party Dealings

136.   Defendant Elovitch's motive is inescapable.   Through his domination of Eurocom, he was the prime beneficiary of the over NIS 1 billion received from Bezeq for the artificially inflated Yes shares.

137.   He was motivated to push through Bezeq's unlawfully inflated acquisition of Yes shares to help him pay off the estimated NIS 1 billion in debt that is burdening his Eurocom empire: between NIS 600 and 700 million in Eurocom debt, nearly split evenly between Bank Hapoalim and the Israeli Discount Bank; and another NIS 260 million in debt for Eurocom's real-estate entities provided by a creditors consortium led by Mizrahi Tefahot Bank.   In reaction to the revelation of the ISA's findings in June 2017, sources close to Eurocom told media that Defendant Elovitch was using the NIS 680 million, Additional Contingent Consideration, and other consideration acquired from Bezeq's purchase of Yes shares to try paying down part of Eurocom's NIS 1 billion debt.   The sources also told media that Defendant Elovitch must divest other assets to help pay off the debt.

138.   Indeed, Defendant Elovitch's scheme did not even fully clear him and his Eurocom empire from their dire straits with excessive bank debt.   Media has reported that within December 2017, Defendant Elovitch and Eurocom must pay down a substantial portion of $400 million in bank debt or risk an action for liquidation; Eurocom warned the public that its creditor banks have sent written notice that Eurocom must pay down significant debt—including

guaranteed debt—within a specified timeframe.  Also, Eurocom warned the public that it is engaging in intensive discussions with the banks to re-structure its outstanding loans.  Media has reported that relations between Eurocom and the banks have soured: sources were quoted to the effect of saying that Eurocom "is acting in bad faith by avoiding requests for documents[.]"  The banks have not accepted a Eurocom offer to settle the debt, and the parties must negotiate over how Eurocom's assets should be divided.  The ISA's investigation has complicated this situation.

139.    Defendant Elovitch also benefited from insider sales during the Class Period, while Defendant BComm's shares were inflated. On January 13, 2016, Internet Gold-Golden Lines Ltd., which Defendant Elovitch through Eurocom controls, sold 575,000 ordinary shares of BComm on the TASE for NIS 97.00, receiving proceeds of NIS 55,775,000.

### 2.    ISA's Findings Against the Individual Defendants

140.    A substantial majority of the ISA's findings and evidence are confidential and under seal.  But the ISA has already disclosed that "there is a prima facie evidentiary basis that establishes" criminal activity in violation of Israel Securities Law (a cognate of U.S. securities laws) and Penal Law (that requires knowledge of fraud): the ISA has disclosed language to effect of it "suspect[ing] that serious offenses of fraud under aggravated circumstances were committed, together with corporate offenses and breach of fiduciary duties."  The ISA has recommended criminal indictments against Defendants Elovitch, Eilon, Handler, and Neiman, who all made actionable statements through Defendant BComm during the Class Period.  The ISA has also recommended criminal indictments against Defendants O. Elovitch, along with Shorer and Filber.[7]

---

[7] On the basis of the ISA's investigation, the Tel Aviv District Attorney's Office must decide whether to indict the individuals.  The Israel State Prosecutor's Office was also involved in the ISA's investigation, so it is likely that a decision on whether to accept the ISA's

141.    Pursuant to the orders of the Tel Aviv-Jaffa Magistrate Court in Israel, with the parties' consents, each of Defendants Elovitch, O. Elovitch, Eilon, Handler, Neiman, and Yochelman, along with Filber, were placed under house arrest at points during the Class Period, pursuant to the following conditions, without limitation: they must have remained away from the offices of Eurocom and/or Bezeq and their subsidiaries and affiliated entities and not have communicated directly or indirectly with any of the executives and/or members of their boards of directors; they must not have made any direct or indirect contact with anyone else implicated in the scheme and under investigation by the ISA or other regulators; they must not have accessed files from any source related to the Ministry of Communications and/or Eurocom and/or Bezeq and their subsidiaries and affiliated entities; they must have appeared for questioning in court in Israel and before regulators; and they must not have left Israel—their passports would be held by the ISA.

142.    Defendant Elovich must have deposited bail of NIS 5,000,000, Defendant Eylon of NIS 1,500,000, Defendant Handler of NIS 700,000, and Defendant Neiman of NIS 700,000. Shorer must have deposited bail of NIS 1,000,000, and Filber of NIS 400,000.

143.    Scathing quotes about the Individual Defendants' involvement in the scheme and their obstruction of the ISA's investigation have been released:

> There are many findings that strengthen the suspicions regarding the involvement of [Defendants Elovitch and Handler] in committing the aforementioned offenses. … The suspects and many others were questioned in connection with the above suspicions. … In view of the seriousness of the offenses detailed above, the manner in which they are carried out and the scope of their severity, and in view of the severe sanction established in respect of them, there is a serious concern in this case of obstruction of justice and escape. … Therefore, we ask the court to impose on the suspects the arrests of the suspects or alternatively on their release under restrictive conditions as detailed in the request.

---

recommendations for indictments will be issued quickly.

144.    Particularly in connection with Defendant Elovich, Tel Aviv Magistrates Court Judge Ronit Poznanski-Katz stated language to the effect of following, without limitation:  "No doubt that this is an unusual request since [Shaul] Elovitch was released at the beginning of the investigation. However, the investigation has developed and the results have led the securities authority to seek a house arrest[.]  …  There is a reasonable suspicion that a different picture has emerged now than what was originally presented to the court[.]"

145.    Particularly in connection with Defendant Handler, the ISA alleged language to the effect of the following, without limitation:  "The fact is that her actions and her involvement are very significant.  She is the negotiator on behalf of Shaul Elovitch and his companies.  The court has clear evidence of an actual concern of obstruction of justice.  …  Her story keeps changing, and therefore also indicates that the concern of disruption that is very real.  …  I mention that she was initially investigated for the offense of disrupting legal proceedings, and it all added up."

146.    The Israel Magistrate Court was presented with evidence gathered to date indicating a reasonable suspicion of Defendant Yochelman's offenses:  "[T]he suspicions attributed to her and the evidence gathered creates a real concern for disruptive actions."

### 3.    High-Level Executives' Involvement in the Scheme

147.    High-level executives' finger prints were all over the scheme.

148.    Defendant Elovitch instructed Defendant Eilon and others to carry out routine, systematic, and methodical manipulations of Yes' Free Cash Flow, including, without limitation, fraudulent actions in Yes' payment system to its suppliers and in its investments in assets.  Also, he instructed his moles on the purportedly Independent Committees to coerce, direct, and taint their deliberations.

149.    Defendant Eilon, acting at Defendant Elovitch's direction, compelled Yes to freeze or delay payments to suppliers, thus artificially improving Yes' Free Cash Flow, while these payments were not made, and meeting the financial targets for the Additional Contingent Consideration.

150.    Defendants Handler and Yochelman subverted the purportedly Independent Committees by acting as undisclosed moles for, and actively and systematically siphoning confidential information to, several executives who were supposed to be blocked off from discussions, including, without limitation, Defendants Elovitch and O. Elovitch, along with Shorer.  Also, Defendants Handler and Yochelman acted according to orders from Eurocom's senior executives to initiate moves and thwart others by the purportedly Independent Committee members and their retained experts, in order to unlawfully promote Eurocom's interests in the framework of Bezeq's acquisition of Yes shares.

151.    As CFOs of the entities implicated here, Defendants Mizrahi, Neiman, Raveh, Tadmor, and Yahalom knew about or recklessly disregarded the scheme.  Bezeq's purchase of Yes shares entailed over NIS 1 billion potentially being siphoned to Eurocom, which Defendant Elovitch controls; this transaction was thus at the forefront of the attention of Defendant BComm, Bezeq, and Yes' executives, especially its CFOs.  Moreover, to meet Yes' Free Cash Flow targets and enable Eurocom—and thus Defendant Elovitch—to obtain NIS 170 million provided by the Additional Contingent Consideration, violations of Israel Securities Law and Penal Law occurred during 2015, 2016, and 2017 by material inflations in Yes' Free Cash Flow, including, according to the ISA, "a long and systematic series of artificial actions in the payment system, acquisitions and investments of the Company."  Monitoring of Yes' Free Cash Flow— which was consolidated into, and at points reached 18% of, Bezeq's Free Cash Flow and

disclosed by BComm throughout the Class Period—fell squarely within the responsibility of Defendants Mizrahi, Neiman, Raveh, Tadmor, and Yahalom, along with other key executives, such as the CEOs.   Indeed, based on its investigation to date (it is ongoing), the ISA recommended a criminal indictment against Defendant Neiman, and pursuant to court order, he has been subjected to house arrest and barred from continuing his position at points during the Class Period.

152.    The scienter allegations are collaborated by information unearthed concerning red flags during the deliberations over the Bezeq-Yes merger.   Merrill Lynch International of the Bank of America Group ("Merrill Lynch") advised Bezeq on the acquisition of Eurocom's shares in Yes; J.P. Morgan, which is in effect Defendant S. Elovitch's home bank, advised Eurocom.   At meetings between representatives from Bezeq, Yes, Eurocom, JP Morgan, and Merrill Lynch, information was revealed from the Eurocom side that could have only reached them through leaks from Bezeq.   Merrill Lynch's representatives were astonished at how—time after time—Eurocom obtained a substantial advantage in the negotiations from leaked information.   During negotiations, Gilad Rosolio ("Rosolio") of Merrill Lynch suspected that information was being unlawfully leaked from the purported Independent Committees.   He asked Bezeq's managers why this was occurring.   Rosolio was shocked by the behavior of Defendant Elovitch's moles, who were siphoning information, and hoped that someone would take action. But this did not happen.   Those who attempted to warn the purported Independent Committees about the leaks met a united front from members of the Bezeq BoD, Yes BoD, and Defendant Elovitch.

## V.   CLASS ACTION ALLEGATIONS

153.    Lead Plaintiffs bring this Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons and entities who

purchased or otherwise acquired BComm ADRs during the Class Period and were damaged thereby. Excluded from the Class are Defendants, BComm's officers and directors, members of their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

154.    The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, BComm ADRs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other Class members may be identified from records maintained by BComm, its transfer agent, and by brokerage firms, who can be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

155.    Lead Plaintiffs' claims are typical of the claims of other Class members, as they are all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

156.    Lead Plaintiffs will fairly and adequately protect the other Class members' interests and have retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

157.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are, without limitation:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business,

financial condition, operations, internal controls, prospects, and management of BComm;

- whether the Individual Defendants caused BComm to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether BComm's ADRs traded on an efficient market;

- whether the prices of BComm's ADRs during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether Class members have sustained damages and, if so, what is the proper measure of damages.

158.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in managing this Action as a class action.

159.    At all relevant times, BComm's ADRs traded in an efficient market, as evidenced by the following, without limitation:

(a) the Company met the requirements for listing, was listed, and actively traded on NASDAQ under ticker symbol BCOM, a highly efficient and automated market;

(b) during the Class Period, an average of over 2,000 shares of BComm's ADRs traded on a daily basis; there were at least 70 market makers for the stock;

(c) the Company filed periodic public reports with the SEC, issued press releases, and conducted telephonic conference calls with analysts;

(d) at least 10 analysts issued reports on BComm during the Class Period;

(e) The markets' rapid incorporation of news related to BComm is evidenced by its ADR-price reactions to the curative disclosures, as set forth above.

160.    As a result of the foregoing, the market for BComm shares promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the ADRs.  Under these circumstances, all BComm ADR

purchasers during the Class Period suffered similar injury through their purchases of shares at artificially inflated prices, and a presumption of reliance applies.

161.   Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- BComm's ADRs are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADRs; and

- Lead Plaintiffs and the other Class members purchased BComm's ADRs between the time that Defendants failed to disclose or misrepresented material facts and the time that the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

162.   Based upon the foregoing, Lead Plaintiffs and the other Class members are entitled to a presumption of reliance upon the integrity of the market.

163.   Also, Lead Plaintiffs and the other Class members are entitled to the presumption of reliance established by the U.S. Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VI.    CLAIMS FOR RELIEF

### COUNT I

**(Against Defendants BComm, Elovitch, Eilon, Handler, Mizrahi, Neiman, Raveh, Tadmor, Turgeman, Yahalom, and Yochelman for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

164.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.    This Count is asserted against Defendants BComm, Elovitch, Eilon, Handler, Mizrahi, Neiman, Raveh, Tadmor, Turgeman, Yahalom, and Yochelman (together, "10(b) Defendants") and is based upon Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). Rule 10b-5(a) makes it unlawful for any person, directly or indirectly, to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

166.    During the Class Period, the 10(b) Defendants did the following: engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.

167.    The scheme was intended to and, throughout the Class Period, did the following: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BComm's ADRs; and (iii) cause Lead Plaintiffs and the other Class members to purchase BComm's ADRs at artificially inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, the 10(b) Defendants—and each of them—took the actions set forth herein.

168.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the 10(b) Defendants participated, directly or indirectly, in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including, without limitation, statements made to securities analysts and the media that were designed to influence the market for BComm's ADRs.   Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BComm's results.

169.    Further, the 10(b) Defendants were required to disclose the material negative trends that negatively affected BComm's operations in the Company's management discussion and analysis.   Item 303 of SEC Regulation S-K (17 C.F.R.   § 229.303(a)(3)(ii)) required BComm to "[d]escribe any known trends or uncertainties" that BComm "reasonably expects will have a material … unfavorable impact on … revenues or income from continuing operations." Instruction 3 to paragraph 303(a) provides that BComm's "discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results of future financial condition."   17 C.F.R. § 229.303(a) instruction 3.   Other sections of Item 303 also created a duty for the 10(b) Defendants to have disclosed the scheme.

170.   By virtue of their positions at BComm, Elovitch, Eilon, Handler, Mizrahi, Neiman, Raveh, Tadmor, Turgeman, Yahalom, and Yochelman had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other Class members or, in the alternative, they acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them.   Said acts and omissions of the 10(b) Defendants were committed willfully or with reckless disregard for the truth.   The 10(b) Defendants issued statements without a reasonable basis in fact.

171.   Information showing that the 10(b) Defendants acted knowingly or with reckless disregard for the truth is particularly within the 10(b) Defendants' knowledge and control.   As the senior managers, executives, and/or directors of BComm and/or its controlled and/or affiliated entities, Elovitch, Eilon, Handler, Mizrahi, Neiman, Raveh, Tadmor, Turgeman, Yahalom, and Yochelman had knowledge of the details of BComm's internal affairs.

172.   The 10(b) Defendants were motivated to make false statements and omit material information necessary to make the statements not misleading.

173.   The 10(b) Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, Elovitch, Eilon, Handler, Mizrahi, Neiman, Raveh, Tadmor, Turgeman, Yahalom, and Yochelman were able to and did, directly or indirectly, control the content of BComm's disclosures.   As officers and/or directors of a publicly held company, they had a duty to disseminate timely, accurate, and truthful information with respect to BComm's businesses, operations, future financial condition, and future prospects.   As a result of the dissemination of the aforementioned false and

misleading reports, releases, and public statements, the market price of BComm's ADRs was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning BComm's business and financial condition that were concealed by the 10(b) Defendants, Lead Plaintiffs and the other Class members purchased or otherwise acquired the Company's ADRs at artificially inflated prices and relied upon the price of the ADRs, the integrity of the market for the ADRs, and/or upon statements that the 10(b) Defendants disseminated, and they were damaged upon the revelation of the truth.

174.    During the Class Period, BComm's ADRs were traded on an active, well-developed, and efficient market.  Lead Plaintiffs and the other Class members, relying on the materially false and misleading statements described herein, which the 10(b) Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of BComm's ADRs at prices artificially inflated by the 10(b) Defendants' wrongful conduct.  Had Lead Plaintiffs and the other Class members known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by the Lead Plaintiffs and the other Class members, the true value of BComm's ADRs was substantially lower than the prices paid by Lead Plaintiffs and the other Class members.  The market price of BComm's ADRs declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and the other Class members.

175.    By reason of the conduct alleged herein, the 10(b) Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

176.    As a direct and proximate result of the 10(b) Defendants' misconduct, Lead Plaintiffs and the other Class members suffered damages.

177.    The 10(b) Defendants thereby violated Section 10(b) of the Exchange Act and Rule 10b-5.

## COUNT II

**(Violations of Section 20(a) and (b) of the Exchange Act Against Defendants Eurocom, Yes, and the Individual Defendants)**

178.    Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

179.    This Count is asserted against Defendants Eurocom, Yes, and the Individual Defendants, and this Count is based upon Section 20(a)-(b) of the Exchange Act (15 U.S.C. § 78t(a)-(b)).

180.    During the Class Period, the Individual Defendants participated in the operation and management of BComm and conducted and participated directly and indirectly in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about BComm's fraudulent misstatements and omissions.

181.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to BComm's financial condition and results of operations and to promptly correct any public statements issued by the Company that had become materially false or misleading.

182.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that BComm disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause BComm to engage in the wrongful acts complained of herein.   The Individual Defendants therefore were "controlling persons" of BComm within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged herein that artificially inflated the market price of BComm's ADRs.

183.    Each of the Individual Defendants acted as a controlling person of BComm.  By reason of their senior management positions and/or being directors of BComm and/or entities that the Company controlled and/or was affiliated with, each of the Individual Defendants had the power to direct the actions of and exercised the same to cause BComm to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of BComm and possessed the power to control the specific activities that comprise the primary violations about which Lead Plaintiffs and the other Class members complain.

184.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, as they culpably participated in the fraud alleged herein.

185.    During the Class Period, Eurocom and Yes through or by means of BComm and/or the Individual Defendants performed, directly or indirectly, an act or thing that was unlawful under Section 20 of the Exchange Act.

## VII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Lead Plaintiffs demand Judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, certifying Lead Plaintiffs as the Class representatives and their choice of counsel, lead counsel, as Class counsel;

B.      Requiring Defendants to pay damages sustained by Lead Plaintiffs and the other

Class members by reason of the acts and transactions alleged herein;

C.      Awarding compensatory damages in favor of Lead Plaintiffs and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including, without limitation, pre-

judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and

other reasonable costs and expenses;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such other and further relief as this Court may deem just and proper.

## VIII.    DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiffs hereby demand trial by

jury of all issues that may be so tried.

Dated:  December 8, 2017

**POMERANTZ LLP**

By: */s/ Marc I. Gross*
Marc I. Gross
Jeremy A. Lieberman
Justin S. Nematzadeh
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181

*Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484

*Counsel for Lead Plaintiffs*