UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REX AND ROBERTA LING LIVING
TRUST u/a DECEMBER 6, 1990, AS
AMENDED, et al., *individually and on
behalf of all others similarly situated*,

                    Plaintiffs,

             -v-

B COMMUNICATIONS LTD., et al.,

                  Defendants.

17-CV-4937 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Lead Plaintiffs ("Plaintiffs"), a trio of investors who purchased shares in Israeli company

B Communications Ltd. ("BComm"), have filed a class action complaint against BComm and

thirteen other defendants on behalf of themselves and other investors who acquired BComm

shares between March 18, 2015, and September 6, 2017. As relevant here, Plaintiffs allege that

BComm violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and

a related Securities and Exchange Commission regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5,

by misleading investors about the activities of a telecommunications company in which BComm

holds a controlling interest. BComm has moved to dismiss the claims against it or, in the

alternative, to stay this action pending resolution of related criminal proceedings in Israel. (Dkt.

No. 33.) For the reasons that follow, BComm's motion to dismiss is granted in part and denied

in part, and its motion to stay is denied.

I.      **Background**

      The following facts are drawn from Plaintiffs' Amended Class Action Complaint and are

assumed to be true for purposes of resolving BComm's motion.

BComm is an Israeli holding company that owns a controlling interest in Bezeq The Israeli Telecommunication Corporation ("Bezeq"), Israel's largest telecommunications operator. (Dkt. No. 17 ("Compl.") ¶ 16.) Plaintiffs' allegations against BComm arise in connection with Bezeq's 2015 acquisition of the controlling interest in satellite-television provider D.B.S. Satellite Services (1998) Ltd. ("Yes") from Israeli private-holding group Eurocom Communications Ltd. ("Eurocom"). (Compl. ¶ 39.) As described further below, Plaintiffs claim, in essence, that this transaction resulted in Eurocom's enrichment at Bezeq's expense and that BComm, either knowing of or turning a blind eye to this result, nonetheless lured its own investors into thinking that all was well. (Compl. ¶¶ 3, 170.)

### A.     Bezeq Purchases Eurocom's Controlling Interest in Yes

Prior to the events of this case, the controlling interest in Yes rested with Eurocom, which owned 50.22% of the company's shares. (Compl. ¶ 39.) At that time, Bezeq owned the remainder of Yes's shares. (*Id.*)

In early 2015, as a first step toward an anticipated merger with Yes, Bezeq negotiated an agreement to purchase the entirety of Eurocom's holdings in Yes. (Compl. ¶¶ 39, 72.) As part of this agreement, Bezeq promised to pay Eurocom 680 million Israeli new shekels ("NIS") as soon as they closed the sale, plus up to NIS 170 million in "Additional Contingent Consideration" depending on how successfully Yes performed thereafter.[1] (Compl. ¶¶ 39–40.) For example, if Yes managed to pull in NIS 1.058 billion in cumulative free cash flow—that is, net cash from operating activities minus (or plus) net cash spent on (or derived from) investment activities—between 2015 and 2017, Bezeq would pay Eurocom the maximum Additional Contingent Consideration of NIS 170 million. (Compl. ¶ 40.)

_____

[1] At all relevant times, one Israeli new shekel was equivalent to roughly $0.25–0.30.

Bezeq's agreement with Eurocom also allowed Eurocom to collect annual advances—with interest—on any Additional Contingent Consideration it might ultimately be entitled to, provided that, at the end of each year, Yes remained on track toward meeting the 2015–2017 cumulative free cash flow total that would ultimately entitle Eurocom to payment. (Compl. ¶ 41.) If, for example, Yes had reached a benchmark of NIS 228 million in free cash flow by the end of 2015, Bezeq would advance one-third of the NIS 170 million to which Eurocom would be entitled if Yes ultimately hit the NIS 1.058 billion target by the end of 2017. (Compl. ¶¶ 40–41.) And if Yes had by the end of 2016 added at least an additional NIS 417 million to the NIS 228 million it had accumulated in 2015, then Bezeq would advance an additional one-third of the NIS 170 million maximum. (*Id.*)

Before Bezeq closed the sale with Eurocom, it sought to address a fact that had potential to arouse the suspicion of self-dealing: Eurocom was almost fully owned and controlled by the family of Shaul Elovitch, the very same man who was at that time both the controlling shareholder and board-of-directors chairman of BComm (which in turn controls Bezeq), as well as the chairman of Bezeq's board of directors. (Compl. ¶¶ 19, 32.) To satisfy minority shareholders that Bezeq had negotiated the Eurocom deal with its own—rather than Elovitch's—best interests in mind, Bezeq's board of directors formed a purportedly independent subcommittee to evaluate the deal. (Compl. ¶ 72.) On February 10, 2015, this subcommittee recommended approving the deal, and Bezeq's shareholders approved the deal the following month. (Compl. ¶¶ 72, 82.)

## B. The Bezeq-Eurocom Deal Enriches Eurocom at Bezeq's Expense

Bezeq's purchase of Eurocom's Yes shares turned out to be a very bad deal for Bezeq and a very good one for Eurocom and Elovitch.

From the outset, the terms of the deal were never subject to truly independent review within Bezeq. Rather, the purportedly independent subcommittee of Bezeq's board of directors that signed off on the deal was allegedly plagued by "ongoing and systematic leaks of confidential, material, and sensitive details and documents" that left it susceptible to Eurocom's influence. (Compl. ¶ 42.) In particular, Bezeq's Chief Executive Officer ("CEO"), Stella Handler, and the secretary of Bezeq's board of directors, Linor Yochelman, are alleged to have provided Elovitch and his family confidential information from within the subcommittee and to have acted at the behest of Elovitch and other Eurocom executives to steer the subcommittee's activities in a way that would promote Eurocom and Elovitch's interests. (Compl. ¶¶ 22, 29, 42.)

What is more, Eurocom and Elovitch continued to manipulate Bezeq even after Bezeq had approved the Eurocom-friendly sales terms. Following the sale's close, Eurocom allegedly conspired with officers at Yes to artificially inflate Yes's 2015 and 2016 free cash flow figures so that they exceeded the annual benchmark values that triggered Bezeq's obligation to make advance Additional Contingent Consideration payments. (Compl. ¶ 43.) For example, acting at Eurocom's direction, Yes's CEO, Ron Eilon, allegedly froze or delayed Yes's payments to suppliers, thus increasing Yes's cash holdings in a way that did not accurately reflect the company's underlying finances. (*Id.*) As a result of this artificial inflation, Bezeq paid out a total of roughly NIS 114 million in Additional Contingent Consideration on the basis of Yes's 2015 and 2016 performance. (Compl. ¶ 50.) Had Yes not manipulated its free cash flows, Plaintiffs contend, Eurocom would have received at most half that amount. (Compl. ¶ 51.) Although Yes did begin accurately reporting its free cash flow in 2017 (Compl. ¶ 46), it remains unclear whether Bezeq will be able to secure a refund of any of the advances it has already paid out (Compl. ¶ 52).

And the negative consequences Bezeq suffered as a result of its dealings with Eurocom did not end there. In June 2017, the Israeli press revealed that the Israel Securities Authority ("ISA"), suspecting criminal violations of Israel's securities laws, had opened an investigation into the Bezeq-Eurocom deal and had consequently raided BComm, Bezeq, and Yes's offices and detained certain company figures, including Elovitch, for questioning. (Compl. ¶ 105.) As a result of this investigation, the ISA has since recommended criminal indictments against, among others, Elovitch; his son, Or; Yes's CEO, Ron Eilon, and Chief Financial Officer ("CFO"), Micky Neiman; and Bezeq's CEO, Stella Handler. (Compl. ¶ 130.) These developments have caused Bezeq's share prices to drop, damaged investor confidence, and delayed or perhaps even stymied altogether Bezeq's hoped-for merger with Yes. (Compl. ¶ 117.)

### C. BComm's Allegedly False or Misleading Statements

Due to the close relationship between the two companies, bad news for Bezeq is bad news for BComm. Throughout a string of revelations regarding Yes's true financial status and the ongoing ISA investigation, the price of BComm's shares fell from $21.50 on June 19, 2017, to $14.49 on September 7, 2017. (Compl. ¶ 8.)

According to Plaintiffs, this revaluation was late in coming. They contend that BComm was well aware from the outset that the Bezeq-Eurocom deal was a hornet's nest but that BComm, in an effort to keep its stock prices afloat, made a series of false or misleading statements throughout 2015, 2016, and 2017 that were designed to hide the true nature of the transaction—and its likely consequences—from would-be investors. (Compl. ¶¶ 166–67.) As described below, these allegedly false or misleading statements fall broadly into four categories.

### 1. Statements Regarding BComm's Free Cash Flow

As a foreign company whose shares trade on a U.S. stock exchange (Compl. ¶ 16), BComm must submit periodic, publicly available reports to the U.S. Securities and Exchange

Commission ("SEC"). Plaintiffs identify seven of these filings, submitted between June 5, 2015, and April 20, 2017, that contain figures purporting to represent BComm's free cash flow during all or part of 2015 and 2016. (Compl. ¶¶ 58–71.) These figures, though, incorporated Bezeq's free cash flow figures, which in turn incorporated Yes's free cash flow figures, which in turn were alleged to have been fraudulently inflated during 2015 and 2016. (Compl. ¶ 54.) Accordingly, Plaintiffs maintain, BComm's representations regarding its free cash flow (and Bezeq and Yes's free cash flows) for those years were false and misleading. (*Id.*)

### 2. Statements Regarding the Bezeq Subcommittee

Plaintiffs identify five SEC filings BComm submitted between March 18, 2015, and April 19, 2016, that describe the subcommittee of Bezeq directors that recommended approval of the Bezeq-Eurocom deal. (Compl. ¶¶ 72–77, 82–83, 88–89.) For example, an exhibit attached to the March 18, 2015 filing describes the subcommittee as "composed of members who are all outside or independent directors" and reports that the subcommittee, "[a]fter reviewing the . . . alternatives," concluded that going through with the purchase of Eurocom's Yes shares was "in the best interest of [Bezeq]." (Compl. ¶ 72 (formatting omitted)). And an exhibit attached to an April 24, 2015 filing reports that the subcommittee "conducted a due diligence of [Yes] with the help of external consultants." (Compl. ¶ 74.) But because the subcommittee was in fact being improperly influenced by Eurocom and Elovitch, Plaintiffs contend, these representations regarding the independent rigor with which the subcommittee assessed the Bezeq-Eurocom deal were false and misleading. (Compl. ¶ 54.)

### 3. BComm's Code of Business Conduct and Ethics

Plaintiffs identify three of BComm's SEC filings that incorporate BComm's Code of Business Conduct and Ethics ("Code of Ethics"). (Compl. ¶¶ 78–79, 90–91, 99–100.) That Code assures investors that BComm employees "must comply with all applicable laws and

regulations" and "are expected to observe high standards of business and personal ethics" by "practic[ing] . . . honesty and integrity in every aspect of dealing with other employees, the public, the business community, shareholders, customers, suppliers and governmental and regulatory authorities." (Compl. ¶ 37.) It goes on to provide that BComm employees "are expected to make or participate in business decisions and actions in the course of their employment . . . based on the best interests of [BComm] as a whole, and not based on personal relationships or benefits." (*Id.*) Because the Bezeq-Eurocom deal, however, was driven by Elovitch's unethical pursuit of private gain, Plaintiffs contend, BComm's avowals that it adhered to its Code of Ethics were false and misleading. (Compl. ¶ 54.)

### 4. Statements Regarding Disclosure and Reporting Controls

Finally, Plaintiffs identify four SEC filings BComm submitted between April 5, 2016, and April 26, 2017, containing certifications that BComm had evaluated its internal disclosure controls and found them sufficient to ensure that information about the company was being reliably disclosed to management for inclusion in public-facing reports. (Compl. ¶¶ 84-85, 92, 96, 101.) These certifications similarly state that BComm had assessed its internal financial-reporting controls and found them sufficient to "provide reasonable assurance" that the company's finances were being accurately calculated. (*Id.*) Finally, several of these certifications are accompanied by signed statements attesting to their truth and comprehensiveness, "[b]ased on [the] knowledge" of the signatory. (Compl. ¶ 86; *see also* Compl. ¶¶ 93–94, 97, 102–03.) But because BComm's internal controls were insufficient to ensure that Elovitch's fraudulent activities were disclosed or that BComm's free cash flow reporting was accurate, Plaintiffs argue, BComm's certification as to the adequacy of those controls was false and misleading. (Compl. ¶ 54.)

### D. The Ensuing Litigation

The Bezeq-Eurocom transaction prompted litigation in both Israel and the United States.

#### 1. The Israeli Litigation

At least five putative civil class actions or derivative actions related to Bezeq's purchase of Eurocom's Yes shares have been filed in the Israeli courts.[2]  (Dkt. No. 34 ¶ 3.)  One of the actions was set to proceed as of mid-August 2017 (Dkt. No. 51-13), one of the actions has been dismissed, and the remaining three actions have been stayed at the request of the ISA or the Attorney General of Israel ("AGI"), which is currently deciding whether to pursue criminal charges against Elovitch or any other Yes or Bezeq personnel based on the ISA's investigation and recommendations (Dkt. No. 34 ¶¶ 3–9).

In successfully arguing for a stay of the Israeli civil litigation, the ISA and AGI have taken the position that such litigation might prove disruptive to the AGI's pursuit of potential criminal charges.  (Dkt. No. 34-2 at 2; Dkt. No. 34-6 at 2.)  In particular, the Israeli authorities have expressed concern that "if an indictment is filed in the criminal proceedings against any of those involved in the civil proceedings, the questioning of this involved party within the framework of the [civil proceedings] before being questioned as a defendant in the criminal proceedings and before other witnesses testify in a matter where the version of that involved party is likely to be relevant to their versions[] is likely to harm the criminal proceedings."  (Dkt. No. 34-6 at 7.)  Moreover, because Israeli law provides that "[a] person is not obligated to deliver evidence if it constitutes a confession of a fact that is a fundamental element of an

---

[2] Although the complaint does not refer to these proceedings, a court resolving a motion to dismiss "may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings."  *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)).

offense which they are charged with, or are likely to be charged with" (Dkt. No. 34-10), the prospect of criminal proceedings might prompt witnesses in the civil actions to withhold testimony that could be helpful to those actions. Conversely, as the AGI has explained, "conducting the [criminal] investigation" first "may lead to results that will aid the civil proceedings and significantly influence their management." (Dkt. No. 34-6 at 10.)

## 2. The Present Action

In parallel with the Israeli proceedings, BComm investor Lynne P. Maleeff initiated this putative class action in this Court on June 29, 2017. (Dkt. No. 1.) Three months later, this Court granted the request of three other BComm investors—Rex and Roberta Ling Living Trust u/a December 6, 1990, as Amended; John Taylor Jones; and David Thomas Jones—to be appointed lead plaintiffs. (Dkt. No. 11.) The newly appointed lead plaintiffs filed a two-count, amended complaint on December 8, 2017, on behalf of themselves and a class of other investors who acquired BComm shares between March 18, 2015, and September 6, 2017.[3] (Compl. ¶ 1.) In addition to BComm, the amended complaint names as defendants Eurocom, Elovitch, and Elovitch's son, Or; BComm's present or former CEO, Doron Tugeman, and CFOs, Itzik Tadmor and Ehud Yahalom; Bezeq's present or former CEO, Stella Handler, CFOs, David Mizrahi and Allon Raveh, and board-of-directors secretary, Linor Yochelman; and Yes, along with its present or former CEO, Ron Eilon, and CFO, Micky Neiman. (Compl. ¶¶ 16–29.)

Count One of the operative complaint alleges that eleven of the fourteen defendants, including BComm, violated Section 10(b) of the Securities Exchange Act and related SEC Rule 10b-5 by engaging in a fraudulent scheme designed to induce investors to buy BComm

---

[3] The complaint actually characterizes the class members as having acquired BComm's American Depository Receipts (Compl. ¶ 1), but Plaintiffs have since clarified that they meant, throughout the complaint, to refer instead to BComm's ordinary shares. (Dkt. No. 50 at 14 n.22.)

shares at artificially inflated prices and by making false or misleading statements or omissions in connection with that fraud. (Compl. ¶¶ 165–68.) Count Two alleges that every defendant other than BComm violated Sections 20(a) and (b) of the Securities Exchange Act, 15 U.S.C. §§ 78t(a)–(b), by exercising control over BComm and thereby facilitating the fraud BComm is alleged to have perpetrated. (Compl. ¶¶ 178–85.)

Presently before the Court is BComm's February 20, 2018 motion to dismiss the single count asserted against it or, alternatively, to stay the action pending the completion of the ongoing criminal proceedings in Israel.[4] (Dkt. No. 33.)

## II.    Legal Standard

### A.    Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To avoid this fate, a complaint "must contain sufficient factual matter" that will, if taken to be true, "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Of course, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Rather, the complaint must contain specific factual allegations that, if true, "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.

Where, as here, the complaint alleges securities fraud, two additional requirements come into play. First, Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). More

---

[4] Today's opinion addresses BComm's motion only and does not resolve any other pending motion to dismiss or stay. (*See* Dkt. Nos. 59, 67, 71.)

specifically, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Second, the complaint must satisfy the heightened pleading standard applicable to securities-fraud allegations pursuant to the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737.  Under that standard, as under Rule 9(b), "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and the complaint moreover must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.* § 78u-4(b)(2)(A).  Such an inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

**B.**     **Motion to Stay**

A district court may "defer[] civil proceedings pending the completion of parallel criminal prosecutions when the interests of justice seem[] to require such action." *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970).  A civil defendant urging such a stay "bears the burden of establishing its need." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012) (quoting *Clinton v. Jones*, 520 U.S. 681, 708 (1997)).  In considering whether a defendant has successfully carried that burden, courts make "a particularized inquiry into the circumstances of, and the competing interests in, the case," *id.* at 99 (quoting *Banks v. Yokmick*, 144 F. Supp. 2d 272, 275 (S.D.N.Y. 2001)), considering factors such as:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

*Id.* (quoting *Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995)). Ultimately, though, these factors "can do no more than act as a rough guide for the district court as it exercises its discretion," looking to "the particular facts before it and the extent to which . . . a stay would work a hardship, inequity, or injustice to a party, the public or the court." *Id.*

## III. Discussion

### A. Motion to Dismiss

To plead a violation of Section 10(b) and Rule 10b-5, a plaintiff must typically allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157. In moving to dismiss, BComm argues that the operative complaint falls short with respect to two of these elements. Specifically, it argues (1) that the Plaintiffs have not adequately alleged that any of BComm's SEC filings contain any materially false or misleading statements or omissions (Dkt. No. 36 at 16–24), and (2) that even if aspects of those filings were false or misleading, Plaintiffs have not adequately alleged that BComm acted with scienter, the requisite mental state.[5] (Dkt. No. 36 at 11–16.)

---

[5] BComm also briefly argues that the complaint inadequately alleges that any of BComm's purportedly false and misleading statements were connected with Plaintiffs' purchase

### 1. Materially False or Misleading Statements or Omissions

A statement is actionable under Section 10(b) and Rule 10b-5 only if it is, directly or by omission, "misleading as to a material fact," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (italics omitted), *i.e.*, a fact substantially likely to be "viewed by the reasonable investor as . . . significantly alter[ing] the 'total mix' of information made available," *id.* (quoting *Basic*, 485 U.S. at 231–32). That said, Section 10(b) and Rule 10b-5 do not themselves "create an affirmative duty to disclose any and all material information," but only a duty to disclose that which is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* at 44 (alteration in original) (quoting 17 C.F.R. § 240.10b-5(b)).

As noted, Plaintiffs claim that BComm's failure to disclose the true nature of the Bezeq-Eurocom deal rendered misleading four categories of statement contained in BComm's SEC filings. The Court agrees in part. As explained below, Plaintiffs have adequately alleged that BComm's lack of disclosure rendered some—but not all—of the statements at issue materially misleading. *See In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 301 n.1 (S.D.N.Y. 2014) ("Courts in this district have granted motions to dismiss with respect to some allegedly misleading statements while allowing claims as to other statements to proceed.").

---

of BComm securities. (Dkt. No. 36 at 25.) As BComm explains it, the complaint alleges that Plaintiffs purchased BComm's American Depository Receipts at artificially inflated prices—but BComm has never issued any American Depository Receipts, and so BComm can have committed no wrongdoing in connection with their sale. (*Id.*) Plaintiffs, though, have since clarified that they intended to refer to BComm's ordinary shares (Dkt. No. 50 at 14 n.22), and Defendants have offered no reason why this Court should decline to allow Plaintiffs to correct this straightforward, if regrettable, mislabeling. *Cf.* Fed. R. Civ. P. 15(a)(2) (directing the court to allow a party to amend a pleading "when justice so requires").

### i. Statements Regarding BComm's Free Cash Flow

BComm does not dispute that Plaintiffs have adequately alleged that the free cash flow figures reported in BComm's SEC filings were inaccurate. Instead, it contends that Plaintiffs have inadequately alleged that these figures were material to investors.[6] (Dkt. No. 36 at 17.) At the motion-to-dismiss stage, though, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Here, Plaintiffs have alleged that Yes's artificially inflated free cash flow represented up to 18.73% of Bezeq's own free cash flow during the relevant period. (Compl. ¶ 56.) And not only did the inflated figures make Bezeq, and therefore BComm, appear to be more liquid than it was in reality; they also disguised the fact that Bezeq did not actually owe the substantial quantities of Additional Contingent Consideration it was paying out. (Compl. ¶ 121.) Moreover, Plaintiffs have alleged that once BComm began accurately reporting its free cash flow—and disclosing the potential civil and criminal liability risks arising as a result of the underlying fraud—its share prices dropped. (Compl. ¶¶ 121–22.) The combination of these factors makes

---

[6] BComm also argues that Plaintiffs have inadequately alleged BComm's scienter with respect to these figures. (Dkt. No. 36 at 17–18.) As explained *infra*, however, the facts alleged here establish that Elovitch's scienter can be imputed to BComm, and there can be no question that Elovitch is properly alleged to have known that Yes's, and therefore BComm's, free cash flow figures were artificially inflated. (*See* Compl. ¶ 149.) Relatedly, BComm insists that its free cash flow figures could not have been materially false because they "did nothing more than report financial information which Bezeq presented as truthful and accurate." (Dkt. No. 54 at 13.) But this argument, too, is just another way of professing a lack of scienter: While BComm's decision to incorporate Bezeq's inaccurate figures into its own might not give rise to liability under Section 10(b) and Rule 10b-5 if BComm had neither knowledge of nor reason to know of their inaccuracy, the figures themselves would nevertheless remain false or misleading.

clear that "reasonable minds" could believe that the true value of Yes's, Bezeq's, and BComm's

free cash flow was not "obviously unimportant" to BComm's investors. *Ganino*, 228 F.3d at 162

(quoting *Goldman*, 754 F.2d at 1067); *see also Villella v. Chem. & Mining Co. of Chile Inc.*, No.

15 Civ. 2106, 2017 WL 1169629, at *12 (S.D.N.Y. Mar. 28, 2017) (finding that financial

underreporting amounting to only 0.5% of the defendant's average annual income and 0.8% of

its average annual paid income tax was material because revelation of the fraud underlying the

underreporting caused a drop in the value of defendant's securities, regulatory penalties, and

reputational harm); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 537 (S.D.N.Y.

2011) (holding that "[a] jury could . . . easily conclude[] that a reasonable investor would . . .

view[]" a struggling company's CEO's "misstatements/omissions regarding cash flow as

significantly altering the 'total mix' of information available"), *aff'd*, 838 F.3d 223 (2d Cir.

2016).

Plaintiffs have thus adequately alleged that BComm's reported free cash flow figures for

2015 and 2016 were false or misleading and that a reasonable investor could conclude that those

figures were material to the investment decision.

## ii.     Statements Regarding the Bezeq Subcommittee

BComm next argues that Plaintiffs have failed to establish that any of the statements in

BComm's SEC filings regarding the Bezeq subcommittee were materially misleading because

none of the statements Plaintiffs identify "refer to the 'independence' of the special committee or

state that it had complied with Israeli law."[7]  (Dkt. No. 36 at 18.)  Of course, even if these

---

[7] Again, BComm also claims a lack of scienter with respect to these statements.  (Dkt. No. 36 at 19.)  Here too, though, Elovitch—whose scienter can be imputed to BComm—is clearly alleged to have known that the Bezeq subcommittee was compromised.  (*See* Compl. ¶ 42.)

statements contained no technical falsehoods, they are nonetheless actionable if they are rendered misleading by the omission of material information. *See Matrixx Initiatives*, 563 U.S. at 44; *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth.").

BComm is correct that most of its statements about the Bezeq subcommittee were in no way misleading. For example, one statement simply reported that "[a] sub-committee of the Board of Directors that was set up to deal with the topic [of the Bezeq-Eurocom deal] . . . approved the transaction between [Bezeq] and Eurocom . . . to acquire all the holdings of Eurocom . . . in [Yes]." (Compl ¶ 82.) This accurate statement contains no latent implications regarding the integrity of the subcommittee's decision-making process or the independence of its conclusions. Similarly, another statement informed investors that the subcommittee "selected" external consultants that helped Bezeq "review the feasibility of the merger" and "conduct[] a due diligence of [Yes]." (Compl. ¶ 74.) This statement, too, sends no particular signal about the subcommittee. And although it might fairly be read to imply that the consultants selected by the subcommittee were untainted, the complaint never alleges that they were anything different.

But one of BComm's statements about the Bezeq subcommittee was not so anodyne. An exhibit attached to BComm's March 18, 2015 SEC filing reports that the subcommittee was "composed of members who [were] all outside or independent directors" in order to assuage concern that the Bezeq-Eurocom transaction "would involve a transaction with [Bezeq's] controlling shareholder." (Compl. ¶ 72.) The exhibit goes on to inform the investor that the subcommittee's resolution to recommend approval of the Bezeq-Yes transaction was based on its considered conclusion that the transaction was "in the best interest of [Bezeq]." (*Id.* (formatting omitted)). The clear implication of this report is that the subcommittee took an objective, arms-

length view of the proposed transaction. But that implication is wholly inconsistent with the omitted fact that subcommittee members were in fact taking their marching orders from self-interested participants in the very deal the subcommittee was meant to assess. *Cf., e.g.*, *In re VEON*, No. 15 Civ. 8672, 2017 WL 4162342, at *6 (company's statement that its increased subscriber numbers and revenues were attributable to its "sales and marketing efforts" in Uzbekistan placed "the reasons for growth in Uzbekistan [sufficiently] at issue" that the statement was rendered misleading by the company's failure to mention that its payment of bribes was another contributor to its success there).[8]

Plaintiffs have therefore adequately alleged that the report BComm submitted about the Bezeq subcommittee along with its March 18, 2015 SEC filing was materially false or misleading. Plaintiffs have failed, however, to establish that any of BComm's remaining statements regarding the subcommittee were similarly actionable.

### iii.    BComm's Code of Business Conduct and Ethics

Turning to the statements that incorporate its Code of Ethics, BComm contends that they are not misleading because they are the sort of generic "puffery" that is too vague to create specific assurances capable of inducing investor reliance. (Dkt. No. 36 at 19–21.)

The Court agrees. The Code of Ethics states that BComm employees "must comply with all applicable laws and regulations" and "are expected to observe high standards of business and

---

[8] In an apparent effort to cast doubt on whether the independence of the Bezeq subcommittee was material, BComm looks outside the complaint and claims that other, truly independent parties outside the compromised subcommittee viewed the Bezeq-Eurocom transaction favorably. (Dkt. No. 54 at 8.) Perhaps it will emerge in discovery that the transaction's pitfalls were so subtle that no reasonable investor would have looked askance at the deal even with the knowledge that Eurocom and Elovitch were active in securing Bezeq's approval. But the Court is unprepared at this stage to deem immaterial as a matter of law the fact that the Bezeq subcommittee was tainted by conflicts of interest.

personal ethics" and "to avoid allowing their private interests to interfere, or appear to interfere, with the interests of [BComm] as a whole." (Compl. ¶ 37.) This language makes "no guarantees that the code [will] be followed," nor does it contain any "representations of historical compliance." *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 718 (S.D.N.Y. 2018). Rather, it is "explicitly aspirational," describing only what employees are "expected" to do. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). "If this type of milquetoast corporate-speak required disclosure of all potential [ethical] violations then known to the company, then 'any company that has [an ethics code] and discloses that [code] in even the most austere terms would be required, *ipso facto*, to disclose any possible deviation that came to its attention.'" *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 513 (S.D.N.Y. 2017) (quoting *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008)); *see also In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755–56 (S.D.N.Y. 2017) ("Because 'a code of ethics is inherently aspirational[,] it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all.'" (alteration in original) (quoting *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 52 F. Supp. 3d 961, 970 (N.D. Cal. 2014))).

To be sure, "[s]ome statements, in context, may amount to more than 'puffery' and may in some circumstances violate the securities laws: for example, a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition or that are clearly designed to distinguish the company from other specified companies in the same industry." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016). In an effort to argue that BComm's Code of Ethics contained this sort of specificity, Plaintiffs point to their allegation that BComm "trumpet[ed]" its Code of Ethics precisely to "quell[] minority

shareholders' concerns about . . . Elovitch and his corporate pyramid's dominance over

BComm." (Compl. ¶ 38.) But nothing in the statements themselves, or in the context of their

issuance, speaks to any specific investor concern or creates any guarantee beyond a hope that

BComm employees will behave ethically. *Cf. In re Banco Bradesco S.A. Sec. Litig.*, 277 F.

Supp. 3d 600, 660 (S.D.N.Y. 2017) (during a "time of concern" over widespread bribery,

defendant company's statement that it had adopted "a formal and effective process for

preventing and combatting corruption and bribery" was sufficiently specific to be misleading).

Ultimately, the vague platitudes in BComm's Code of Ethics are insufficiently concrete

to be misleading in a way that could give rise to liability under Section 10(b) and Rule 10b-5.

### iv.  Statements Regarding Disclosure and Reporting Controls

Finally, BComm argues that its certifications regarding the adequacy of its internal

disclosure and financial-reporting controls are not misleading because the complaint fails to

allege any particular deficiency in the controls. (Dkt. No. 36 at 21–24.)

Here, too, BComm is correct. The complaint does nothing to describe BComm's system

of internal controls, let alone to identify why that system was inadequate. Instead, Plaintiffs

invite the inference that the internal controls *must* have been inadequate because they failed to

ensure that BComm "reported accurate Free Cash Flow and compliance with Israel Securities

Laws and Penal Laws." (Compl. ¶ 54.) But "allegations that [a company's] controls must have

been deficient because they may have failed to detect some weaknesses in its financial reports or

disclosures in some instances[] are not sufficient," particularly where the company's statements

attesting to the adequacy of the controls "do not purport to guarantee that [the] controls will

perform perfectly in every instance" but instead "speak to 'reasonable assurance' or 'reasonable

certainty.'" *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 648; *see also In re*

*Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d at 757 (recognizing that "allegations as to [a]

company's deficient financial controls and accounting [a]re wholly conclusory" where the

complaint lacks "any factual allegations concerning [the company's] financial reporting

processes" (second alteration in original) (quoting *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352,

370 (E.D.N.Y. 2013))).

Plaintiffs have therefore failed to adequately allege that BComm's statements attesting to

the adequacy of its internal disclosure and financial reporting controls were false or misleading.[9]

### 2. Scienter

While Plaintiffs have plausibly alleged that certain statements in BComm's SEC filings

regarding BComm's (and Bezeq's and Yes's) free cash flow and Bezeq's board-of-directors

subcommittee were materially false or misleading, BComm can be liable for those statements

under Rule 10(b) and Rule 10b-5 only if it acted with scienter, "a mental state embracing intent

to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v.

Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). In addition to conscious intent, "the scienter

element can [also] be satisfied by a strong showing of reckless disregard for the truth." *S.

Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Recklessness in the

---

[9] To the extent Plaintiffs argue that the SEC filings' signed certifications attesting in general to the filings' truth and comprehensiveness are themselves false or misleading statements that form an independent basis for liability, those certifications "contained an important qualification that the certifying officer's statements are true 'based on [his] knowledge.'" *Menaldi*, 277 F. Supp. 3d at 517. As discussed *infra*, Plaintiffs have failed to allege that the specific officers who signed the SEC filings on behalf of BComm had any knowledge of the facts that rendered those filings inaccurate. Accordingly, Plaintiffs have failed to provide any basis for concluding that the subjectively qualified certifications are in fact false. *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007) ("[F]or such certifications to be materially false, it is insufficient for the financial statements [included in the SEC filings] to have been false—[the defendants who certified the filings] must also have had knowledge of that falsity.").

securities-fraud context refers to "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *id.* (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)) (italics omitted), or to "evidence that the 'defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud,' and hence 'should have known that they were misrepresenting material facts,'" *id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)) (italics omitted).

Where, as here, the defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). While "the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant," *id.*, it is possible to allege corporate scienter "without being able to name the individuals who concocted and disseminated the fraud" where, for example, a corporation issues a statement "so dramatic" that it would necessarily "have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false," *id.* at 195–96 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).

Here, the complaint makes clear which BComm officers were responsible for the allegedly misleading SEC filings. According to the complaint, each filing was signed by either BComm's CEO at the time, Doron Turgeman, or one of the two people who served as BComm's CFOs during the relevant period, Itzik Tadmor or Ehud Yahalom.[10] (Compl. ¶¶ 58, 60, 62, 64,

---

[10] The complaint also claims Elovitch and others "had ultimate authority" over these filings (Compl. ¶ 55), but it fails to plead any "factual content"—such as the process by which BComm's SEC filings were drafted, compiled, or approved—that would give that "mere

66, 68, 70, 72, 74, 76, 80, 82, 88, 93, 94, 96, 99, 102, 103.)  Thus, corporate scienter can be

ascribed to BComm if the complaint establishes that Turgeman, Tadmor, or Yahalom knew or

recklessly disregarded the risk that BComm's SEC filings misrepresented the nature of Bezeq's

deal with Eurocom—if those officers are alleged to have been "sufficiently knowledgeable about

[BComm]," in other words, "to know that the [SEC filings were] false."  *Teamsters*, 531 F.3d at

196 (quoting *Makor Issues & Rights*, 513 F.3d at 710).

The complaint, though, contains no specific factual allegations that create an inference,

let alone a strong one, that Turgeman, Tadmor, or Yahalom knew the true nature of the Bezeq-

Eurocom deal.  None of these three BComm officers is alleged to have participated in

compromising the supposedly independent Bezeq board-of-directors subcommittee (Compl.

¶ 42) or in manipulating Yes's free cash flow figures (Compl. ¶ 43), nor is the ISA's

investigation alleged to have implicated any of them in misconduct (Compl. ¶¶ 124–30, 140–46).

Similarly, none of these officers is alleged to have been privy to the "red flags" the complaint

maintains were raised "during the deliberations over the Bezeq-Yes merger."  (Compl. ¶ 152.)

Instead, the complaint merely alleges that BComm's officers must have "kn[own] about

or recklessly disregarded" the fact that something was amiss with the Bezeq-Eurocom deal

because the transaction "was at the forefront of [BComm's] attention" and because "[m]onitoring

---

conclusory statement[]" the sort of substantive heft necessary to establish its plausibility at the
motion-to-dismiss stage, *Ashcroft*, 556 U.S. at 678.  To be sure, the complaint notes that
BComm's SEC filings contained attached exhibits that were signed by Elovitch and other Bezeq
officers alleged to have known the true nature of the Bezeq-Eurocom deal.  (*See, e.g.*, Compl.
¶¶ 42, 72, 74, 82.)  But the complaint offers no basis for inferring that any individuals other than
Turgeman, Tadmor, and Yahalom, made any decisions as to what information to submit to the
SEC *on behalf of BComm*, even if other individuals may have knowingly produced misleading
materials *on behalf of Bezeq* and then made those materials available to BComm to do with as it
saw fit.  *Cf. Maung v. Merrill Lynch & Co.*, No. 99 Civ. 9687, 2000 WL 1159835, at *10
(S.D.N.Y. Aug. 15, 2000) (rejecting plaintiffs' efforts to hold parent corporations "liable for their
subsidiary's actions without alleging facts that state a proper legal predicate for that liability").

of Yes' Free Cash Flow . . . fell squarely within the[ir] responsibility." (Compl. ¶ 151.) To the extent that these allegations seek to imply that Turgeman, Tadmor, or Yahalom had actual knowledge of the true nature of the Bezeq-Eurocom transaction, they are insufficiently specific to render that inference more compelling than the "opposing inference[s]" that the BComm officers were merely careless or that Elovitch took deliberate steps to hide his self-enrichment scheme from these officers. *Tellabs*, 551 U.S. at 314. And to the extent that these allegations seek only to imply that Turgeman, Tadmor, or Yahalom acted with reckless disregard for the true nature of the Bezeq-Eurocom transaction, they are likewise insufficient because they fail to offer any specific factual support for the notion that the officers had a "duty to monitor" the accuracy of Bezeq's self-reported free cash flow figures or that the officers overlooked any "obvious signs of fraud." *S. Cherry St.*, 573 F.3d at 109 (quoting *Novak*, 216 F.3d at 308) (italics omitted); *cf. Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268–71 (2d Cir. 1996) (rejecting claim that parent corporation acted recklessly in failing to investigate the unusually high profits of its subsidiary).

Without any allegations sufficient to create a strong inference that the BComm officers directly responsible for the allegedly misleading SEC filings acted with the requisite scienter, Plaintiffs are left to argue that somebody else "whose intent could be imputed to [BComm]" did so. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Teamsters*, 531 F.3d at 195). Beyond Turgeman, Tadmor, and Yahalom, the complaint identifies only two individuals who are alleged to have held any position at BComm during the relevant period: Elovitch himself, who was BComm's controlling shareholder and chairman of BComm's board of directors, and Elovitch's son, Or, whom the complaint describes as having been "a director of BComm." (Compl. ¶¶ 19–20.)

As for Or, the complaint offers no elaboration on his role within BComm. And beyond a fleeting and nonspecific allegation that he received confidential information from the purportedly independent Bezeq subcommittee (Compl. ¶ 42), the complaint contains no particular factual allegations about Or's involvement in or knowledge of any of the events underlying Plaintiffs' fraud claims. The complaint therefore neither creates a strong inference that Or acted with scienter nor establishes that his intent could be imputed to BComm even had he done so.

Elovitch himself, though, is another story entirely. Not only is he alleged to have been aware of the true nature of the Bezeq-Eurocom deal, but he is in fact alleged to have facilitated the deal so as to enrich himself. (Compl. ¶¶ 136–39.) Moreover, the complaint contains specific allegations that, if true, establish Elovitch's active participation in the underlying scheme. In particular, Elovitch is alleged to have deliberately wielded improper influence over the Bezeq subcommittee and to have instructed officers at Yes to inflate their free cash flow figures. (Compl. ¶ 148.) In other words, to the extent that BComm's SEC filings were misleading for failing to disclose the facts surrounding Bezeq's purchase of Eurocom's Yes shares, the complaint adequately alleges that Elovitch "knew facts or had access to information suggesting that [BComm's] public statements were not accurate." *Novak*, 216 F.3d at 311.

BComm never argues otherwise. Instead, it replies only that Elovitch's knowledge cannot be imputed to BComm. (Dkt. No. 36 at 14–16; Dkt. No. 54 at 1–5.) Under ordinary agency principles, of course, "acts of a [company's] controlling shareholder or dominating officer" typically "are . . . imputed" to the company. *Thabault v. Chait*, 541 F.3d 512, 527 (3d Cir. 2008) (applying New Jersey law); *accord Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 164–65 (2d Cir. 2003) (applying

Texas law). But without disputing the validity of this general rule, BComm makes two arguments as to why it should not apply to the specific facts of this case.

First, BComm points out that "[t]he intent of officers and directors can be imputed to the corporation only where they acted within the scope of their authority." (Dkt. No. 36 at 15.) Because Elovitch is alleged to have "acted on behalf [of] and for the benefit of his family's separate, privately owned entity, Eurocom," BComm argues, he was not acting within the scope of his authority as BComm's director and controlling shareholder when he facilitated the allegedly fraudulent Bezeq-Eurocom transaction—a transaction that, BComm observes, was actually detrimental to BComm's bottom line. (*Id.*) *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 64 (2d Cir. 2013) (describing rule of New York law, rooted in general agency principles, that "directs a court not to impute to a corporation the bad acts of its agent" where the agent commits fraud "*against* a corporation rather than on its behalf" (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467 (N.Y. 2010))).

This argument, though, misconceives the precise nature of the conduct that Plaintiffs seek to impute to BComm. Perhaps Elovitch acted outside the scope of his authority and adversely to BComm when he took steps to push through a deal that he knew was not in BComm's best interests. But Plaintiffs do not assert that BComm is liable under the securities laws merely because Bezeq cut a bad deal. Rather, the basis for BComm's liability is its failure to disclose to investors just how bad a deal Bezeq had cut, despite knowing as much, and thereby lulling investors into purchasing BComm shares at prices that overstated the company's actual value. Elovitch's decision not to publicize the facts surrounding the Bezeq-Eurocom deal "clearly benefitted [BComm]" by "inflat[ing] the value of [its] securities" and enabling it "to continue to attract investment." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382–83 (S.D.N.Y. 2015);

*see also id.* (rejecting argument that the scienter of officers involved in a bribery scheme through which their company was "drastically overpaying," *id.*at 374, for certain assets could not be imputed to the company because the underlying scheme was adverse to the company's interests).

To be sure, corporate scienter might not attach where a company issues materially misleading statements solely because a low-level employee with no relationship to the investing public fails to disclose to his higher-ups a fraud he has committed against his own employer. *See, e.g.*, *Barrett v. PJT Partners Inc.*, No. 16 Civ. 2841, 2017 WL 3995606, at *8 (S.D.N.Y. Sept. 8, 2017). But where a company's highest-level directors allow the company's outward-facing communications to omit their own known, material misconduct, they can fairly be said to act on behalf of the company regardless of whether the underlying misconduct itself benefits the company. *Cf., e.g.*, *Acticon AG v. China N. E. Petrol. Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015) (summary order) (imputing to a company the scienter of a CEO who "attest[ed] to the company's internal controls, while allegedly simultaneously looting [the company's] treasury and engaging in unauthorized transfers of company funds").

Second, BComm argues that Elovitch's scienter cannot be imputed to BComm because Elovitch is not alleged to have played a role in preparing the allegedly misleading SEC filings. Courts are split on whether corporate scienter can attach where the allegations fail to establish that the specific employee responsible for making or approving an actionable statement acted with scienter. *Compare Makor Issues & Rights*, 513 F.3d at 707–08; *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) ("For purposes of determining whether a statement made by [a] corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement . . . ."), *with In re Omnicare, Inc. Sec. Litig.*, 769

F.3d 455, 476 (6th Cir. 2014) (holding that the scienter not only of "[t]he individual agent who uttered or issued the misrepresentation" but also of "[a]ny high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance" can be "probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter under Section 10(b)" (quoting Patricia S. Abril & Ann Morales Olazábal, *The Locus of Corporate Scienter*, 2006 Colum. Bus. L. Rev. 81, 135 (2006))).  That said, courts in this district have generally coalesced around the view that "there is no requirement 'that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter.'"  *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005)).

Certainly, there must be "*some* connection at the corporation between a misstatement and the requisite quantum of knowledge of its falsity" for corporate scienter to attach.  *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017) (emphasis added).  But that requirement is generally satisfied where the employee with knowledge of the facts that make a corporate statement misleading occupies a position likely to enjoy some oversight over the company's public-facing representations.  *See, e.g.*, *Loreley Fin.*, 797 F.3d at 178 (finding corporate scienter adequately alleged where "high-level employees" not alleged to have prepared their companies' offering documents knew the facts that made those documents misleading); *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *10 (scienter of corporate executives alleged to have "orchestrated a bribery scheme" and "to have understood how th[ose] bribes could impact, or be reflected in, [their company's] financial statements" could be imputed to the company despite the lack of any allegation "that the executives with knowledge of the bribery had any role

in financial reporting"); *cf. Barrett*, 2017 WL 3995606, at *7 (deciding whether a corporate employee's scienter should be imputed to the company requires considering not only "the connection between the executive's role and the fraudulent statements" but *also* "the individual's relative seniority at the issuing entity").

Although the complaint here never specifically alleges that Elovitch examined the contents of BComm's SEC filings, it must be the case that, as BComm's controlling shareholder and board-of-directors chairman, Elovitch knew that, absent disclosure of the true nature of the Bezeq-Eurocom deal, BComm's statements to investors would be materially misleading. Indeed, the complaint alleges that, before news of the facts surrounding the Bezeq-Eurocom deal went public, one of Elovitch's companies sold vast quantities of BComm stock at an artificially inflated price. (Compl. ¶ 139.) It requires no great inferential leap to surmise that Elovitch, despite not having himself drafted the allegedly misleading statements at issue, deliberately stood idly by despite being well aware that BComm's investors were being taken for a ride.

In short, Plaintiffs have pleaded facts sufficient to create a strong inference that Elovitch acted with scienter and that his scienter can be imputed to BComm, the company he controlled. Accordingly, Plaintiffs have stated a plausible Section 10(b) and Rule 10b-5 claim against BComm, at least with respect to its reported free cash flow figures and its March 18, 2015 filing regarding the Bezeq subcommittee.

### B.    Motion to Stay

BComm next argues that even if Plaintiffs have stated a plausible securities-fraud claim against it, the entire litigation should be stayed pending resolution of the criminal investigation in Israel. (Dkt. No. 36 at 25–35.) As explained above, whether and to what extent a stay of a civil case is warranted to accommodate parallel criminal proceedings requires "a particularized inquiry into the circumstances of, and the competing interests in, the case." *Louis Vuitton*, 676

F.3d at 99 (quoting *Banks*, 144 F. Supp. 2d at 275).  This circuit's six-factor framework guides this case-specific inquiry, although the factors "can do no more than act as a rough guide" for this Court's exercise of discretion.  *Id.*

The first factor, which courts "have recognized as . . . particularly significant," is "the overlap of the issues in the criminal and civil cases."  *SEC v. Platinum Mgmt. (NY) LLC*, No. 16 Civ. 6848, 2017 WL 2915365, at *4 (E.D.N.Y. July 7, 2017).  According to the complaint, as well as to statements submitted by the AGI in the Israeli litigation, the ongoing criminal investigation in Israel focuses on the very Bezeq-Eurocom transaction that takes center stage in this civil suit.  (Compl. ¶ 124; Dkt. No. 34-6 at 3.)  Indeed, Plaintiffs never dispute that there is likely to be substantial overlap between the civil and criminal proceedings here.

But the extent to which application of the first factor supports a stay is undercut by the fact that no criminal indictments have yet been issued.  "Absent indictment, the scope and nature of the criminal investigation is unknown," leaving this Court unable to "determine the extent to which an indefinite criminal case" will eventually "overlap[] with a pending civil action."  *JHW Greentree Capital, L.P. v. Whittier Trust Co.*, No. 5 Civ. 2985, 2005 WL 1705244, at *1 (S.D.N.Y. July 22, 2005).  *If* there is a criminal prosecution in Israel, to be sure, its subject matter will likely align with that of this action.  But because the lack of an indictment makes it impossible to confirm that likelihood at present, the first factor tilts less heavily in BComm's favor than it otherwise might.

 The second factor—"the status of the [criminal] case, including whether the defendants have been indicted"—is clearly in Plaintiffs' favor.  *Louis Vuitton*, 676 F.3d at 99.  Almost a year has passed since the ISA recommended criminal indictments in connection with the Bezeq-Eurocom transaction (Compl. ¶ 124), and yet nothing indicates that indictments are forthcoming.

"Courts in this district have generally refused to stay a civil proceeding where the defendant has not been indicted but is under criminal investigation." *In re Worldcom, Inc. Sec. Litig.*, No. 2 Civ. 3288, 2002 WL 31729501, at *4 (S.D.N.Y. Dec. 5, 2002). This is because, "[p]re-indictment, . . . it is inherently unclear to the Court just how much the unindicted [civil] defendant really has to fear," whereas "the delay imposed on the plaintiff is potentially indefinite." *Sterling Nat'l Bank v. A-Q Hotels Int'l, Inc.*, 175 F. Supp. 2d 573, 577 (S.D.N.Y. 2001).

BComm contends that this case involves the sort of "unique considerations" that have prompted courts to grant pre-indictment stays in the past. *Citibank, N.A. v. Super Sayin' Pub., LLC*, 86 F. Supp. 3d 244, 248 (S.D.N.Y. 2015). Specifically, it argues that "indictments against some of the Individual Defendants are imminent" and that "the AGI and ISA supported similar stays in the Israeli civil litigations to preserve the integrity of their criminal investigations." (Dkt. No. 36 at 28.) But BComm points to no authoritative support for its claim that indictments are imminent, and regardless of the position the Israeli authorities have taken in other cases, they have made no representations to *this* Court in connection with *these* proceedings. Until an indictment is actually issued, or this Court has reason to believe one is on the way, the second factor militates against the "'extraordinary remedy' of staying a civil case until the conclusion of a related criminal proceeding." *Citibank*, 86 F. Supp. 3d at 246 (quoting *Louis Vuitton*, 676 F.3d at 98).

The third factor requires weighing "the private interests of the plaintiffs in proceeding expeditiously . . . against the prejudice to plaintiffs caused by the delay." *Louis Vuitton*, 676 F.3d at 99. BComm itself acknowledges that a stay would subject Plaintiffs to "uncertainty as to the length of time the criminal action may take since indictments have not yet been issued" (Dkt.

No. 36 at 34), despite their "clear interest in commencing discovery in order to pursue an expeditious resolution of their claims," *Citibank*, 86 F. Supp. 3d at 248. And nowhere does BComm dispute that "[d]elaying the civil case[] indefinitely runs the risk that [defendants] . . . may not ultimately have sufficient assets to satisfy a judgment should [P]laintiffs succeed." *Id.* This factor too, then, weighs against a stay.

The fourth factor is "the private interests of and burden on the defendants." *Louis Vuitton*, 676 F.3d at 99. BComm expresses concern that Israeli law might prevent witnesses who are under investigation from providing testimony and that those witnesses might in any event choose to invoke the privilege against self-incrimination rather than testify. (Dkt. No. 36 at 29–31.) This concern, though, is premature. As a corporation, BComm itself has no constitutional right against self-incrimination. *See Ironbridge Corp. v. Comm'r*, 528 F. App'x 43, 46 (2d Cir. 2013) (summary order). So BComm's claim of prejudice instead rests on its fear that the inability of *other* witnesses to testify will hamper its ability to prove its case. But at this juncture, before discovery has even begun, it is speculative to think that BComm will be deprived of critical evidence if this litigation proceeds. Thus, although this factor may well ultimately weigh in BComm's favor, the extent to which it does is as yet unclear. *Cf. Sterling Nat'l Bank*, 175 F. Supp. 2d at 578 ("[S]ince depositions have not yet taken place, there is no way of measuring with any precision what questions [witnesses] may refuse to answer, or what damage may be done to [defendant's] position in the civil case by any assertions of privilege they might choose to make.").

Fifth, the Court considers "its own well-recognized interest in disposing 'of the causes on its docket with economy of time and effort.'" *Louis Vuitton*, 676 F.3d at 104 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). BComm argues that judicial economy favors a stay

because, for example, "evidence gathered and presented during the criminal prosecution can be used in the civil action." *SEC v. Shkreli*, No. 15 Civ. 7175, 2016 WL 1122029, at *6 (E.D.N.Y. Mar. 22, 2016). Moreover, it argues, this Court has an interest in deferring out of comity to the interests of foreign governments. (Dkt. No. 36 at 31–33.) Again, though, the Israeli authorities have not chosen to take any role in this litigation, and the judicial economies that BComm anticipates will materialize only if there ever is indeed a criminal prosecution. At present, the Court has no interest in imposing certain delay in the hopes of securing uncertain efficiencies down the road.

Sixth and finally, granting a stay here would not serve the public interest. After all, "parties who claim to have been victimized by frauds or other crimes are entitled to pursue their civil remedies, and it would be perverse if plaintiffs who claim to be the victims of criminal activity were to receive slower justice than other plaintiffs because the behavior they allege is sufficiently egregious to have attracted the attention of the criminal authorities." *Sterling Nat'l Bank*, 175 F. Supp. 2d at 575. Absent a more compelling showing that expeditious resolution of the civil claims against BComm will impede Israel's enforcement of its criminal laws, BComm has failed to demonstrate that the public interest favors a stay.

In sum, BComm asks this Court to delay this entire litigation on the off chance that, at some future time, certain witnesses whose testimony might prove favorable might be unable to offer that testimony because they might face a criminal prosecution of unspecified scope. BComm cannot rely on such a speculative prospect to carry its burden of showing that the "extraordinary remedy" of a stay is warranted at this time. *Louis Vuitton*, 676 F.3d at 98. Of course, future developments might alter the Court's decisional calculus, so BComm retains the right to renew its request for a stay in the event of a material change in circumstances.

**IV.     Conclusion**

For the foregoing reasons, BComm's motion to dismiss is GRANTED IN PART AND

DENIED IN PART, and BComm's motion to stay is DENIED.

The Clerk of Court is directed to close the motion at Docket Number 33.

SO ORDERED.

Dated:  September 27, 2018
        New York, New York

_____
                J. PAUL OETKEN
             United States District Judge