UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REX AND ROBERTA LING LIVING TRUST u/a DECEMBER 6, 1990, AS AMENDED, et al., *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> -v- <br><br> B COMMUNICATIONS LTD., et al., <br><br> Defendants. | 17-CV-4937 (JPO) <br><br> OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

In this putative class action arising under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.*, investors who suffered losses after a drop in the value of their shares in Israeli company B Communications Ltd. ("BComm") seek relief from fourteen corporate and individual defendants. Ten of those defendants now move to dismiss the claims against them. (Dkt. Nos. 59, 67, 71.) For the reasons that follow, the motions are granted.

I.      **Background**

The allegations in this case center on a self-enrichment scheme allegedly orchestrated by Defendant Shaul Elovitch and executed with the help of officers at Bezeq The Israeli Telecommunication Corporation ("Bezeq"), Israel's largest telecommunications operator. (Dkt. No. 17 ("Compl.") ¶ 16.) The Court first explains the particulars of the alleged scheme before describing the allegedly false investor-facing statements that form the basis of the present action. The Court concludes with a brief discussion of how this litigation has thus far progressed.

For purposes of the present motions, the Court assumes the truth of all factual allegations in the operative Amended Class Action Complaint. Familiarity with the Court's prior opinion in

this case is presumed.  *See Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.* ("*BComm I*"), 346 F. Supp. 3d 389 (S.D.N.Y. 2018).

### A.      The Underlying Scheme

In 2015, Bezeq, which at that time owned almost half the shares of satellite-television provider D.B.S. Satellite Services (1998) Ltd. ("Yes"), sought to purchase the remainder of Yes's shares from Israeli private-holding group Eurocom Communications Ltd. ("Eurocom") as a first step toward an anticipated merger with Yes.  (Compl. ¶¶ 39, 72.)  But the proposed sale carried the risk of self-dealing.  Both Eurocom and BComm, a holding company that is alleged to control Bezeq, were at all relevant times fully or almost fully controlled by Elovitch and his family.  (Compl. ¶¶ 2, 16, 19, 32.)  Accordingly, to reassure Bezeq's minority shareholders that the Yes transaction would be carried out with Bezeq's—rather than Elovitch's—best interests in mind, Bezeq's board of directors formed a purportedly independent subcommittee to evaluate the deal.  (Compl. ¶ 72.)  On February 10, 2015, this subcommittee recommended approving the deal, and Bezeq's shareholders did so the following month.  (Compl. ¶¶ 72, 82.)

The complaint, however, alleges that the subcommittee that recommended the deal was in fact anything but independent.  Rather, the subcommittee's work was allegedly compromised by "ongoing and systematic leaks of confidential, material, and sensitive details and documents." (Compl. ¶ 42.)  And two subcommittee members in particular—Bezeq's Chief Executive Officer ("CEO"), Defendant Stella Handler, and the secretary of Bezeq's board of directors, Defendant Linor Yochelman—are alleged to have leaked information from the subcommittee to Elovitch and his family and to have acted at the behest of Elovitch and others at Eurocom to steer the subcommittee's activities.  (Compl. ¶¶ 22, 29, 42.)

As a result, the complaint goes on, Elovitch's fingerprints can be seen on the deal that ultimately materialized.  In addition to a sum of 680 million Israeli new shekels ("NIS") paid at

the close of the deal, Bezeq agreed to pay Eurocom up to another NIS 170 million in "Additional Contingent Consideration" thereafter, depending on how successfully Yes performed.[1] (Compl. ¶¶ 39–40.) The deal provided that Eurocom's eligibility for this additional consideration would be based on Yes's free cash flow—that is, its net cash derived from operating activities minus (or plus) net cash spent on (or derived from) investment activities—with Eurocom eligible for the full NIS 170 million if Yes's free cash flow from 2015–2017 hit a cumulative total of NIS 1.058 billion. (Compl. ¶ 40.) In the interim, Bezeq agreed to make annual advance payments up to a total of around NIS 114 million, plus interest, if in 2015 and 2016 Yes appeared to be on track toward meeting the figure that would entitle Eurocom to the full NIS 170 million. (Compl. ¶ 41.)

The opportunity for Eurocom to collect these advances, the complaint maintains, allowed Elovitch to enrich himself at Bezeq's expense. According to the complaint, Eurocom conspired with officers at Yes throughout 2015 and 2016 to artificially inflate Yes's free cash flow figures so that they exceeded the annual benchmark values that entitled Eurocom to receive advances from Bezeq. (Compl. ¶ 43.) For example, Yes's CEO, Defendant Ron Eilon, allegedly froze or delayed Yes's payments to suppliers at Eurocom's behest in an effort to inflate Yes's cash holdings. (*Id.*) As a result of these supposedly illicit efforts, Bezeq ultimately ended up paying out the maximum NIS 114 million in advances on the basis of Yes's reported 2015 and 2016 performance even though, the complaint maintains, Eurocom would have received at most half this amount had Yes not manipulated its free cash flow figures. (Compl. ¶¶ 50–51.)

But the good times did not last. In 2017, Yes came clean about its actual free cash flow, leaving Bezeq with knowledge that it had overpaid and with uncertainty as to whether it would

---

[1] At all relevant times, one Israeli new shekel was equivalent to roughly $0.25–0.30.

be able to recover the advances it had already paid out.  (Compl. ¶¶ 46, 52.)  And the bad news did not end there.  In June 2017, the Israeli press reported that the Israel Securities Authority ("ISA") was investigating the Bezeq-Eurocom deal for possible violations of Israel's securities laws.  (Compl. ¶ 105.)  In connection with the investigation, the ISA has recommended the criminal indictment of, among others, Elovitch and his son; Yes's CEO, Defendant Eilon; Yes's Chief Financial Officer ("CFO"), Defendant Micky Neumann[2]; and Bezeq's CEO, Defendant Handler.  (Compl. ¶ 130.)  These developments have caused Bezeq's share prices to drop and have called the future of Bezeq's hoped-for merger with Yes into question.  (Compl. ¶ 117.)

### B.     The Allegedly False or Misleading Statements

As a result of the damage done to the value of Bezeq's stock, BComm—Bezeq's holding company—took a hit as well.  From June 19, 2017, to September 7, 2017, the price of BComm's shares, which trade on both Israeli and American exchanges, fell from $21.50 to $14.49.[3] (Compl. ¶¶ 8, 16.)  But according to the complaint, what was news to the markets was not news to BComm.  To the contrary, the complaint alleges, BComm, aware of the problems associated with the Bezeq-Eurocom deal, issued a series of false or misleading statements between 2015 and 2017 in the hopes of hiding these problems—and their likely consequences—from would-be investors.  (Compl. ¶¶ 166–67.)  These statements fall broadly into four categories.

First, the complaint identifies seven filings that BComm submitted to the U.S. Securities and Exchange Commission ("SEC") between June 5, 2015, and April 20, 2017, and that contain alleged misrepresentations about BComm's financial health during all or part of 2015 and 2016.

---

[2] The complaint refers to Defendant Neumann as Micky "Neiman," but this opinion uses Neumann's preferred spelling.  (*See* Dkt. No. 74 at 1 & n.1.)

[3] The complaint mistakenly refers to BComm's ordinary shares as American Depository Receipts.  (Compl. ¶ 1; Dkt. No. 50 at 14 n.22.)  For present purposes, the error is irrelevant.

(Compl. ¶¶ 58–71.)  In particular, these filings—each of which was signed or approved either by Defendant Doron Turgeman, BComm's CEO at the time, or by Defendant Itzik Tadmor, BComm's CFO at the time—contained figures purporting to represent BComm's free cash flow. (*Id.*)  But these figures, the complaint alleges, were false because they incorporated Bezeq's free cash flow figures, which in turn incorporated Yes's free cash flow figures, which in turn were alleged to have been fraudulently inflated during 2015 and 2016.  (Compl. ¶ 54.)

Second, the complaint identifies five SEC filings that BComm submitted between March 18, 2015, and April 19, 2016, and that contain purportedly false statements about the subcommittee of Bezeq directors that recommended approval of the Bezeq-Eurocom deal. (Compl. ¶¶ 72–77, 82–83, 88–89.)  These filings—each of which was signed by Defendants Turgeman or Tadmor, or by Defendant Ehud Yahalom, who served as BComm's CFO until May 3, 2015—either made statements about the subcommittee or incorporated statements that Bezeq had made about the subcommittee and that had been signed or approved by Defendants Handler or Yochelman.  (*Id.*; *see also* Dkt. No. 63 ¶ 4.)  According to the complaint, these statements falsely attested to the independence of the subcommittee—a subcommittee that was in fact being improperly influenced by Eurocom and Elovitch.  (Compl. ¶ 54.)

Third, the complaint identifies three SEC filings signed by Defendants Turgeman, Tadmor, and Yahalom that BComm submitted between April 27, 2015, and April 26, 2017, and that incorporated BComm's Code of Business Conduct and Ethics ("Code of Ethics").  (Compl. ¶¶ 76, 78–79, 88, 90–91, 99–100.)  The complaint maintains, though, that BComm's representations that it complied with its Code of Ethics—which touted BComm employees' legal compliance, "high standards of business and personal ethics," and "honesty and integrity"

(Compl. ¶ 37)—were false in light of Elovitch's alleged misconduct around the Bezeq-Eurocom deal (Compl. ¶ 54).

And fourth, the complaint identifies four SEC filings that BComm submitted between April 5, 2016, and April 26, 2017, and that attached certifications—some of which were signed by Defendant Handler and by either Defendant David Mizrahi or Defendant Allon Raveh, both of whom acted as Bezeq's CFO for portions of the relevant period—attesting that BComm's and Bezeq's internal disclosure controls were sufficient to ensure that information about the companies was being adequately compiled and disclosed to management for inclusion in public-facing reports. (Compl. ¶¶ 84–85, 92, 96, 101.) But because BComm and Bezeq's internal controls did not result in disclosure of Elovitch's fraudulent activities or of inaccuracies in the companies' reported free cash flows, the complaint alleges, any certification that those controls were adequate was false or misleading.[4] (Compl. ¶ 54.)

### C.    The Present Litigation

BComm investor Lynne P. Maleeff initiated the instant putative class action on June 29, 2017. (Dkt. No. 1.) Soon thereafter, three other BComm investors—Rex and Roberta Ling Living Trust u/a December 6, 1990, as Amended; John Taylor Jones; and David Thomas Jones—were appointed lead plaintiffs. (Dkt. No. 11.) On December 8, 2017, lead plaintiffs filed a two-count amended complaint on behalf of themselves and a class of certain investors ("Plaintiffs") who acquired BComm shares between March 18, 2015, and September 6, 2017. (Compl. ¶ 1.)

---

[4] In this Court's prior opinion, the Court concluded that the complaint plausibly alleges that the statements about BComm's free cash flow and one of the statements about the Bezeq subcommittee were false or misleading, but that none of the other identified statements are plausibly alleged to have been similarly misleading. *See BComm I*, 346 F. Supp. 3d at 402–05.

The amended complaint names a total of fourteen defendants: Eurocom, along with Shaul Elovitch and his son; BComm, along with its CEO Doron Turgeman and CFOs Itzik Tadmor and Ehud Yahalom; Bezeq's CEO Stella Handler, CFOs David Mizrahi and Allon Raveh, and board-of-directors secretary Linor Yochelman; and Yes, along with its CEO Ron Eilon and CFO Micky Neumann. (Compl. ¶¶ 16–29.) Count One charges all defendants except Yes, Eurocom, and Elovitch's son with violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, a related SEC regulation, by engaging in a fraudulent scheme aimed at inducing investors to buy BComm shares at artificially inflated prices and by making false or misleading statements or omissions to further that scheme. (Compl. ¶¶ 164–77.) Count Two alleges that every defendant other than BComm violated Sections 20(a) and (b) of the Exchange Act, 15 U.S.C. §§ 78t(a)–(b), by exercising control over an entity, *i.e.*, BComm, that violated Section 10(b) and Rule 10b-5. (Compl. ¶¶ 178–85.)

On February 20, 2018, BComm moved to dismiss the claims against it. (Dkt. No. 33.) And on July 12, 2018, three additional motions to dismiss were filed by (1) Tadmor, Turgeman, and Yahalom (the "BComm Defendants") (Dkt. No. 59); (2) Handler, Mizrahi, Raveh, and Yochelman (the "Bezeq Defendants") (Dkt. No. 71); and (3) Yes, Eilon, and Neumann (the "Yes Defendants") (Dkt. No. 67) (all together, the "Moving Defendants"). In a September 27, 2018 opinion and order, the Court granted BComm's motion in part and denied it in part.[5] *See BComm I*, 346 F. Supp. 3d at 412–13. That opinion, though, reserved decision on the remaining

---

[5] The Court also rejected BComm's alternative request that this action be stayed pending resolution of criminal proceedings currently ongoing in Israel. *See BComm I*, 346 F. Supp. 3d at 410–12. To the extent that the Moving Defendants likewise seek a stay (*see* Dkt. No. 64 at 23–24; Dkt. No. 72 at 24; Dkt. No. 74 at 24–25), the Court is not aware of any material developments that have transpired since it denied BComm's request. The Court therefore declines to revisit its prior determination that a stay is unwarranted.

motions to dismiss, which had not yet been fully briefed. *Id.* at 399 n.4. Briefing on those motions is now complete, and the Court is prepared to address their merits.

## II. Legal Standard

The Moving Defendants seek dismissal on two grounds. First, they argue that this Court lacks personal jurisdiction over them and so should dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2). Second, they argue that the complaint fails to state a viable legal claim against them and so should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. Rule 12(b)(2)

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (per curiam). Where a court has held no evidentiary hearing on the jurisdictional question, "the plaintiff need only make a prima facie showing" on the basis of the pleadings and any affidavits in the record "that the court possesses personal jurisdiction over the defendant." *Id.* In assessing whether a plaintiff has carried this burden, a court must "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in [his or her] favor." *Dorchester Fin. Sec., Inc. v. Banco BJR, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (per curiam) (quoting *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010)).

### B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter" that will, if taken to be true, "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Of course, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* Rather, the complaint must contain specific factual allegations that, if true, "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.

Where, as here, a complaint alleges securities fraud, it must clear two further hurdles. First, to comply with Federal Rule of Civil Procedure 9(b)'s requirement that a complaint alleging fraud describe the fraud "with particularity," Fed. R. Civ. P. 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Second, allegations of securities fraud must satisfy the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737. Under the PSLRA, as under Rule 9(b), "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and, "with respect to each act or omission alleged," must moreover "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.* § 78u-4(b)(2)(A). Such an inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III. Discussion

The Court begins with the Moving Defendants' jurisdictional arguments and then, to the extent necessary, addresses their merits-based arguments.

### A. Personal Jurisdiction

The Moving Defendants first argue that this Court lacks personal jurisdiction over them in connection with this suit. (Dkt. No. 64 at 6–11; Dkt. No. 72 at 10; Dkt. No. 74 at 8–12.)

For a court to take jurisdiction over a non-consenting defendant, two conditions must be satisfied. First, the court "must have a statutory basis" for the exercise of jurisdiction. *Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*, 582 F.3d 393, 396 (2d Cir. 2009). Second, the court's statutorily authorized exercise of jurisdiction must comport with constitutional due process principles. *See id.* The Moving Defendants agree that Section 27 of the Exchange Act, 15 U.S.C. § 78aa, which "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment," *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 799 (S.D.N.Y. 2018) (quoting *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990)), provides a statutory basis for jurisdiction here (Dkt. No. 64 at 7; Dkt. No. 72 at 10; Dkt. No. 74 at 9). But the Moving Defendants argue that this Court's exercise of personal jurisdiction over them in this lawsuit would violate due process.

To assess whether an exercise of jurisdiction over the Moving Defendants would comport with due process, the Court must conduct "an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 453 (S.D.N.Y. 2005) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). The "minimum contacts" analysis "looks to 'whether the defendant has certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* (alteration and omission in original) (quoting *Bank Brussels*, 305 F.3d at 127). And the "reasonableness" inquiry, in turn, asks "'whether it is reasonable under the circumstances of the particular case' to assert personal jurisdiction." *Id.* (quoting *Bank Brussels*, 305 F.3d at 129).

The Court separately addresses each component of the due process analysis.

### 1.   Minimum Contacts

Because Plaintiffs' invocation of this Court's jurisdiction "is premised on a federal statute" that authorizes nationwide service of process, "the forum applicable for contacts analysis is the United States rather than the forum state." *SEC v. Alexander*, No. 00 Civ. 7290, 2003 WL 21196852, at *2 (S.D.N.Y. May 20, 2003) (quoting *SEC v. Gonzalez de Castilla*, No. 01 Civ. 3999, 2001 WL 940560, at *3 n.2 (S.D.N.Y. Aug. 20, 2001)); *see also SEC v. Sharef*, 924 F. Supp. 2d 539, 544 (S.D.N.Y. 2013).  Accordingly, this Court must ask whether the Moving Defendants have "purposefully avail[ed]" themselves of "the privilege of conducting activities within the [United States], thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (first alteration in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Plaintiffs have not alleged that any of the Moving Defendants are domiciled in the United States.  (Compl. ¶¶ 18, 21–29; *see also* Dkt. No. 61 ¶ 2; Dkt. No. 62 ¶ 2; Dkt. No. 63 ¶ 2; Dkt. No. 68 ¶ 2; Dkt. No. 69 ¶¶ 2, 5.)  Nor do Plaintiffs argue that any of the Moving Defendants otherwise have "affiliations with the [United States] [that] are so 'continuous and systematic' as to render them essentially at home" in this country.  *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The record thus contains no basis for concluding that this Court has "*general* jurisdiction . . . to hear any and all claims against" the Moving Defendants.  *Id.* (emphasis added) (quoting *Goodyear*, 564 U.S. at 919).  Instead, Plaintiffs rely on the principle of *specific* jurisdiction, which allows the courts of a given forum to take jurisdiction over an out-of-forum defendant in connection with only those claims that "aris[e] out of or relate[] to the defendant's contacts with the forum."  *Id.* (quoting *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).

Here, Plaintiffs' claims indisputably "aris[e] out of or relate[] to," *id.*, domestic sales of BComm securities, as well as the allegedly fraudulent filings BComm has submitted to United States regulators in connection with those sales. (*See* Compl. ¶¶ 13–16, 58–104.) The critical question, then, is whether those activities reflect the Moving Defendants' "purposeful[] avail[ment]" of "the privilege of conducting activities within the [United States]." *Best Van Lines*, 490 F.3d at 242 (quoting *Burger King*, 471 U.S. at 475).

As for the BComm Defendants, the answer is "yes." Courts in this District have regularly held allegations that a defendant signed off on materially misleading SEC filings to be sufficient at the pleading stage to establish minimum contacts. *See, e.g.*, *Das*, 332 F. Supp. 3d at 801 (exercising personal jurisdiction over the CEO of a foreign company on the basis of his signing annual SEC filings in connection with the domestic sale of the company's shares); *In re VEON Ltd. Sec. Litig.*, No. 15 Civ. 8672, 2018 WL 4168958, at *6 (S.D.N.Y. Aug. 30, 2018) (concluding that plaintiffs had made out a *prima facie* showing of minimum contacts where they alleged that "each Individual Defendant signed specific SEC filings that contained allegedly misleading information"); *In re Alstom SA*, 406 F. Supp. 2d 346, 399 (S.D.N.Y. 2005) ("The signing of documents filed with the SEC which form the basis for Plaintiffs' claims is sufficient contact with the jurisdiction to justify this Court's exercise of jurisdiction over [the signatory]."). Here, the BComm Defendants are each alleged to have signed or approved allegedly misleading SEC filings on behalf of BComm. (*See, e.g.*, Compl. ¶¶ 58, 76.) These actions are sufficient to establish a *prima facie* case that these defendants have minimum contacts with the United States for purposes of the instant suit.

The BComm Defendants see things differently. They point out that the mere fact that a defendant is an officer of a foreign company accused of domestic wrongdoing is insufficient, in

and of itself, to establish personal jurisdiction over that officer. (Dkt. No. 64 at 8–9.) This argument, though, is beside the point. While a foreign corporate officer might not be subject to suit in the United States absent "specific allegation[s]" that she "issued any statements . . . that constitute the [domestic] misconduct alleged," *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 542 (S.D.N.Y. 2007), Plaintiffs have made precisely such allegations here. And while the BComm Defendants argue that jurisdiction is proper only if a foreign corporate officer is plausibly alleged to have "*knowingly* signed a false SEC filing intending to defraud United States shareholders" (Dkt. No. 64 at 9), "this argument conflates proof of minimum contacts with proof of the alleged misconduct arising out of those contacts," *SEC v. Straub*, No. 11 Civ. 9645, 2016 WL 5793398, at *8 (S.D.N.Y. Sept. 30, 2016). For present purposes, Plaintiffs "need only [allege] Defendants' contacts with the United States and that the suit arises out of or relates to those contacts." *Id.* In the case of the BComm Defendants, Plaintiffs have done so.[6]

The Bezeq and Yes Defendants, though, are another story. None of these defendants are alleged to have "played *any* role in making, proposing, editing or approving [BComm's] public filings in the United States." *In re Braksem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017). At most, these defendants are alleged only to have signed allegedly false statements that

---

[6] The Court acknowledges that *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008), suggested in dicta that a foreign defendant's act of signing an allegedly misleading SEC filing might be "insufficient" for the United States to take jurisdiction over that defendant, *id.* at 467. But the *AstraZeneca* court had little occasion to consider the question fully. The complaint in that case vaguely alleged that certain defendants "caused the distribution of false and misleading reports and statements to . . . investors in the U.S." but failed to identify those statements with particularity. *Id.* After rejecting the complaint as improperly pleaded, the court denied plaintiffs leave to add an allegation that the defendants in question had signed a specific, allegedly misleading SEC filing. *Id.* While the *AstraZeneca* court, in denying leave to amend, did take the view that the proposed amended would be "insufficient" to establish personal jurisdiction, it also made clear that "such amendment would be futile" in any event in light of its holding that plaintiffs had failed to state an Exchange Act violation. *Id.*

*BComm* then elected to incorporate into its own SEC filings. (*See, e.g.*, Compl. ¶¶ 72, 74, 84, 96.) Certainly, "signing or directly manipulating financial statements" or other information that ultimately reaches United States investors might be sufficient to confer personal jurisdiction if the issuer has "*knowledge* that [the information] will be relied upon" by such investors. *Sharef*, 924 F. Supp. 2d 539 at 547 (emphasis added). But the complaint here alleges no facts from which the Court can infer that any of the Bezeq or Yes Defendants anticipated or intended that BComm would incorporate their statements into its SEC filings. As this Court has observed,

> The complaint also claims [Eilon, Handler, Mizrahi, Neumann, Raveh,] and others "had ultimate authority" over [BComm's SEC] filings (Compl. ¶ 55), but it fails to plead any "factual content"— such as the process by which BComm's SEC filings were drafted, compiled, or approved—that would give that "mere conclusory statement[]" the sort of substantive heft necessary to establish its plausibility at the motion-to-dismiss stage, *Ashcroft*, 556 U.S. at 678. To be sure, the complaint notes that BComm's SEC filings contained attached exhibits that were signed by . . . Bezeq officers alleged to have known the true nature of the Bezeq-Eurocom deal. (*See, e.g.*, Compl. ¶¶ 42, 72, 74, 82.) But the complaint offers no basis for inferring that any individuals other than [the BComm Defendants] made any decisions as to what information to submit to the SEC *on behalf of BComm*, even if other individuals may have knowingly produced misleading materials *on behalf of Bezeq* and then made those materials available to BComm to do with as it saw fit. *Cf. Maung v. Merrill Lynch & Co.*, No. 99 Civ. 9687, 2000 WL 1159835, at *10 (S.D.N.Y. Aug. 15, 2000) (rejecting plaintiffs' efforts to hold parent corporations "liable for their subsidiary's actions without alleging facts that state a proper legal predicate for that liability").

*BComm I*, 346 F. Supp. 3d at 406 n.10; *see also Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1256 (S.D.N.Y. 1984) (finding the fact that an auditor "might have foreseen that [the audited party] would incorporate [the auditor's statements] in an SEC filing" insufficient to support personal jurisdiction over the auditor).

The Court concludes that Plaintiffs have plausibly alleged that the BComm Defendants, but not the Bezeq and Yes Defendants, have sufficient minimum contacts with the United States

to support this Court's exercise of personal jurisdiction here. All claims against Defendants Eilon, Handler, Mizrahi, Neumann, Raveh, Yes, and Yochelman are therefore dismissed.

## 2. Reasonableness

Despite Plaintiffs' plausible *prima facie* case that the BComm Defendants have the requisite minimum contacts with the United States, due process requires that the exercise of personal jurisdiction over those defendants must nevertheless be "reasonable under the circumstances of the particular case." *In re Parmalat*, 376 F. Supp. 2d at 453 (quoting *Bank Brussels*, 305 F.3d at 129). The BComm Defendants argue that it is not. (Dkt. No. 64 at 10–11.)

Typically, assessing the reasonableness of exercising jurisdiction over a given defendant requires a court to consider:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum . . . in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the . . . judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001) (quoting *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1028 (2d Cir. 1997)). But where, as here, the statutory basis for jurisdiction is "a federal law which provides for nationwide service of process," the question of reasonableness becomes "largely academic" in light of "the strong federal interests involved." *Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13 Civ. 5790, 2015 WL 144165, at *5 (S.D.N.Y. Jan. 12, 2015) (quoting *SEC v. Syndicated Food Servs. Int'l, Inc.*, No. 04 Civ. 1303, 2010 WL 3528406, at *3 (E.D.N.Y. Sept. 3, 2010)).

The BComm Defendants have not carried their burden of showing that "this is the 'rare case' in which [the] inconvenience" of defending against a lawsuit is "so substantial as to achieve constitutional magnitude." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600,

645 (S.D.N.Y. 2017) (second quoting *Burger King*, 471 U.S. at 484). Essentially, they point out

that they are all residents of Israel and that New York itself has no particularized interest in this

lawsuit. But the relevant forum here is the United States writ large, not simply New York, and

the BComm Defendants cannot dispute the United States' "strong federal interests" in enforcing

its securities laws. *Atlantica Holdings*, 2015 WL 144165, at *5 (quoting *Syndicated Food Servs.*,

2010 WL 3528406, at *3). And "[a]lthough it might not be convenient for [the BComm]

Defendants to defend this action in the United States, [the BComm] Defendants have not made a

particular showing that the burden on them would be 'severe' or 'gravely difficult.'" *SEC v.

Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013).

Ultimately, then, the Court concludes that Plaintiffs have made out an adequate *prima

facie* showing that personal jurisdiction over the BComm Defendants is proper.

## B.      Merits

Having satisfied itself of its jurisdiction over the BComm Defendants in connection with

Plaintiffs' claims here, the Court turns to the substance of those claims. The operative complaint

charges the BComm Defendants with (1) violating Section 10(b) of the Exchange Act and

Rule 10b-5 by making fraudulent statements or engaging in a scheme to defraud (Compl.

¶¶ 164–77), and (2) violating Sections 20(a) and 20(b) of the Exchange Act by exercising control

over a primary violator, *i.e.*, BComm (Compl. ¶¶ 178–85). The BComm Defendants argue that

both counts should be dismissed for failure to state a claim. (Dkt. No. 64 at 13–23.)

### 1.      Section 10(b) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must typically allege

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance

upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge*

*Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). The BComm

Defendants argue that the complaint fails to adequately allege that they made any material

misrepresentations or omissions (Dkt. No. 64 at 19–20), that they acted with scienter, the

requisite mental state (Dkt. No. 64 at 13–18), or that their alleged statements or omissions caused

Plaintiffs' economic loss (Dkt. No. 64 at 20–21). The Court agrees on the scienter point and so

need not address the others.

As noted, the PSLRA requires that a securities fraud complaint allege facts that create a

strong inference that the defendant acted with scienter, *see Novak v. Kasaks*, 216 F.3d 300, 305–

06 (2d. Cir. 2000), "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs*,

551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). A

plaintiff may satisfy this requirement by pleading facts that show "either: 1) a 'motive and

opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious misbehavior

or recklessness.'" *Emps.' Ret. Sys. of the Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d

Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99). And recklessness in this context refers to

"an extreme departure from the standards of ordinary care to the extent that the danger was either

known to the defendant or so obvious that the defendant must have been aware of it," *S. Cherry*

*St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *In re Carter-Wallace,*

*Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)) (italics omitted), or to "evidence that the

'defendants failed to review or check information that they had a duty to monitor, or ignored

obvious signs of fraud,' and hence 'should have known that they were misrepresenting material

facts,'" *id.* (quoting *Novak*, 216 F.3d at 308) (italics omitted).

As for motive and opportunity, the Court must ask whether the complaint "point[s] to

'the concrete benefits that could be realized' from one or more of the allegedly misleading

statements." *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).

Critically, though, "it is not sufficient to allege goals that are 'possessed by virtually all corporate

insiders,' such as . . . the desire to maintain a high stock price." *Id.* (quoting *Novak*, 216 F.3d at

307). And in this case, the complaint is devoid of any allegations that Tadmor, Turgeman, or

Yahalom had any personal incentive to commit the alleged fraud.

As for allegations of conscious misbehavior or recklessness, the Court has already

concluded that the complaint comes up short. As the Court's prior opinion explained, the

complaint

> contains no specific factual allegations that create an inference, let
> alone a strong one, that Turgeman, Tadmor, or Yahalom knew the
> true nature of the Bezeq-Eurocom deal. None of these three
> BComm officers is alleged to have participated in compromising the
> supposedly independent Bezeq board-of-directors subcommittee
> (Compl. ¶ 42) or in manipulating Yes's free cash flow figures
> (Compl. ¶ 43), nor is the ISA's investigation alleged to have
> implicated any of them in misconduct (Compl. ¶¶ 124–30, 140–46).
> Similarly, none of these officers is alleged to have been privy to the
> "red flags" the complaint maintains were raised "during the
> deliberations over the Bezeq-Yes merger." (Compl. ¶ 152.)
>
> Instead, the complaint merely alleges that BComm's officers must
> have "kn[own] about or recklessly disregarded" the fact that
> something was amiss with the Bezeq-Eurocom deal because the
> transaction "was at the forefront of [BComm's] attention" and
> because "[m]onitoring of Yes' Free Cash Flow . . . fell squarely
> within the[ir] responsibility." (Compl. ¶ 151.) To the extent that
> these allegations seek to imply that Turgeman, Tadmor, or Yahalom
> had actual knowledge of the true nature of the Bezeq-Eurocom
> transaction, they are insufficiently specific to render that inference
> more compelling than the "opposing inference[s]" that the BComm
> officers were merely careless or that Elovitch took deliberate steps
> to hide his self-enrichment scheme from these officers. *Tellabs*, 551
> U.S. at 314. And to the extent that these allegations seek only to
> imply that Turgeman, Tadmor, or Yahalom acted with reckless
> disregard for the true nature of the Bezeq-Eurocom transaction, they
> are likewise insufficient because they fail to offer any specific
> factual support for the notion that the officers had a "duty to
> monitor" the accuracy of Bezeq's self-reported free cash flow
> figures or that the officers overlooked any "obvious signs of fraud."

> *S. Cherry St.*, 573 F.3d at 109 (quoting *Novak*, 216 F.3d at 308)
> (italics omitted); *cf. Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268–71
> (2d Cir. 1996) (rejecting claim that parent corporation acted
> recklessly in failing to investigate the unusually high profits of its
> subsidiary).

*BComm I*, 346 F. Supp. 3d at 407 (alterations in original). The Court has no reason to depart from its prior assessment.

Plaintiffs' Count One claims against the BComm Defendants are therefore dismissed for failure to adequately allege scienter.

### 2.      Sections 20(a) and 20(b)

To establish control-person liability under Section 20(a), a plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108. The Court has already concluded that Plaintiffs have adequately alleged that BComm committed a primary violation, *see BComm I*, 346 F. Supp. 3d at 410, and the BComm Defendants never dispute that they exercised control over BComm in their CEO and CFO roles. But the BComm Defendants argue that the complaint fails to allege their culpable participation in the alleged fraud. (Dkt. No. 64 at 22–23.)

The Second Circuit has suggested that a plaintiff must plead a defendant's culpability as an element of a Section 20(a) claim, *see ATSI Commc'ns*, 493 F.3d at 108, but some courts in this Circuit have instead held that it falls to a Section 20(a) defendant to assert good faith as an affirmative defense, *see In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 597–98 (S.D.N.Y. 2010) (citing cases). The Court, though, need not address this issue. Plaintiffs, after all, accept that they "must *allege*" that the BComm Defendants were, "in some meaningful sense, . . . culpable participant[s] in the [BComm's] primary violation." (Dkt. No. 76 at 53 (emphasis added).) And, just as the Court has concluded that Plaintiffs have failed to allege scienter for

purposes of Section 10(b) and Rule 10b-5, the Court likewise concludes that Plaintiffs have not sufficiently alleged culpability for purposes of Section 20(a). *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 254 (S.D.N.Y. 2018) ("[T]o plead 'culpable participation' for purposes of a Section 20(a) claim, a plaintiff must plead facts demonstrating 'that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct.'" (quoting *Special Situations Fund III Q, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014))).

This leaves Plaintiffs' Section 20(b) claim. The parties dispute whether a private right of action exists under Section 20(b) (Dkt. No. 64 at 23 n.13; Dkt. No. 76 at 53–56), which forbids "any person, directly or indirectly, [from] do[ing] . . . through or by means of any other person" anything that the Exchange Act and its accompanying regulations would forbid the person from doing him or herself, 15 U.S.C. § 78t(b). Here too, though, the Court need not weigh in. Regardless of whether or not Section 20(b) creates a private right of action, Plaintiffs never suggest that it can give rise to liability absent the culpability required of a Section 20(a) claim. Therefore, for the same reasons the Court concludes that Plaintiffs have failed to state a claim under Section 20(a), the Court concludes that Plaintiffs have failed to state a claim under Section 20(b), even assuming that such a claim might otherwise be cognizable.

Plaintiffs' Count Two claims against the BComm Defendants are therefore dismissed.

## IV. Conclusion

For the foregoing reasons, the BComm, Bezeq, and Yes Defendants' motions to dismiss are GRANTED.

The Clerk of Court is directed to close the motions at Docket Numbers 59, 67, and 71 and to terminate Doron Turgeman, Itzik Tadmor, Ehud Yahalom, D.B.S. Satellite Services (1998)

Ltd., Ron Eilon, Stella Handler, David Mizrahi, Micky Neumann (or "Neiman"), Allon Raveh, and Linor Yochelman as defendants in this case.

      SO ORDERED.

Dated: March 28, 2019
       New York, New York

                                           J. PAUL OETKEN
                                 United States District Judge