## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REX AND ROBERTA LING LIVING TRUST u/a DECEMBER 6, 1990, as AMENDED, JOHN TAYLOR JONES, and DAVID THOMAS JONES, Individually and on Behalf of All Others Similarly Situated, | No. 1:17-cv-04937 (JPO) |
| Plaintiffs, | |
| -against- | |
| B COMMUNICATIONS LTD., EUROCOM COMMUNICATIONS LTD., D.B.S. SATELLITE SERVICES (1998) LTD., SHAUL ELOVITCH, OR ELOVITCH, RON EILON, STELLA HANDLER, DAVID MIZRAHI, MICKY NEIMAN, ALLON RAVEH, ITZIK TADMOR, DORON TURGEMAN, EHUD YAHALOM, and LINOR YOCHELMAN, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## <u>MOTION FOR CLASS CERTIFICATION</u>

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      PRELIMINARY STATEMENT .............................................................................. 1

II.     STATEMENT OF FACTS ....................................................................................... 2

III.    PROCEDURAL HISTORY ...................................................................................... 5

IV.     ARGUMENT ........................................................................................................... 6

        A.      THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF
                CIVIL PROCEDURE 23 ............................................................................. 6

                1.      The Rule 23(a) Requirements are Satisfied ................................. 7

                        a)      The Proposed Class Is So Numerous That Joinder of All Members
                                Is Impracticable ................................................................... 7

                        b)      Questions of Law or Fact Are Common to the Class ............ 8

                        c)      Plaintiffs' Claims Are Typical of the Class ........................ 9

                        d)      Plaintiffs Will Fairly and Adequately Protect  the Interests of the
                                Class .................................................................................. 10

        B.      The Requirements of Rule 23(b)(3) Are Satisfied ............................... 11

                1.      Common Questions of Law and Fact Predominate .................... 11

                        a)      The Basic Reliance Presumption Applies ........................... 12

                2.      A Class Action Is Superior to Other Available Methods for the Fair and
                        Efficient Adjudication of the Controversy ................................ 17

                3.      Rule 23(g) Is Satisfied .............................................................. 19

V.      CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Products, Inc., v. Windsor*,
117 S. Ct. 2231 (1997)................................................................................6, 10, 11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013)...........................................................................................7

*Angley v. UTi Worldwide, Inc.*,
311 F. Supp. 3d 1117 (C.D. Cal. 2018) ...............................................................17

*Aranaz v. Catalyst Pharm. Partners Inc.*,
302 F.R.D. 657 (S.D. Fl. 2014)............................................................................17

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)...................................................................................10

*Basic Inc v. Levinson*,
485 U.S. 224 (1988)..................................................................................... *passim*

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) .................................................................................9

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco*
*Managed Care, L.L.C.*,
504 F.3d 229 (2d Cir. 2007)...................................................................................7

*Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*, No. CV 07-2536 PSG,
2009 U.S. Dist. LEXIS 71653 (C.D. Cal. Aug. 12, 2009)....................................10

*Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)...................................................................................18

*Darquea v. Jarden Corp.*, No. 06 Civ 722 (CLB),
2008 U.S. Dist. LEXIS 17747 (S.D.N.Y. Mar. 6, 2008) .......................................7

*Dietrich v. Bauer*,
192 F.R.D. 119 (S.D.N.Y. 2000) ...........................................................................8

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
89 F.R.D. 87 (S.D.N.Y. 1981) .............................................................................12

*Epifano v. Boardroom Business Products, Inc.*,
130 F.R.D. 295 (S.D.N.Y. 1990) ...........................................................................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011) ...................................................................................................7, 12

*Gen. Tel. Co. of Southwest v. Falcon*,
  102 S. Ct. 2364 (1982) .........................................................................................................9

*Haddock v. Nationwide Fin. Services, Inc.*,
  262 F.R.D. 97 (D. Conn. 2009).............................................................................................9

*Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II)*,
  134 S. Ct. 2398 (2014) ...........................................................................................13, 14, 15

*In re Accredo Health, Inc.*, No. 03-2216 DP,
  2006 U.S. Dist. LEXIS 97621 (W.D. Tenn., March 7, 2006) ..............................................17

*In re Agent Orange Prod. Liab. Litig.* MDL No. 381,
  818 F.2d 145 (2d Cir. 1987)..................................................................................................9

*In re Baldwin-United Corp. Litig.*,
  122 F.R.D. 424 (S.D.N.Y. 1986) .........................................................................................10

*In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) .........................................................................................17

*In re Blech Sec. Litig.*,
  187 F.R.D. 97 (S.D.N.Y. 1999) .............................................................................................7

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  245 F.R.D. 147 (S.D.N.Y. 2007),
  *order aff'd in part, vacated in part*, 574 F.3d 29 (2d Cir. 2009) ............................................9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d at 35 ......................................................................................................................10

*In Re Frontier Insurance Group, Inc. Securities Litigation*,
  172 F.R.D. 31 (E.D.N.Y. 1997)..............................................................................................8

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ...........................................................................................7

*In re JPMorgan Chase & Co. Secs. Litig.*, No. 12 Civ. 03852 (GBD),
  2015 U.S. Dist. LEXIS 132181 (S.D.N.Y. September 29, 2015)..........................................17

*In re Mills Corp. Sec. Litig.*,
  257 F.R.D. 101 (E.D. Va. 2009) ..........................................................................................17

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  191 F.R.D. 369 (S.D.N.Y. 2000) ...........................................................................................9

iii

*In re Petrobras Sec. Litig.*,
    312 F.R.D. 354 (S.D.N.Y. 2016) ........................................................................19

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................................8

*In re SCOR Holding (Switzerland) AG Litig.*,
    537 F Supp. 2d 556 (S.D.N.Y. 2008) ...........................................................9, 19

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) ..........................................................................9

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) .............................................................................11

*In re Vivendi Universal, S.A Sec. Litig..*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ..........................................................................8

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .................................................................11, 18

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) ...............................................................................8

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ......................................................................2, 3

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010) ..........................................................................8

*Nationwide Life Ins. Co. v. Haddock*,
    460 Fed. Appx. 26 (2d Cir. 2012) ......................................................................9

*Petrie v. Elec. Game Card, Inc.*,
    308 F.R.D. 336 (C.D. Cal.  2015) .....................................................................17

*Phillips Petroleum Co v. Shutts.*,
    105 S. Ct. 2965 (1985) ........................................................................................6

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008) ...............................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ......................................................................................18

*UFCW Local 1776 v. Eli Lilly and Co.*,
    620 F.3d 121 (2d Cir. 2010) .............................................................................12

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)..................................................................................14

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) .....................................................................8, 9

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011).........................................................................................7

### Statutes

Securities Exchange Act of 1934 Section 10(b), 15 U.S.C. §78j(b).........................5, 12

Securities Exchange Act of 1934 Section 20(a), 15 U.S.C. §78t(a) ........................5, 12

### Rules

Federal Rule of Civil Procedure 23 ....................................................................... *passim*

S.E.C. Rule 10b-5 ................................................................................................5, 13

### Other Authorities

Lucian A. Bebchuk and Allen Ferrell, *Rethinking Basic*, 69 BUS. LAW. 671 (May 2014)............15

Lead Plaintiffs Rex and Roberta Ling Living Trust u/a December 6,1990, as Amended, John Taylor Jones, and David Thomas Jones (collectively, "Plaintiffs"), in the above-referenced action ("Action") respectfully submit this memorandum in support of their motion for class certification pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs seek certification of the following Class:

> All persons and entities who purchased or otherwise acquired BComm ordinary shares listed on NASDAQ ("Shares") between March 18, 2015 and September 6, 2017, both dates inclusive ("Class Period") excluding Defendants, current and former officers and directors of B Communications Ltd. ("BComm"), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

## I.      PRELIMINARY STATEMENT

This lawsuit is a textbook example of insiders lining their own pockets at the expense of investors.  BComm is an Israeli based holding company, with the same shares available on both the NASDAQ exchange and Israel's Tel Aviv Stock Exchange ("TASE").  It has one single asset: a controlling interest in Bezeq The Israeli Telecommunication Corp. Ltd. ("Bezeq").  This Action centers on the fraud that occurred within the corporate pyramid scheme that included BComm, Bezeq and other companies all controlled by Defendant Elovitch.  In essence, Elovitch caused another company he controlled, D.B.S. Satellite Services (1998) Ltd. ("Yes"), to inflate its cash flow, thereby facilitating BComm's payment of over NIS $1.1 billion for Yes shares. The monies were then siphoned off to other Elovitch companies to pay down his enormous debt.

BComm investors first learned of the fraud to which they were subjected when in June 2017, The Israel Securities Authority ("ISA") raided the offices of several Elovitch controlled companies, and he and other family members were arrested, causing BComm stock to plummet.

1

Class certification of these claims is eminently appropriate.  The questions of law and fact relevant to the merits – issuance of false and misleading statements, reliance, materiality, scienter, loss causation and economic loss – are identical for each and every member of the putative Class.  Indeed, class action treatment is especially appropriate because many members of the putative Class have relatively small losses, making it unfair and inefficient to force them to vindicate their claims individually.  "[T]he Second Circuit . . . has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co*., 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (citations omitted).

## II.     STATEMENT OF FACTS

During the Class Period, Plaintiffs purchased Shares in the United States and were damaged upon the revelation of the alleged curative disclosures.  ¶¶13-15.[1]

**The Pyramid**

Defendant Elovitch and his family, through a corporate pyramid, were BComm's controlling and majority shareholder.  ¶19.  BComm is headquartered in Israel and is a holding company that owns a controlling interest in Bezeq.  ¶16.  Bezeq is Israel's largest telecommunications operator and offers fixed-line telecommunications services, cellular telephony, television, satellite broadcasts, and other products and services.  *Id.*  Defendant Yes is a satellite-television provider and one of BComm and Bezeq's subsidiaries.  ¶18.  Elovitch served as the chairman of the Board of Directors and controlling shareholder of numerous entitles, including BComm, Bezeq, and Yes during the Class Period.  ¶¶19, 32-33.

---

[1]"¶_" refers to citations herein to paragraphs in the Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint"), filed December 8, 2017, unless stated otherwise.

**The Fraud Orchestrated in Connection with the Bezeq-Yes Merger**

The Bezeq-Yes merger, which was agreed to in 2015, designed to syphon money away from shareholders and into the pockets of Elovitch and his family.  ¶¶4, 39.  The transaction contemplated that Bezeq (over 70% owned by public shareholders) would acquire all of Yes's shares then owned by Eurocom Ltd ("Eurocom," also controlled by Elovitch) thereby giving Bezeq complete ownership of Yes.  ¶¶32, 39.  Bezeq agreed to pay Eurocom NIS 680 million in cash at closing plus additional consideration up to NIS 170 million ("Additional Contingent Consideration").  *Id.*  The Additional Contingent Consideration depended on Yes's meeting Free Cash Flow[2] targets in 2015, 2016, and 2017.

In order to meet targets for the Additional Contingent Consideration, Elovitch and his minions fraudulently materially inflated the Yes' Free Cash Flow, by utilizing, according to an ISA press release, "a long and systematic series of artificial actions."  ¶127.  For example, at Elovitch's directions, Yes' Chief Executive Officer caused Yes to freeze or delay payments to suppliers.  *Id.*  In so doing, Yes's financial results became inflated.  Since these results were consolidated with Bezeq and BComm's reported results, they too were inflated, thereby impacting the price of BComm's publicly traded stock.

The entire merger with Yes was designed to enable Elovitch to raid Bezeq's cash coffers by over NIS 1.1 billion, thereby enabling him pay off an estimated NIS 1 billion in bank debt that plagued his Eurocom empire.  ¶¶136, 137.

In addition to Defendants' reporting of materially false cash flows for BComm, Bezeq, and Yes, Defendants perpetrated a fraud to unlawfully push through the Bezeq-Yes merger. On March 18, 2015, BComm reported that a purportedly independent subcommittee of Bezeq's BoD, which it referred to during the Class Period as the "Committee," "Ad Hoc Committee," "Independent Committee," and/or "Sub-Committee" (amongst other titles), approved the Bezeq-Yes merger.  ¶42.  But this Committee was anything but independent.  *Id.*

---

[2] "Free Cash Flow" was defined as net cash from operating activities less (or plus) net cash for the purchase/sale of property, plant, and equipment and intangible assets.  ¶39.

In 2017, the ISA began investigating the Bezeq-Yes merger, including, the inflation of results necessary to trigger payment of the Additional Contingent Consideration and the leaks between entities.  ¶¶42, 105, 124, 127.  According to the ISA's prima facie findings of criminal liability, in violation of Israel Securities Law and Penal Law, there were ongoing and systematic leaks of confidential, material, and sensitive details and documents from the Committee's discussion.  ¶42.

**<u>Defendants' Dishonesty is Revealed</u>**

Between June 20, 2017 and September 6, 2017 (post-market), a flurry of curative disclosures hit the market, many of which precipitated statistically significant declines of BComm shares.  ¶¶105-22.  On June 20, *The Times of Israel* and *Globes* both reported that ISA had opened an investigation into BComm, Bezeq, and Yes in connection with the acquisition of Yes shares by Bezeq from Eurocom.  ¶105.  On June 22, 2017, additional details were revealed regarding the investigation ISA had opened an investigation into BComm, Bezeq, and Yes in connection with the acquisition of Yes shares by Bezeq.  ¶107.  From June 23-26, 2017, further news hit the market, including ISA's investigation of additional Bezeq and Yes executives and information about a civil litigation in Tel Aviv about Bezeq's acquisition of Yes.  ¶¶109-110. On July 14-17, 2017, Defendants Elovitch and O. Elovitch were arrested and further details about the misuse of confidential information in connection with the merger emerged.  ¶¶114-115.

On September 6, 2017, the last date of the Class Period, BComm disclosed Bezeq had written to Yes, Eurocom and Eurocom's bank creditors expressing doubt as to whether Eurocom or Yes had the ability to repay Bezeq for any funds that Bezeq had advanced to Yes that needed to be returned.  ¶121.  The Company also reiterated that Yes's Free Cash Flow for the first six months of 2017 had decreased by 28.48%.  ¶48.  At the time, citing the "revised free cash flow forecast for [Yes] for 2017," Bezeq eliminated NIS 84 million of Additional Contingent

Consideration (of the original NIS 170 million) that remained unpaid as of that date and was entitled to a return of a portion of the moneys already advanced.  *Id.*[3]

BComm Shares closed at $21.50 on June 19, 2017.  ¶8.  Through September 7, 2017, the share price deflated to $14.49 (a dizzying drop of over 30%).  ¶¶105-22.

### III.    PROCEDURAL HISTORY

Plaintiff Lynne P. Maleeff filed a class action complaint on June 29, 2017 alleging violations under Sections 10(b) and 20(a)-(b) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) against BComm, Doron Turgeman, Itzik Tadmor and Ehud Yahalom. Dkt. 1.  On September 27, 2017, this Court issued an Order, appointing Rex and Roberta Ling Living Trust u/a December 6, 1990, as Amended, John Taylor Jones and David Thomas Jones as Lead Plaintiffs.  Dkt. 11.

On December 8, 2017, Lead Plaintiffs filed their Complaint concerning securities fraud and asserting a class period of March 18, 2015 through September 6, 2017, inclusive, against BComm, Eurocom Communications Ltd., D.B.S.  Satellite Services (1998) Ltd., Shaul Elovitch, Or Elovitch, Ron Eilon, Stella Handler, David Mizrahi, Micky Neiman, Allon Raveh, Itzik Tadmor, Doron Turgeman, Ehud Yahalom, and Linor Yochelman.  Dkt. 17.  On February 20, 2018, Defendant BComm moved to dismiss or stay the Complaint as to BComm.  Dkt. 33.  On July 12, 2018, Defendants Itzik Tadmor, Doron Turgeman and Ehud Yahalom moved to dismiss the Complaint as to them.  Dkt. 59.  That same day, Defendants D.B.S. Satellite Services (1988) Ltd., Ron Eilon and Micky Neiman moved to dismiss the Complaint as to them.  Dkt. 67.  That same day, Defendants Stella Handler, David Mizrahi, Allon Raveh and Linor Yochelman moved

---

[3] By this time, Bezeq already advanced to Yes approximately NIS 114 million for the Additional Contingent Consideration.  ¶50.  At most, Elovitch and Eurocom were entitled to less than one-third of the potential NIS 170 million of Additional Contingent Consideration, and Bezeq overpaid advances to those entities by at least 50%.  ¶51.

to dismiss the Complaint as to them.  Dkt. 71.  Defendants Eurocom, Shaul Elovitch and Or Elovitch have not yet appeared in the action.

On September 27, 2018, the Court issued an Opinion and Order ("Order"), granting in part and denying in part Defendant BComm's motion to dismiss and denying the motion to stay. Dkt. 78.  With its Order, the Court granted Defendant BComm's motion to dismiss with regard to some statements.  On March 28, 2019, the Court granted the motions of all the parties who filed motions to dismiss on July 12, 2018.  Dkt. 87.

## IV.    ARGUMENT

### A.    THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) are met:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  *Amchem Products, Inc., v. Windsor*, 117 S. Ct. 2231, 2245 (1997). In addition, the Court must determine whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3).  *Id.*  Class actions promote judicial economy by aggregating small claims into one lawsuit.  "Class actions ... permit the plaintiffs to pool claims which would be uneconomical to litigate individually.  [M]ost of the plaintiffs would have no realistic day in court if a class action were not available."  *Phillips Petroleum Co v. Shutts.*, 105 S. Ct. 2965, 2973 (1985).  "The preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."  *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

It is well settled that "[t]here is a strong public policy in favor of private enforcement of the nation's securities laws."  *Epifano v. Boardroom Business Products, Inc*., 130 F.R.D. 295, 298 (S.D.N.Y. 1990).  Thus, Courts in the Second Circuit have repeatedly acknowledged that

"[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally." *Darquea v. Jarden Corp.*, No. 06 Civ 722 (CLB), 2008 U.S. Dist. LEXIS 17747, at *12 (S.D.N.Y. Mar. 6, 2008) (citation omitted).  In a securities fraud action, if a court is in doubt as to whether to certify a class action, it should err in favor of certification.  *See In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002).

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), Rule 23 is not a "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.  Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not appropriate to delve into merits issues such as scienter, materiality or loss causation.  *See, e.g., Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) ("*Halliburton I*"); *see also Amgen*, 133 S. Ct. at 1193-94.

## 1.     The Rule 23(a) Requirements are Satisfied

### a)     The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable."  Impracticable does not mean impossible, but only that the difficulty of joining all class members make use of the class action appropriate.  *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007).  Further, a plaintiff need not allege the exact number or identity of class members.  *See In*

*re Blech Sec. Litig.*, 187 F.R.D. 97 at 103 (S.D.N.Y. 1999).  "Joinder is generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010), *citing Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997).  "[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A Sec. Litig..*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (collecting cases) (citation omitted); *accord Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008).

Publicly available information reveals that during the Class Period there were approximately 29.889 million Shares outstanding each year, making joinder impracticable.[4] Though Plaintiffs have not yet ascertained the precise number of potential Class members, common sense suggests that even if one assumes that Internet Gold owned nearly 65% of the outstanding stock during the Class Period, the almost 10.5 million Shares remaining were dispersed among hundreds—or thousands—of potential Class members.  *In Re Frontier Insurance Group, Inc. Securities Litigation*, 172 F.R.D. 31 (E.D.N.Y. 1997).  Numerosity is satisfied.

### b)    Questions of Law or Fact Are Common to the Class

The Rule 23(a)(2) requirement that "there are questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted."  *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995); *see also Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the context of securities fraud litigation").  Commonality "is established so long as the

---

[4] These shares were available on both the NASDAQ and Israel's Tel Aviv Stock Exchange ("TASE").

plaintiffs can identify some unifying thread among the [class] members' claims." *Haddock v. Nationwide Fin. Services, Inc*., 262 F.R.D. 97, 116 (D. Conn. 2009), *vacated and remanded sub nom. Nationwide Life Ins. Co. v. Haddock*, 460 Fed. Appx. 26 (2d Cir. 2012).  Even a single common legal or factual question will suffice.  *See In re Agent Orange Prod. Liab. Litig*. MDL No. 381, 818 F.2d 145, 166-67 (2d Cir. 1987).

Here, common questions of law and fact include: (i) whether Defendants' statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether the price of BComm's stock was artificially inflated during the Class Period; and (iv) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses.  The misstatements were made to the Class as a whole, and injured market participants in the same way.  In comparable situations, courts have consistently found the commonality requirement to have been satisfied.  *See, e.g., In re SCOR Holding (Switzerland) AG Litig*., 537 F Supp. 2d 556 (S.D.N.Y. 2008); *Wagner*, 251 F.R.D. at 116; *In re Flag Telecom Holdings, Ltd. Sec. Litig*., 245 F.R.D. 147, 157-158 (S.D.N.Y. 2007), *order aff'd in part, vacated in part*, 574 F.3d 29 (2d Cir. 2009).  Indeed, here, like all Section 10(b) cases, the commonality of the shareholders' claims is self-evident.  *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).

### c)      Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiff be typical of the claims of the class.  The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge."  *Gen. Tel. Co. of Southwest v. Falcon*, 102 S. Ct. 2364, 2370 n.13 (1982).  "Typicality does not require that the situations of the named representatives and the class members be identical."  *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citation omitted); *see also In re Sumitomo Copper Litig*.,

182 F.R.D. 85, 94 (S.D.N.Y. 1998).  A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *In re Flag Telecom Holdings, Ltd. Sec. Litig*., 574 F.3d at 35.  In other words:

> Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investors' perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig*., 122 F.R.D. 424, 428 (S.D.N.Y. 1986) (citations omitted).

Plaintiffs satisfy the typicality requirement.  They each purchased BComm Shares during the Class Period in the United States.  Dkt. 9; Ex. B.  Only one of them sold any Shares during the Class Period—and that Plaintiff still retained Shares throughout the Class Period.  *Id.*  Their claims, like those of all other Class members, derive from the same legal theories and the same misrepresentations and omissions.  Accordingly, Plaintiffs' claims are typical of those of the Class.  *Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*, No. CV 07-2536 PSG (PLAx), 2009 U.S. Dist. LEXIS 71653, at *14-15 (C.D. Cal. Aug. 12, 2009).

### d)      Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met.  The focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp*., 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted).  This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem Products, Inc*., 117 S. Ct. at 2250 (citation omitted).  It is important to

emphasize that "[t]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, . . . and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig*., 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted).

Here, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem Products, Inc*., 117 S. Ct. at 2250-51, and no actual or potential conflicts exist.  Based on their purchases of BComm stock during the Class Period, Plaintiffs' interests are directly aligned with the Class members' interests, who were injured by the same materially false and misleading omissions and misstatements.  *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (explaining that "named plaintiffs' interests are directly aligned with those of the absent class members: they are purchasers of WorldCom equity and debt securities who suffered significant losses as a result of the investments").  Each Plaintiff is willing to serve as a representative of the Class, is kept informed of litigation information and understands his responsibility to absent class members.  Additionally, Plaintiffs have engaged qualified, experienced and capable counsel, Pomerantz.

### B.    The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication.

### 1.    Common Questions of Law and Fact Predominate

"Predominance is a test readily met in certain cases alleging consumer or securities fraud…" *Amchem Products, Inc*., 117 S. Ct. at 2250.  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are

more substantial than the issues subject only to individualized proof." *See UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("[T]o allow various secondary issues of plaintiff's claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.").

Common questions predominate because Defendants' omissions and misstatements affected all Class members in the same manner, by inflating the price of BComm stock. Plaintiffs will prove, on a common basis, the elements of their Sections 10(b) and 20(a)-(b) claims. Those claims rest on a core set of omissions and misstatements concerning Bezeq's purchase of Yes, including whether the Bezeq subcommittee involved in the purchase was independent and acting in the best interests of Bezeq, and Yes's reported free cash flow (which were incorporated into BComm's financials). The Section 10(b) claims thus turn predominantly—if not exclusively—on common, class-wide questions concerning whether Defendants' omissions and misstatements were misleading and material, whether they caused losses to the Class, and whether Defendants acted with scienter. This leaves reliance: "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 131 S. Ct. at 2184. The *Basic* reliance presumptions apply here.

### a)     The *Basic* Reliance Presumption Applies

Plaintiffs rely on the fraud-on-the-market reliance presumption first recognized by the Supreme Court in *Basic*. *See Basic Inc v. Levinson,* 485 U.S. 224, 241-47 (1988). The fundamental premise underlying this construct is that "'an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction.'"

*Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II),* 134 S. Ct. 2398, 2414 (2014).  As

explained in *Basic*:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. … An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

485 U.S. at 241-42, 247.

The Supreme Court in *Halliburton II* reaffirmed *Basic*'s "fairly modest premise that

'market professionals generally consider most publicly announced material statements about

companies, thereby affecting stock market prices.'" *Halliburton II*, 134 S. Ct. at 2410.  Further,

the Supreme Court in *Halliburton II* stated that the *Basic* presumption did not rest on a "binary"

view of market efficiency but instead on a matter of degree and proof by a preponderance; to

recognize the presumption was not conclusively to adopt any particular theory of how quickly

and completely publicly available information was reflected in market price.  *Id*.  "Debates about

the precise *degree* to which stock prices accurately reflect public information are thus largely

beside the point."  *Id.* (emphasis in original).

     i.     Defendants' Fraud Inflated the Price of BComm Stock Purchased by Class Members

Direct price impact is a fundamental premise of the *Basic* reliance presumption.  "The

market impact of an alleged misstatement or omission can be demonstrated by measuring the

abnormal returns of the Company's common stock on days when the corrective information was

disclosed to the market and corrected the misrepresentations and omissions described in the

Complaint."  *See* Expert Report of John D. Finnerty, Ph.D. in Support of Lead Plaintiffs' Motion for Class Certification ("Finnerty Report")[5], ¶11.

This does not necessarily mean that each alleged misstatement or omission will cause an abnormal positive return, as a materially misleading misstatement might simply maintain the market's expectations.  *Id.  See also Waggoner v. Barclays PLC,* 875 F.3d 79, 104 (2d Cir. 2017) ("lack of price movement on the dates of the alleged misrepresentations does not rebut the Basic presumption" because these statements could merely maintain the inflation already present in a stock's price).

In *Halliburton II*, the Supreme Court stated that to invoke the *Basic* reliance presumption, a plaintiff must prove four elements:  (1) the alleged misrepresentations were publicly known and (2) material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and the truth was revealed.  134 S. Ct. at 2413. But the presumption's efficient market analysis is only an "indirect proxy for price impact." *Halliburton II*, 134 S.Ct. at 2415-16.  Price impact is direct proof of the *Basic* fraud-on-the-market reliance presumption:  "Because market efficiency is not a yes-or-no proposition, a public, material misrepresentation might not affect a stock's price even in a generally efficient market." *Id.* at 2414.  "The fact that a misrepresentation 'was reflected in the market price at the time of [the] transaction'— that it had price impact—is '*Basic*'s fundamental premise.' … It thus has everything to do with the issue of predominance at the class certification stage."  *Id.* at 2416. "But as explained, publicity and market efficiency are nothing more than prerequisites for an indirect showing of price impact." *Id.*

*Halliburton II*, though, made clear that plaintiffs do not have the burden of demonstrating price impact.  *See id.* at 2413-14.  Indeed, that was considered too high a hurdle, "efficiency"

---

[5] The Finnerty Report is Exhibit A to the Declaration of Cara David, dated July 31, 2019.

was deemed to suffice.  *See id.* at 2408-17.  Here though, Plaintiffs have elected to demonstrate actual price impact in order to satisfy the *Basic* reliance presumption.  This is in line with academic literature.  In "Rethinking Basic," Lucian A. Bebchuk and Allen Ferrell suggest that "Classwide reliance. . . should depend not on the 'efficiency' of the market for the company's security but on the existence of fraudulent distortion of the market price."  Lucian A. Bebchuk and Allen Ferrell, *Rethinking Basic*, 69 Bus. Law. 671 (May 2014).  This can be shown by price impact of corrective disclosures.

Plaintiffs demonstrate that the price of BComm stock was inflated as a direct result of defendants' fraud-on-the-market through the alleged materially false and misleading misrepresentations, and all investors who purchased BComm stock at inflated prices were damaged and entitled to recovery.  Common issues of the impact of Defendants' fraud predominate over any individual issues.  Plaintiffs' expert, Dr. John D. Finnerty, PH.D., of AlixPartners, LLP, conducted an event study on BComm Shares to determine the price impact from a series of alleged curative disclosures.  *See* Finnerty Report ¶¶26, 48-72.  An event study is a standard statistical technique that financial economists use to determine whether a security's price reaction to a news announcement (or some other event) is statistically significant.  *See id.* ¶27.

The event study found that there was negative price impact for each and every corrective disclosure alleged in the Complaint.  With respect to those disclosures, four abnormal returns exhibited statistical significance at the 10% level or better.  Among the four dates, abnormal returns on two dates were statistically significant at the most significant 1% level, and abnormal returns on two dates were statistically significant at the widely accepted 10% level.  *See* Finnerty

Report ¶11.   Dr. Finnerty analyzed, and found, price impact with regard to the following

corrective disclosures:

1.  **June 20, 2017:**  In the morning, *The Times of Israel* and *Globes* both reported that ISA had opened an investigation into BComm, Bezeq, and Yes in connection with the acquisition of Yes shares by Bezeq from Eurocom.  There was a negative abnormal return but it was not statistically significant at the 10% level.

2.  **June 22, 2017:**  Before the market opened, BComm filed with the SEC a Form 6-K, which revealed an additional development regarding the investigation, including details regarding the release of Defendant Elovitch and other Yes officers.  There was a negative abnormal return statistically significant at the 10% level.

3.  **June 23, 2017-June 26, 2017:**  After the market closed on Friday, June 23, B Communications filed with the SEC a Form 6-K revealing that the ISA was investigating additional Bezeq and Yes executives.  That day there was a negative abnormal return statistically significant at the 1% level.

4.  **July 6, 2017:**  *Globes* reported that the Court involved in the ISA investigation had forbidden O. Elovitch from contact with Bezeq or Yes officers/employees and Elovitch was barred from visiting the offices of Bezeq or other Eurocom entities or from contacting others involved in Bezeq.  There was a negative abnormal return but it was not statistically significant at the 10% level.

5.  **July 14-17, 2017:**  On Friday, July 14, 2017, after the market closed, B Communications filed with the SEC a Form 6-K, containing the infomration that Elovitch, O. Elovitch, and Stella Handler, the CEO of Bezeq, would be subject to house arrest until July 21, 2017.  That Sunday, *Globes* reported further details about executives inappropriate dealing in the Company's confidential information.  Monday, July 17, there was a negative abnormal return statistically significant at the 1% level.

6.  **July 18-19, 2017:**  *The Times of Israel* reported the ISA investigation expanded to include the former Israel Minister of Communications Director-General and Defendant Elovitch.  There was a negative abnormal return but it was not statistically significant at the 10% level.

7.  **September 4-5, 2017:**  The market was closed on September 4 for Labor Day, but Chardan published a stock analyst report lowering its price target because of the ongoing ISA investigation.  The following day there was a negative abnormal return statistically significant at the 10% level.

8.  **September 6-7, 2017:**  After the market closed on September 6, B Communications filed with the SEC a Form 6-K report disclosing Bezeq had written to Yes, Eurocom and Eurocom's bank creditors expressing doubt as to whether Yes or Eurocom had the ability

to repay Bezeq for any funds that Bezeq had advanced to DBS that needed to be returned. There was a negative abnormal return but it was not statistically significant at the 10% level.

Courts have routinely looked to statistically significant price declines in response to curative disclosures, similarly to what Plaintiffs demonstrate here, in applying the *Basic* reliance presumption.  *See, e.g.*, *In re JPMorgan Chase & Co. Secs. Litig.*, No. 12 Civ. 03852 (GBD), 2015 U.S. Dist. LEXIS 132181, at *19-21 (S.D.N.Y. September 29, 2015) (finding that plaintiffs' event study examining only the alleged curative-disclosure dates supported cause-and-effect factor to determine market efficiency); *In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, 281 F.R.D. 134, 143-44 (S.D.N.Y. 2012) (applying the *Basic* reliance presumption where the record demonstrated that Bank of America Corp.'s stock experienced a statistically significant price decline after the fraud was revealed through news about Merrill, Lynch & Co., Inc.'s bonuses); *In re Accredo Health, Inc.*, No. 03-2216 DP, 2006 U.S. Dist. LEXIS 97621, at *22-35 (W.D. Tenn., March 7, 2006) (finding that plaintiffs demonstrated the cause-and-effect factor supporting market efficiency through only one example of defendant's stock price falling after negative news).[6]

### 2.  A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation.  Together with predominance, the superiority requirement "ensures that the class will be certified only when it would achieve economies of time, effort, and expense, and promote

---

[6] *See also Angley v. UTi Worldwide, Inc.*, 311 F. Supp. 3d 1117 (C.D. Cal. 2018) (finding an event study supportive of market efficiency); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 358-59 (C.D. Cal.  2015) (applying the *Basic* reliance presumption to a portion of the class period in part because "Plaintiffs have also provided unrefuted evidence that EGC's stock price dropped after key revelations [of the fraud] during February–May 2010."); *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 669-73 (S.D. Fl. 2014) (finding that the extent and immediacy of the price impact from two disclosures served as strong empirical evidence of market efficiency); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 103-04, 106-07 (E.D. Va. 2009) ("A finding of market efficiency for the preferred shares is further supported by the considerable price drop in Mills preferred stock [after a curative disclosure].").

uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 104 (2d Cir. 2007).

This Court analyzes four factors in determining the superiority of the class action:  "A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action."  Fed. R. Civ. P. 23(b)(3).  These factors weigh in favor of class certification in this case.

The members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive.  *In re WorldCom, Inc. Sec. Litig*., 219 F.R.D. at 304 (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered economic loss of *de minimus* value).  A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 127 S. Ct. 2499, 2508 n.4, (2007) ("Nothing in the PSLRA, we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses' — a matter crucial to the integrity of domestic capital markets.") (citations omitted).  Moreover, there are likely to be thousands of class members.

"Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *In re SCOR Holding (Switzerland) AG Litig*., 537 F. Supp.2d at 579.  It would also "risk disparate results among those seeking redress." *Id*.  Finally, there is no reason to expect any difficulties in managing this case as a class action. Indeed, class actions of this size and complexity are common.

### 3.    Rule 23(g) Is Satisfied

Rule 23(g) provides that "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel."  Rule 23(g)(1)(A) sets forth the following relevant factors: (i) counsel's work in identifying or investigating potential claims; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.  Pomerantz is eminently qualified to be class counsel.  The firm was established in 1940 by the late Abraham L. Pomerantz, the recognized "Dean of the Class Action Bar" and a "pioneer in the class action/derivative field."  The firm has litigated securities fraud cases under federal and state laws for seventy-five years on behalf of institutional and individual investors in both class and individual actions and has set important precedents.  Courts have routinely acknowledge Pomerantz's securities litigation prowess.[7]  Indeed, the National Law Journal named Pomerantz to the Plaintiffs' Hot List Hall of Fame for 2013.[8]  Pomerantz has already devoted their experience and resources to vigorously pursue all Class members' interests, having filed a factually detailed Complaint, opposed multiple motions to dismiss, and conducted further proceedings.

---

[7]  *See, e.g.*, *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 362 (S.D.N.Y. 2016) ("[O]n the basis not only of [the Firm's] prior experience but also on the Court's observation of its advocacy over the many months since it was appointed lead counsel, the Court concludes that Pomerantz, the proposed class counsel, is qualified, experienced and able to conduct the litigation."); *see also* pomerantzlawfirm.com.

[8]  "The Plaintiffs' Hot List." National Law Journal (Mar. 3, 2014).

## V.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this Action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiffs as class representatives; (3) appointing Pomerantz as class counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated:  July 31, 2019

**POMERANTZ LLP**

By: */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Marc I. Gross
Cara David
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

*Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484

*Counsel for Lead Plaintiffs*