# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| REX AND ROBERTA LING LIVING TRUST u/a DECEMBER 6, 1990, as AMENDED, JOHN TAYLOR JONES, and DAVID THOMAS JONES, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -against- | ) ) | No. 1:17-cv-04937 (JPO) |
| B COMMUNICATIONS LTD., EUROCOM COMMUNICATIONS LTD., D.B.S. SATELLITE SERVICES (1998) LTD., SHAUL ELOVITCH, OR ELOVITCH, RON EILON, STELLA HANDLER, DAVID MIZRAHI, MICKY NEIMAN, ALLON RAVEH, ITZIK TADMOR, DORON TURGEMAN, EHUD YAHALOM, and LINOR YOCHELMAN, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Expert Report of Assen Koev

October 28, 2019

**Contents**

I.   Qualifications.................................................................................................................... 2

II.  Assignment and Summary of Opinions.......................................................................... 2

III.  Bases for the Opinions ................................................................................................... 5

  A.   The Market for BCOM's Stock Was Not Efficient During the Class Period..................... 5

   1.   Market Efficiency......................................................................................................... 5

   2.   BCOM's Stock Did Not Trade in an Efficient Market ....................................................... 7

  B.   There was No Price Impact on Any of the Alleged Misstatements Dates........................ 17

  C.   The Finnerty Report Does Not Prove Price Impact on the Alleged Disclosure Dates ...... 18

   1.   Dr. Finnerty's Statistical Tests are Flawed on Three of the Four days he Considers
   Statistically Significant........................................................................................................ 19

   2.   Dr. Finnerty's Event Study is Unreliable Because of the Evidence of BCOM's Market
   Inefficiency ........................................................................................................................ 23

IV.  Conclusions.................................................................................................................... 27

## I.  Qualifications

1.  I am a Principal in the Finance Practice at Charles River Associates ("CRA"), an economic consulting firm. I joined CRA in August 2003.  I hold an undergraduate degree in Economics from Clark University, and a Master of Science degree in Applied Economics from the Simon Business School, University of Rochester.  I conducted research focused on empirical asset pricing, international finance, and portfolio optimization as a part of the Ph.D. program in Finance with concentration in Applied Econometrics at the Simon Business School and completed the program A.B.D.  At the University of Rochester, I also taught Ph.D.-level courses on mathematical methods in Economics and Finance and laboratory sections of MBA courses on Introductory Statistics.

2.  I have conducted research and consulted clients at CRA for over 15 years.  I have extensive experience in matters involving event studies, the analysis of market efficiency, price impact, and the computation of damages in claims under Section 10(b) of the Securities and Exchange Act.  I have consulted multiple clients including government agencies, corporations (and their officers and directors), financial institutions, auditors and institutional and individual investors.  I have drawn upon my teaching and consulting experience in formulating my opinions in this matter.

3.  A copy of my curriculum vitae is attached as Appendix A.

## II.  Assignment and Summary of Opinions

4.  I have been asked by counsel for B Communications Ltd. ("BCOM") to review and opine on the analysis and opinions presented in the Expert Report of Dr. John D. Finnerty ("Finnerty Report") in this matter.[1]  Specifically, I have been asked to (a) review and opine on the evidence related to market efficiency in BCOM's stock over the period from

---

[1] The Finnerty Report is titled "Expert Report of John D. Finnerty, Ph.D., In Support of Lead Plaintiffs' Motion for Class Certification," dated July 31, 2019.  See also Amended Class Action Complaint for Violations of the Federal Securities Laws, Rex and Roberta Ling Living Trust et. al. vs. B Communications Ltd. et al., SDNY, 17-cv-04937, dated December 8, 2017 ("Complaint").

March 18, 2015 through September 6, 2017 ("Class Period") and (b) review and opine on the analysis and opinions related to price impact expressed in the Finnerty Report.

5. It is my understanding that under the Supreme Court's decisions in Basic, Inc. v. Levinson (1988) and Halliburton Co. v. Erica P. John Fund, Inc. (2014), plaintiffs in securities fraud class actions may show reliance on an alleged misrepresentation by demonstrating, among other things, that a security traded on an efficient market. The demonstration of market efficiency could include a properly executed event study, though, an event study on its own is insufficient to prove market efficiency. Additionally, a defendant may rebut the presumption of reliance by providing evidence of the absence of price impact by the alleged defendant's misstatements and disclosures of such misstatements. In the BCOM case, it is my understanding that Dr. Finnerty, upon instruction from Plaintiffs' counsel, has taken upon the burden of proving the price impact of certain alleged misstatement and disclosure statements by BCOM.[2] I do not opine on the sufficiency of such an analysis to satisfy the legal requirements for class certification in securities fraud cases generally. However, in light of Dr. Finnerty's approach, my analysis uses Dr. Finnerty's methodology, to the extent possible, and without endorsing it, to show that my opinions hold based on his methodology.

6. My opinions in this matter are summarized below and the bases for my opinions are explained in detail in the sections that follow:

   a. BCOM's stock did not trade in an efficient market during the Class Period. More specifically:

      i. BCOM's stock exhibited strong autocorrelation which, as both Dr. Finnerty and I agree, is indicative of market inefficiency;

      ii. BCOM's stock did not trade on the NASDAQ on more than 6% of the trading days in the Class Period and did not have closing price information

---

[2] Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, dated July 31, 2019, pp. 14-15; Deposition of John D. Finnerty, October 15, 2019 ("Finnerty Deposition"), p. 48.

3

on more than 23% of the trading days. Both Dr. Finnerty and I agree that BCOM's trading volume is indicative of market inefficiency; and

    iii.    BCOM's stock does not satisfy the factors set forth in *Cammer v. Bloom* (1989) ("Cammer") and *Krogman v. Sterritt* (2001) ("Krogman") – the most commonly used benchmarks for market efficiency used by the courts and by Dr. Finnerty in his prior work. Dr. Finnerty has not addressed directly any of the Cammer or Krogman Factors.

    b.    According to the Finnerty Report, there is not a single alleged misstatement date with a statistically significant price impact.  The misstatements include days when affirmative misstatements about the inflated cash flows of D.B.S. Satellite Services (1998) Ltd. ("Yes") were allegedly released.[3]

    c.    According to the Finnerty Report, there is no statistically significant price impact following 4 of the 8 alleged disclosure dates in the Complaint.  Dr. Finnerty's findings of statistical significance on the remaining 4 of the 8 alleged disclosure dates do not establish price impact because of errors and flaws in his methodology.

7.    In the course of preparing my report, I have been assisted by staff at CRA working under my direction and supervision. CRA is being compensated at an hourly rate of $750 for my work in this matter, and the compensation is not dependent on my opinions or the outcome of this matter. My work in this matter is ongoing, and I reserve the right to supplement or modify my opinions to the extent new information comes to light subsequent to the date of this report. A complete list of the documents that I have relied upon in forming my opinions is attached as Appendix B.

---

[3] According to the Complaint, "the Bezeq-Yes merger was the subject of an agreement negotiated in 2015." It is alleged that "[d]efendants artificially and materially inflated Yes' Free Cash Flows, which were also consolidated into Bezeq's Free Cash Flows and Bezeq's financial results were consolidated into BComm's financial statements." Complaint ¶¶ 39, 54.

**III.   Bases for the Opinions**

**A.  The Market for BCOM's Stock Was Not Efficient During the Class Period**

**1.  Market Efficiency**

8.  The Efficient Market Hypothesis was proposed by Dr. Eugene Fama.  In his paper "Efficient Capital Markets: a Review of Theory and Empirical Work," Dr. Fama defines an efficient market as one in which "prices always 'fully reflect' available information."[4] The requirement that prices "always fully reflect" information means that information must be incorporated quickly.[5]  This interpretation of market efficiency has been adopted by finance academics, practitioners, and courts in securities litigation.  For example, the Cammer court states that "[a]n efficient market is one which rapidly reflects new information in price."[6]

9.  There are three levels of market efficiency that have been commonly adopted – weak-form, semi-strong form, and strong-form. The market for a stock is considered weak-form efficient if the stock price reflects all information contained in the stock's past prices. In other words, in a weak-form efficient market, one cannot predict future prices, or returns, from past prices alone.  The market for a stock is semi-strong-form efficient if the stock price reflects all public information. Public information, in this context, includes all company announcements or relevant news that have been released. In a semi-strong-form efficient market it is not possible to use public information to predict future stock prices.  By definition, a market cannot be semi-strong form efficient if it is not weak-form efficient.  The market for a stock is considered strong-form efficient if the stock price reflects all information, both public and private. By definition, a market cannot be strong-form efficient if it is not weak-form and semi-strong form efficient.[7]

---

[4] Fama, E. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," Journal of Finance, Vol. 25, p. 383.

[5] Chordia, T., Roll, R., Subrahmanyam, A. (2005), "Evidence on the speed of convergence to market Efficiency, Journal of Financial Economics, 76(2), 271-292

[6] See Cammer, 711 F. at 1264.

[7] Campbell, J., Lo A., MacKinlay, A., (1997), "The Econometrics of Financial Markets," Princeton University Press, p. 22.

10. It is my understanding that, in class certification proceedings, Plaintiffs need to establish, among other things, that the market for a stock is efficient in order to invoke the presumption of reliance laid out in Basic, Inc. v. Levinson (1988) and Halliburton Co. v. Erica P. John Fund, Inc. (2014).[8]  The existence of an efficient market is necessary to ensure that the alleged misstatements or omissions affected a company's stock price. It is also my understanding that Plaintiffs need to establish that the market is semi-strong form efficient.[9]

11. There is a growing volume of literature that tests the market efficiency of the stock markets and which documents potential market inefficiencies across a large number of stocks and in individual stocks.[10]  In securities litigation, courts have relied on criteria indicative of market efficiency.  The most prominent of these are the five factors stipulated in Cammer (the "Cammer Factors").  These factors are: (i) average weekly share turnover; (ii) coverage of the company by securities analysts; (iii) the presence of market-makers and arbitrageurs; (iv) the eligibility of the company to file a Form S-3 with the SEC; and (v) existence of a cause-and-effect relationship between unexpected company-specific news and stock price response.[11]  In addition courts often also consider a set of factors stipulated in Krogman (the "Krogman Factors").  These factors are: (i) the market capitalization of the stock; (ii) the bid-ask spread of the stock price and (iii) the size of the public float of the company.[12]

---

[8] Information from counsel and Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988), and Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 268 (2014).

[9] See, for example, Carden, N., (1998), "Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency," University of Chicago Law Review, pp. 883-884.

[10] See, for example, Lakonishok, J., A. Shleifer and R. Vishny (1995), "Contrarian Investment, Extrapolation and Risk," Journal of Finance 50.  Most academic research is based on large samples of stocks but case-studies involving individual firms have also been published. See for example, Lamont, O. and R. Thaler, (2003), "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," The Journal of Political Economy, Vol. 111.

[11] See Cammer, 711 F. Supp. 1264, at 1286.

[12] See Krogman, 202 F.R.D. 467.

### 2. BCOM's Stock Did Not Trade in an Efficient Market

*a) BCOM's Stock Exhibited Significant Autocorrelation in Returns*

12. Autocorrelation in returns is a form of predictability in returns.[13]  It means that future returns can be, on average, predicted by using past returns.  Therefore, autocorrelation in returns is inconsistent with weak-form efficiency and, by definition, semi-strong form market efficiency.  In fact, the academic literature uses tests for autocorrelation in returns, among other methods, to test for market efficiency.[14]

13. Dr. Finnerty's analysis documents statistically and economically significant autocorrelation in both BCOM's raw returns and abnormal returns.  Dr. Finnerty shows two tests of autocorrelation in his report.

   a. Dr. Finnerty includes an autocorrelation regression, also known as AR(1) regression, which tests for the presence of predictability of adjacent day returns, or returns at lag of 1 day.[15]  Dr. Finnerty's AR(1) regression shows that, during the Class Period, BCOM's raw and abnormal returns on a given day were predictable by knowledge of the prior day's raw and abnormal returns.  Dr. Finnerty's Exhibit 8, Panel A shows that this autocorrelation is statistically significant at the 1% level – the highest level of significance used in academic research by his own account.[16]  The autocorrelation coefficient of the abnormal returns is -0.33, implying that, on average, 33% of any abnormal return would be reversed on the next day.  When Dr. Finnerty incorporates the autocorrelation into his main testing model – the modified CAPM model – the autocorrelation in abnormal returns increases to -0.38. As I discuss in the next section, an average of 38% reversal of any abnormal return is both statistically and economically significant estimate.

---

[13] Autocorrelation is also known as "serial correlation."

[14] Campbell, J., Lo A., MacKinlay, A., (1997), "The Econometrics of Financial Markets," Princeton University Press,  pp. 44-48.

[15] Finnerty Report, ¶ 38 and Finnerty Report, Exhibit 8, Panel A.

[16] Finnerty Report, ¶ 42.

b. Dr. Finnerty also reports a non-parametric test labeled as "Portmanteau Test." Using this test, Dr. Finnerty tests jointly for a presence of autocorrelation in up to 5 prior days, i.e. lags of 1 through 5 days. The Portmanteau Test used by Dr. Finnerty showed that both the raw returns and abnormal returns of BCOM's stock are autocorrelated, i.e. predictable not only by the adjacent day returns, as documented by his AR(1) regression, but by up to 5 days of prior returns.[17] Such long-term autocorrelation is even stronger evidence of market inefficiency.

14. Dr. Finnerty acknowledges that autocorrelation in returns is inconsistent with market efficiency. This is documented in several of his prior expert reports that I have been able to review. For example, in the In Re Chicago Bridge & Iron Company N.V. case, Dr. Finnerty's report states that "[n]one of the tests conducted has produced evidence of significant serial correlation that would contradict market efficiency for CBI's common stock."[18] In his deposition in the current matter Dr. Finnerty also acknowledges the same point:

"A: I test for that because if a market exhibits serial correlation, then the returns on any day could presumably be predicted by the returns on a prior day if we wanted to figure out the relationship embodied in the serial correlation. In that case, the shares would not exhibit a random walk and the stock would not be deemed efficient."[19]

> b) *BCOM's Stock Did Not Trade at All or Had No Closing Price on Many Days*

15. The importance of trading activity and trading volume in courts' decisions about market efficiency is undeniable. The Cammer court states:

*"The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies*

---

[17] Finnerty Report, ¶ 39 and Finnerty Exhibit 8, Panel B.
[18] Expert Report of John. D. Finnerty, Ph.D. In Support of Lead Plaintiff's Motion for Class Certification, In Re Chicago Bridge & Iron Company N.V. Securities Litigation, dated February 4, 2019, ¶99.
[19] Finnerty Deposition, p. 115.

*a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."*[20]

16. Dr. Finnerty's data shows that BCOM's stock did not trade at all on the NASDAQ on 38 (or 6%) of the 624 trading days in the Class Period.[21] Exhibit 1 provides a summary of these results.

17. Dr. Finnerty's data also shows that BCOM's stock has no recorded closing price for 144 (or 23%) of the 624 trading days in the Class Period.[22] See Exhibit 1. The absence of an official closing price reported by NASDAQ implies that, at best, NASDAQ did not have a reliable basis to determine a closing price for BCOM's stock.

18. Even more importantly, these 144 days with no available closing price include days on which one would expect significant interest from investors. For example, 2 of the 11 earnings announcement days during the Class Period and 4 of the alleged misstatement days in the Complaint show no closing prices.[23] The average volume on the 144 days with no available closing price is 67 shares, or 90 shares if only days with positive volume are counted, both of which are fewer than a single round lot order.[24] Dr. Finnerty also agreed in his deposition that he found a significant number of days on which BCOM did not trade.[25] The fact that investors did not trade actively enough on days with releases of potentially economically important data casts doubt on the attention paid by investors to BCOM's stock and, consequently, on the efficiency of that stock.[26]

---

[20] See Cammer, 711 F. Supp. at 1286.

[21] Based on the backup materials produced with the Finnerty Report. See files "Regression.xlsx" and "Price Volatility.xlsx." The absence of volume and closing price information was also verified with data from the Center for Research in Security Prices ("CRSP"). Results in Exhibit 1 are based on independent confirmation with CRSP data.

[22] Based on the backup materials produced with the Finnerty Report. See file "Regression.xlsx." Results in Exhibit 1 are based on independent confirmation by CRSP data.

[23] See Exhibit 5 to this report and Finnerty Report, Exhibit 9.

[24] The estimate of 67 shares is the average volume of all 144 days with no closing price in the CRSP data. The estimate of 90 shares is the average volume of all 106 days with no closing price but showing positive volume in the CRSP data.

[25] See Finnerty Deposition, p. 22.

[26] "The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." Cammer, 711 F. Supp. at 1286.

*c)  BCOM's Stock Does Not Satisfy the Cammer Factor Requirements*

19. The absence of trading and closing price information on a large number of days during the Class Period and the strong autocorrelation present in BCOM's raw and abnormal returns are convincing evidence of the market inefficiency of the stock.  As additional proof, I also discuss the results of my analysis of the Cammer Factors.  The Cammer Factors are a set of five factors that I understand the courts have used consistently over the last 30 years to gauge the efficiency of stocks in securities class actions.  These factors are (i) sufficiently high average weekly share turnover; (ii) coverage of the company by securities analysts; (iii) the presence of market-makers and arbitrageurs; (iv) the eligibility of the company to file a Form S-3 with the SEC; and (v) existence of cause-and-effect relationship between unexpected company-specific news and stock price response.[27]  Dr. Finnerty acknowledges in his deposition that "the Cammer factors are consistent with the economic literature and provide valuable insight into whether the market for a security is efficient."[28]

Cammer Factor 1: Volume Turnover

20. The court in Cammer decided that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."[29]  Exhibit 2 of this report shows that the weekly volume turnover of BCOM's stock on the NASDAQ is 0.03% - 30 times less than the minimum threshold of 1% set by the Cammer court.  This result shows that not only did BCOM not trade at all on a number of days but it also traded very little on days when it did trade.  Dr. Finnerty does not address this factor in his report.

Cammer Factor 2: Number of Securities Analysts Following the Stock

21. The Cammer court states that "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.

---

[27] See Cammer, 711 F. Supp. at 1286.
[28] Finnerty Deposition, pp. 39-40.
[29] See Cammer, 711 F. Supp. at 1286.

The existence of such analysts would imply, for example, the [Company's] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[30]

22. There were only 3 equity analysts following BCOM during the Class Period. Those were analysts from Arrowhead Bid, Deutsche Bank, and Chardan Capital Markets. The first two published only 2 reports each during the Class Period spanning 2.5 years. See Exhibit 3.[31] Dr. Finnerty claims in his deposition that he identified 12 analysts, but he has not documented his findings.[32]

Cammer Factor 3: Number of Market Makers for the Stock

23. The Cammer court states that "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[33]

24. I have been able to establish the existence of up to 25 market makers during the Class Period.[34] However, the number of market makers is misleading without any evidence of the trading activity by such market makers. The Cammer court states, quoting Bromberg and Lowenfels, that "[f]or over the counter markets without volume reporting, the number of market makers is probably the best single criterion."[35] In the case of BCOM, however, volume data is widely reported and shows that volume was very low as documented in Exhibit 2 and by the fact that BCOM's stock had no trading volume on 6% and no recorded closing price on 23% of the trading days in the Class Period. Therefore, the number of market makers cannot be considered indicative of market efficiency for BCOM's stock on its own.

---

[30] See Cammer, 711 F. Supp. at 1286.

[31] I include equity analysts who provide coverage, price targets, and estimates for the stock. A number of reports available through Refinitiv constitute summaries of public data and machine generated output. Such reports are not usually associated with a specific named analyst.

[32] Finnerty Deposition, p. 64.

[33] See Cammer, 711 F. Supp. at 1286-87.

[34] Center for Research in Security Prices ("CRSP"), values for variable "Market Maker Count" for BCOM over the Class Period. Bloomberg's RANK function identifies 24 market makers for BCOM during the Class Period.

[35] See Cammer, 711 F. Supp. at 1293.

25. In evaluating the existence of market makers and arbitrageurs, courts and financial experts also often rely on the level of institutional ownership of the stock.  Dr. Finnerty explains in one of his prior reports:

*"High levels of institutional ownership and the active trading by these holders are further evidence that is consistent with the market for CBI's common stock being efficient during the Class Period. Institutional investors are sophisticated market participants, who closely track their investments and who contribute readily to the quick dissemination of information and its incorporation into a security's price, which facilitates price discovery by other investors. Moreover, institutional investors, along with broker-dealers, typically facilitate short selling by lending securities to short sellers. Thus, high levels of institutional ownership improve market efficiency by enabling investors, such as hedgers and arbitrageurs, to engage in short selling."[36]*

26. In Exhibit 4, I summarize the evidence on institutional ownership of BCOM's stock. Between March 2015 and September 2017, institutional investors held between 4.2% and 17.2% of BCOM's stock.  Notably, between June 2016 and September 2017 institutional investors held less than 6% of BCOM's stock at the end of every quarter. In comparison, a study of institutional ownership between 1989 and 2010 showed that, on average, institutional investors held 41.2% of a company's stock. The bottom 25% of companies had institutional ownership of 21.2%.[37]  Thus, the institutional ownership of BCOM was significantly below the cut-off for the bottom quartile of companies by institutional ownership.

Cammer Factor 4: Eligibility to File Form S-3

27. The court in Cammer states that "it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met."[38]  It is my understanding that BCOM was ineligible to file a form S-3 because it is not organized in

---

[36] Expert Report of John. D. Finnerty, Ph.D. In Support of Lead Plaintiff's Motion for Class Certification, in In Re Chicago Bridge & Iron Company N.V. Securities Litigation, dated February 4, 2019, ¶ 39.

[37] Gao, G. P., Moulton, P. C., and Ng, D. T. (2015). "Institutional ownership and return predictability across economically unrelated stocks," Working Paper, Cornell University, Table 1.

[38] See Cammer, 711 F. Supp. at 1287.

the U.S. as required by the SEC regulations for such a filing.[39]  Dr. Finnerty does not address this factor.

Cammer Factor 5: Cause and Effect Relationship Between the<br>Arrival of New Information and Price Reaction

28. The Cammer court states that "it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory."[40]  For the sake of brevity, I refer to the fifth Cammer Factor as the "cause-and-effect factor."

29. Dr. Finnerty has not fully analyzed the fifth Cammer Factor.  Dr. Finnerty has only tested for price impact of BCOM's stock on the alleged misstatement days and alleged disclosure days, and not on representative news events. In fact, he testifies that his test cannot be the basis for establishing cause and effect relationship to "news generally":

*"Q. So you are not concluding here that the B Communications stock exhibited a price impact in response to news generally; correct?*

*A. That's correct. I wasn't testing that. I don't know whether that is untrue either. What I am opining on is that the price of B Comm stock was impacted by the fraud as pled in the complaint, which was what my assignment tasked me with doing."[41]*

30. In other instances of his deposition, however, Dr. Finnerty states that the methodology of the test of the fifth Cammer Factor for market efficiency and the test of price impact are the same.[42]  These statements do not prove that Dr. Finnerty's tests are applicable to the analysis of the cause-and-effect factor. While the regression methodology for testing price impact and the cause-and-effect factor are similar, the sample selection criteria are different as I explain in detail below.  Dr. Finnerty, by his own testimony, has only tested

---

[39] Requirement I.A.1 for eligibility to file form S-3 states "The registrant is organized under the laws of the United States or any State or Territory or the District of Columbia and has its principal business operations in the United States or its territories." See https://www.sec.gov/files/forms-3.pdf.
[40] See Cammer, 711 F. Supp. at 1287.
[41] Finnerty Deposition, p. 73.
[42] Finnerty Deposition, p. 51.

if the price responded on the alleged misstatement and alleged disclosure dates.[43] Because Dr. Finnerty claims that he does not necessarily expect a price reaction on the alleged misstatement dates (see below) and only finds statistically significant price response on some alleged disclosure dates, I restrict my attention to the latter in this subsection.

31. A test for market efficiency needs to test if the stock responded to value relevant information during the Class Period in general, not whether the stock changed on the alleged disclosure dates which plaintiffs have selected to demonstrate that they suffered harm. Because the alleged disclosure dates were selected by plaintiffs to demonstrate the harm they allegedly suffered, it is more than likely the dates were chosen because their returns are negative. Therefore, the alleged disclosure dates are almost always a biased sample of dates with negative abnormal returns. In order to test if a stock responds to information generally, the science of statistics requires that statistical tests be performed on random samples with regard to the variable being tested, i.e. price reaction.[44] For example, experts often use earnings announcements because (i) they are considered to contain value relevant information, and (ii) the price response following them is random, depending on whether the earnings surprise is positive or negative. The same argument is also supported by the academic literature on tests for market efficiency.[45] Thus an event study on the alleged disclosure dates only cannot be a sufficient test of the cause-and-effect factor.

32. To examine the evidence of cause and effect relationship in Dr. Finnerty's analysis, I extracted from his backup material the abnormal returns he computes on the days that BCOM announces earnings during the Class Period. Many of these days with earnings

---

[43] Finnerty Report, ¶ 26.

[44] Moore D. et. al., The Practice of Statistics for Business and Economics, 3rd Edition, p. 446, states: "If you can't regard your data as a random sample, however, the results of inference may be of little value."

[45] See Ferrillo P., F. Dunbar, and D. Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," 78 St. John's Law Review 81, 119-22 (2004), where the authors state: "Because stock prices move all the time, one must compare the movements in response to news stories with a control group of prices. One way to do this would be to look at a sample of days in a class period exclusive of those days alleged to be corrective disclosure(s) and perform a news search." The authors further explain their reasoning as follows: "The examination would exclude those days in which a corrective disclosure was made because plaintiffs would normally choose a class period where corrective disclosures coincide with large negative price movements; including those days in the analysis would bias the results."

announcements also contain dividend announcements.  It is generally recognized that "earnings [are] the single most important item in the financial reports issued by publicly held firms."[46]  In Exhibit 5, I show the abnormal returns and their statistical significance as computed by Dr. Finnerty.  Exhibit 5 shows that none of the abnormal returns on days with BCOM's earnings announcements during the Class Period are statistically significant.  The absence of statistical significance shows that there is no conclusive evidence BCOM's stock price responded to the company's earnings announcements at all.  As a result, I conclude that BCOM's stock does not meet the requirements of the fifth Cammer Factor.

### d) BCOM's Stock Does Not Satisfy the Krogman Factors Requirements

33. As further tests of market efficiency, I also add the results from the analysis of the Krogman Factors.  These factors are (i) market capitalization; (ii) bid-ask spread, and (iii) size of public float.[47]

<u>Krogman Factor 1: Market Capitalization</u>

34. The Krogman court states that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[48]

35. Exhibit 6 shows that during the Class Period the market capitalization of BCOM's stock (at the end of each month) varied between $432.8 million and $873.7.0 million.  This market capitalization places BCOM, on average, at the median of the market capitalizations of all common and foreign stocks traded on US exchanges during the Class Period.[49]

---

[46] See Degeorge, F., Patel J., and R. Zeckhauser (1999), "Earnings Management to Exceed Thresholds," Journal of Business, 72, p. 1.

[47] See, Krogman, 202 F.R.D. at 478.

[48] See, Krogman, 202 F.R.D. at 478.

[49] The average percentile of BCOM's market capitalization, at monthly frequency, was 49.5%.  The comparison set includes all stocks available in the CRSP monthly files with share codes 10, 11 and 12. BCOM's share code is 12.

<u>Krogman Factor 2: Bid-Ask Spread</u>

36. The Krogman court states that "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[50]

37. In Exhibit 7, I show the bid-ask spread as percentage of the closing price of BCOM's stock. In general, the lower the bid-ask spread required by the market makers, the lower the cost of trading to investors is and the faster and more fully information is incorporated into the stock price.[51] Dr. Finnerty does not consider the bid-ask spread in the Finnerty Report but states in other reports that "[t]he wide availability of information about the stock and the high level of trading, which promote market efficiency, will lead market makers in the stock to set relatively small bid-ask spreads."[52]

38. Exhibit 7 shows that BCOM's bid-ask spread was, on average, 5.41% of its price, and was as high as 7.2% in 2015. Such wide bid-ask spreads are not indicative of multiple active market makers competing to improve on the best bid and ask quotes. In comparison, the average bid-ask spreads on the NASDAQ are less than 1% of the stock price.[53] A bid-ask spread that is several times bigger than the bid-ask spread of the typical NASDAQ or NYSE listed company is indicative of high trading costs, which inhibit the incorporation of new information.

<u>Krogman Factor 3: Public Float</u>

39. The Krogman court, citing an expert in that case, states that "[b]ecause insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have

---

[50] See, Krogman, 202 F.R.D. at 474.

[51] See, Krogman, 202 F.R.D. at 474.

[52] Expert Report of John. D. Finnerty, Ph.D. In Support of Lead Plaintiff's Motion for Class Certification, in In Re Chicago Bridge & Iron Company N.V. Securities Litigation, dated February 4, 2019, ¶ 69.

[53] A 2004 comparative study between NYSE and NASDAQ, for example, estimates that the average bid-ask spread of NASDAQ stocks is between 0.3% and 0.6%. See Chung, K., Van Ness, B., & Van Ness, R. (2004), "Trading costs and quote clustering on the NYSE and NASDAQ after decimalization," Journal of Financial Research, 27, p. 316. More recently, Dr. Finnerty documents in a different report that during the alleged class period of that report (October 2013 – June 2015), the average and median bid-ask spread of NYSE listed companies is 0.13% to 0.05%, respectively. See Expert Report of John. D. Finnerty, Ph.D. In Support of Lead Plaintiff's Motion for Class Certification, in In Re Chicago Bridge & Iron Company N.V. Securities Litigation, dated February 4, 2019, ¶ 70.

greater holdings by insiders are less likely to accurately reflect all available information about the security."[54]

40. Insiders held between 65% and 67% of BCOM's stock during Class Period, implying that the public float of the company was between 33% and 35% in the same period.[55]  In comparison, a study of companies' free floats between 2003 and 2011 shows that the average US company float was 91.7%, and that  75% of the companies had float in excess of 90.0%.[56]  Thus, BCOM's public float was very low even in comparison to the companies in the bottom quartile of public float percentages. Dr. Finnerty, in his deposition, noted that he does not remember any cases in his experience for which float represented only 35% of the shares outstanding.[57]

**B.  There was No Price Impact on Any of the Alleged Misstatements Dates**

41. Dr. Finnerty states that he tested for price impact on both alleged misstatement and alleged disclosure dates.[58]

42. Dr. Finnerty's results in Exhibit 9 of his report show that there aren't any alleged misstatement dates that have statistically significant abnormal returns even at the weakest statistical level of significance, 10%, that he considers.  Therefore, none of the abnormal returns on the alleged misstatement dates can be distinguished from random day-to-day movements.  As Dr. Finnerty explains "[s]tock prices are volatile and typically one of these regression models that people employed will only explain 20 or 30 percent of the variation in stock price.  The rest of the variation is due to statistical noise, so if the variation in price -- you said it was not due to any news."[59]

---

[54] See, Krogman, 202 F.R.D. at 474.
[55] The insider holdings of BCOMs stock were held by Internet Gold Golden Lines Ltd. Source: Refinitiv.
[56] Ding, X., Ni, Y. and Zhong, L. (2004), "Free Float and Market Liquidity around the World." Journal of Empirical Finance, 38(A), Table 1.  The paper also shows that the average Israel company float was 52.2%.
[57] Finnerty Deposition, p. 34.
[58] Finnerty Report, ¶ 26.
[59] Finnerty Deposition, p. 27.

43. In addition, on 4 of the 12 alleged misstatement dates, NASDAQ did not even disseminate a closing price for BCOM's stock which is necessary for the computation of abnormal returns.[60]

44. Dr. Finnerty's report dismisses the findings above by stating that one should not expect to see price impact on an alleged misstatement date if that misstatement is one of omission.[61] This is unlikely to be the case here.  It is my understanding that, of the four alleged types of misstatements in the Complaint, only one has not been dismissed in full, and that is the allegation that Yes' cash flows were inflated to meet a threshold set in the acquisition agreement.  The Complaint states that BCOM's quarterly financial statements explicitly reported "Net increase in cash and cash equivalents."[62]  Dr. Finnerty has not shown any evidence that these statements represented omissions rather than affirmative acts of filing misstated financial statements.  In fact, Dr. Finnerty confirms in his deposition that the alleged misstatements of Yes' cash flows "could very well be an affirmative misrepresentation" and not an omission.[63]

45. Dr. Finnerty has not provided any alternative explanation for why such misstatements should not be tested for statistical significance. Exhibit 9 of the Finnerty Report shows that none of the abnormal returns on the days with alleged misstatements are statistically significant. Therefore, I conclude that Dr. Finnerty's analysis shows no evidence of price impact related to any misstatements, and particularly to misstatements related to the alleged inflation in Yes' cash flows.

## C. The Finnerty Report Does Not Prove Price Impact on the Alleged Disclosure Dates

46. Dr. Finnerty analyzes 8 alleged disclosure dates.  He states that his analysis shows that 2 of the alleged disclosures are statistically significant at the 1% significance level (June 26, 2017 and July 17, 2017), 2 are significant at the 10% significance level (June 22, 2017 and September 5, 2017), and 4 are not significant at the 10% significance level.[64]  I

---

[60] See dates with "NA" in column "Actual Return" in Finnerty Report, Exhibit 9.
[61] Finnerty Report, ¶ 25.
[62] Complaint, ¶¶ 58, 60, 62, 66, 68, 70.
[63] Finnerty Deposition, pp. 75-76.
[64] Finnerty Report, ¶ 11.c.

have reviewed Dr. Finnerty's price impact analysis on the 4 days he claims have statistically significant abnormal returns at the 10% level or 1% level.

47. I do not focus on the days on which he does not find a statistically significant price reaction. Dr. Finnerty states that "[he] observed a negative price impact of each corrective disclosure on the corrective Disclosure Dates as alleged in the Complaint on B Communications' stock after adjusting for market-wide and industry-wide factors in an appropriately designed event study."[65] However, in the absence of statistical significance (even at the 10% level), it is statistically impossible to distinguish the estimated price impact from zero, i.e. from no price response at all.

48. I review Dr. Finnerty's analysis of the alleged disclosures for which Dr. Finnerty claims to find statistically significant price reactions at the 1% or 10% significance level. As I describe below, this analysis is flawed and unreliable for at least three reasons.

### 1. Dr. Finnerty's Statistical Tests are Flawed on Three of the Four days he Considers Statistically Significant

49. To explain the misspecification of Dr. Finnerty's statistical test (t-test) it is useful to consider an intuitive explanation of the test. A t-test compares the price impact attributed to an event, i.e. the abnormal return, to the normal day-to-day variation in the abnormal return of a firm. The normal day-to-day variation of the abnormal return of a firm is the benchmark of how the firm's price changes in the absence of news.[66] Or, as Dr. Finnerty explains, this day-to-day variation "is due to statistical noise… not due to any news."[67] The t-test then compares the abnormal return on the alleged disclosure date to that benchmark. If the abnormal return associated with the alleged disclosure is sufficiently larger than the typical day-to-day variation in abnormal returns, the price impact is considered to be statistically significant.[68]

---

[65] Finnerty Report, ¶ 11.b.
[66] This day-to-day variation is generally measured by the standard error of the regression market model. I adopt the less scientific 'day-to-day variation' terminology because it is more descriptive.
[67] Finnerty Deposition, p. 27.
[68] For the standard methodology of event studies and statistical testing of event days, see Kritzman, M. (1994), "What Practitioners Need to Know About Event Studies," Financial Analysts Journal or Campbell, J., Lo A., MacKinlay, A., (1997), "The Econometrics of Financial Markets," Princeton University Press, pp. 149-178.

50. For example, on Monday June 26, 2017, Dr. Finnerty computes an abnormal return of -7.39%.[69] He compares that abnormal return to the day-to-day variation in BCOM's abnormal returns of 2.78%.[70] Because the abnormal return on June 26, 2017 is 2.7 times larger than the benchmark (t-statistic is 7.39 / 2.78 = 2.7), Dr. Finnerty's statistical test concludes that the news must be causing this large abnormal return, with statistical significance at the 1% level.[71]

51. Dr. Finnerty applies the same testing methodology to all other days with alleged disclosures. However, he makes a mistake on 3 of the 4 alleged disclosure dates that he finds to be statistically significant (June 26, 2017, July 17, 2017 and September 5, 2017).[72]

52. It should be noted that the alleged disclosure dates on June 26, 2017 and July 17, 2017 on which Dr. Finnerty documents statistical significance at 1% are both Mondays. The alleged disclosure date on September 5, 2017 was the Tuesday after the U.S. Labor Day holiday. That means the abnormal returns Dr. Finnerty computed on each of these alleged disclosure dates is a return from the closing price on the prior Friday to the closing price on Monday (for June 26, 2017 and July 17, 2017) and Tuesday (for September 5, 2017). In other words, the abnormal returns on June 26, 2017 and July 17, 2017 cover 3 calendar days and the abnormal return on September 5, 2017 covers 4 calendar days.

53. Dr. Finnerty states in his deposition that these 3 and 4 calendar day windows contain a single trading day: "[t]he market is closed in the United States on Saturday and Sunday, so I don't -- I wouldn't characterize that as a three-day return in market time. That's a one-day return."[73] Based on this opinion Dr. Finnerty computes his t-statistic test by comparing the abnormal returns on June 26, 2017, July 17, 2017 and September 5, 2017 to the day-to-day variance of a single trading day.

---

[69] Finnerty Report, Exhibit 9
[70] The value of 2.78 is the standard error in Dr. Finnerty's modified CAPM Model in the Finnerty Report, Exhibit 9.
[71] Finnerty Report, Exhibit 9.
[72] Finnerty Report, Exhibit 9.
[73] Finnerty Deposition, p. 106.

54. Dr. Finnerty, however, fails to consider that Sunday is a trading day on the Tel Aviv Stock Exchange ("TASE") where BCOM also trades. In fact, Dr. Finnerty acknowledges that TASE is the primary market for BCOM where the stock trades more actively than it does on NASDAQ in the US.[74]  Therefore, the period from Friday to Monday contains, in fact, 2 trading days for BCOM's stock – Sunday and Monday.  In that case, the proper comparison for the abnormal return on the Mondays (June 26, 2017 and July 17, 2017) is not the day-to-day variation for a single trading day but for two trading days.  The benchmark for the abnormal return on September 5, 2017 is as high as 3 times the normal day-to-day variation because of the 3 trading days from the close of Friday (September 1, 2019) through the close on Tuesday (September 5, 2019).

55. Dr. Finnerty, in his deposition, seems to disagree with my observation above that BCOM returns on Monday include 2 trading days and that the 2 trading days should be accounted for when testing the significance of abnormal returns, even though he acknowledges that TASE is the more liquid and primary market for BCOM's stock.

*"Q. Okay, but it's looking from Friday to Monday.*

*A. Calendar days, it's four days, but there's research that actually makes that adjustment, and you find that the only reason that the weekend would be significant is if there are other disclosures that would also be reflected on Monday, but in real time, in trading time, one would expect the market to react the following Monday. That's the customary practice and the literature supports that."[75]*

56. Dr. Finnerty does not provide a specific reference to the literature he refers to in his deposition.  Academic studies have indeed compared the statistical properties of the Monday returns vs. the returns on other weekdays.[76]  However, to my knowledge that literature is focused on companies trading on a single market.  For such companies, there

---

[74] Finnerty Deposition, pp. 20-21.  In the Finnerty Deposition p. 107, Dr. Finnerty claims that he accounted for the trading day of TASE on Sunday, stating "in the market model, I include the value of the return on the market in Tel Aviv for that previous 24 hours."  This is not accurate for two reasons.  A review of Dr. Finnerty's model confirms that the TASE return he uses in his model for the "previous 24 hours" is the Monday TASE return, not the Sunday one. Finnerty Report, Backup file "Regression.xlsx", tab "Class Period Fit."  Second, even if Dr. Finnerty had used the Sunday TASE return in his model, that would not change the fact that he compares the BCOM Monday return to a the 1-day day-to-day variation in returns and not to 2-day variation.

[75] Finnerty Deposition, p. 106.

[76] French. K and R. Roll (1986), "Stock return variances: The arrival of information and the reaction of traders," Journal of financial economics, 1986.

is indeed only one trading day from the close of Friday to the close of Monday – the trading day on Monday. BCOM, on the other hand, trades on two markets and has two trading days (Sunday and Monday) in the period from the close of market on Friday to the close of market on Monday.

57. To confirm the validity of my observation above, I compared the volatility of BCOM's abnormal return, as computed by Dr. Finnerty, on all Mondays during the Class Period and all other week days (non-Mondays) on NASDAQ on which BCOM has a recorded return. This analysis is shown in Exhibit 8.

58. In Exhibit 8, I conduct two tests. First, I test if the volatility of Dr. Finnerty's Monday abnormal returns is equal to the volatility of the other trading days. The results show that this is not the case at the strongest 1% significance level.[77] The statistical tests prove that the volatility of Monday's abnormal returns is reliably higher than the volatility of other trading days' abnormal returns. Second, I test if the volatility of Monday's abnormal returns are equal to twice the volatility of other trading days' abnormal returns. The statistical tests show that this hypothesis cannot be rejected at the commonly used levels of statistical significance.[78] In other words, it is statistically impossible to distinguish the volatility of Monday abnormal returns from the volatility of the abnormal returns in a two-day period. As a result, I conclude that the adjustment made to Dr. Finnerty's test statistics are necessary and appropriate.

59. Based on the evidence above, Dr. Finnerty's t-tests are mis-specified with a bias toward finding higher level of statistical significance because of the low threshold set for the Monday/Tuesday abnormal returns. In Exhibit 9, I use Dr. Finnerty's Exhibit 9 to make a correction to his t-test to account for these additional trading days. As Exhibit 9 to this report shows, the correction of Dr. Finnerty's Exhibit 9 results in each of Dr. Finnerty's 3 statistically significant days being less significant. September 5, 2017 is no longer significant even at the 10% significance level. The significance of the June 26, 2017 alleged disclosure declines from the strongest 1% significance level to the weakest 10%

---

[77] See Exhibit 8, [6][a].
[78] See Exhibit 8, [6][b].

significance level.  The significance of the July 17, 2017 alleged disclosure declines from the 1% strongest significance level to the weaker 5% significance level.

### 2. Dr. Finnerty's Event Study is Unreliable Because of the Evidence of BCOM's Market Inefficiency

#### a) Dr. Finnerty' Model is Not an Accepted Formulation of a "Market Model"

60. Event studies use market models to separate the stock returns on a given day into a company-specific/abnormal return and expected return components.  The Finnerty Report utilizes what Dr. Finnerty names "modified CAPM Model."[79]  The CAPM model is a relationship that states that the expected stock risk premium is a multiple of the expected market risk premium, with that multiple commonly known as 'beta' or 'market beta.'[80]  Dr. Finnerty makes a number of modifications to the CAPM model.  He adds (a) an industry index (NASDAQ Telecommunications Index), (b) a second market index (Tel Aviv Stock Exchange All Share Index), (c) the percentage change in the exchange rate for Israel's currency (NIS), and (d) the abnormal return from the previous day.[81]

61. Dr. Finnerty explains that he includes the abnormal return on the previous day "in order to adjust for the serial correlation."[82]  In other words, Dr. Finnerty explains the use of the past abnormal return as a correction of negative autocorrelation that was discussed in Section III.A.2.a.  As I explain in the next subsection, Dr. Finnerty fails to correct the autocorrelation of BCOM's returns.  More importantly, however, the addition of the abnormal return from the previous day to the market model makes his model unreliable and speculative when used in an event study.

62. The inclusion of past abnormal returns in an event study market model is not supported by the extensive literature on event studies, litigation expert reports, or Dr. Finnerty's own reports that I have been provided.  Dr. Finnerty's modified CAPM model states that the expected return on BCOM's stock embeds a reversal of the prior day's abnormal

---

[79] Finnerty Report, ¶¶ 40-41.
[80] See Bodie Z., A. Kane and A. Marcus, Investments, 3rd Edition, pp. 236-238.  Risk premium is the company stock return in excess of a risk-free return.
[81] See Finnerty Report, Exhibit 9.
[82] See Finnerty Report, ¶ 40.

return.  Therefore, Dr. Finnerty's market model assumes that investors consistently overreact to news and reverse part of the effect of the overreaction on the next day.  Then they reverse part of the reversal on the day after, and so on.  As discussed earlier, the reversals of abnormal return are an indication of market inefficiency.  Dr. Finnerty's market model is an attempt to perform an event study on a stock that does not trade in an efficient market.  So, not only is this model unsupported by the existing body of event study literature, but it also creates insurmountable problems as the evidence below shows.

> b) *Dr. Finnerty Has Not Correctly Computed the Price Impact of the Alleged Disclosure Events Because They are Not Equal to the Disclosure Days' Abnormal Returns*

63. It is my understanding that for the purposes of class certification the relevant price impact is the one associated with the alleged disclosure announcement, not the price impact on the day of the announcement.  Dr. Finnerty's atypical model has created a distinction between the price impact due to an event and the price impact on the date of the event.  This distinction creates a fundamental measurement error in Dr. Finnerty's model.

64. Dr. Finnerty's fundamental error comes from the atypical nature of his market model.  His model stipulates that the abnormal return on any one day will be partially reversed on the next day.  By definition, this fact means that the abnormal return measured on any alleged disclosure day is not the full measure of the price impact of the disclosure announcement.  The full impact of the alleged disclosure announcement needs to incorporate the reversal of the abnormal return recorded on that day, as Dr. Finnerty's model predicts. Dr. Finnerty does not incorporate the reversal of abnormal returns in his computation of the price impact of the alleged disclosure announcements.

65. An example of the concept above is the following.  According to Dr. Finnerty, the abnormal return on July 17, 2017 is -8.76%.  Dr. Finnerty assumes incorrectly that this abnormal return is the full price impact of the alleged disclosure on July 17, 2017.[83]  But the return on that day (July 17, 2017) does not represent the price impact of the announcement that Dr. Finnerty needs to measure.  Dr. Finnerty's own model shows that

---

[83] Finnerty Report, Exhibit 9.

24

BCOM's stock reverses, on average, 38% of the abnormal return on the next day. Therefore, Dr. Finnerty's own model shows that the -8.76% abnormal return on July 17, 2017 is not the full price impact of the alleged disclosure announced on July 17, 2017. On July 18, 2017, BCOM reversed an estimated 3.33% of the -8.76% decline from July 17, 2017 (3.33% = 38% of 8.76%).  So, the price impact of the July 17, 2017 alleged disclosure declines to -5.43% by July 18, 2017 (-5.43% = -8.76% + 3.33%).   This reversal process continues over many days in the future, resulting eventually in a total price impact for the alleged disclosure announcement on July 17, 2017 which is strictly lower than the abnormal return measured on July 17, 2017 by Dr. Finnerty.

66. In short, Dr. Finnerty's error is that he adopts the testing framework of event studies designed for efficient markets while explicitly rejecting market efficiency in his modified CAPM model.  In models based on the assumption of efficient markets, experts often assume that the abnormal return on the day represents the price impact of the announcement.[84]  In Dr. Finnerty's model, the price impact of an alleged disclosure is explicitly spread over many days following the disclosure announcement.  Yet, Dr. Finnerty only measures and tests the abnormal return on the day of the alleged disclosure, thus overestimating the impact of the alleged disclosure event itself.

67. Dr. Finnerty cannot argue that the incorrect test of the abnormal return on the day of the alleged disclosure is nevertheless indicative of price impact for two reasons.  First, the negative sign of the autocorrelation in BCOM's stock is important. Negative autocorrelation implies a reversal pattern in returns. Therefore, the abnormal return measured on the day of the alleged disclosure is strictly higher than the true price of the announcement itself, if one exists.  So, Dr. Finnerty's abnormal return is biased toward finding a larger price impact.

68. Second, Dr. Finnerty's existing results cannot be used to infer the true value of the price impact, i.e. cannot be corrected without revisions to his modified CAPM model.  The reason for that is the fact that Dr. Finnerty's modified CAPM Model still suffers from the

---

[84] This assumption is only valid if there are no other confounding announcements on the same date and if there are no reasons to believe the announcement impact spans multiple days.

same problem – autocorrelation – that his model attempts to correct.  I document this finding in Exhibit 10.

69. Exhibit 10 shows a test of autocorrelation in Dr. Finnerty's abnormal returns, after his adjustment for autocorrelation.  If Dr. Finnerty's adjustment was sufficient (or appropriate) one would not expect to find any remaining autocorrelation in the abnormal returns.  This is not the case.  As Exhibit 10 shows, the abnormal returns computed by Dr. Finnerty's model result in a statistically significant autocorrelation at lag of 3 days.  Therefore, according to Dr. Finnerty's model, predictability still exists between days that are 3 days apart, such as Monday to Thursday or Tuesday to Friday.

70. This is not a surprising result in light of Dr. Finnerty's findings in the Finnerty Report, Exhibit 8, Panel B, that the autocorrelation in BCOM's return was strong and statistically significant with as many as 5 days lag.  The Finnerty Report states that he "found that the p-values in both sets of tests [raw returns and abnormal returns] are statistically significant at the 1% level for each of the one-day to five-day lags during the Class Period. (See Exhibit 8, Panel B.)."[85]  It is, therefore, unsurprising that autocorrelation is still present in his model after correcting for autocorrelation at 1-day lag only in his modified CAPM model.  Had Dr. Finnerty incorporated the modified CAPM model to include adjustments for as many as 3-day lags, the additional modifications would have been not only atypical but likely unprecedented in the event study literature.

71. In summary, Dr. Finnerty's tests of price impact are unreliable and speculative even if I adjust for the incorrect count of trading days I show in Exhibit 9.  Dr. Finnerty's estimates of the price impact do not capture the full price impact which, as his model implies, would be spread over multiple days.  The presence of price impact cannot be inferred from the existing results in Dr. Finnerty's analysis because Dr. Finnerty's model still exhibits autocorrelation in abnormal returns.

---

[85] Finnerty Report, ¶ 39.

## IV.   Conclusions

72. BCOM's stock on NASDAQ traded in an inefficient market. This fact is proven by (i) the absence of any trading or closing price information on many days during the Class Period, (ii) the analysis of the Cammer Factors and Krogman Factors shown in this report, (iii) Dr. Finnerty's results on autocorrelation in the raw and abnormal returns, (iv) Dr. Finnerty's own deposition testimony, and (v) Dr. Finnerty's market model formulation.

73. Dr. Finnerty's analysis does not establish price impact. First, Dr. Finnerty makes a mistake in counting the number of trading days over which he computes 3 of the 4 days on which he finds any statistical significance. Correcting Dr. Finnerty's error results in eliminating all evidence of price impact at the 1% significance level and shows that the alleged disclosure on September 5, 2017 is not statistically significant.

74. Dr. Finnerty's results are unreliable and speculative. Without the assumption or proof of market efficiency, Dr. Finnerty performs price impact analyses that are not supported by the established event study literature. His price impact measurement is inconsistent with his own model assumptions that price impact reverses over the days following the alleged disclosure announcement. As a result, his results are shown to be biased toward finding larger price impact and/or more significant price impact.

Submitted this 28th day of October, 2019.

Assen Koev

# ASSEN KOEV

Charles River Associates, 129 Summit Ave, Summit, NJ 07901; (212) 520-7280

## EXPERIENCE

| | |
|---|---|
| 2003 - Ongoing | Charles River Associates, Finance Practice, Boston, MA, Oakland, CA, New York, NY and Summit, NJ |
| | 2009 – Ongoing - Principal |
| | 2006 – 2009 – Associate Principal |
| | 2003 - 2006 – Senior Associate |
| 2000 – 2003 | Simon Business School, University of Rochester |
| | Course Instructor: "Mathematical Methods in Economics" (Ph.D. Class) |
| | Laboratory Instructor: "Introductory Statistics" (MBA Class) |
| 1997 | Ford Motor Company, Basildon, UK |
| | Management Training Program |

## EDUCATION

| | |
|---|---|
| 1998 – 2003 | Simon Business School, University of Rochester, Rochester, NY |
| | ABD Finance and Applied Econometrics (Ph.D. Program) |
| 1997 - 2000 | Simon Business School, University of Rochester, Rochester, NY |
| | MS Applied Economics |
| 1993 – 1997 | Clark University / The London School of Economics |
| | Bachelor of Arts in Economics (Summa cum Laude) |

## REPRESENTATIVE CONSULTING EXPERIENCE

- Securities class actions with focus on class certification analyses, damages analyses, and settlement analyses.
- Antitrust litigation and regulatory investigations of market manipulation involving precious metals, US Treasury securities, SSA bonds, interest rates, US agency securities, and credit default swaps (CDS).

- Mortgage Backed Securities (MBS) and other asset backed securities (ABS) litigation matters, including valuation, risk analysis, scenario simulations, and others.
- Tortuous interference litigation matters.
- ERISA litigation matters.
- Arbitrations and corporate litigations involving broker-dealers, private equity funds, REITs, and others.

## WORKING PAPERS AND PUBLICATIONS

Koev A., (2002) "Dynamic International Portfolio Allocation: An Empirical Investigation," Working Paper.

Koev A. and T. Duarte-Silva (2019), "The Cammer turnover factor in securities class actions," Bloomberg Law.

Attari M. and Koev, A, (2009) "Economic Issues in ETF Litigation," Working Paper, CRA Insights.

**Appendix B: Documents Relied Upon**

**CASE DOCUMENTS**

- Amended Class Action Complaint for Violations of the Federal Securities Laws, Rex and Roberta Living Trust et. al. vs. B Communications Ltd. et al., SDNY 17-cv-04937, dated December 8, 2017.

**EXPERT REPORTS**

- Expert Report of John D. Finnerty, Ph.D, dated July 31, 2019.
- Expert Report of John. D. Finnerty, Ph.D. In Support of Lead Plaintiff's Motion for Class Certification, in In Re Chicago Bridge & Iron Company N.V. Securities Litigation, dated February 4, 2019.

**FINNERTY REPORT BACKUP**

- Regression.xlsx.
- Price Volatility.xls.

**DEPOSITIONS**

- Deposition of John D. Finnerty, October 15, 2019.

**ACADEMIC PAPERS & BOOKS**

- Fama, E. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," Journal of Finance, Vol. 25.
- Chordia, T., Roll, R., Subrahmanyam, A. (2005), "Evidence on the speed of convergence to market efficiency," Journal of Financial Economics, 76(2).
- Campbell, J., Lo, A., MacKinlay, A. (1997), "The Econometrics of Financial Markets," Princeton University Press.
- Carden, A. (1998), "Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency," University of Chicago Law Review.
- Lakonishok, J., A. Shleifer and R. Vishny (1995), "Contrarian Investment, Extrapolation and Risk," Journal of Finance.
- Lamont, O. and R. Thaler, (2003), "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," The Journal of Political Economy, Vol. 111.
- Gao, G. P., Moulton, P. C., and Ng, D. T. (2015), "Institutional ownership and return predictability across economically unrelated stocks," Working Paper, Cornell University.
- Moore D. et. al., The Practice of Statistics for Business and Economics, 3rd Edition.
- Ferrillo P., F. Dunbar, and D. Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," 78 St. John's Law Review 81 (2004).
- Degeorge F., Patel J., Zeckhauser R. (1999), "Earnings Management to Exceed Thresholds," Francois, Jayendu Patel, and Richard Zeckhauser, Journal of Business.

- Chung, K., Van Ness, B., & Van Ness, R. (2004), "Trading costs and quote clustering on the NYSE and NASDAQ after decimalization," Journal of Financial Research, 27, 316.
- Ding, X., Ni, Y. and Zhong, L. (2004), "Free Float and Market Liquidity around the World." Journal of Empirical Finance, 38(A).
- Kritzman, M. (1994), "What Practitioners Need to Know About Event Studies," Financial Analysts Journal.
- French. K and R. Roll (1986), "Stock return variances: The arrival of information and the reaction of traders," Journal of Financial Economics.
- Bodie Z., A. Kane and A. Marcus, Investments, 3rd Edition.

## COURT DECISIONS

- Cammer v. Bloom, 711 F. (D.N.J. 1989).
- Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988).
- Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 268 (2014).
- Krogman v. Sterritt 202 F.R.D. 467, 474 (N.D. Tex. 2001).

## OTHER DOCUMENT

- SEC Form S-3 Eligibility Requirements, <https://www.sec.gov/files/forms-3.pdf>.

## DATA AND DATABASES

- Bloomberg
- The Center for Research in Security Prices (CRSP)
- Refinitiv

**Exhibit 1**

**Dates with Zero Volume or Missing Closing Price for BCOM Stock : 3/18/2015 - 9/6/2017**

|  |  | Number of Trading Days [a] | Total Trading Days [b] | Percentage of Total Days [c] |
|---|---|---|---|---|
| [1] | Zero Volume | 38 | 624 | 6.09% |
| [2] | Missing Closing Price | 144 | 624 | 23.08% |

**Notes:**

[a]    Center for Research in Security Price (CRSP) and Finnerty Backup files "Regression.xlsx" and "Price Volatility.xlsx."

[b]    Center for Research in Security Price (CRSP) and Finnerty Backup files "Regression.xlsx" and "Price Volatility.xlsx"

[c]    = [a] / [b]

**Exhibit 2**
**BCOM Weekly Volume Turnover: 3/18/2015 - 9/6/2017**

|  | Week Starting | Total Volume | Shares Outstanding | Turnover |
|---|---|---|---|---|
|  | [a] | [b] | [c] | [d] |
| [1] | 3/18/2015 | 7,605 | 29,889 | 0.03% |
| [2] | 3/25/2015 | 1,688 | 29,889 | 0.01% |
| [3] | 4/1/2015 | 1,852 | 29,889 | 0.01% |
| [4] | 4/9/2015 | 5,578 | 29,889 | 0.02% |
| [5] | 4/16/2015 | 9,127 | 29,889 | 0.03% |
| [6] | 4/23/2015 | 10,120 | 29,889 | 0.03% |
| [7] | 4/30/2015 | 1,706 | 29,889 | 0.01% |
| [8] | 5/7/2015 | 12,816 | 29,889 | 0.04% |
| [9] | 5/14/2015 | 5,917 | 29,889 | 0.02% |
| [10] | 5/21/2015 | 16,071 | 29,889 | 0.05% |
| [11] | 5/29/2015 | 14,304 | 29,889 | 0.05% |
| [12] | 6/5/2015 | 1,209 | 29,889 | 0.00% |
| [13] | 6/12/2015 | 3,222 | 29,889 | 0.01% |
| [14] | 6/19/2015 | 2,120 | 29,889 | 0.01% |
| [15] | 6/26/2015 | 1,091 | 29,889 | 0.00% |
| [16] | 7/6/2015 | 1,936 | 29,889 | 0.01% |
| [17] | 7/13/2015 | 3,484 | 29,889 | 0.01% |
| [18] | 7/20/2015 | 3,319 | 29,889 | 0.01% |
| [19] | 7/27/2015 | 2,193 | 29,889 | 0.01% |
| [20] | 8/3/2015 | 4,716 | 29,889 | 0.02% |
| [21] | 8/10/2015 | 8,559 | 29,889 | 0.03% |
| [22] | 8/17/2015 | 2,067 | 29,889 | 0.01% |
| [23] | 8/24/2015 | 4,815 | 29,889 | 0.02% |
| [24] | 8/31/2015 | 409 | 29,889 | 0.00% |
| [25] | 9/8/2015 | 1,272 | 29,889 | 0.00% |
| [26] | 9/15/2015 | 1,509 | 29,889 | 0.01% |
| [27] | 9/22/2015 | 1,900 | 29,889 | 0.01% |
| [28] | 9/29/2015 | 2,038 | 29,889 | 0.01% |
| [29] | 10/6/2015 | 3,293 | 29,889 | 0.01% |
| [30] | 10/13/2015 | 10,372 | 29,889 | 0.03% |
| [31] | 10/20/2015 | 14,686 | 29,889 | 0.05% |
| [32] | 10/27/2015 | 3,550 | 29,889 | 0.01% |
| [33] | 11/3/2015 | 6,872 | 29,889 | 0.02% |
| [34] | 11/10/2015 | 5,020 | 29,889 | 0.02% |
| [35] | 11/17/2015 | 4,118 | 29,889 | 0.01% |
| [36] | 11/24/2015 | 1,944 | 29,889 | 0.01% |
| [37] | 12/2/2015 | 2,179 | 29,889 | 0.01% |
| [38] | 12/9/2015 | 4,365 | 29,889 | 0.01% |
| [39] | 12/16/2015 | 3,535 | 29,889 | 0.01% |
| [40] | 12/23/2015 | 1,225 | 29,889 | 0.00% |
| [41] | 12/31/2015 | 2,468 | 29,889 | 0.01% |

**Exhibit 2**
**BCOM Weekly Volume Turnover: 3/18/2015 - 9/6/2017**

|      | Week Starting | Total Volume | Shares Outstanding | Turnover |
|------|---------------|--------------|--------------------|----------|
|      | [a]           | [b]          | [c]                | [d]      |
| [42] | 1/8/2016      | 2,030        | 29,889             | 0.01%    |
| [43] | 1/15/2016     | 2,582        | 29,889             | 0.01%    |
| [44] | 1/25/2016     | 2,605        | 29,889             | 0.01%    |
| [45] | 2/1/2016      | 16,867       | 29,889             | 0.06%    |
| [46] | 2/8/2016      | 5,575        | 29,889             | 0.02%    |
| [47] | 2/16/2016     | 2,240        | 29,889             | 0.01%    |
| [48] | 2/23/2016     | 9,941        | 29,889             | 0.03%    |
| [49] | 3/1/2016      | 4,719        | 29,889             | 0.02%    |
| [50] | 3/8/2016      | 2,933        | 29,889             | 0.01%    |
| [51] | 3/15/2016     | 4,673        | 29,889             | 0.02%    |
| [52] | 3/22/2016     | 6,001        | 29,889             | 0.02%    |
| [53] | 3/30/2016     | 6,344        | 29,889             | 0.02%    |
| [54] | 4/6/2016      | 2,912        | 29,889             | 0.01%    |
| [55] | 4/13/2016     | 2,822        | 29,889             | 0.01%    |
| [56] | 4/20/2016     | 1,919        | 29,889             | 0.01%    |
| [57] | 4/27/2016     | 4,524        | 29,889             | 0.02%    |
| [58] | 5/4/2016      | 300          | 29,889             | 0.00%    |
| [59] | 5/11/2016     | 238          | 29,889             | 0.00%    |
| [60] | 5/18/2016     | 1,172        | 29,889             | 0.00%    |
| [61] | 5/25/2016     | 26,709       | 29,889             | 0.09%    |
| [62] | 6/2/2016      | 35,346       | 29,889             | 0.12%    |
| [63] | 6/9/2016      | 127,328      | 29,889             | 0.43%    |
| [64] | 6/16/2016     | 29,992       | 29,889             | 0.10%    |
| [65] | 6/23/2016     | 27,924       | 29,889             | 0.09%    |
| [66] | 6/30/2016     | 13,419       | 29,889             | 0.04%    |
| [67] | 7/8/2016      | 14,304       | 29,889             | 0.05%    |
| [68] | 7/15/2016     | 10,816       | 29,889             | 0.04%    |
| [69] | 7/22/2016     | 14,047       | 29,889             | 0.05%    |
| [70] | 7/29/2016     | 13,998       | 29,889             | 0.05%    |
| [71] | 8/5/2016      | 4,994        | 29,889             | 0.02%    |
| [72] | 8/12/2016     | 3,541        | 29,889             | 0.01%    |
| [73] | 8/19/2016     | 4,519        | 29,889             | 0.02%    |
| [74] | 8/26/2016     | 4,025        | 29,889             | 0.01%    |
| [75] | 9/2/2016      | 4,870        | 29,889             | 0.02%    |
| [76] | 9/12/2016     | 8,445        | 29,889             | 0.03%    |
| [77] | 9/19/2016     | 3,440        | 29,889             | 0.01%    |
| [78] | 9/26/2016     | 2,894        | 29,889             | 0.01%    |
| [79] | 10/3/2016     | 2,718        | 29,889             | 0.01%    |
| [80] | 10/10/2016    | 2,910        | 29,889             | 0.01%    |
| [81] | 10/17/2016    | 2,489        | 29,889             | 0.01%    |
| [82] | 10/24/2016    | 1,527        | 29,889             | 0.01%    |

**Exhibit 2**
**BCOM Weekly Volume Turnover: 3/18/2015 - 9/6/2017**

|       | Week Starting | Total Volume | Shares Outstanding | Turnover |
|-------|---------------|--------------|--------------------|----------|
|       | [a]           | [b]          | [c]                | [d]      |
| [83]  | 10/31/2016    | 2,601        | 29,889             | 0.01%    |
| [84]  | 11/7/2016     | 9,803        | 29,889             | 0.03%    |
| [85]  | 11/14/2016    | 5,905        | 29,889             | 0.02%    |
| [86]  | 11/21/2016    | 5,623        | 29,889             | 0.02%    |
| [87]  | 11/29/2016    | 2,890        | 29,889             | 0.01%    |
| [88]  | 12/6/2016     | 13,456       | 29,889             | 0.05%    |
| [89]  | 12/13/2016    | 3,638        | 29,889             | 0.01%    |
| [90]  | 12/20/2016    | 11,416       | 29,889             | 0.04%    |
| [91]  | 12/28/2016    | 4,566        | 29,889             | 0.02%    |
| [92]  | 1/5/2017      | 7,237        | 29,889             | 0.02%    |
| [93]  | 1/12/2017     | 6,431        | 29,889             | 0.02%    |
| [94]  | 1/20/2017     | 16,117       | 29,889             | 0.05%    |
| [95]  | 1/27/2017     | 9,913        | 29,889             | 0.03%    |
| [96]  | 2/3/2017      | 3,266        | 29,889             | 0.01%    |
| [97]  | 2/10/2017     | 2,445        | 29,889             | 0.01%    |
| [98]  | 2/17/2017     | 5,479        | 29,889             | 0.02%    |
| [99]  | 2/27/2017     | 10,427       | 29,889             | 0.03%    |
| [100] | 3/6/2017      | 7,192        | 29,889             | 0.02%    |
| [101] | 3/13/2017     | 16,118       | 29,889             | 0.05%    |
| [102] | 3/20/2017     | 5,053        | 29,889             | 0.02%    |
| [103] | 3/27/2017     | 6,173        | 29,889             | 0.02%    |
| [104] | 4/3/2017      | 4,031        | 29,889             | 0.01%    |
| [105] | 4/10/2017     | 1,711        | 29,889             | 0.01%    |
| [106] | 4/18/2017     | 5,428        | 29,889             | 0.02%    |
| [107] | 4/25/2017     | 3,089        | 29,889             | 0.01%    |
| [108] | 5/2/2017      | 5,229        | 29,889             | 0.02%    |
| [109] | 5/9/2017      | 6,637        | 29,889             | 0.02%    |
| [110] | 5/16/2017     | 5,991        | 29,889             | 0.02%    |
| [111] | 5/23/2017     | 5,736        | 29,889             | 0.02%    |
| [112] | 5/31/2017     | 6,847        | 29,889             | 0.02%    |
| [113] | 6/7/2017      | 4,817        | 29,889             | 0.02%    |
| [114] | 6/14/2017     | 11,061       | 29,889             | 0.04%    |
| [115] | 6/21/2017     | 48,993       | 29,889             | 0.16%    |
| [116] | 6/28/2017     | 11,274       | 29,889             | 0.04%    |
| [117] | 7/6/2017      | 10,721       | 29,889             | 0.04%    |
| [118] | 7/13/2017     | 17,705       | 29,889             | 0.06%    |
| [119] | 7/20/2017     | 8,258        | 29,889             | 0.03%    |
| [120] | 7/27/2017     | 6,421        | 29,889             | 0.02%    |
| [121] | 8/3/2017      | 9,005        | 29,889             | 0.03%    |
| [122] | 8/10/2017     | 4,885        | 29,889             | 0.02%    |
| [123] | 8/17/2017     | 7,653        | 29,889             | 0.03%    |

**Exhibit 2**
**BCOM Weekly Volume Turnover: 3/18/2015 - 9/6/2017**

|  | Week Starting | Total Volume | Shares Outstanding | Turnover |
|---|---|---|---|---|
|  | [a] | [b] | [c] | [d] |
| [124] | 8/24/2017 | 8,645 | 29,889 | 0.03% |
| [125] | 8/31/2017 | 3,025 | 29,889 | 0.01% |
| [126] | **Average** |  |  | **0.03%** |

**Sources:** Center for Research in Security Prices (CRSP)
**Notes:**
[1] - [125]:
[a]           Starting date of week
[b]           Weekly total volume for weel starting on [a]
[c]           CRSP
[d]            = [b] / [c]
[126][d]      = Average ([1][d] through [125][d])

**Exhibit 3**
**BCOM Analyst Reports**

| | Title [a] | Date [b] | Contributor [c] | Analyst [d] |
|---|---|---|---|---|
| [1] | No surprises in 2Q17; end of structural separation in BEZQ is a key catalyst | 9/4/2017 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [2] | 1Q17 - neutral for our view, maintain BUY on valuations | 5/21/2017 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [3] | PT downgrade to ILS91 on lower BEZQ, keep BUY on target NAV discount | 4/3/2017 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [4] | ABID - B. Communications - Due Diligence and Valuation Report | 1/5/2017 | ARROWHEAD BID | RENAUD, THOMAS, ET AL |
| [5] | 3Q16: loss on early bond redemption costs, high discount to target NAV | 11/24/2016 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [6] | Bond refinancing leads to cost savings, upgrade to BUY on higher upside | 9/20/2016 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [7] | 2Q16 better q-o-q, no div. announced, PT reduced to ILS107 on lower BEZQ price | 8/4/2016 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [8] | 1Q16: Net loss on interest costs and low BEZQ NI, but will pay high dividends | 5/26/2016 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [9] | 4Q15 results and sale of 4.18% in BEZQ in 1Q16 supportive for future dividends | 3/22/2016 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [10] | PT up to ILS125 on strong BEZQ, rating down to Neutral on lower NAV discount | 3/10/2016 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [11] | B Communications Ltd. : [Revised] Thoughts on Bezeq share sale and the possible tender offer | 2/26/2016 | DEUTSCHE BANK | PORWAL, HIMANSHU |
| [12] | BCOM sells 4.18% in BEZQ in the market, the sale implies 38% net debt reduction | 2/2/2016 | CHARDAN CAPITAL MARKETS | ROGOVIN, LENA, ET AL |
| [13] | ABID - B. Communications - Due Diligence and Valuation Report | 9/25/2015 | ARROWHEAD BID | RENAUD, THOMAS, ET AL |
| [14] | B Communications Ltd. : Initiate on BCOM 7.375% '21s with a Buy | 9/8/2015 | DEUTSCHE BANK | PORWAL, HIMANSHU, ET AL |

**Source:** Refinitiv

**Exhibit 4**
**Institutional Ownership of BCOM Stock: March 2015 - September 2017**

| | | 31-03-2015 [a] | 30-06-2015 [b] | 30-09-2015 [c] | 31-12-2015 [d] | 31-03-2016 [e] | 30-06-2016 [f] | 30-09-2016 [g] | 31-12-2016 [h] | 31-03-2017 [i] | 30-06-2017 [j] | 30-09-2017 [k] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | Institutional Holdings (millions) | 5,127,377 | 4,056,664 | 4,143,562 | 4,041,177 | 4,405,865 | 1,683,381 | 1,295,334 | 1,286,531 | 1,369,208 | 1,266,447 | 1,252,416 |
| [2] | Total Shares (millions) | 29,889,045 | 29,889,045 | 29,889,045 | 29,889,045 | 29,889,045 | 29,889,045 | 29,889,045 | 29,889,045 | 29,889,045 | 29,889,045 | 29,889,045 |
| [3] | Percentage Institutional Ownership | 17.2% | 13.6% | 13.9% | 13.5% | 14.7% | 5.6% | 4.3% | 4.3% | 4.6% | 4.2% | 4.2% |
| | **Investor Name** | | | | | | | | | | | |
| [4] | Altshuler Shaham Ltd. | 1,996,903 | 1,766,263 | 1,766,263 | 1,766,263 | 1,766,263 | 127,266 | 127,266 | 127,266 | 127,266 | 127,266 | 127,266 |
| [5] | Fjärde AP-Fonden | 1,430,176 | 1,430,176 | 1,430,176 | 1,430,176 | 1,430,176 | | | | | | |
| [6] | Altshuler Shaham Mutual Funds Management Ltd. | 1,017,608 | 230,640 | 230,640 | | | | | | | | |
| [7] | Sphera Funds Management Ltd. | - | - | - | - | - | 148,861 | - | - | - | - | - |
| [8] | Mellon Investments Corporation | 45,378 | - | 31,356 | 31,602 | 40,230 | 129,337 | 128,306 | 130,919 | 134,730 | 53,590 | 93,609 |
| [9] | Deutsche Asset Management Americas | 45,566 | 42,905 | 20,885 | 23,291 | 67,549 | 56,818 | 34,878 | 19,969 | 10,188 | 147 | 585 |
| [10] | Renaissance Technologies LLC | 27,000 | 27,700 | 27,900 | 28,000 | 28,500 | 31,300 | 33,400 | 33,900 | 35,000 | 36,300 | 36,800 |
| [11] | BlackRock Institutional Trust Company, N.A. | 18,560 | 21,114 | 20,580 | 36,811 | 60,171 | 59,205 | 59,281 | 60,559 | 62,966 | 63,125 | 67,687 |
| [12] | O'Shaughnessy Asset Management, LLC | - | - | - | - | - | - | - | - | | | |
| [13] | Geode Capital Management, L.L.C. | 8,335 | 8,405 | 8,547 | 9,195 | 9,110 | 9,110 | 9,195 | 9,535 | 10,045 | 13,809 | 14,173 |
| [14] | Schweizerische Nationalbank | 7,634 | 9,634 | 10,980 | 10,980 | 14,148 | 14,148 | 14,148 | 14,148 | 14,148 | 19,903 | 19,903 |
| [15] | Schroder Investment Management Ltd. (SIM) | 3,304 | 3,304 | 3,304 | 34,580 | - | - | - | - | - | - | - |
| [16] | Northern Trust Global Investments | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | | |
| [17] | Charles Schwab Investment Management, Inc. | 4,706 | 8,046 | 17,630 | 19,103 | 23,485 | 22,482 | 24,819 | 28,876 | 41,234 | 23,779 | 10,748 |
| [18] | UBS Financial Services, Inc. | 2,256 | 789 | 6,412 | 2,454 | 647 | 1,498 | 1,808 | 12,569 | 8,327 | 1,247 | 8,159 |
| [19] | UBS Asset Management (Switzerland) | 1,839 | 1,839 | 1,839 | 1,839 | 1,839 | 1,839 | 1,839 | 1,839 | 1,839 | 1,839 | 1,839 |
| [20] | Citi Investment Research (US) | - | - | 44 | - | 16,279 | 4,415 | - | 2,960 | - | 109 | 109 |
| [21] | Tower Research Capital LLC | 731 | 230 | 403 | 262 | 411 | 300 | 541 | 106 | 100 | - | - |
| [22] | Ireland Strategic Investment Fund | 662 | 662 | 662 | 662 | 662 | 662 | 662 | | | | |
| [23] | Ground Swell Capital, LLC | 500 | 500 | 500 | 500 | 500 | 500 | | | | | |
| [24] | Deutsche Bank Securities Inc. | - | - | - | - | - | - | - | - | | | |
| [25] | Wells Fargo Advisors | 150 | 150 | 660 | 405 | 405 | 405 | 405 | 405 | 405 | 405 | 405 |
| [26] | Hanseatic Management Services, Inc. | - | - | - | - | - | - | - | - | | | |
| [27] | BNY Mellon Asset Management | 78 | - | 78 | 504 | 504 | 504 | 504 | 504 | 504 | 504 | 504 |
| [28] | Bank of America Merrill Lynch (US) | 357 | 1,043 | 1,367 | 931 | 4,233 | 3,669 | 6,613 | 5,182 | 778 | 2,263 | 4,431 |
| [29] | Morgan Stanley & Co. LLC | 50 | 51 | - | 52 | 44 | - | - | - | - | - | - |
| [30] | NEXT Financial Group, Inc. | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | - | 5 | 5 |
| [31] | Barclays Capital | - | - | 16,565 | 2,131 | 10,118 | 9,514 | 4,745 | - | - | - | - |
| [32] | BlackRock Financial Management, Inc. | - | - | | | | | | | | | |
| [33] | Goldman Sachs International | - | - | 12,428 | - | - | - | - | - | 10,283 | 12,504 | - |
| [34] | Morgan Stanley Smith Barney LLC | - | 4,000 | - | - | - | 500 | 500 | 500 | - | 3,000 | 3,000 |
| [35] | Norges Bank Investment Management (NBIM) | - | - | - | | | 5,065 | 5,065 | 5,065 | 45,537 | 45,537 | 42,635 |
| [36] | Schroder Investment Management North America Inc. | - | - | - | 3,539 | - | - | - | - | - | - | - |
| [37] | STANLIB Asset Management Ltd. | | | | | | | | | | | |
| [38] | The Vanguard Group, Inc. | - | | | | 141,033 | 170,626 | 182,929 | 182,929 | 188,176 | 190,985 | 197,488 |
| [39] | Tocqueville Asset Management LP | - | - | - | - | - | - | | | | | |
| [40] | Acadian Asset Management LLC | | | 31,683 | 132,596 | 214,275 | 157,354 | 26,412 | 19,178 | 11,136 | 19,588 | 6,825 |
| [41] | Acrospire Investment Management LLC_NLE | | | | | | 601 | 200 | 200 | 200 | 200 | 200 |
| [42] | Advisor Group, Inc | | | | | | 3,379 | - | - | - | - | - |
| [43] | AJO, LP | | | | | | | 25,110 | 16,283 | - | - | - |
| [44] | AllianceBernstein L.P. | | | | | | 29,360 | 29,360 | 35,170 | 46,540 | 50,340 | 54,240 |
| [45] | AMP Capital Investors Limited | | | | 10,550 | 8,100 | - | - | - | - | - | - |
| [46] | AQR Capital Management, LLC | 901 | - | - | - | 58,585 | 135,061 | 170,892 | 166,451 | 182,169 | 153,189 | 125,444 |
| [47] | BlackRock Investment Management (UK) Ltd. | | | | | 1,465 | 2,487 | 4,248 | 4,285 | - | - | - |
| [48] | Bridgeway Capital Management, Inc. | | | | | 350 | 300 | 300 | - | - | - | - |
| [49] | California Public Employees' Retirement System | | | | | | 47,165 | 47,165 | 47,165 | 47,165 | 39,422 | 39,422 |
| [50] | Callan LLC | | | | | | | | | | | 664 |
| [51] | Clal Insurance Enterprises Holdings Ltd. | 482,828 | 482,828 | 482,828 | 476,228 | 476,228 | 476,228 | 302,856 | 302,856 | 302,856 | 302,856 | 302,856 |
| [52] | ClariVest Asset Management LLC | | | | | 1,643 | - | 2,537 | 3,212 | - | - | - |

**Exhibit 4**
**Institutional Ownership of BCOM Stock: March 2015 - September 2017**

| | | 31-03-2015 [a] | 30-06-2015 [b] | 30-09-2015 [c] | 31-12-2015 [d] | 31-03-2016 [e] | 30-06-2016 [f] | 30-09-2016 [g] | 31-12-2016 [h] | 31-03-2017 [i] | 30-06-2017 [j] | 30-09-2017 [k] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [53] | Counsel Portfolio Services, Inc. | | | | | | 3,742 | 7,446 | 14,339 | 11,136 | 19,588 | 6,825 |
| [54] | Cutler Group, LP | | | | | 540 | 540 | 540 | 540 | 440 | 440 | 440 |
| [55] | Edmond de Rothschild Asset Management (France) S.A. | | 900 | 1,600 | 2,300 | 7,780 | 9,850 | 10,250 | 10,500 | 14,400 | 18,350 | 19,570 |
| [56] | Florida State Board of Administration | | | | | | | | | 46,776 | 46,776 | 46,776 |
| [57] | Invesco Capital Management LLC | | | | | 1,404 | 1,428 | 1,428 | 1,428 | - | - | - |
| [58] | J.P. Morgan Securities LLC | | | | 49 | 49 | 49 | 49 | 49 | 49 | - | - |
| [59] | J.P. Morgan Securities plc | | | | | 41 | - | - | - | 344 | 344 | 344 |
| [60] | Massachusetts Mutual Life Insurance Company | | | | | | | 174 | 174 | 174 | 174 | 174 |
| [61] | Northern Trust Investments, Inc. | | | 3,058 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 9,568 | 9,704 |
| [62] | Nuveen LLC | | | | | | | | | | 6,038 | 6,308 |
| [63] | OppenheimerFunds, Inc._NLE | 11,800 | 11,800 | 11,800 | 11,800 | 11,800 | 11,800 | 11,800 | | | | |
| [64] | Philadelphia International Advisors, L.P._NLE | 8,496 | 311 | | | | | | | | | |
| [65] | RBC Capital Partners | | | | | | | | 8 | 1 | - | - |
| [66] | Segall Bryant & Hamill, LLC | 8,496 | 311 | 311 | 311 | 311 | 311 | 8,848 | 8,848 | 5,208 | - | - |
| [67] | SunAmerica Asset Management, LLC | | | | | 2,085 | - | - | - | - | - | - |
| [68] | T. Rowe Price Associates, Inc. | | | | | | | | 9,799 | 2,522 | 168 | 168 |
| [69] | Vanguard Investments Australia Ltd. | | | | | | | 588 | 588 | 344 | 2,250 | 2,244 |
| [70] | Vanguard Investments Canada Inc. | | | | | | | | | | | 27 |
| [71] | Zürcher Kantonalbank (Asset Management) | | | | | 839 | 1,639 | 4,164 | 4,164 | 2,164 | 839 | 839 |

**Source: Refinitiv**
**Notes**
Institutional shareholders include shareholders with Investor Type = Brokerage Firms or Investment Managers.
[1]        = sum of [4] through [71]
[2]        BCOM SEC forms 20-F
[3]        = [1] / [2]
[4] - [71]: Refinitiv Instititional Ownership History.

**Exhibit 5**

**Test of Cause-and-Effect on BCOM Earnings Announcement Dates: 3/18/2015 - 9/6/2017**

|  | Period | Announcement Date | Announcement Time | Price Impact Date | Abnormal Return | T-stat | P-Value |
|---|---|---|---|---|---|---|---|
|  | [a] | [b] | [c] | [d] | [e] | [f] | [g] |
| [1] | 2014:Q4 | 3/26/2015 | 1:07 PM | 3/26/2015 | -1.87% | (0.67) | 0.50 |
| [2] | 2015:Q1 | 5/21/2015 | 7:57 AM | 5/21/2015 | 2.66% | 0.96 | 0.34 |
| [3] | 2015:Q2 | 8/31/2015 | 7:11 AM | 8/31/2015 | Missing Data | | |
| [4] | 2015:Q3 | 11/19/2015 | 9:01 AM | 11/19/2015 | -3.35% | (1.20) | 0.23 |
| [5] | 2015:Q4 | 3/17/2016 | 6:57 AM | 3/17/2016 | -0.08% | (0.03) | 0.98 |
| [6] | 2016:Q1 | 5/26/2016 | 7:19 AM | 5/26/2016 | Missing Data | | |
| [7] | 2016:Q2 | 8/4/2016 | 6:24 AM | 8/4/2016 | -4.13% | (1.48) | 0.14 |
| [8] | 2016:Q3 | 11/23/2016 | 7:27 AM | 11/23/2016 | 1.94% | 0.70 | 0.49 |
| [9] | 2016:Q4 | 3/30/2017 | 6:03 AM | 3/30/2017 | -1.33% | (0.48) | 0.63 |
| [10] | 2017:Q1 | 5/18/2017 | 7:14 AM | 5/18/2017 | -0.89% | (0.32) | 0.75 |
| [11] | 2017:Q2 | 8/31/2017 | 8:58 AM | 8/31/2017 | 0.26% | 0.09 | 0.93 |

**Notes:**

| | |
|---|---|
| **[a]** | Quarterly Period |
| [b] | BCOM SEC filings |
| [c] | BCOM SEC filings |
| [d] | = [b] if [c] is before 4pm; [b]+1 if [c] is after 4pm |
| [e] | Finnerty Report backup file "Regression.xlsx", tab "Class Period Fit |
| [f] | = [e] / Standard Error of Regression. Standard Error of Regression is from Finnerty Report, Exhibit 9 |
| [g] | = p-value of [f], assuming t-distribution with 188 degrees of freedom, and two sided test |

**Exhibit 6**
**BCOM Market Capitalization and Market Capitalization Percentile Relative to Common Stocks in CRSP**



**Sources:**

Center for Research in Security Prices, Monthly Prce File

**Notes:**

CRSP stocks include all stocks with available price information at the end of the month and SHRCD=10, 11 or 12.

**Exhibit 7**
**BCOM Bid-Ask Spread by Year: 3/18/2015 - 9/6/2017**

|     | Year | Bid-Ask Spread ($) [a] | Bid-Ask Spread (%) [a] |
| --- | --- | --- | --- |
| [1] | 2015 | 1.40 | 7.18% |
| [2] | 2016 | 1.12 | 4.39% |
| [3] | 2017 | 0.84 | 4.66% |
| [3] | Average | 1.12 | 5.41% |

**Notes:**

[1] - [2]:

[a]        Average of difference (Ask Price - Bid Price) by year. Source CRSP

[b]        Average of difference (Ask Price - Bid Price) / Closing Price, by year. Source CRSP

[3]:        = Average ([1] through [3])

**Exhibit 8**

**Variance Tests for Dr. Finnerty's Monday and non-Monday Abnormal Returns: 3/18/2015 - 9/6/2017**

|  |  | H0: Monday Variance = Non-Monday Variance [a] | H0: Monday Variance = 2 x Non-Monday Variance [b] |
|---|---|---|---|
| [1] | Monday Abnormal Return Variance | 0.14% | 0.14% |
| [2] | Non-Monday Abnormal Return Variance | 0.08% | 0.16% |
| [3] | Monday Abnormal Return Sample | 66 | 66 |
| [4] | Non-Monday Abnormal Return Sample | 305 | 305 |
| [5] | F-statistic | 1.72 | 0.86 |
| [6] | P-Value | 0.14% | 23.04% |

**Sources**: Finnerty Report, Backup file "Regression.xlsx", tab "Class Period Fit"

**Notes:**

Abnormal returns on the alleged misstatement and disclosure dates are excluded

[1]       = Variance of Monday abnormal returns

[2][a]    = Variance of Non-Monday abnormal returns

[2][b]    = 2 x Variance of Non-Monday abnormal returns

[3]       = Count of Monday abnormal returns

[4]       = Count of Non-Monday abnormal returns

[5]       = [1] / [2]

[6]       = p-value of [5] assuming F-distribution with degrees of freedom ([3]-1,[4]-1)

**Exhibit 9**

**Adjusted Finnerty T-tests on Alleged Disclosure Dates Including Multiple Trading Days**

|  |  | Finnerty Report, Exhibit 9 | | | Adjusted Finnerty Report, Exhibit 9 | | |
|---|---|---|---|---|---|---|---|
|  |  | 26-Jun-17 | 17-Jul-17 | 5-Sep-17 | 26-Jun-17 | 17-Jul-17 | 5-Sep-17 |
|  |  | [a] | [b] | [c] | [d] | [e] | [f] |
| [1] | Trading Days | 1 | 1 | 1 | 2 | 2 | 3 |
| [2] | Abnormal Return | -7.39% | -8.76% | -5.41% | -7.39% | -8.76% | -5.41% |
| [3] | Standard Error | 2.78% | 2.78% | 2.78% | 3.93% | 3.93% | 4.82% |
| [4] | T-stat | (2.66) | (3.15) | (1.94) | (1.88) | (2.23) | (1.12) |
| [5] | P-Value | 0.85% | 0.19% | 5.33% | 6.16% | 2.71% | 26.30% |
| [6] | Significance | *** | *** | * | * | ** |  |

**Notes:**

[a]- [c]:   Finnerty Report, Exhibit 9

[1][d]       = 2 (June 25, 2017 on TASE and June 26, 2017 on TASE and NASDAQ)

[1][e]       = 2  (July 16, 2017 on TASE and July 17, 2017 on TASE and NASDAQ)

[1][f]        = 3 (September 3, 2017 on TASE, September 4, 2017 on TASE and September 5, 2017 on TASE and NASDAQ)

[2]           Finnerty Report, Exhibit 9

[3]           = [3] x sqrt([1])

[4]           = [2] / [3]

[5]           = p-value of [4], assuming t-distribution with 188 degrees of freedom, and two sided test

[6]           = *, if significant at 10% or better

              = **, if significant at 5% or better

              = *** if significant at 1% or better

**Exhibit 10**

**Autocorrelation Test for the Abnormal Returns in the Finnerty Report Model: 3/18/2015 - 6/19/2017**

|  |  | Coefficient [a] | Standard Error [b] | t Stat [c] | P-value [d] |
|---|---|---|---|---|---|
| [1] | Intercept | 0.00 | 0.002 | 0.503 | 61.5% |
| [2] | Abnormal Return Lag 1 | (0.03) | 0.056 | (0.477) | 63.4% |
| [3] | Abnormal Return Lag 2 | (0.03) | 0.056 | (0.547) | 58.5% |
| [4] | Abnormal Return Lag 3 | 0.15 | 0.055 | 2.654 | 0.8% |
| [5] | Abnormal Return Lag 4 | 0.07 | 0.056 | 1.268 | 20.6% |
| [6] | Abnormal Return Lag 5 | (0.00) | 0.056 | (0.039) | 96.9% |

**Source:** Finnerty Report, Backup file "Regression.xlsx", tab "Class Period Fit"

**Notes:** AR(5) regression for "Abnormal Return"

AR(5) regression uses abnormal returns from Finnerty Backup file "Regression.xlsx", tab "Class Period Fit"

Only abnormal returns with available numeric values are used in the AR(5) regression

Regression equation of AR(5) regression:

$R(t) = c(1) + c(2)*R(t-1) + c(3)*R(t-2) + c(4)*R(t-3) + c(5)*R(t-4) + c(6)*R(t-5) + e(t)$