# EXHIBIT C

⚠ Caution
As of: October 23, 2019 10:54 PM Z

## *Buttonwood Tree Value Partners, LP v. Sweeney*

United States District Court for the Central District of California, Southern Division

September 12, 2013, Decided; September 12, 2013, Filed

Case No.: SACV 10-00537-CJC(MLGx)

**Reporter**
2013 U.S. Dist. LEXIS 201118 *

BUTTONWOOD TREE VALUE PARTNERS, LP and JOHN SORRELLS on Behalf of Themselves and all Others Similarly Situated, Plaintiffs, vs. JACK A. SWEENEY, STEVEN J. SWEENEY, MARILYN J. SWEENEY, GARY M. HORGAN, H. ANTHONY GARTSHORE, ELIZABETH THOMPSON, FRED. M. EDWARDS, THOMAS E. McCULLOUGH, RICHARD SCHREIBER, LAWRENCE J. SHERMAN, and DELOITTE & TOUCHE, LLP, Defendants.

**Prior History:** *Buttonwood Tree Value Partners, LP v. Sweeney, 2012 U.S. Dist. LEXIS 183438 (C.D. Cal., Dec. 10, 2012)*

## Core Terms

stock, misrepresentations, class period, predominate, proposed class, class certification, class action, Plaintiffs', days, securities, shares, securities fraud, class member, purchases, issues, named plaintiff, requirements, courts, causation, cases, stock price, volatility, question of law, omissions, trading, dummy, parties, losses, court finds, adequacy

**Counsel:** [*1] For Buttonwood Tree Value Partners LP, on behalf of themselves and all others similarly situated, John Sorrells, on behalf of themselves and all others similarly situated, Plaintiffs: Ilene Freier Brookler, Greenfield and Goodman LLC, Los Angeles, CA USA; Jon A Tostrud, Tostrud Law Group PC, Los Angeles, CA USA; Jonathan W Cuneo, Matthew E Miller, PRO HAC VICE, Cuneo Gilbert and LaDuca, LLP, Washington, DC USA; Richard D Greenfield, PRO HAC VICE, Greenfield and Goodman LLC, New York, NY USA; Sandra Watson Cuneo, Cuneo Gilbert and LaDuca LLP, Los Angeles, CA USA.

For Jack A Sweeney, Steven J Sweeney, Marilyn J Sweeney, Gary M Horgan, H Anthony Gartshore, Elizabeth Thompson, Fred M Edwards, Thomas E Mccullough, Richard Schreiber, Lawrence J Sherman,

Defendants: Charles E Weir, LEAD ATTORNEY, Gregory Raymond Jones, Jason David Strabo, Thomas A Ryan, McDermott Will and Emery LLP, Los Angeles, CA USA; Julian Lucien Andre, Office of US Attorney, Los Angeles, CA USA.

**Judges:** CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE.

**Opinion by:** CORMAC J. CARNEY

## Opinion

**ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

### INTRODUCTION

Plaintiffs Buttonwood Tree Value Partners, LP ("Buttonwood") and John Sorrells, individually and [*2] on behalf of all others similarly situated (collectively, "Plaintiffs"), brought this action against certain officers and directors (collectively, "Defendants")[1] of First Regional Bancorp ("FRB") and its now-failed banking subsidiary, First Regional Bank (the "Bank"), alleging violations of *Sections 10(b)* and *20(a) of the Securities and Exchange Act of 1934* ("*Exchange Act*"). Plaintiffs seek to have the Court certify this securities litigation as a class action pursuant to *Federal Rule of Civil Procedure 23(a)* and *(b)(3)* on behalf "of all persons and entities who purchased or otherwise acquired FRB securities during the [period of January 30, 2007 to

---

[1] The named Defendants are Jack A. Sweeney, Lawrence Sherman, H. Anthony Gartshore, Steven J. Sweeney, Gary M. Horgan, Elizabeth H. Thompson, Thomas E. McCullough, Marilyn J. Sweeney, Fred M. Edwards, and Richard Schreiber. (Dkt. No. 179 [Third Am. Compl. "TAC"] ¶¶ 11, 16.)

January 29, 2010, inclusive (the "Class Period")] and were damaged thereby" (the "Proposed Class").[2] (TAC ¶ 26.) Plaintiffs also seek the appointment of the law firms Greenfield & Goodman, LLC ("G&G") and Cuneo, Gilbert & LaDuca, LLP ("CGL") as co-lead counsel. After carefully considering the evidence presented by the parties and the arguments of their counsel, the Court finds that class certification is warranted because all requirements of *Federal Rule of Civil Procedure 23(a)* and *23(b)(3)* are satisfied here. Accordingly, Plaintiffs' motion for class certification is GRANTED.

## BACKGROUND

Plaintiffs have alleged that Defendants made a number **[*3]** of false and misleading statements and concealed relevant material information during the Class Period regarding the true financial and operating condition of FRB and the Bank. (TAC ¶ 2.) Plaintiffs claim that Defendants' fraud artificially inflated or propped up the prices of FRB's securities, which subsequently declined precipitously, eventually becoming nearly worthless. (*Id.* ¶ 5.) Defendants carried out this scheme, Plaintiffs allege, for the purposes of maintaining their compensation packages and keeping FRB afloat while they sought infusions of capital for the company. (*Id.* ¶ 3.)

Plaintiffs claim that, throughout the Class Period, Defendants understated FRB's Allowance for Loan and Lease Losses by at least $90 million, failed to report over $50 million in loan charge-offs, and mischaracterized non-performing and impaired loans — all of which allegedly resulted in significant overstatement of the Bank's financial statements throughout the Class Period. (*Id.* ¶ 4.) Plaintiffs further allege that, throughout the Class Period, Defendants concealed material facts concerning FRB and the Bank's violations of Securities and Exchange Commission ("SEC") policies, accounting regulations, **[*4]** Federal Deposit Insurance Corporation ("FDIC") rules and regulations, banking regulator warnings and Cease and Desist Orders; lack of compliance with the Bank's internal policies and procedures; and imprudent lending practices. (*Id.* ¶ 3.) Additionally, the TAC alleges that, during the same period, Defendants issued false Sarbanes-Oxley Act of 2002 certifications concerning the adequacy of the Bank's internal controls and oversight management. (*Id.* ¶¶ 13–14.)

Buttonwood, an investment partnership, and Mr. Sorrells, an individual, acquired shares of FRB stock from May 2008 to February 2009. (*Id.* ¶¶ 9–10.) Both Buttonwood and Mr. Sorrells' purchases were ultimately made by the same man, John Norberg. (Dkt. No. 192-5 ["Norberg Decl."] ¶¶ 2, 4.) Mr. Norberg is Buttonwood's managing partner, and purchased FRB shares on Buttonwood's behalf in that capacity. (*Id.* ¶ 4.) He is also the principal of a separate brokerage firm, Standard Investment Chartered, Inc. ("Standard"), and in that capacity he manages investment accounts for a number of institutional and individual investors, including Mr. Sorrells. (*Id.*) Some of the accounts at Standard, such as Mr. Sorrells' account, are managed by Mr. **[*5]** Norberg on a nondiscretionary basis — that is, Mr. Norberg makes purchases with the advance approval or knowledge of the client. (*Id.*) Other accounts at Standard are managed by Mr. Norberg on a discretionary basis. (*Id.*)

Mr. Norberg asserts that his purchases of FRB stock on behalf of Buttonwood and Mr. Sorrells were based on information that he learned from FRB's publicly disseminated documents. (*Id.* ¶ 5.) Following his purchase of $385,123.86 of FRB stock on behalf of Buttonwood, and $52,615.90 of FRB stock on behalf of Mr. Sorrells in the May to July 2008 timeframe, Mr. Norberg had an in-person meeting with Anthony Gartshore, FRB's CEO, and Gary Horgan, a member of FRB's board of directors, at FRB's headquarters. (*Id.*) Mr. Norberg's purpose in meeting with Mr. Gartshore was to perform his "due diligence" responsibilities. (*Id.*) After the in-person meeting and prior to his last set of purchases of FRB stock on behalf of FRB and Mr. Sorrells, Mr. Norberg spoke again to Mr. Gartshore after receiving an FRB press release concerning the company's financial condition. (*Id.*) In both the in-person meeting and the telephone call prior to Mr. Norberg's last purchases, Mr. Gartshore told Mr. **[*6]** Norberg that "the Bank's capital was so strong," which Mr. Norberg believed to be a reiteration of FRB's prior press releases stating that FRB and the Bank were "well-capitalized." (*Id.*)

In the spring of 2009, following a decline in the market

---

[2] The TAC excludes from the Proposed Class "Defendants herein, officers and directors of FRB and/or the Bank, members of their immediate families and the heirs, successors or assigns of any of the foregoing." (TAC ¶ 26.) The Proposed Class includes "[p]urchasers of FRB Shares, purchased directly or indirectly by and for FRB's 401(k), Employee Stock Ownership Plan ('ESOP') and other benefit plans, other than for the benefit of the foregoing individuals." (*Id.*)

prices of FRB stock, Mr. Norberg retained a lawyer to investigate the decline. (*Id.* ¶ 6.) In January 2010, after the Bank was seized by the FDIC, Mr. Norberg decided to retain a different law firm, G&G, to advise Buttonwood with regard to potential securities fraud and ultimately to file this class action lawsuit. (*Id.* ¶ 7.) In particular, Mr. Norberg reached out to a lead attorney at G&G, Richard Greenfield. (*Id.*) Mr. Greenfield and Mr. Norberg had been long-time acquaintances, and Mr. Greenfield and his wife had brokerage accounts with Standard, which were managed by Mr. Norberg. (*Id.*) Indeed, during the Class Period, Mr. Norberg purchased $38,000 in FRB stock for the Greenfields' account on a completely discretionary basis. (*Id.*)

## ANALYSIS

Plaintiffs seeking to certify a class action must satisfy two sets of requirements under *Federal Rule of Civil Procedure 23*. First, the proposed class must satisfy the four requirements of *Rule 23(a)*: (1) the class is so numerous that joinder of all members **[*7]** is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. Second, the party seeking certification must show that the action falls within one of the three subsections of *Rule 23(b)*. In this case, Plaintiffs seek certification pursuant to *23(b)(3)*, which allows certification where "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3)*. On a motion for class certification, the proponent bears the burden of demonstrating that each prerequisite for class designation is met. *Moeller v. Taco Bell Corp., 220 F.R.D. 604, 607 (N.D. Cal. 2004)* (citing *In re N. Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig., 693 F.2d 847, 854 (9th Cir. 1982))*. In determining whether certification is proper, a district court must take the substantive allegations of the complaint as true, and may also consider extrinsic evidence submitted by the parties. *Id.* (citing *Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975))*.

### A. Requirements Under *Rule 23(a)*

### 1. Numerosity

A proposed class meets *Rule 23(a)*'s numerosity **[*8]** requirement where the class is so numerous that joinder of all members individually is "impracticable." *Fed. R. Civ. P. 23(a)(1)*. No exact numerical cut-off is required; rather, the specific facts of each case must be considered. *Gen. Tel. Co. of Nw., Inc. v. E.E.O.C., 446 U.S. 318, 330, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980)*. Numerosity is presumed, however, where the plaintiff class contains forty or more members. *Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)*. Additionally, it is not necessary to state the exact number of class members when the plaintiff's allegations "plainly suffice" to meet the numerosity requirement. *Schwartz v. Harp, 108 F.R.D. 279, 281–82 (C.D. Cal. 1985)*. Here, Plaintiffs allege that there are more than five hundred members of the Proposed Class. (Dkt. No. 192-1 ["Class Cert. Mot."] at 4.) Moreover, there is evidence in the record that lends support to Plaintiffs' allegation. (*See* Dkt. No. 192-6 ["Miller Decl."] ¶ 3 (noting that, according to FRB's Report on Form 10-K for the period ending December 31, 2008, persons not affiliated with FRB held 8,062,579 of FRB's outstanding shares).) Joinder of more than five hundred plaintiffs would be impracticable. Defendants, furthermore, do not dispute that the proposed class is numerous. Therefore, the Court finds that the Proposed Class is sufficiently numerous.

### 2. Commonality

*Rule 23(a)(2)* requires that class members' claims contain **[*9]** "questions of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2)*. The commonality requirement has been construed permissively, and may be satisfied if plaintiffs show that "class members have shared legal issues by divergent facts or that they share a common core of facts but base their claims for relief on different legal theories." *Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1988)*. The common issues of fact or law must be of sufficient importance to convince a court that a class action is the most efficient way of determining the rights of the parties. *Stott v. Haworth, 916 F.2d 134, 145 (4th Cir. 1990)* ("Class certification is only proper when a determinative critical issue overshadows all other issues."); *Martin v. Dahlberg, Inc., 156 F.R.D. 207, 214 (N.D. Cal. 1994)* ("[T]he core purposes of a class suit will only be advanced if the common issues of law or fact are issues central to the case."); *see also Wal-Mart Stores, Inc. v.*

*Dukes, 564 U.S. 338, 131 S. Ct. 2541, 2545, 180 L. Ed. 2d 374 (2011)* (interpreting commonality requirement to mean a "common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

In *Blackie*, the Ninth Circuit held that public disclosures alleged to contain misrepresentations and overstatements of earnings and assets, and misleading accountings of expenses, **[\*10]** [3] presented common questions of law and fact:

> The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the "common question" requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit.

*Blackie, 524 F.2d at 902.* Taking its approach from *Blackie*, one district court found that a proposed securities class satisfied the commonality requirements when all the potential class members had "the same basic legal claims (securities fraud) based on the same nucleus of operative facts." *Schaefer v. Overland Express Family of Funds, 169 F.R.D. 124, 128 (S.D. Cal. 1996)*.

Plaintiffs here detail a series of material omissions and misrepresentations from the sources investors typically rely upon to receive the information that is vital to their financial decision making. These include press releases

---

[3] The *Blackie* plaintiffs' complaint alleged that the price of the company's stock was artificially inflated because "the [defendant corporation's] annual reports . . . for fiscal years 1970 and 1971, various interim reports, press releases and other documents (a) overstated earnings, (b) overstated the value of inventories and other assets, (c) buried expense items and other costs incurred for research and development in inventory, (d) misrepresented the companies' current ratio, (e) failed to establish adequate reserves for receivables, (f) failed to write off certain assets, (g) failed to account for the proposed discontinuation of certain product lines, and (h) misrepresented [defendant corporation's] prospects for future earnings." *Blackie, 524 F.2d at 902.*

and public filings with the SEC. Plaintiffs' allegations raise the following common questions **[\*11]** of law and fact: (1) whether the Bank's capital was inadequate; (2) whether its allowance for loan losses reflected the quality of the Bank's loan portfolio; (3) whether its financial statements were materially false and misleading; (4) whether its underwriting and oversight risk management were lacking; and (5) whether the Bank's internal policies and procedures were followed. (Class Cert. Mot. at 6.) These common questions form the core of a case for securities fraud; they are also extremely similar to questions of law and fact that other courts have found to be common in previous securities fraud cases. *See, e.g., Blackie, 524 F.2d at 902.* If they chose to press this action as individuals, all class members would still have to prove these questions. Defendants do not dispute that the commonality requirement is satisfied here. Accordingly, the Court finds that there is sufficient commonality of questions of law and fact to certify the Proposed Class.

### 3. Typicality

*Rule 23(a)(3)* requires that "the claims and defenses of the representative parties [b]e typical of the claims and defenses of the class." *Fed. R. Civ. P. 23(a)(3).* To meet the typicality standard, the Ninth Circuit does not require the named plaintiffs' injuries to be "identical with those **[\*12]** of the other class members, [but] only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same injurious course of conduct." *Armstrong v. Davis, 275 F.3d 849, 869 (9th Cir. 2001)*; *accord Hanlon, 150 F.3d at 1020* ("Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."). Even if a class representative's claims are typical of the class, "[s]everal courts have held that 'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" *Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir 1992)* (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990)).*

In this case, Defendants argue that Plaintiffs should be deemed atypical because they are subject to a unique defense — namely, that Plaintiffs did not rely on the integrity of the market in deciding to purchase FRB stock. (Dkt. No. 196 ["Class Cert. Opp'n"] at 17.) Whether the Plaintiffs relied on the integrity of the

market is relevant because Plaintiffs here rely on the fraud-on-the-market doctrine to satisfy the justifiable reliance element of their *Rule 10b-5* claims. (*See* TAC ¶ 136.) The United States Supreme Court has held that when **[\*13]** securities fraud class action plaintiffs meet certain requirements,[4] they are entitled to a fraud-on-the-market presumption of reliance. This creates a rebuttable presumption that the plaintiffs in the class actually relied on the defendants' material misrepresentations or omissions when purchasing or selling a security. *Basic, 485 U.S. at 248*. This presumption is rebuttable, however, by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff." *Id.* This link may be severed, for example, by showing that a particular plaintiff relied on nonpublic information in deciding to purchase the stock at issue. *See Hanon, 976 F.2d at 508−09*.

Importantly, the Ninth Circuit has "emphasize[d] that the defense of non-reliance is not a basis for denial of class certification." *Id. at 509*. The proper inquiry at the class certification stage, rather, is whether "it is predictable that a major focus of the litigation will be on a defense unique to [the named plaintiff]." *Id. at 508−09* (holding that named plaintiff's reliance on the integrity of the market would likely be subject to "serious dispute" given numerous facts suggesting that he was a "professional" plaintiff who frequently made stock purchases to gain **[\*14]** standing to file securities fraud lawsuits); *accord Schaefer, 169 F.R.D. at 129* ("Defendants need not show that these unique defenses will necessarily succeed, but rather that they will shape the focus of litigation in a way that may harm class members and ultimately risk the class' chance of recovery."). Thus, it is the threat of unique defenses to preoccupy class representatives, rather than the viability of those defenses, that determines whether a proposed class representative should be deemed typical for purposes of class certification.

The identified defense in this case — Plaintiffs' reliance

on non-market information — does not pose such a threat. Both Plaintiffs purchased more than half of their total investments in FRB stock *before* Mr. Norberg had any meetings with FRB officers.[5] Because discussions between Mr. Norberg and FRB corporate representatives beginning in September 2008 in no way "sever the link" between alleged market-wide misrepresentations and Plaintiffs' purchases in May through July 2008, a substantial portion of Plaintiffs' purchases are free from the specter of unique defenses. The defense of reliance on non-market information may or may not prove successful, but that is not what matters. **[\*15]** What matters here is that the defense identified by Defendants does not threaten to be a major focus of the litigation so as to harm the interests of absent class members. *See Hanon, 976 F.2d at 508−09*.

The cases cited by Defendants are not to the contrary. Defendants cite four cases in which courts have "refuse[d] to certify a proposed class where the representative had direct or personal interactions with board members or officers of the issuing company before purchasing company stock." (Class Cert. Opp'n at 17.) For example, in *Grace v. Perception Technology Corp., 128 F.R.D. 165 (D. Mass. 1989)*, the court held that unique defenses rendered atypical the claims of a proposed class representative who had purchased 90% of his stock *after* a private meeting with two corporate officers in which he received information not generally available to the market. *128 F.R.D. at 168−69*. Likewise, in the three other cases cited by Defendants, the named plaintiffs apparently made their *entire* purchases of stock *after* private meetings or telephone calls with corporate executives. *See Shiring v. Tier Techs. Inc., 244 F.R.D. 307, 313−14 (E.D. Va. 2007)*; *Landry v. Price Waterhouse Chartered Accountants, 123 F.R.D. 474, 476 (S.D.N.Y. 1989)*; *Beck v. Status Game Corp., No. 89 Civ. 2923 (DNE), 1995 U.S. Dist. LEXIS 9978, 1995 WL 422067, at \*3−4 (S.D.N.Y. July 14, 1995)*. The cases cited by Defendants are distinguishable because in those cases the unique defense of reliance on non-market information threatened to wipe out the named

---

[4] The requirements are "(1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed." *Basic Inc. v. Levinson, 485 U.S. 224, 248, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*.

[5] It is undisputed that Buttonwood purchased approximately 80% of its overall investment in FRB ($385,123.86 of a total of $479,127.86 invested) and Mr. Sorrells purchased over 50% of his overall investment ($52,615.90 of a total of $99,630.91 invested) between May and July 2008 — clearly before the first meeting or discussion between Mr. Norberg and a representative of FRB, which took place in September 2008. (Class Cert. Mot. at 10−11; *see also* Norberg Decl. ¶¶ 4−5.)

plaintiffs' **[\*16]** claims with respect to all or nearly all of their stock purchases. Because the majority of Plaintiffs' purchases here are not subject to any unique defense identified by Defendants, Plaintiffs' claims "are reasonably co-extensive with those of absent class members," and, therefore, Plaintiffs' claims are sufficiently typical under *Rule 23(a)(3)*'s "permissive standards." *Hanlon, 150 F.3d at 1020*.

## 4. Adequacy

*Rule 23(a)(4)* requires that "the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. The adequacy requirement depends on two inquiries: (1) whether the class representatives and their counsel have any conflicts of interest with other class members; and (2) whether the class representatives and their counsel will prosecute the action vigorously on behalf of the class. *Stanton v. Boeing Co., 327 F.3d 938, 957 (9th Cir. 2003)*. Reviewing a securities class action, the district court in *Schaefer* formulated the issue of adequacy as determining whether the "representative party's attorney [would] be qualified" and whether "the named plaintiffs' interests [would] not be antagonistic to the remainder of the class." *Schaefer, 169 F.R.D. at 130*. The district court in *In re Unioil Sec. Litig., 107 F.R.D. 615 (C.D. Cal. 1985)*, stated the following regarding the adequacy requirement:

> There is considerable overlap between the typicality prerequisite **[\*17]** of *Rule 23(a)(3)* and the adequate representation requirement of *Rule 23(a)(4)*. Although a court may consider potential conflicts of interest, the Ninth Circuit has observed that courts generally decline to consider conflicts at the outset, unless the conflict is apparent and at the very heart of the suit.

*107 F.R.D. at 622* (citation omitted).

Here, it is undisputed that G&G and CGL are qualified to conduct this type of litigation. Both firms have extensive experience prosecuting securities fraud class actions, and both firms have served as lead counsel in comparable cases over the years. (Dkt. No. 192-2 ["Greenfield Decl."] ¶ 9.) Nor is there any dispute that Plaintiffs and proposed class counsel have vigorously litigated this case for three years. The parties do, however, dispute (1) whether Buttonwood is an adequate representative given that its managing partner, Mr. Norberg, provided brokerage services to

Buttonwood's counsel, Mr. Greenfield, and (2) whether Mr. Greenfield should be appointed class counsel given that he is a member of the Proposed Class.

### a. Relationship Between Mr. Norberg and Mr. Greenfield

Defendants' principal argument in opposition is that Buttonwood is an inadequate representative because its managing partner, **[\*18]** Mr. Norberg, "receives financial gain through his business relationship with [Mr. Greenfield, lead class counsel in this case]." (Class Cert. Opp'n at 20.) In particular, Mr. Greenfield and his wife are clients of Mr. Norberg's brokerage firm, Standard, and Mr. Norberg manages the Greenfields' accounts with Standard on a discretionary basis. (Norberg Decl. ¶ 4; Greenfield Decl. ¶ 5.) Additionally, Mr. Greenfield and Mr. Norberg have been acquainted with one another for over 20 years and are now friends. (Norberg Decl. ¶ 8.) In support of this argument, Defendants cite a number of cases that express the concern "that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members." *Sipper v. Capital One Bank, No. CV 01-9547 LGB (MCX), 2002 U.S. Dist. LEXIS 3881, 2002 WL 398769, at \*4 (C.D. Cal. Feb. 28, 2002)* (quoting *Susman v. Lincoln Am. Corp., 561 F.2d 86, 95–96 (7th Cir. 1977)*) (internal quotation marks omitted). But a close examination of these cases reveals that they do not support a finding that Buttonwood is an inadequate representative.

In *Sipper*, the court denied class certification because named plaintiffs failed to disclose in a timely manner that one of the attorneys representing the proposed class and one of **[\*19]** the named plaintiffs had been business partners in a series of real estate deals and had been joint defendants in a prior lawsuit. *2002 U.S. Dist. LEXIS 3881, [WL] at \*3–4*. Neither the named plaintiff nor the attorney disclosed the close business relationship to the court, to the attorney's other clients in the matter, or to co-counsel. *2002 U.S. Dist. LEXIS 3881, [WL] at \*3*. While acknowledging that "the existence of a business relationship does not *automatically* preclude class representation," the court noted that the failure to disclose a close business relationship between class counsel and a named plaintiff was "of great import" at least in that case because "[t]he entire course of conduct in this matter . . . suggest[ed] collusion between [the named plaintiff and attorney who were close business partners]." *2002 U.S.*

*Dist. LEXIS 3881, [WL] at *3-4*.

Similarly, in another case cited by Defendants, *Simon v. Ashworth, Inc., No. CV 07-1324-GHK (AJWx), 2007 U.S. Dist. LEXIS 96131, 2007 WL 4811932 (C.D. Cal. Sept. 28, 2007)*, the court found a conflict of interest where the named plaintiff had close family and business ties with class counsel. *2007 U.S. Dist. LEXIS 96131, 2007 WL 4811932, at *4*. Plaintiff's father had worked for class counsel's law firm for at least two years; plaintiff had known counsel for his "whole life" and made frequent social visits to the law offices; and plaintiff had sporadically worked in the law offices. *Id.* Moreover, [*20] the court inferred from the fact that plaintiff was willing to forego pursuing statutory damages, which had been demanded in the complaint, that plaintiff "[wa]s essentially prosecuting this action solely for attorneys' fees." *Id.*

Lastly, Defendants cite *London v. Wal-Mart Stores, Inc., 340 F.3d 1246 (11th Cir. 2003)*, which found that a district court abused its discretion by ignoring "significant personal and financial ties" between class counsel and a named plaintiff. *340 F.3d at 1255*. Class counsel and the named plaintiff had been close friends since high school, and the named plaintiff had been the attorney's stockbroker for many years. *Id. at 1249*. After the named plaintiff discussed his enrollment in a credit life insurance program with his "friend and attorney," the attorney advised him to not cancel his coverage, to continue to pay premiums, and to file suit, even though at that time he had paid only $0.41 in premiums. *Id. at 1249-50*. The court noted that "[t]he requirement for a stringent examination of the adequacy of the class representative is especially great when, as in this case, the attorney's fees will 'far exceed[]' the class representative's recovery." *Id. at 1254* (quoting *Shroder v. Suburban Coastal Corp., 729 F.2d 1371, 1375 (11th Cir. 1984))* (brackets in original). The court then added that "[i]n *such circumstances*, 'courts fear that a class representative [*21] who is closely associated with the class attorney [will] allow settlement on terms less favorable to the interests of absent class members.'" *Id.* (quoting *Shroder, 729 F.2d at 1375*) (emphasis added) (second set of brackets in original).

Unlike *Sipper, Simon*, and *London*, nothing in this case suggests collusion between Buttonwood (or its managing partner, Mr. Norberg) and G&G (or Mr. Greenfield), or otherwise creates the impression of impropriety. First, the relationship between Mr. Norberg and Mr. Greenfield falls short of the close business and family relationships at issue in the cases cited by

Defendants. Mr. Greenfield and Mr. Norberg have not been close friends since high school as the attorney and named plaintiff had been in *London*, nor are they business partners as were the attorney and named plaintiff in *Sipper*. Mr. Greenfield does not own any interest in Buttonwood, and the totality of his transactions with Standard make up less than 1% of Standard's revenues. (Norberg Decl. ¶ 8.) And unlike the named plaintiff and attorney in *Simon*, there is no indication that Mr. Norberg or anyone in his family was ever employed by Mr. Greenfield's firm. While it is true that Mr. Norberg has been acquainted with Mr. [*22] Greenfield for over 20 years and that he considers the Greenfields to be friends, his declaration also states without contradiction that the Greenfields pay commissions and securities mark-ups that are no different than those paid by any other clients of Standard. (*Id.*)

Second, this is not the type of situation where a class representative has a minimal financial interest in recovery that is dwarfed by the potential attorneys' fees to be gained by class counsel. According to Mr. Norberg, Buttonwood's $400,000 loss from its investment in FRB stands out as the largest loss Buttonwood has ever sustained. (Dkt. No. 192-6, Exh. B ["Norberg Dep. Excerpts"] at 167:5-14.) Third, and finally, the fact that Buttonwood and G&G have vigorously litigated this case for more than three years, particularly when considered together with the magnitude of Buttonwood's compensable losses, strongly suggests that Buttonwood and G&G are not out to quickly rake in fees for G&G at any expense to other class members. *See Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 52 (D. Conn. 2000)* ("The Court will not decline class certification simply because the plaintiff and his counsel have had professional dealings in the past, without any other evidence suggesting some improper [*23] purpose for the suit."). The Court also finds significant the fact that Buttonwood first retained other counsel to investigate its claims months in advance of hiring G&G. (Norberg Decl. ¶¶ 6-7.) This fact further vitiates any suggestion that Buttonwood and G&G are litigating this case collusively.

Defendants contend that Plaintiffs' filing, and later withdrawal, of a motion in bankruptcy court for leave to proceed derivatively on behalf of FRB's bankruptcy estate (the "Bankruptcy Motion") demonstrates an actual conflict of interest between Plaintiffs (or their counsel) and absent class members. (Class Cert. Opp'n at 20.) Defendants contend that because "any funds received pursuant to . . . claims [brought derivatively by

Plaintiffs] would be property of the FRB bankruptcy estate . . ., Plaintiffs and the putative class [as holders of equity claims] would not receive any distribution." (*Id.* at 12.) Therefore, Defendants contend, "Plaintiffs and their counsel abandoned their putative Class and sought to pursue claims for another group of claimants." (*Id.*) The Court disagrees. As Defendants acknowledge, any funds received would have been "subject to distribution in accordance with the order of **[*24]** priority established by the Bankruptcy Code." (*Id.*) Notably, all members of the Proposed Class were not only "holders of equity claims," but also had creditor status as potential victims of securities fraud by virtue of a proof of claim filed on the Proposed Class's behalf by Plaintiffs. (Dkt. No. 196-7 ["Bankruptcy Mot."] ¶ 3.) And even if their claims as creditors were low in priority, there is no suggestion that Plaintiffs or class counsel had a more senior distribution preference than the remaining class members, or that the Bankruptcy Motion was filed in order to obtain attorneys' fees for class counsel. Thus, even if filing the Bankruptcy Motion was disadvantageous to absent class members, it was no less disadvantageous to Plaintiffs. Therefore, Plaintiffs' filing of the Bankruptcy Motion does not demonstrate a conflict of interest.

In summary, the Court declines to infer collusion between Buttonwood and its lead counsel, Mr. Greenfield, simply because Buttonwood's managing partner has provided brokerage services to Mr. Greenfield, particularly in light of Buttonwood's significant financial interest in obtaining classwide relief and its vigorous litigation of this case over the **[*25]** past three years.

### b. Mr. Greenfield's Ownership of FRB Stock

Defendants also dispute the adequacy of Mr. Greenfield as class counsel because "[Mr. Greenfield] and his wife . . . were members of the putative Class, having owned FRB shares." (Class Cert. Opp'n at 11.) *Section 21D(a)(9) of the Exchange Act*, as modified by the Private Securities Litigation Reform Act of 1995, provides that in circumstances where "a plaintiff class is represented by an attorney who directly owns or otherwise has a beneficial interest in the securities that are the subject of the litigation, the court shall make a determination of whether such ownership or other interest constitutes a conflict of interest sufficient to disqualify the attorney from representing the plaintiff class." *15 U.S.C. § 78u-4(a)(9)*. It is undisputed that during the Class Period, Mr. Norberg purchased

$38,000 of FRB stock for Mr. Greenfield's brokerage account with Standard (as well as for his wife's account) on a completely discretionary basis. (Greenfield Decl. ¶ 5; Norberg Decl. ¶ 7.) Mr. Greenfield voluntarily brought his purchases of FRB stock to the Court's attention with the filing of Plaintiffs' original motion for class certification in October 2011. (Dkt. No. 52; **[*26]** Greenfield Decl. ¶ 7.) Mr. Greenfield also indicated at that time that, in order to eliminate even the appearance of any potential conflict of interest, he and his wife had assigned any potential recovery they might obtain to a local charity. Based on these facts, the Court finds that Mr. Greenfield's ownership of FRB stock does not "constitute a conflict of interest sufficient to disqualify [him] from representing the plaintiff class." *See 15 U.S.C. § 78u-4(a)(9)*.

### B. Requirements Under *Rule 23(b)*

*Rule 23(b)(3)* permits certification where "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy" in light of, among other things, "the difficulties likely to be encountered in the management of a class action." *Fed. R. Civ. P. 23(b)(3)*.

### 1. Predominance

Predominance is a similar inquiry to commonality, but requires a heightened showing that facts and issues common to the class predominate over any individual issues that might be present. *See Fed. R. Civ. P. 23(b)(3)*. The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by **[*27]** representation." *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*. In assessing predominance, it is necessary to begin with the elements of the relevant causes of action. This action seeks redress for alleged violations of *Sections 10(b)* and *20(a)* of the Exchange Act, and *Rule 10b-5*, promulgated by the SEC. *Section 10(b)* makes it "unlawful to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." *15 U.S.C. § 78j(b)*. *Subsection (b) of Rule 10b-5* similarly provides that "it shall be unlawful for any person, directly or indirectly . . . to make any untrue statement of a material fact or to

omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *17 C.F.R. § 240.10b-5(b)*.[6] To establish a securities fraud under these laws, a party must show (1) a material misrepresentation or omission by the defendant; (2) scienter, an intent to deceive; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss (damages); and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S. Ct. 1309, 1317, 179 L. Ed. 2d 398 (2011)*.

Defendants argue that the predominance requirement is not [*28] satisfied because (1) Plaintiffs have failed to establish the fraud-on-the-market presumption of reliance, and (2) Plaintiffs have not proved that common issues of fact predominate over the span of the Class Period.

### a. Fraud-on-the-Market Presumption of Reliance

Defendants argue that Plaintiffs have failed to establish the existence of an efficient market, such that they have not established the fraud-on-the-market presumption of reliance. If Plaintiffs fail to establish this presumption, individual issues will unavoidably predominate, and proceeding as a class will be inappropriate. *Basic, 485 U.S. at 242*; *Wal-Mart, 131 S. Ct. at 2552 n.6* (noting that "*Rule 23(b)(3)*'s [predominance] requirement . . . would often be an insuperable barrier to class certification [in securities class actions], . . . . [b]ut that the problem dissipates if the plaintiffs can establish the applicability of the so-called 'fraud on the market' presumption"). In order to establish the presumption, Plaintiffs must show "(1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; [*29] and (5) that the plaintiff traded the shares between the time the

misrepresentations were made and the time the truth was revealed." *Basic, 485 U.S. at 248*. Defendants only dispute whether Plaintiffs have satisfied the third criteria — that FRB shares were traded on an efficient market during the Class Period.

The Ninth Circuit has adopted the so-called *Cammer* factors as a nonexclusive guide to determining whether a market is efficient. *Binder v. Gillespie, 184 F.3d 1059, 1064–65 (9th Cir. 1999)* (acknowledging with apparent approval district court's application of the factors outlined in *Cammer v. Bloom, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989)*). These factors assess (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file an S-3 Registration Statement; and (5) whether there are "empirical facts" showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *Id.* (citing *Cammer, 711 F. Supp. at 1286–87*). "The first four *Cammer* factors indirectly assess market efficiency by evaluating whether the attributes of the market for that security are conducive to informational efficiency," [*30] whereas "the final factor explores whether an important *result* of an efficient market [that is, a causal connection between releases of new information to the market and stock price movements] exists." *In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586, 613–14 (C.D. Cal. 2009)*. At the class certification stage, Plaintiffs must establish "threshold facts" or "basic facts" of market efficiency in order to invoke the presumption of reliance. *In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 17 (1st Cir. 2005)*; *see also id.* ("The question of how much evidence of efficiency is necessary for a court to accept the fraud-on-the-market presumption of reliance at the class-certification stage is therefore one of degree.")

Defendants do not dispute that the first four *Cammer* factors suggest an efficient market for FRB shares during the Class Period. The first factor — the average weekly trading volume expressed as a percentage of total outstanding shares — is particularly suggestive of market efficiency. Plaintiffs assert — and Defendants do not contend otherwise — that the average weekly turnover rate of FRB common stock during the Class Period was 366,198 shares, or 3.09% of FRB's total shares outstanding. (Miller Decl. ¶ 3.) Numerous courts have held that a weekly trading volume of 2% of outstanding shares "would [*31] justify a strong presumption that the market for a security is an efficient

---

[6] *Section 20(a)* provides that "every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *15 U.S.C. § 78t(a)*.

one," and "one percent would justify a substantial presumption." *See, e.g., Cammer, 711 F. Supp. at 1286*; *In re 2TheMart.com, Inc. Sec. Litig., 114 F. Supp. 2d 955, 963 (C.D. Cal. 2000)* (same). If the turnover rate is computed based on float (that is considering only the shares held by persons not affiliated with FRB), the rate is even more impressive — a weekly turnover rate of 4.54% during the last two years of the Class Period. (Miller Decl. ¶ 3.)

Plaintiffs also assert without contradiction that (1) FRB was followed by buy-side analysts throughout the Class Period, (*id.* ¶ 4); (2) that FRB was followed by a prominent sell-side analyst firm for all but the last week of the Class Period, (*id.*); (3) that a total of 15 to 20 firms made a market in FRB securities during the relevant time period, (*id.* ¶ 5; Dkt. No. 192-10 ["Warmenhoven Decl."] ¶ 3); and (4) that FRB was eligible to, and did on at least one occasion, file a Registration Statement on Form S-3, (Miller Decl. ¶ 6).

Defendants solely dispute whether Plaintiffs have offered empirical facts establishing a relationship between unexpected corporate events or financial releases and an immediate response in the stock price. (*See* Class Cert. [*32] Opp'n at 21–22.) Many courts consider this to be the most important *Cammer* factor, as it is, "after all, . . . the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer, 711 F. Supp. at 1287*. In connection with this factor, Plaintiffs have proffered the expert opinion of economist Scott D. Hakala, Ph.D., who performed an event study and concluded that "identified news events explained a substantial and disproportionate portion of the movement in FRB's share price over time, consistent with an informationally efficient market." (Dkt. No. 88-2 ["Hakala Decl."] ¶ 24.) An event study is a statistical regression analysis designed to assess the effect of an event on a dependent variable, such as the company's stock price. *In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003)*.

Dr. Hakala conducted his event study in three stages: (1) he conducted a "blind" selection of material, company-specific news events;[7] (2) he identified and analyzed possible market indices and guideline or peer

group companies; and (3) he created a baseline of volatility (based on FRB's background volatility and controlling for market forces and peer group factors) and determined whether the news events identified in stage one had a statistically relevant effect [*33] on FRB's stock price beyond the baseline volatility. (Hakala Decl. ¶¶ 15–18, 23.) *See also Carpenters Health & Welfare Fund v. Coca-Cola Co., No. 1:00-CV-2838-WBH, 2008 U.S. Dist. LEXIS 112315, 2008 WL 4737173, at *2 (N.D. Ga. Mar. 14, 2008)* ("The goal of the event study is to adjust the fluctuations in the share price to compensate for market forces, peer group factors, random volatility, and company-specific but non-fraud related activities."). Background volatility is the degree to which a stock's value typically or randomly fluctuates. A finding that FRB stock had low background volatility, meaning that FRB stock price fluctuations were generally not dramatic, would "set the bar low" for Plaintiffs to show that significant news days coincided with significant stock price fluctuations. Conversely, a high background volatility would mute the significance of stock price movements on significant news days, and thus would reduce the likelihood of finding that the news release caused the stock price movement.

Defendants do not take issue with Dr. Hakala's event study methodology generally. They instead argue that his event study should not be relied upon for two reasons. First, Defendants argue that, by his own concession, Dr. Hakala's event study is preliminary. (Class [*34] Cert. Opp'n at 21.) Defendants also argued at the hearing on the present motion that a *Daubert* motion would be premature because Dr. Hakala's study is subject to change. But Dr. Hakala made clear when he disclosed his event study in November 2011 that his opinions should be considered preliminary "in the context that additional discovery and additional analyses might be performed." (Hakala Decl. ¶ 27.) Dr. Hakala also noted that his opinion was preliminary in the sense that his search for news events was potentially incomplete. (*See id.* ¶¶ 9(e), 16.) Notably, notwithstanding the admittedly preliminary nature of his opinions, Dr. Hakala found that "the analyses performed were sufficient to establish . . . that the [misrepresentations and omissions] alleg[ed] in the Complaint . . . did cause substantial (statistically significant and material) losses to investors in FRB's common shares during . . . the Class Period." (*Id.* ¶ 5.) As explained below, Dr. Hakala's event study is sufficient to establish the basic facts of empirical evidence of a cause-and-effect relationship between material events and stock price changes. Thus, the Court finds that the preliminary nature of Dr. Hakala's

---

[7] According to Dr. Hakala, the data selection process was "blind" because "the information likely to be new and material was selected for inclusion in the study without access to or reference to the actual stock price reaction on the corresponding dates." (Hakala Decl. ¶ 16.)

opinions [*35] goes to the weight to be given them in the analysis of the *Cammer* factors, and not to their admissibility.

Second, Defendants contend that Dr. Hakala erred by over-controlling for news days when determining the background volatility of FRB stock. (Class Cert. Opp'n at 21–22.) In determining background volatility, Dr. Hakala controlled for significant releases of new information about FRB to the market (which, he presumes, could cause spikes in the daily volatility of FRB stock) by excluding from the background volatility calculation the volatility levels of 107 "event days" that he identified in stage one. (Hakala Decl. ¶ 24.) He carried out the exclusion of event days by using so-called "dummy variables." (*Id.* ¶ 18 n.13.) A dummy variable takes the value of 0 or 1 to indicate the presence or absence of some quality — in this case, the presence or absence of a material news release on a given day. By assigning a 0 to each material news day (and a 1 to the remaining days), the material news days are excluded from the calculation of background volatility. While dummy variables "are a common and accepted component of securities fraud event studies," *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston, 853 F. Supp. 2d 181, 188 (D. Mass. 2012)*, some courts have expressed the concern [*36] that overusing dummy variables can have the effect of "understat[ing] the usual volatility of the stock, which has the effect of making it appear that news had a greater affect [sic] on price than it actually had," *In re Northfield Labs., Inc. Sec. Litig., 267 F.R.D. 536, 548 (N.D. Ill. 2010)*. Dr. Hakala disagrees with that concern, however, and contends that "adding 'too many' events ensures the relative absence of bias and ensures consistency of the estimates but at some slight loss of efficiency." (Hakala Decl. ¶ 16 n.11.)

Defendants have not provided an expert's report to contest Dr. Hakala's analysis. Instead, they cite three cases in which courts rejected Dr. Hakala's expert opinions in part due to his overuse of dummy variables: *Northfield, Bricklayers*, and *Xcelera*.[8] These cases are

distinguishable, however. Dr. Hakala has noted in reply that even if he were to employ a more conservative version of his event study methodology — "dummying out" a total of 64 events over a period of 1,036 trading days (6.4% of the trading days studied) — the events of interest are still jointly and, in most instances, individually statistically significant. (Hakala Reply Decl. ¶¶ 4–5.) By contrast, Dr. Hakala dummied out 117 of 1,383 trading days (8%) in *Northfield*, 130 of 343 trading days [*37] (38%) in *Xcelera*, and 211 of 388 trading days (54%) in *Bricklayers. See Bricklayers, 853 F. Supp. 2d at 188–89* (acknowledging percentages of dummied-out days in *Northfield* and *Xcelera* and noting that defendants in *Bricklayers* had conceded that dummying out 34 days of 388 total trading days on which significant AOL-related news appeared would have been proper).

Although the percentage of dummied-out days in Northfield (about 8%) comes close to the 6.4% dummied out here, *Northfield* is distinguishable for additional reasons. First, Dr. Hakala was criticized in *Northfield* for "exclud[ing] *all* dates on which he could find *any* news about Northfield, *even if the news was not new*." *Northfield, 267 F.R.D. at 548* (emphasis added). By contrast, even Dr. Hakala's original event study here (in which he dummied out about 10% of the days studied) "was limited to only the most relevant and obvious company-specific events." (Hakala Reply Decl. ¶ 4.) Second, the *Northfield* court found a lack of analyst coverage during a substantial portion of the class period

---

[8] Defendants do not dispute that "[i]n total, there have been more than 20 instances where courts have rejected or denied attacks on the event study methodology [Dr. Hakala] employed in this case." (Dkt. No. 198-1 ["Hakala Reply Decl."] ¶ 6.) Instead, they argue that the Court should view that number skeptically because courts have rejected Dr. Hakala's event studies more often than not after the Supreme Court's 2005 decision in *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*. But the

Court sees no reason to attach special significance to cases that rejected Dr. Hakala's opinions on the basis of *Dura. Dura* is inapposite at the class certification stage because it involved a plaintiff's burden in pleading loss causation — not in proving market efficiency. Given that proof of loss causation is not a prerequisite to certifying a securities class action, *see Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 131 S. Ct. 2179, 2186, 180 L. Ed. 2d 24 (2011)*, decisions rejecting Dr. Hakala's opinions on the basis of *Dura* are distinguishable. Moreover, Plaintiffs' burden to prove basic facts to establish market efficiency at the class certification stage is lesser in degree than their burden to prove loss causation post-certification. *See PolyMedica, 432 F.3d at 17*. Two of the three post-*Dura* decisions on which Defendants rely to discredit Dr. Hakala, however, rejected his event study methodology *after* class certification. *Compare Bricklayers, 853 F. Supp. 2d at 185–91* (post-certification *Daubert* motion), *and In re Xcelera.com Sec. Litig., No. 00-11649-RWZ, 2008 U.S. Dist. LEXIS 77807, 2008 WL 7084626, at *1–2 (D. Mass. Apr. 25, 2008)* (same), *with Northfield, 267 F.R.D. at 548–49* (class certification motion). The Court therefore accords lesser, not greater, significance to *Bricklayers* and *Xcelera*.

and also concluded that trading volume did not indicate market efficiency over the course of the class period. *Northfield, 267 F.R.D. at 547–48*. That **[*38]** is not the case here — Defendants do not dispute that the first four *Cammer* factors indicate market efficiency. Third, *Northfield* is distinguishable simply because it dealt with a different company. In all likelihood, the frequency of material news events varies significantly depending on the company. Accordingly, that a certain percentage of dummied-out days may have been deemed excessive in *Northfield* says little about whether the same percentage should be deemed excessive in this case. And even if *Northfield* were on all fours with this case, the Court declines to adopt its rationale and finds that the degree to which Dr. Hakala should have dummied out event days in this particular case goes to the weight to be given to his opinions rather than to their admissibility.[9]

In summary, the Court finds that Dr. Hakala's event study provides sufficient empirical evidence to establish market efficiency, at least at this stage of the case. Because Defendants do not dispute that the remaining *Cammer* factors indicate an efficient market for FRB stock during the Class Period — or, indeed, that the first factor creates a "strong presumption" of an efficient market — Plaintiffs have met their burden **[*39]** of establishing market efficiency.

### b. Predominance of Common Issues Over the Span of the Class Period

Defendants also contend that common issues of fact do not predominate over the span of the Class Period due to purported corrective disclosures in March 2008

---

[9] Plaintiffs submit that Dr. Hakala's methodology (1) is generally accepted and has been widely accepted in statistics since 1975; (2) has substantial peer-reviewed academic support dating from 1987 through the current date; (3) is recommended in some academic peer-reviewed texts as superior to and more reliable than alternative methods; (4) has been subject to extensive testing and shown to be reliable; and (5) has no published peer-reviewed academic paper criticizing or demonstrating its invalidity or lack of reliability. (Hakala Decl. ¶ 8.) Defendants do not directly dispute these points, other than to contend that Dr. Hakala uses dummy variables and that some other courts have rejected his opinions for excessive use of dummy variables. At this preliminary stage in the proceedings, the Court finds Dr. Hakala's opinions admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*.

regarding internal-control issues. At the hearing on the present motion, counsel for Defendants expanded on this argument and argued that Plaintiffs cannot satisfy the predominance requirement by merely pleading that Defendants' alleged misrepresentations and omissions were part of a common scheme — Plaintiffs must, according to Defendants, make an evidentiary showing that a common thread throughout the series of misrepresentations and omissions exists or that the misrepresentations and omissions were part of an overarching fraudulent scheme. Plaintiffs contend in response that because "the method of proof is not any different as to one member of the [Proposed] Class [as] it is to another[,] this is entirely a merits question that has no bearing on any *Rule 23* criteria, and this is not the time or place for it." (Dkt. No. 198 ["Class Cert. Reply"] at 4.)

The Supreme Court in *Wal-Mart* emphasized that "*Rule 23* does not set forth a mere pleading **[*40]** standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *131 S. Ct. at 2551*. Thus, *Wal-Mart* clarified that Plaintiffs bear the burden of offering evidence proving that each *Rule 23* requirement is met. That said, it is not clear that it necessarily follows from *Wal-Mart* that a court must — as it does in the context of a motion for summary judgment — "weed out" the alleged facts and focus only on the evidence in the record. *See id.* ("*[S]ometimes* it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question . . . .") (quoting *Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982))* (internal quotation marks omitted) (emphasis added); *id.* (noting that a plaintiff "must be *prepared* to prove that" the *Rule 23* requirements are in fact satisfied) (emphasis added). Nevertheless, the Court recognizes that it must engage in a "rigorous analysis" to satisfy itself that the *Rule 23* prerequisites are actually, not presumably, met. *Id.*

After undertaking a rigorous analysis, the Court finds that the record here indicates that the predominance test is met. First, as discussed **[*41]** above, Plaintiffs have established the fraud-on-the-market presumption of reliance. In connection with establishing this presumption, Plaintiffs have submitted a number of sworn declarations. (*See* Hakala Decl.; Hakala Reply Decl.; Miller Decl.) As the Court in *Wal-Mart* noted, "in class-action suits for securities fraud[,] *Rule 23(b)(3)*'s [predominance] requirement . . . would often be an

insuperable barrier to class certification, . . . . But the problem dissipates if the plaintiffs can establish the applicability of the so-called 'fraud on the market' presumption." *131 S. Ct. at 2552 n.6*; *see also Halliburton, 131 S. Ct. at 2184* ("Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance.").

Second, there is evidence in the record of misrepresentations made throughout the Class Period that concern numerous issues. For example, in connection with his event study, Dr. Hakala reviewed "analyst reports, press releases, securities filings, and news articles." (Hakala Decl. ¶ 16.) Based on that review, Dr. Hakala reached the following conclusion in his sworn declaration:

> Throughout the Class Period the Defendants made statements and assertions regarding the adequacy of internal controls, the **[\*42]** 'conservative' nature of the Company's lending policies, the 'quality' of the Company's loan portfolio, the relative absence of losses and issues with the existing loan portfolio in light of economic conditions, the adequacy of the Company's reserves for loan losses, the ability to [sic] the company to manage its loan portfolio to avoid or minimize losses in light of the economic conditions, the adequacy of the Company's capitalization ('well-capitalize' was the term frequently used in press releases and other disclosures) for regulatory purposes, and the safety and soundness of the Company's lending protocols and loan reviews.

(*Id.* ¶ 9(b) (including references to specifically identified events).) Dr. Hakala also reported that information identified in various securities filings and disclosures by FRB correctively disclosed to the market that FRB had to comply with cease and desist orders, was required to amend and restate its accounting for loan losses, increased its reserves for previously undisclosed loan losses and anticipated loan losses, and was unable to increase its capitalization sufficiently to remain well-capitalized. (*Id.* ¶ 9(c) (including references to specifically identified **[\*43]** events).) Dr. Hakala's sworn declaration also incorporated by reference an attached "Preliminary Event Study Summary," which details public statements by FRB for numerous days throughout the Class Period. (Dkt. No. 88-4 ["Prelim. Event Study Summ."].) For example, Dr. Hakala identified that on October 31, 2008, FRB reported that it had profitable Q3 results, that its capital position had strengthened, and that it remained "well-capitalized."

(*Id.* at 6.) Similarly, he identified that on December 5, 2008, FRB filed a Form 8-K and "disclosed loan issues." (*Id.*) Moreover, a number of FRB earnings releases and reports on SEC filings, as well as a copy of the FDIC Office of Inspector General Office of Material Loss Reviews Report concerning FRB (the "OIG Report"), provide additional support for and corroboration of Dr. Hakala's conclusions. (*See* Dkt. No. 88, Attachs. 8–14.) In particular, the earnings releases and SEC filings provide numerous examples of FRB public statements that the TAC alleges were fraudulently made by Defendants, and the OIG Report details numerous causes of FRB's failure and material loss[10] — many of the same issues that the TAC alleges were concealed by Defendants from the market. **[\*44]** All class members' claims turn on findings of whether the statements identified by Dr. Hakala were made and whether they were false. Defendants may presently dispute Dr. Hakala's findings, but the resolution of that dispute is not properly addressed at the class certification stage.

Third, it is undisputed that several elements of a *Rule 10b-5* claim — including materiality, connection between the misrepresentation and the purchase or sale of a security, and loss causation — are subject to common proof. Indeed, the Supreme Court has recently held that materiality and loss causation need not be proved at the class certification stage. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 133 S. Ct. 1184, 1191, 185 L. Ed. 2d 308 (2013)* (materiality); *Halliburton, 131 S. Ct. at 2186* (loss causation).

Fourth, all class members' claims will fail if they are unable to show that Defendants made their misrepresentations or omissions with scienter — the knowledge that they were false and the intent to commit fraud upon their shareholders. Proving scienter is a key to every class member's case. If, as alleged,

---

[10] The OIG Report concludes that "[FRB]'s failure was due to (1) ineffective Board of Directors (Board) and management oversight, which included weak risk management practices, violations of laws and regulations, and lack of adherence to some examination recommendations; (2) high concentrations in Commercial Real Estate . . . and Acquisition, Development, and Construction . . . lending; (3) inadequate loan underwriting; (4) poor credit administration; and (5) increased dependence on brokered deposits as funding sources during a critical period in 2008." (Dkt. No. 88-14 ["OIG Report"] at I-1.) The OIG Report also concludes that "[l]oan-related losses were responsible for the depletion of earnings and the erosion of capital." (*Id.*)

Defendants engaged in an ongoing scheme to defraud shareholders that stretched over the entire Class Period, the evidence of scienter will be identical for all class members, no matter when they purchased or sold FRB shares **[*45]** within the proposed Class Period. The same evidence applies equally to each class member; proving or disproving scienter does not hinge on any individual Proposed Class member's actions, but on Defendants' actions. "As to scienter], therefore, the class is entirely cohesive: It will prevail or fail in unison." *Amgen, 133 S. Ct. at 1191*.

That these issues are common to the entire class is significant, because the Ninth Circuit in *Blackie* found that common questions of law and fact related to misrepresentations and omissions in securities fraud suits could predominate over individual discrepancies between class members regarding reliance, loss causation, and damages. *Blackie, 524 F.2d at 905–06*. "The presence of different methods of reliance by different members of the class does not result in a conclusion that individual issues predominate over the common questions," especially when the class is "united by a multitude of common factual and legal issues." *Schaefer, 169 F.R.D. at 131*. The *Schaefer* court concluded that common issues of "repeated misrepresentations" made to "a class of purchasers allegedly defrauded over a period of time," rightfully predominated over individual issues related to causation. *Id. at 128*. In *Unioil*, the district court found that when "a common **[*46]** nucleus of misrepresentations, material omissions and market manipulations [exists], the common questions predominate over any differences between individual class members with respect to damages, causation or reliance." *Unioil, 107 F.R.D. at 622*.

The Court therefore finds that the fraud-on-the-market presumption is satisfied, and that the record before the Court shows a string of related public statements, which, according to Plaintiffs' particularly plead allegations, omitted or misrepresented material information to investors. Additionally, under recent Supreme Court precedent, Plaintiffs are not required to prove materiality or loss causation, as these issues are inherently common to all class members. Thus, common questions predominate over individual questions such as loss causation, damages, or reliance. Accordingly, Plaintiffs in this case have met *Rule 23(b)(3)*'s predominance requirement.

## 2. Superiority

*Rule 23(b)(3)* also requires that a class action be superior to other methods for fairly and efficiently adjudicating the controversy. District courts have consistently recognized that the common liability issues involved in securities fraud cases are ideally suited for resolution by way of a class action. In the *Unioil* securities **[*47]** litigation, the district court found that "given the substantial number of possible class members" and "the competence and experience of counsel on both sides," the plaintiffs' claims were best adjudicated in a class action. *Id. at 622*. Similarly, in *Freedman v. Louisiana-Pacific Corp.*, a district court found superiority in another securities fraud action because "courts have consistently embraced the class action device as a superior method of adjudicating federal securities fraud claims," and because the plaintiffs in that case sought "a determination on essentially the same issues, therefore, a class action would enhance judicial economy and efficiency." *922 F. Supp. 377, 400 (D. Or. 1996)*. "The availability of the class action to redress such frauds has been consistently upheld, in large part because of the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws." *Blackie, 524 F.3d at 903* (citations omitted).

The Court is convinced that in this case a class action is the superior method for fairly and efficiently adjudicating Plaintiffs' securities fraud claims. Trying each plaintiff's case separately would be incredibly inefficient, burdensome, and costly. Judicial economy demands **[*48]** that the Court certify the Proposed Class and resolve the parties' controversy in just one forum. More importantly, allowing this case to proceed as a class action is in keeping with the interests of justice and the perception of equal treatment under the law. If every plaintiff had to bring his or her own action against Defendants, there would be a substantial danger of inconsistent findings and judgments.[11] Finally, the Court does not foresee any great difficulties in managing this securities fraud case as a class action. The securities laws are not overly technical or complex. The individual questions of law and fact are limited in number. They certainly do not predominate over the common questions of law and fact. Counsel for both the Proposed Class and Defendants are highly experienced and skilled. The Court is confident that it can manage

---

[11] Additionally, for those class members whose alleged losses are not significant enough to spur them to seek relief individually, a class action provides an opportunity to find redress without footing the crippling costs of litigation.

this class action in a fair and efficient manner. As the Ninth Circuit has so aptly stated, securities fraud cases fit *Rule 23* "like a glove." *Epstein v. MCA, Inc., 50 F.3d 644, 668 (9th Cir. 1995)*. Accordingly, the Court finds that a class action is a superior method for adjudicating this controversy.

## C. Defendants' Requests to Modify the Class Definition

Defendants also argue that, as an alternative to **[*49]** denial of class certification, the class definition should be modified so as to (1) shorten the Class Period to commence on October 31, 2008, (2) include subclasses for the periods before and after March 4, 2008, and (3) exclude in-and-out traders from the class. (Class Cert. Opp'n at 23–25.) These requests are premature. The Court, of course, maintains the right to modify the class definition at a later stage of the proceedings should any decision on the merits — such as a successful motion for partial summary judgment — so warrant.

Defendants first argue that in-and-out traders should be excluded from the class definition. Stock purchasers are in-and-out traders if they "purchased stock during the period of misrepresentation but sold it before any disclosure which either partially or completely corrected the misrepresentation." *Wool v. Tandem Computers Inc., 818 F.2d 1433, 1437 (9th Cir. 1987)*, overruled on other grounds by *Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990)*. Although the Ninth Circuit held in *Wool* that in-and-out traders may be included in a class, the Ninth Circuit did so based on its application of the "out of pocket" rule that had been set forth in *Blackie*, which fixes damages as "the difference between the purchase price and the value of the stock at the date of purchase." **[*50]** *Id.* (holding that "an in-and-out trader . . . may suffer recoverable damages under the out-of-pocket rule even in the absence of corrective disclosures"). In *Dura*, however, the Supreme Court rejected the Ninth Circuit's conceptually related "inflated purchase price" approach to loss causation, and held that "at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." *Dura, 544 U.S. at 342*. As some courts have noted, "[i]t is unclear whether *Dura*'s discussion of inflated purchase price as it relates to loss causation overturns the Ninth Circuit's rule in *Wool*." *McGuire v. Dendreon Corp., 267 F.R.D. 690, 698 (W.D. Wash. 2010)* (noting that "[d]istrict courts in the Ninth Circuit have been in conflict with

each other over whether in-and-out traders are appropriately included").

Given that the Proposed Class is otherwise certifiable, the Court declines to exclude particular categories of plaintiffs on the theory that such plaintiffs would have difficulty proving loss causation or damages based on the *current* factual record. With discovery still incomplete in this case, (*see* Class Cert. Reply at 4 n.5), "it remains an open question as to whether the [first-in-time **[*51]** disclosure currently identified by the parties] was [indeed] the first corrective disclosure, or the first time damages occurred." *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative & "ERISA" Litig., 247 F.R.D. 32, 41 (D.D.C. 2008)*. If, following completion of discovery, Defendants successfully move for partial summary judgment on this issue, they may then renew their request to exclude in-and-out traders from the class.

As for Defendants' request to modify the start date of the Class Period, Defendants argue that because October 31, 2008 is the first "event of interest" identified by Dr. Hakala on which FRB's stock price actually increased, none of the alleged misrepresentations prior to that date could have artificially inflated FRB's stock price. To the extent it is incumbent upon the Court to consider the merits of this issue, the Court observes that Defendants' argument rests on a flawed premise — that a stock's value can only be artificially inflated by a news event if its price goes up on the day of the news event. See *Schleicher v. Wendt, 618 F.3d 679, 683–84 (7th Cir. 2010)* (concluding that misrepresentations or omissions "designed to slow the rate of fall" of a stock price are actionable even if the stock "price [i]s declining throughout the class period"). **[*52]** The Court therefore declines to modify the Class Period at this time.

Defendants also contend that the Class should be divided into two subclasses because common issues do not predominate over individual issues as between plaintiffs who purchased before March 4, 2008 and those who purchased after that date. (Class Cert. Opp'n at 24.) In particular, Defendants argue that because a March 4–5, 2008 Cease and Desist Order correctively disclosed internal-control issues that had been allegedly misrepresented to the market on prior occasions, "individuals who purchased before March 2008 had a different total mix of information than those who purchased later in the Class Period." (*Id.* at 23.) Be that as it may, however, Plaintiffs allege a number of misrepresentations throughout the Class Period that are unrelated to internal-control issues. Thus, common issues of law or fact predominate as between Proposed

2013 U.S. Dist. LEXIS 201118, *52

Class members who purchased before March 4, 2008 and those who purchased after that date. The Court therefore declines to divide the Proposed Class into subclasses at this time.

## CONCLUSION

Plaintiffs have satisfied the numerosity, commonality, typicality, and adequacy requirements of *Rule 23(a)*. Plaintiffs have **[*53]** also satisfied the predominance and superiority requirements of *Rule 23(b)(3)*. Accordingly, the Court GRANTS Plaintiffs' motion for class certification and ORDERS certification of the proposed class pursuant to *Rule 23(b)(3)*.

DATED: September 12, 2013

/s/ Cormac J. Carney

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

End of Document