# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CHICAGO BRIDGE & IRON COMPANY N.V. SECURITIES LITIGATION | Case No. 1:17-CV-1580 |
| | JURY TRIAL DEMANDED |

# EXPERT REPORT OF JOHN D. FINNERTY, Ph.D. IN SUPPORT

# OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Table of Contents

**I.     Qualifications** ....................................................................................................1
**II.    Assignment** .......................................................................................................3
**III.   Summary of Opinions** .....................................................................................4
**IV.    Background** ......................................................................................................4
  A.    Overview of CBI's Business During the Class Period .......................................4

  B.    Allegations.........................................................................................................6

**V.     Efficiency of the Market for CBI's Common Stock During the Class Period** ..........8
  A.    Application of the *Cammer* Factors to the Market for CBI's Common Stock..............12

    i.    *Cammer* Factor One: Weekly Trading Volume......................................12

    ii.   *Cammer* Factor Two: Stock Analyst Coverage ....................................13

    iii.  *Cammer* Factor Three: Existence of Market Makers, Institutional Investors, and Arbitrageurs..............................................................14

    iv.   *Cammer* Factor Four: CBI's Eligibility to File SEC Form S-3 ..................16

    v.    *Cammer* Factor Five: The Relationship between News Events and Security Price Changes ..............................................................17

  B.    Application of the *Krogman* Factors to the Market for CBI's Common Stock .............25

    i.    Company's Market Capitalization................................................25

    ii.   Stock's Bid-Ask Spread............................................................26

    iii.  Stock's Public Float................................................................27

  C.    Additional Factors Considered .......................................................................27

    i.    Put-Call Parity Tests................................................................28

    ii.   Random Walk Tests................................................................34

      a.    Non-Parametric Tests........................................................35

      b.    Parametric Tests..............................................................37

**VI.    Methodology for the Calculation of Damages per Share**..............................39
**VII.   Conclusions Regarding the Efficiency of the Market for CBI's Common Stock During the Class Period** ................................................41

## I.   Qualifications

1.   I am an Academic Affiliate at AlixPartners, LLP, a financial and operational consulting firm, where I was previously a Managing Director. I have extensive experience in securities valuation, derivatives valuation, solvency analysis, business valuation, damages calculations, and litigation support for matters involving securities fraud, breach of contract, commercial disputes, valuation disputes, solvency, fairness, and breach of fiduciary duty. I have testified as an expert in securities and other financial matters, broker hiring disputes, and valuation disputes, in federal and state court and in arbitration and mediation proceedings. I have also testified as an expert in bankruptcy court proceedings concerning the valuation of securities and businesses, the economics of debt-for-debt exchanges, and the fairness of proposed plans of reorganization.

2.   Prior to joining AlixPartners, I was a Managing Principal at Finnerty Economic Consulting, LLC, which provided financial consulting and valuation services to law firms, corporations, industry associations, and government agencies. Prior to forming Finnerty Economic Consulting in 2003, I was a Managing Principal at Analysis Group, Inc., an economic consulting firm. Prior to joining Analysis Group, I was a Partner (non-audit) in the PricewaterhouseCoopers Financial Advisory Services Group. I have also held investment banking positions at Morgan Stanley, Lazard Frères, McFarland Dewey, and Houlihan Lokey Howard & Zukin. I previously served as a Director, Executive Vice President, Treasurer, and Chief Financial Officer of College Savings Bank, an FDIC-insured and New Jersey-chartered thrift institution.

3.   I am a Professor of Finance at Fordham University's Gabelli School of Business, where I was the founding Director of the school's Master of Science in Quantitative Finance Program. I

1

was awarded early tenure in 1991, and I received the Gladys and Henry Crown Award for Faculty Excellence in 1997. I have published 16 books, including Corporate Financial Management, 5th ed., Project Financing, 3rd ed., and Debt Management, and I have published more than 120 articles and professional papers concerning corporate finance, fixed income, and business and securities valuation. I co-hold four patents on financial products, including a life insurance product that paid off in units of a specially designed certificate of deposit that would pay the cost of the beneficiary's college education.

4.     I have previously published a paper on the calculation of damages in securities fraud cases entitled, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," which was published in the Spring 2003 issue of the Stanford Journal of Law, Business & Finance. I have also published a paper on the settlement amounts in securities fraud class actions, entitled, "Determinants of the Settlement Amount in Securities Fraud Class Action Litigation," which was published in the Summer 2006 issue of the Hastings Business Law Journal. I have extensive experience testing for market efficiency, performing loss causation analysis, and calculating damages in securities fraud cases.

5.     My teaching and research deal mainly with corporate finance, investment banking, fixed income securities valuation, fixed income portfolio management, and the design and valuation of complex securities. My corporate finance and investment banking courses cover business valuation, securities valuation, public offerings of securities, and equity financing. I was inducted into the Fixed Income Analysts Society Hall of Fame in 2011.

6.     I previously served as the Chair of the Trustees, President, and Director, and I am currently serving as a Trustee of the Eastern Finance Association, an academic finance organization. I am a former Director of the Financial Management Association. I have served as the President

2

and Director of the Fixed Income Analysts Society, an association of finance professionals based in New York City. I am a former editor of *Financial Management*, one of the leading academic finance journals, and a former editor of *FMA Online*. I am a former member of the editorial boards of the *Journal of Portfolio Management* and the *International Journal of Portfolio Analysis & Management* and a former associate editor of the *Journal of Applied Finance*.

7. I received a Ph.D. in Operations Research from the Naval Postgraduate School, an M.A. in Economics from Cambridge University, where I was a Marshall Scholar, and a B.A. in Mathematics from Williams College. Attached as Appendix A is a true and correct copy of my current resume, which lists all publications I have written or co-authored and includes a brief description of my trial and deposition testimony within at least the past four years.

8. I am being compensated at a rate of $1,130 per hour for my work on this matter. I have been assisted in the preparation of this expert report by AlixPartners's staff working under my direction and supervision. I will also receive compensation based on the professional fees earned by AlixPartners in conjunction with their support of my work in writing this report. Neither my compensation nor AlixPartners's compensation is contingent on my findings or on the outcome of this matter.

9. The materials that I considered in coming to my opinions in this matter are referenced in this expert report and accompanying exhibits or are listed in Appendix B to this expert report.

## II. Assignment

10. Kahn Swick & Foti, LLC, lead counsel, and Pomerantz LLP, additional counsel for the Plaintiffs in this matter ("Counsel"), have asked me to conduct appropriate studies and opine on the efficiency of the market for the common stock of Chicago Bridge & Iron Company

3

N.V. ("CBI" or the "Company") during the period extending from October 30, 2013 through June 23, 2015 inclusive (the "Class Period"). Counsel has also asked me to opine whether the amount of the damages per share suffered by class members who purchased shares of CBI's common stock during the Class Period when the fraud-related inflation was removed from CBI's stock price could be calculated on a class-wide basis.

## III.   Summary of Opinions

11.   Based on my education, knowledge, and training in economics; my experience in performing market efficiency analysis in connection with securities class action matters; and my review of the case documents, company filings, and other information relevant to this matter, I have reached the following opinions to a reasonable degree of certainty in the financial economics profession after conducting appropriate studies, the results of which are described in this expert report:

   a.   The market for the shares of CBI's common stock was open, developed, and efficient during the Class Period; and

   b.   The damages per share suffered by class members who purchased shares of CBI's common stock during the Class Period when the fraud-related inflation was removed from the stock price could be calculated on a class-wide basis.

## IV.   Background

### A.   Overview of CBI's Business During the Class Period

12.   Founded in 1889, CBI was one of the largest energy infrastructure construction companies in the world during the Class Period. Its services included providing conceptual design, technology, engineering, procurement, fabrication, modularization, construction, commissioning, maintenance, program management and environmental services to customers in the energy infrastructure market

4

throughout the world.[1] CBI was also a provider of diversified government services. CBI highlighted in its SEC filings that "we capitalize on our global expertise and local knowledge to safely and reliably deliver projects virtually anywhere."[2] Throughout the Class Period, CBI was one of the contractors responsible for the construction of two nuclear power plants being built in Georgia and South Carolina. Shares of CBI's common stock were traded under the ticker symbol CBI on the New York Stock Exchange ("NYSE").

13.    CBI entered into an agreement to acquire Shaw Group, Inc. ("Shaw") on July 30, 2012 and closed the acquisition on February 13, 2013. It paid approximately $3.4 billion for Shaw ($2.9 billion in cash and $488.8 million in stock).[3] Shaw was one of the leading global fabricators of nuclear power plants. According to the Complaint, at the time of the acquisition, two new nuclear power plants based on the AP1000 design, a modular design developed by Westinghouse Electric Corporation ("WEC"), were under construction in the United States: Vogtle and V.C. Summer (the "Nuclear Projects"). Stone & Webster, one of Shaw's subsidiaries, was involved in the Nuclear Projects as a contractor and fabricator.[4]

14.    Following the acquisition of Shaw in the first quarter of 2013, CBI had four business segments: 1) Engineering, Construction and Maintenance, 2) Fabrication Services, 3) Technology, and 4) Government Solutions.[5]

15.    On October 27, 2015, CBI announced that it would sell its nuclear construction business to WEC.[6] As part of the transaction, WEC would indemnify CBI for liabilities arising before or after the closing of the transaction. CBI was expected to take a $1.0-$1.2 billion charge to

---

[1] CBI, SEC Form 10-K for FY 2013, February 27, 2014.
[2] *Id.*
[3] *Id.*
[4] Complaint, ¶¶2-3.
[5] CBI, SEC Form 10-K for FY 2013, February 27, 2014.
[6] CBI, "CB&I to Sell Nuclear Construction Business to Westinghouse," October 27, 2015.

5

goodwill and working capital.[7]

### B.  Allegations

16.  The Complaint alleges both material misrepresentations and material omissions that it attributes to CBI and the Individual Defendants.  The distinction between the two is economically important.  Both misrepresentations and omissions result in artificial stock price inflation: the misrepresentations (fraud by commission) trigger a price increase or mitigate an otherwise expected price decrease that would have occurred but for the fraud, and the omission of material negative information (fraud by omission) avoids a price decrease that would have occurred but for the fraud.  The repetition of a misrepresentation can also avoid a price decrease that would have occurred but for the fraud – in such instances. a repeated misrepresentation can act as an omission. i.e., the omission of the truth that the misrepresentation was and is false.

17.  Plaintiffs allege that the Defendants made several misrepresentations and omissions during the Class Period, primarily relating to the performance of CBI's nuclear business.  In particular, Plaintiffs allege that CBI initially proclaimed the Nuclear Projects as "immediate accretive to earnings within the first year" and as "forerunners to the construction of additional nuclear projects."[8]  However, Plaintiffs allege that the Nuclear Projects became "enormous liabilities for CBI in both the short term and long term."[9]  Plaintiffs allege that although CBI experienced deteriorating profitability and delayed construction schedules relating to the Nuclear Projects during the Class Period. Defendant failed to "timely or truthfully" disclose to investors the problems and their impact on the value of the Nuclear Projects.[10]

---

[7] *Id.*
[8] Complaint, ¶4.
[9] Complaint, ¶5.
[10] Complaint, ¶5.

18. Specifically, Plaintiffs allege that, during the Class Period, Defendants made following the misrepresentations and omissions: "(1) falsely claimed that CBI was protected from liability arising from cost overruns on the Nuclear Projects when the Company was actually exposed to substantial liability; (2) made materially false and misleading statements regarding the progress of the Nuclear Projects; (3) falsely asserted that delays in construction would have no effect on CBI's profitability; (4) hid fabrication defects and unsafe practices by CBI, including improper welding of critical nuclear modules; (5) failed to disclose a stop work order resulting from CBI's lack of safety compliance; (6) hid the fact that the Nuclear Projects had become so uneconomical for CBI that it was secretly considering giving away its share of the Nuclear Projects to cut off its liability; and (7) boosted reported revenues, earnings, and assets by repeatedly violating Generally Accepted Accounting Principles ("GAAP") in multiple respects."[11]

19. According to the Complaint, after the acquisition of Shaw, Defendants allegedly "retroactively manipulated the Shaw purchase accounting by more than a billion dollars" for three quarters between April 1, 2013 and December 31, 2013, by increasing the liability for contracts in progress by $1.2 billion and goodwill by about $850 million."[12] In addition, the Complaint alleges that CBI improperly carried the overvalued assets on its books until October 2015, without recognizing any goodwill impairment during the Class Period.

20. The Complaint alleges that negative information concerning CBI's nuclear business began entering the market in early June 2014.[13] Specifically, the Complaint alleges that, from June 2014 through June 2015, the following information was disclosed to the market: "(i) the

---

[11] Complaint, ¶5.
[12] Complaint, ¶6.
[13] Complaint, ¶8.

7

Nuclear Projects were behind schedule; (ii) the Nuclear Projects were incurring cost overruns; (iii) the parties involved in the Nuclear Projects disagreed over liability for cost overruns; (iv) delays would lead to additional costs for which CBI could be liable; and (v) the projects were improving."[14]

## V.    Efficiency of the Market for CBI's Common Stock During the Class Period

21.    An efficient market is one in which "security prices fully reflect all available information."[15] Stock price movements take place only after someone. on the basis of new information, is able to better assess the value of the asset.[16] There are three versions of the Efficient Market Hypothesis ("EMH").[17] The weak form of the EMH states that stock prices reflect all information contained in past trading in the market. The semi-strong form of the EMH holds that stock prices reflect all publicly available information. This is the form of the EMH adopted by the Supreme Court in *Basic*.[18] The strong form of the EMH states that stock prices reflect all public and private information. There is little evidence that the strong form of the EMH holds because it would be surprising if insiders with possession of material non-public information could not earn abnormal trading profits.[19]

22.    The Supreme Court stated in *Halliburton II* that *Basic* did not "endorse 'any particular theory of how quickly and completely publicly available information is reflected in market price,'" and that the fraud-on-the-market theory is based "on the fairly modest premise that 'market

---

[14] Complaint, ¶8.

[15] Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, Modern Portfolio Theory and Investment Analysis, 6th ed., John Wiley & Sons, Inc., Hoboken, NJ, 2003, page 402.

[16] Emery, Douglas R., John D. Finnerty, and John D. Stowe, Corporate Financial Management, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 452.

[17] Fama, Eugene, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 25, March 1970, pages 383-417.

[18] *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

[19] Jaffe, Jeffrey, "Special Information and Insider Trading," *Journal of Business*, 47, July 1974, pages 410-428, and Lorie, James, and Victor Niederhoffer, "Predictive and Statistical Properties of Insider Trading," *Journal of Law and Economics*, 11, April 1968, pages 91-103.

8

professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[20]

23.   The focus of my analysis is on the semi-strong form of the EMH, which is the most widely accepted characterization of what is meant by an "efficient market" in the securities industry and in academia. The semi-strong form of the EMH is at least as rigorous as the "fairly modest premise" specified by the Supreme Court. Thus, a showing that the market for a stock exhibits the characteristics of a semi-strong efficient market would demonstrate that company-specific information reached market professionals, "thereby affecting stock market prices."

24.   If a security's price fully reflects all public information, an investor can rely on it as the market's consensus assessment of the security's fair value. Judge Alfred J. Lechner, Jr., in *Cammer v. Bloom*,[21] cited commentators Bromberg and Lowenfels[22] ("Bromberg") in defining certain key terms related to market efficiency in the context of a stock traded other than on the New York Stock Exchange (where trading is subject to overall capitalization requirements and other indicia suggesting market efficiency):

- An open market is one in which anyone, or at least a large number of persons, can buy or sell.

- A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually,

---

[20] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2403 (2014) ("*Halliburton II*"), quoting *Basic*, 485 U.S. at 248, n. 28.

[21] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). This decision is widely considered the definitive legal authority on the issue of the efficiency of the market for a company's stock. *See, e.g., Teamsters Local 445 Freight Div. v. Bombardier*, 546 F. 3d 196, 204 n. 11(2d Cir. 2008); *Billhofer v. Flamel Technologies, S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (Sweet J.) (applying the *Cammer* factors when assessing market efficiency); The Harvard Law School Forum on Corporate Governance and Financial Regulation, "Do Courts Count Cammer Factors," August 23, 2012.

[22] *Id.* at 1276 (citing Bromberg and Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6, August 1988).

9

but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

- An efficient market is one which rapidly and accurately reflects new information in the security's price.

These terms are cumulative in the sense that a developed market will almost always be an open one, and an efficient market will almost invariably be a developed one.[23]

25. The *Cammer* court described five factors that should be considered (in addition to the exchange on which a security is listed) in determining whether a market for a specific security is efficient:

   a. the stock's average weekly trading volume;

   b. the number of securities analysts who follow and report on the stock;

   c. the presence of market makers, institutional investors, and arbitrageurs trading the stock;

   d. the company's eligibility to file a Form S-3 Registration Statement with the Securities and Exchange Commission ("SEC"); and

   e. a cause-and-effect relationship, over time, between unexpected corporate events or financial news releases and an immediate response in stock price.[24]

26. It is my opinion that the *Cammer* factors are consistent with the economics literature and that they provide valuable insight into whether the market for a security is efficient.[25] *Cammer* Factor Five (a cause-and-effect relationship, over time, between unexpected corporate events or financial news releases and an immediate response in stock price) is especially important

---

[23] *Id.*

[24] *Cammer*, at 1286-1287.

[25] Barber, Brad M., Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation Law,* 19, Winter 1994, pages 285-312.

because it relates directly to the definition of an efficient market. I examine each of these factors for the market for CBI's common stock during the Class Period.

27. In addition to the five *Cammer* factors, I also applied the three *Krogman* factors to examine further the efficiency of the market for CBI's common stock during the Class Period.[26] These factors are: (i) the company's market capitalization; (ii) the stock's bid-ask spread; and (iii) the stock's public float. The *Krogman* tests are also often cited as an additional set of factors that can be used to test for market efficiency.[27] The *Krogman* tests, along with the *Cammer* factors, provide valuable insight regarding the efficiency of the market for CBI's common stock during the Class Period.

28. Additionally, I analyzed whether put-call parity held for CBI's stock and options throughout the Class Period, and I also tested whether the price of CBI's common stock followed a random walk during the Class Period. These tests can provide additional evidence of market efficiency, alongside the *Cammer* and *Krogman* tests, though no one test is, by itself, likely to be dispositive. Put-call parity is a mathematical relationship between the price of a company's common stock and the prices of its call and put options, which holds when all those instruments are accurately priced. Put-call parity should hold for CBI's stock and options, at least to a close approximation, and the price movements of shares of CBI's common stock should generally follow a random walk if the market for CBI's common stock is efficient. The random walk model suggests that, in an efficient market, stock price movements are independent and the returns on the stock are identically distributed over time.[28]

---

[26] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

[27] Cornell, Bradford and James C. Rutten, "Market Efficiency, Crashes, and Securities Litigation," *Tulane Law Review*, 81, December 2006, pages 443-471.

[28] Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, Modern Portfolio Theory and Investment Analysis, 6th ed., John Wiley & Sons, Inc., Hoboken, NJ, 2003, page 405.

29. The *Krogman* tests, the put-call parity tests, and the random walk tests, taken in conjunction with the *Cammer* factor tests, collectively facilitate a thorough assessment of whether the market for CBI's common stock was efficient during the Class Period.

### A. Application of the *Cammer* Factors to the Market for CBI's Common Stock

#### i.    *Cammer* Factor One: Weekly Trading Volume

30. High trading volume is indicative of an efficient market. As stated in *Cammer*:

> The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.[29]

31. "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[30]

32. During the Class Period, shares of CBI's common stock were listed on the NYSE. Exhibit 1 shows the daily price and trading volume of shares of CBI's common stock during the Class Period and also during the one-year periods that precede and follow the Class Period. The average weekly reported trading volume for CBI's common stock was approximately 8.7 million shares. (*See* Exhibit 2.) The average weekly trading volume of shares of CBI's common stock was 8.06% of the shares of CBI's common stock outstanding, which provides a strong presumption of a liquid and efficient market for CBI's common stock. In addition, the examination of weekly historical turnover ratios indicates that the volume of trading was large enough each week during the Class Period to support the conclusion that the market for CBI's common stock was efficient during the Class Period.

---

[29] *Cammer*, at 1286.
[30] *Id.*, at 1293 citing Bromberg, et al.

33.   The annualized turnover ratio is the annual reported trading volume divided by the number of shares outstanding.  A total of over 751 million shares of CBI's common stock traded during the Class Period, and there was, on average, 108 million shares of CBI's common stock outstanding during the Class Period.  (*See* Exhibit 2.)  Since the Class Period spans approximately 1.65 years, the annualized turnover ratio was 421.88% for CBI's common stock.  (*See* Exhibit 2.)  In comparison, the average annualized turnover ratio for NYSE-listed common stocks was 56.9% between October 2013 and August 2015.[31]  (*See* Exhibit 3.)  The high turnover ratio for CBI's common stock, which greatly exceeds the NYSE average, further justifies a strong presumption that the market for CBI's common stock was efficient during the Class Period according to the Bromberg criteria, as articulated by the *Cammer* court.

### ii.   *Cammer* Factor Two: Stock Analyst Coverage

34.   Securities analysts play a critical role in promoting the efficiency of the securities markets.  Analysts devote substantial amounts of time and resources to collecting and assessing information regarding the companies they follow.  Their ability to provide sophisticated analysis and convey new information and their conclusions as to its implications for investors in the market for a stock improve the speed and accuracy with which market prices adjust to reflect new information.  Within twenty-four hours of a company's earnings release, many stock analysts in an efficient market will have disseminated in-depth research reports.

35.   During the Class Period, at least 28 securities firms contributed at least 307 securities analyst reports that covered CBI.  (*See* Exhibit 4.)  Barclays Capital, BB&T Capital Markets, Credit Suisse, Deutsche Bank, Jefferies, JPMorgan, Macquarie Research, UBS, Wells Fargo, and William Blair & Company are some of the firms that had analysts who followed CBI during

---

[31] NYSEData.com Factbook.

the Class Period.

36. The regular availability of stock analyst research reports from leading broker-dealers, who covered CBI during the Class Period, is evidence that the market for CBI's common stock was efficient during the Class Period.

37. In addition, CBI issued regular press releases during the Class Period, made regular securities filings with the SEC, and held regular analyst conference calls. CBI also received regular press coverage throughout the Class Period, and information concerning CBI was widely disseminated throughout the Class Period through national news services.

### iii.   *Cammer* Factor Three: Existence of Market Makers, Institutional Investors, and Arbitrageurs

38. Shares of CBI's common stock were listed on the NYSE during the entire Class Period. During this period, numerous financial entities were actively buying and selling shares of CBI's common stock. As disclosed in Schedule 13-F filings, during the Class Period, an average of approximately 600 institutional investors held CBI's common shares. Between 63 percent and 74 percent of CBI's outstanding common shares were held by these institutional investors during the Class Period. (*See* Exhibit 5.) These institutions actively adjusted their holdings of shares of CBI's common stock. The sum of the absolute values of the quarterly changes in securities held by each individual institutional shareholder ranged from approximately 16.5 million to 35.5 million shares of CBI's common stock during the Class Period.

39. Schedule 13-F filings report the holdings of institutional investors on one day in each calendar quarter, and quarter-to-quarter changes in shareholdings can significantly understate the total volume of trading by these institutional shareholders by failing to account for instances where

14

institutional shareholders bought and sold shares during the respective quarters. Thus, my estimation of the volume of institutional trading in shares of CBI's common stock is conservative. High levels of institutional ownership and the active trading by these holders are further evidence that is consistent with the market for CBI's common stock being efficient during the Class Period. Institutional investors are sophisticated market participants, who closely track their investments and who contribute readily to the quick dissemination of information and its incorporation into a security's price, which facilitates price discovery by other investors. Moreover, institutional investors, along with broker-dealers, typically facilitate short selling by lending securities to short sellers. Thus, high levels of institutional ownership improve market efficiency by enabling investors, such as hedgers and arbitrageurs, to engage in short selling.

40. The NYSE designates market professionals each known as a Designated Market Maker (DMM) (formerly, a Specialist), who are responsible for maintaining orderly trading markets in listed stocks and bonds. Specifically, DMMs are required to "maintain a fair and orderly market in their stocks, quote at the NBBO [National Best Bid and Offer] a specified percentage of the time, and facilitate price discovery throughout the day as well as at the open, close and in periods of significant imbalances and high volatility"; to "provide price improvement and match incoming orders"; and to "being on parity with quotes from floor brokers and those on the Display Book" to enhance market quality.[32]

41. NYSE-listed stocks also trade on other exchanges, including the NASDAQ. Market makers/broker-dealers working on the NASDAQ exchange are primarily investment companies that trade shares through the NASDAQ's electronic network.

---

[32] *See* https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf.

15

42.    There is evidence that numerous financial entities were actively buying and trading shares of CBI's common stock during the Class Period. According to Bloomberg, there were 21 active market makers, in addition to the DMM, that facilitated trades for shares of CBI's common stock between October 2013 and June 2015.[33] (*See* Exhibit 6.) The large number of market makers facilitating trading in shares of CBI's common stock during the Class Period is indicative of a liquid and efficient market for CBI's common stock during this period. Greater liquidity lessens the likelihood of price inefficiencies and facilitates investors' price discovery.

### iv.    *Cammer* Factor Four: CBI's Eligibility to File SEC Form S-3

43.    The Securities Act of 1933 requires companies to file registration statements prior to the sale of securities to the public. Form S-3 is a simplified registration form that allows incorporation by reference of Securities Exchange Act of 1934 (the "Exchange Act") reports for companies based in the United States only.[34] Form S-3 is available to large, seasoned companies. However, I note that an amendment to the eligibility requirements for Form S-3, which was effective January 28, 2008, now allows for smaller companies to file on Form S-3.[35]

44.    The primary requirements for S-3 eligibility are that the issuer must have filed all materials required under the Exchange Act for at least twelve months and that the public float of the company's common equity must be $75 million or greater. As stated in the SEC release establishing the requirements for S-3 eligibility, "This form is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has

---

[33] Per Bloomberg L.P. Bloomberg's list of market makers includes 170 entities, although some reported very low trading volumes. I considered an active market maker to be a market maker that traded at least one million shares of CBI's common stock during the period studied.

[34] http://www.sec.gov/about/forms/forms-3.pdf.

[35] Securities and Exchange Commission, "Revisions to the Eligibility Requirements for Primary Securities Offerings on Forms S-3 and F-3," Release No. 33-8878; File No. S7-10-07, December 2007.

16

already been disseminated and accounted for by the market place."[36]

45. CBI was eligible to file on Form S-3 throughout the Class Period because CBI filed all materials required under the Exchange Act, and the public float of the Company's common stock was greater than $75 million during the Class Period. In fact, prior to the Class Period, CBI filed a Form S-3ASR (automatic shelf registration), reflecting its eligibility.[37]

> v. *Cammer* Factor Five: The Relationship between News Events and Security Price Changes

46. In evaluating market efficiency, perhaps the most reliable test of market efficiency comes from *Cammer* Factor Five, the relationship between news events and securities price changes, because it ties directly to the definition of an efficient market. An efficient market will react quickly to new information that is economically significant. I examined the responsiveness of CBI's common share price to material news events to test whether the market for CBI's common stock was efficient during the Class Period. I performed an event study for shares of CBI's common stock to investigate the relationship between changes in CBI's stock price and news events concerning CBI.

47. An event study is a standard statistical technique that financial economists use to determine whether a security's price reaction to a news announcement (or some other event) is statistically significant. It is consequently the standard analytical technique that financial economists use to assess the stock market's responsiveness to new information when testing for market efficiency. The new information is the 'event', and generally, the one-day change in the issuing company's common stock price the day the information is released into the

---

[36] *Cammer*, at 1284-1285 citing SEC Securities Act Release No. 6331, 46 Red. Reg. 41,902, reprinted in Fed. Sec. L. Rep. (CCH) Spec. Regs. No. 926, extra ed. (Aug. 13, 1981).
[37] *See* June 19, 2012 Form S-3ASR, available at https://www.sec.gov/Archives/edgar/data/1027884/000119312512275570/d368387ds3asr.htm.

17

market (or the next trading day if the information is disclosed publicly while the market is closed) indicates the stock market's assessment of the information's significance. The stock market's reaction is consistent with market efficiency when the actual reaction to the new information conforms to the reaction one would expect on the basis of economic theory. I also examined directionality. Although testing for directionality may not be required to determine market efficiency for purposes of the fraud-on-the-market doctrine, my additional determination that CBI's stock price moved in the expected direction in reaction to new information further confirms market efficiency. [38]

48.   I performed an event study to analyze the daily total return on shares of CBI's common stock. The total daily return is the daily percentage change in the price of a share, adjusted for any dividend distributions. In order to focus on the impact of the company-specific news on the price of a security, one calculates a security's abnormal return around the time of the announcement. A security's abnormal return is the difference between the security's actual return and its expected return. A security's expected return is the return one would expect based on general market price movements and industry-related factors that are unrelated to the specific event that is being examined, as reflected in the changes in the prices of stocks of firms in the same industry. Once one has calculated a security's abnormal returns, one can use standard statistical tests to determine whether any of these abnormal returns are statistically significant.

49.   I calculated the expected returns on shares of CBI's common stock by applying the widely

---

[38] See, e.g., In re Petrobras Sec. Litig., 862 F.3d 250, 277 (2d Cir. 2017) (district court's finding that directionality was not required was "within the range of permissible decisions"); and Wilson v. LSB Indus., 2018 U.S. Dist. LEXIS 138832, at *40 (S.D.N.Y. Aug. 13, 2018) (lack of directionality analysis did not impair usefulness of market efficiency report).

accepted Fama-French Three-Factor Model.[39] Eugene Fama and Kenneth French developed what is now known as the Fama-French Three-Factor Model in 1993.[40] The Fama-French Three-Factor Model expresses the excess return on a common stock on day t ($R_t$) over the return on Treasury bills that day ($R_F$) in terms of three key factors. The return on Treasury bills represents the return one would expect on a risk-free investment. This model "has become widely known and adapted."[41] The model identifies the following three factors that explain excess stock returns:

- $(R_m - R_F)$ – the excess return on the equity market portfolio ($R_m$) over the return on Treasury bills ($R_F$);[42]

- *SMB* ("small minus big") – the difference between the returns on small-capitalization stocks and the returns on large-capitalization stocks; and

- *HML* ("high minus low") – the difference between the returns on high book-to-market stocks (commonly known as value stocks) and the returns on low book-to-market stocks (commonly known as growth stocks).

50. The regression formula for the Fama-French Three-Factor Model, which is fitted to daily data, is:

$$R_t - R_F = \alpha + \beta(R_m - R_F) + s(SMB) + h(HML) + \epsilon \qquad (Equation\ 1)$$

51. The variables $R_m - R_F$, *SMB*, and *HML* are defined above. The coefficients $\beta$, $s$, and $h$ measure the contributions of the respective factors to the excess return on the stock, $R_t - R_F$.

---

[39] Fama, Eugene F., and Kenneth R. French, "Common Risk Factors in the Returns on Stocks and Bonds," *Journal of Financial Economics*, 33, 1993, pages 3-56.

[40] *Id.*

[41] Emery, Douglas R., John D. Finnerty, and John D. Stowe, Corporate Financial Management, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 191.

[42] The equity market portfolio return, $R_m$, represents the value-weighted return on all NYSE, AMEX and NASDAQ stocks.

A positive coefficient suggests a direct relationship between the factor and the return on the analyzed stock. The larger the coefficient, the more responsive the stock's return will be to that factor on any given day. The Fama-French Three-Factor Model has become widely accepted for event study analysis.[43] It is a significant improvement over the (unadjusted) Capital Asset Pricing Model ("CAPM") because it prices the risks associated with small firm size and financial distress.[44]

52.    Morningstar's *Cost of Capital Yearbook*, which has been widely relied upon for historical rate of return data in the investment management industry, uses the Fama-French Three-Factor Model, among other models, to calculate the cost of equity capital for firms in various industries.[45] The Morningstar *Cost of Capital Yearbook* was discontinued after 2013 and replaced by the Duff & Phelps *Valuation Handbook*, which also employs the Fama-French Three-Factor Model, among other models, to calculate the cost of capital.[46]

53.    Controlling for industry factors that can affect the price of a company's stock is appropriate in an event study, as several articles in the academic and professional literature have previously noted.[47] Indeed, academic research has pointed out the importance of making sure that

---

[43] *See*, for example, Boehme, Rodney D., and Sorin M. Sorescu, "The Long-run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance," *Journal of Finance*, 57, 2002, pages 871-900, and Ang, James S., and Shaojun Zhang, "An Evaluation of Testing Procedures for Long Horizon Event Studies," *Review of Quantitative Finance and Accounting*, 23, 2004, pages 251-274. Eugene Fama also won the Nobel Prize in Economics in 2013. "Eugene F. Fama – Facts," Nobelprize.org. Nobel Media AB 2014. Available at http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/2013/fama-facts.html.

[44] Emery, Douglas R., John D. Finnerty, and John D. Stowe, Corporate Financial Management, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 192.

[45] Morningstar, Cost of Capital 2013 Yearbook, 2013, page 12.

[46] Duff & Phelps, 2014 Valuation Handbook, Industry Cost of Capital, page 6.

[47] Tabak, David I., and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank, eds., Litigation Services Handbook, 3rd ed., Wiley, New York, 2001, chapter 19. *See* also Alexander, Janet C., "The Value of Bad News," *UCLA Law Review*, 41, August, 1994, pages 1421-69; Macey, Jonathan R., Geoffrey P. Miller, Mark L. Mitchell, and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," 77 *Virginia Law Review Association*, 1017, August 1991, pages 1021-28; MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35, March 1997, pages 13-39; Mitchell, Mark L., and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, 49, February 1994, pages 545-90; and Cornell, Bradford, and R. Gregory

estimates of returns to investors on securities are free of the bias that can occur with the omission of an explanatory factor when using a market model, such as the CAPM or the Fama-French Three-Factor Model, to conduct an empirical study.[48]

54.    I modified the Fama-French Three-Factor Model in Equation 1 to include the returns on an industry index of common stocks that are comparable to CBI to take into account the sensitivity of CBI's common stock price to movements in the comparable companies' common stock prices during the Class Period. The regression formula for my Modified Fama-French Three-Factor Model is:

$$R_t - R_F = \alpha + \beta(R_m - R_F) + s(SMB) + h(HML) \qquad \qquad (Equation\ 2)$$
$$+ i(Industry\ Index) + \epsilon$$

55.    *Industry Index* represents the return on a market-weighted custom index comprised of members of the Standard & Poor's 1500 Construction & Engineering Index ("S15CSTE Index").[49] The coefficient $i$ measures the contribution of industry-wide factors, as measured by the daily percentage change in the *Industry Index*, to the daily excess returns on CBI's common stock.

---

Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, 37, June 1990, pages 883-923.

[48] Bartholdy, Jan, and Paula Peare, "Unbiased Estimation of Expected Return Using CAPM," *International Review of Financial Analysis*, 2003, pages 69-81. The article specifically mentions the CAPM but its analysis applies equally to the Fama-French Three-Factor Model because that model is really just an extended version of the CAPM. *See* Brealey, Richard A., Stewart C. Myers, and Franklin Allen, Principles of Corporate Finance, 9th ed., McGraw-Hill, New York, 2008, pages 225-227. Mark M. Carhart also constructed a four-factor model, which takes the Fama-French three-factor model and extends it by adding a momentum factor. The momentum factor is calculated as the equal-weighted average of firms with the highest 30 percent eleven-month return lagged one month *less* the equal-weighted average of firms with the lowest 30 percent eleven-month return lagged one month. *See* Mark M. Carhart, "On Persistence in Mutual Fund Performance," *Journal of Finance*, 52, March 1997, pages 57-82 and Fama, Eugene F. and Kenneth R. French, "Size, value, and momentum in international stock returns," *Journal of Financial Economics*, 105, 2012, pages 457-472.

[49] The members of the Standard & Poor's 1500 Construction & Engineering Index consisted of AECOM, Aegion Corp., Comfort Systems, Dycom Industries Inc., EMCOR Group Inc., Fluor Corp., Granite Construction Inc., Jacobs Engineering Group Inc., KBR Inc., Orion Group Holdings Inc., Quanta Services Inc., and URS Corp. during the Class Period. I also considered other industry indices, including S&P Building and Construction Select Industry Index and Russell 3000 Manufacturing & Production Subsector Index, but the return on the Standard & Poor's 1500 Construction & Engineering Index provides a higher correlation with the return on CBI's stock during the Class Period than the other industry indices.

56.  A multiple regression model is fitted to data using an estimation period that is ideally untainted by fraud and comparable to the event period (i.e., the Class Period).[50]  However, CBI's common stock exhibited heightened volatility during the Class Period as compared to the one-year period prior to the Class Period.[51]  (*See* Exhibit 7.)  CBI's common stock price volatility was 24.44% during the pre-Class Period and 37.83% during the Class Period, which means that the stock's volatility during the Class Period was 1.55x its volatility during the pre-Class Period.  This heightened volatility will tend to cause an unusually high percentage of statistically significant abnormal returns during the Class Period when the pre-Class Period is used to estimate the market model in Equation 2.  Using the pre-Class Period as the estimation period will bias the tests of the Class Period abnormal returns leading to false positives when these abnormal returns are tested for statistical significance.  Therefore, it is my opinion that due to the relatively elevated volatility during the Class Period, it is most appropriate to use the Class Period as the estimation period for fitting the market model in Equation 2.[52]

57.  When using the Class Period to fit the market model, it is also necessary to isolate the effects of any alleged fraud on the security's price prior to calculating the security's abnormal returns. One manner of estimating abnormal returns during the Class Period is to augment the regression model to include dummy variables for the event dates to control for the effects of

---

[50] For event studies, there are four choices for the estimation period, (1) before the event period, (2) during the event period, (3) after the event period, or (4) around the event period. *See* Glenn V. Henderson, Jr., "Problems and Solutions in Conducting Event Studies," *Journal of Risk and Insurance*, 57, 1990, pages 282-306.

[51] I note that the volatility of CBI's common stock for the one year after the Class Period was higher than the volatility during the Class Period and thus would be unsuitable to use for the estimation period. *See* Exhibit 7.

[52] For comparison purposes, I also tested a regression model using the one year prior to the Class Period as the estimation period for fitting the stock price model. The results are presented in Appendix D. Also, using the one year after the Class Period for the estimation period would not be appropriate because of CBI's transformative transaction, in which it sold its nuclear construction business to WEC in October 2015. A transformative transaction fundamentally changes the nature of a company and, consequently, could fundamentally affect the market for its common stock.

fraud-related events on the parameter estimation.[53]  Another procedure, which is similar, is to drop the event dates during the estimation period, which is the method I selected.[54]

58.   I reviewed the news events during the Class Period and the Complaint in this matter to compile a list of news events related to the alleged fraud during the Class Period, including any allegedly false and misleading statements, material omissions, and disclosures.  Exhibit 8 provides a comprehensive list of the fraud-related news event dates alleged in the Complaint.  I dropped all these fraud-related news event dates from the estimation period I used to fit the Fama-French Three-Factor Model in order to avoid having the returns on these dates bias the parameter estimates in my regression model.

59.   I then applied the Modified Fama-French Three-Factor Model for every day in the Class Period to test whether the stock market's reactions to CBI's daily news events were statistically significant during the Class Period.  (*See* Exhibits 9 and 10.)  In each case, I used a two-tailed test of statistical significance to test whether the daily abnormal return on CBI's common stock is zero (the null hypothesis) against the alternative hypothesis that the daily abnormal return is different from zero (the alternative hypothesis).[55]

60.   I report the results of the statistical testing for all dates during the Class Period in Exhibit 10.  I

---

[53] A study by Binder describes an approach that parameterizes the abnormal returns in the regression model by including a set of dummy variables.  Each dummy variable takes on the value one for a particular event, and the coefficient of the dummy variable measures the abnormal return associated with the event.  *See* John J. Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting*, 11, 1998, pages 111-137.  *See also* John J. Binder, "Measuring the Effects of Regulation with Stock Price Data," *RAND Journal of Economics*, 16, 1985, pages 167-183, and Glenn V. Henderson, Jr., "Problems and Solutions in Conducting Event Studies," *Journal of Risk and Insurance*, 57, 1990, pages 282-306.

[54] I note that the estimated regression coefficients would be identical under the two methods. However, dropping the event dates instead of including dummy variables for the event dates enhances the reliability of the regression model, because dummy variables might artificially increase the goodness-of-fit of a regression model (measured by adjusted R-squared) merely by adding more dummy dates.

[55] The two-tailed test is conservative because I would normally expect that a corrective disclosure would elicit a negative stock market reaction, in which case the alternative hypothesis is that the abnormal stock market return is less than zero and a one-tailed test would seem more appropriate. Thus, the two-tailed test with a 10% critical significance level is equivalent to a one-tailed test with a more conservative 5% critical significance level.

23

distinguish when the abnormal stock return is significantly different from zero at the 1%

significance level (highly statistically significant), 5% level (statistically significant), or 10%

level (weakly statistically significant), which is also consistent with the general practice within

the field of financial economics. (*See* Exhibit 11.) Academic articles in the financial

economics literature typically identify results that are statistically significant at all three levels

of statistical significance but place the most weight on statistical results that are significant at

the 1% level, less weight on those that are significant at the 5% level, and the least weight on

those that are only significant at the 10% level.

61.   In order to identify news events relevant to CBI during the Class Period, I examined earnings

release dates during the Class Period as well as the alleged misrepresentation and disclosure

dates identified in the Complaint. I also identified additional dates as providing Company-

specific, value-relevant information, which results in instances where disclosure dates I study

differ from those alleged in the Complaint.[56]   Because earnings announcements typically

include many of the most important company news items, they are often used to test the impact

of new information on a company's stock price when investigating the efficiency of the market

for the company's stock. I examined the cause-and-effect relationship between these news

events and the responsiveness of CBI's common stock price by testing the abnormal returns on

each news announcement date for statistical significance by performing an event study.

Because the *Cammer* court addressed only anecdotal evidence of stock price movements on a

few news dates, my examination utilizing the well-accepted event study methodology is at

least consistent with, and I believe more rigorous and scientific than, the cause-and-effect

---

[56] CBI released its earnings results on six dates during the Class Period: (1) February 25, 2014, (2) April 23, 2014, (3) July 24, 2014, (4) October 23, 2014, (5) February 24, 2015, and (6) April 23, 2015. As all earnings results were released after the market closed on each of the six dates, I have examined the market reactions of CBI's common stock on the following trading dates.

24

evidence submitted in *Cammer*.

62.  I reviewed the information released on the misrepresentation and disclosure dates and found that CBI's stock price reacted in a manner that is consistent with an efficient market on every one of these dates.  For all earnings release dates I reviewed, the information released was economically significant to investors and securities analysts, and CBI's stock price reactions are also statistically significant at the 5% level or better and are in the direction one would expect in an efficient market.  (See Exhibit 9.)

63.  I present a detailed review of all the event days I identified and tested in Appendix C to this report.

### B.  Application of the *Krogman* Factors to the Market for CBI's Common Stock

64.  In addition to the five *Cammer* factors, I also applied the three *Krogman* factors to examine further the efficiency of the market for CBI's common stock during the Class Period.

### i.    Company's Market Capitalization

65.  During the Class Period, the quarterly average market capitalization of CBI's common stock ranged from approximately $4.5 billion to approximately $9.4 billion.  (*See* Exhibit 12.)

66.  The NYSE is the world's largest and most liquid stock exchange.  Its infrastructure and participants allow it to provide a reliable, liquid, and efficient market place.  Its stringent listing standards insure that issuers are large enough to facilitate a liquid market, and its regulations insure that material company information is disclosed promptly to investors.  In general, to be listed on the NYSE, the market value of publicly held common stock must exceed $50 million.[57]

---

[57] NYSE Listed Company Manual,
http://nysemanual.nyse.com/LCMTools/PlatformViewer.asp?selectednode=chp_1_9_2_1&manual=%2Flcm%2Fs
ections%2Flcm-sections%2F.

67.  Shares of CBI's common stock were traded on the NYSE throughout the entire Class Period.

As Bromberg stated:

> [A]t a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the Nasdaq National Market System.[58]

The listing of the shares of CBI's common stock on the NYSE is consistent with the market for CBI's common stock being efficient during the Class Period.

68.  During the Class Period, the market capitalization of CBI's common stock on average was approximately 135 times as large as the $50 million minimum for NYSE listing.  The median market capitalization for all stocks traded on the NYSE ranged from $1.9 billion to $2.1 billion, during the Class Period.[59]  The very large market capitalization of CBI's common stock in relation to the average market capitalization of NYSE stocks is consistent with the market for CBI's common stock being efficient during the Class Period.

### ii.    Stock's Bid-Ask Spread

69.  A stock's bid-ask spread provides an indication of the efficiency of the market for the stock. An efficient market is open and developed.  An open market is one in which anyone, or at least a large number of persons, can buy or sell.  A developed market is one which has a relatively high level of activity and trading frequency, and for which price and volume information is widely available.  It usually has the ability to absorb a reasonable amount of trading with relatively small price changes.  The wide availability of information about the stock and the high level of trading, which promote market efficiency, will lead market makers in the stock to set relatively small bid-ask spreads.  Consequently, a small bid-ask spread for a stock is

---

[58] *Cammer*, at 1292, citing Bromberg & Lowenfels.

[59] Based on data provided by the Center for Research in Security Prices (CRSP), as of each calendar quarter from December 31, 2014 to September 31, 2015.

26

consistent with the market for the stock being efficient.

70.    During the Class Period, the average and median daily bid-ask spreads for CBI's common stock were both 0.02%. (*See* Exhibit 13.) For the Class Period, the average and median daily bid-ask spreads for all ordinary common shares traded on the NYSE were 0.13%, and 0.05%, respectively.[60] The average and median bid-ask spreads for CBI's common stock were below the average and median for all NYSE common stocks in the Class Period, respectively, which is evidence that supports market efficiency.

### iii.    Stock's Public Float

71.    During the Class Period, the percentage of public float of CBI's common stock, calculated as the number of shares outstanding less the number of shares held by insiders divided by the number of shares outstanding, was approximately 89.2%. (*See* Exhibit 12.) The market value of CBI's public float averaged $6 billion during the Class Period.

72.    The large size of the public float for CBI's common stock suggests a liquid market for the security. As noted, an efficient market is open and developed. A developed market is one which has a relatively high level of activity and trading frequency, and therefore usually has the ability to absorb a reasonable amount of trading with relatively small price changes, which is the hallmark of a liquid market. Consequently, the large public float for CBI's common stock during the Class Period is consistent with the hypothesis that the market for CBI's common stock was a liquid, efficient market during the Class Period.

### C.  Additional Factors Considered

73.    In addition to the *Cammer* factors and the *Krogman* factors discussed in the previous sections of this report, I also performed two sets of additional tests for market efficiency that are

---

[60] Based on data provided by CRSP.

described in the economics literature. These tests can provide valuable insights into whether the market for a security is efficient.[61] The additional tests I conducted are (a) testing whether the "put-call parity" relationship between the price of CBI's common shares and the prices of the call options and put options written on CBI's common shares was satisfied during the Class Period and (b) performing "random walk" tests.

### i.   Put-Call Parity Tests

74.   *Put-call parity* expresses a relationship between the prices of a company's put and call options and the price of its common stock. Put-call parity should hold in an efficient capital market.[62] Testing whether put-call parity holds can assist in assessing whether the market for a company's common stock and the market for options on its common stock are efficient. Put-

---

[61] This literature includes Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics*, 74, 2004, pages 305-342; Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22, 2009, pages 1955-1980; Battalio, Robert, and Paul Schultz, "Options and the Bubble," *Journal of Finance*, 2006, pages 2071-2102; Fama, Eugene, "The Behavior of Stock Prices," *Journal of Business*, 38, 1965, pages 34-105; Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, Modern Portfolio Theory and Investment Analysis, 6th ed., John Wiley & Sons, Inc., Hoboken, NJ, 2003; Fama, Eugene F. and Kenneth R. French, "Permanent and Temporary Components of Stock Prices," *Journal of Political Economy*, 96, 1988, pages 246-273; Dufour, Jean-Marie, Y. Lepage, and H. Zeidan, "Nonparametric Testing for Time Series: A Bibliography," *Canadian Journal of Statistics*, 10, 1982, pages 1-38; Mittsdorffer, R., and J. Diederich, "Prediction of First Day Returns of Initial Public Offering in the US Stock Market Using Rule Extraction from Support Vector Machines," *Studies in Computational Intelligence* (SCI), 80, 2008, pages 185–203; Luger, Richard, "Exact Nonparametric Tests for a Random Walk With Unknown Drift Under Conditional Heteroscedasticity," Research Department, Bank of Canada, pages 2-3; Campbell, B., and Jean-Marie Dufour, "Exact Nonparametric Orthogonality and Random Walk Tests," *Review of Economics and Statistics*, 77, February 1995, pages 1-16; Boehmer, Ekkehart and Eric K. Kelley, "Institutional Investors and the Informational Efficiency of Prices," *Review of Financial Studies*, 22, 2009, pages 3563-3594; Boehmer, Ekkehart, Charles M. Jones, and Xiaoyan Zhang, "Which Shorts Are Informed?," *Journal of Finance*, 63, April 2008, pages 491-527; Boehmer, Ekkehart and Juan Wu, "Short Selling and the Price Discovery Process,," *Journal of Financial Studies*, 26, 2013, pages 287-322; Klemkosky, Robert C. and Bruce G. Resnick, "Put-Call Parity and Market Efficiency," *Journal of Finance*, 34, December 1979, pages 1141-1155; Bris, Arturo, William N. Goetzmann, and Ning Zhu, "Efficiency and the Bear: Short Sales and the Markets Around the World," *Journal of Finance*, 62, June 2007, pages 1029-1079; and Elyasiani, Elyas, Shmuel Hauser, and Beni Lauterbach, "Market Response to Liquidity Improvements: Evidence from Exchange Listings," *Financial Review*, 41, 2000, pages 1-14.

[62] Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics*, 74, 2004, pages 305-342, and Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22, 2009, pages 1955-1980.

call parity tests are joint tests of the efficiency of the markets for the stock and for the options written on the stock.

75. A holder of an equity call option has the right to purchase the underlying stock at a specified strike (or exercise) price. A holder of an equity put option has the right to sell the underlying stock at a specified exercise price. If put-call parity holds, then the price of a put option ("$P$") with a particular strike price and expiration date will equal the price of a call option ("$C$") with the same strike price and expiration date minus the price of the underlying stock ("$S_0$") plus the present value of the exercise price ("$PV(X)$") plus the present value of the dividends on the underlying common stock expected to be paid during the remaining duration of the options ("$PV(dividend)$"). This relationship expressed in equation form is:

$$P = C - S_0 + PV(X) + PV(Dividend) \qquad \text{(Equation 3)}$$

76. In this equation, the put and call options must have the same exercise price and the same expiration date. Rearranging Equation 3 to express the share price produces the following stock price and option price relationship:

$$S_0 = C - P + PV(X) + PV(Dividend) \qquad \text{(Equation 4)}$$

77. If this relationship does not hold,[63] which is commonly referred to as a *put-call parity violation*, arbitrageurs should be able to earn riskless profits by buying the relatively cheap assets and selling the relatively expensive ones. Such arbitrage opportunities generally do not occur (except possibly for very short time periods) in an efficient market. Academics have argued that in certain situations, short sale restrictions have limited the ability of arbitrageurs

---

[63] The relationship embodied in Equation 4 is referred to as put-call parity. When put-call parity holds, the price of the firm's common stock, which is on the left-hand side of the equal sign in Equation 4, equals the sum of the variables on the right-hand side of the equal sign, which means that the combination of items produces exactly the same value as the share of common stock.

to take advantage of the mispricing of assets.[64]  In particular, it has been argued that if investors are limited in their ability to sell the stock short, there will be a tendency for the share price on the left-hand side of Equation 4 to be greater than the sum of the elements on the right-hand side, in which case the stock will be overpriced, and a riskless arbitrage opportunity will exist.

78.  First, I investigated whether there is any evidence that might indicate whether short-sale constraints might have impeded an efficient market for CBI's common stock during the Class Period.[65]  For NYSE stocks, the average short interest as a percentage of shares outstanding was approximately 3.2% during the Class Period.[66]  (*See* Exhibit 14.)  The average short interest in shares of CBI's common stock as a percentage of shares of CBI's common stock outstanding during the Class Period was approximately 5.5%.  (*See* Exhibit 14.)  The short interest in shares of CBI's common stock, on average and during all periods studied, was small relative to its institutional ownership.

79.  While the level of CBI's average short interest was elevated in 2015, the put-call parity test results will indicate whether any short-sale effects were strong enough to induce significant violations of put-call parity in the market for CBI's common stock during the Class Period. The put-call parity tests, which I perform next, test whether shares of CBI's common stock traded at prices above where they would be expected to trade in a market with enough short selling to achieve and maintain put-call parity.

80.  Using option pricing data obtained from the OptionMetrics database and CBI's common stock

---

[64] Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics*, 74, 2004, pages 305-342, and Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22, 2009, pages 1955-1980.

[65] Battalio, Robert, and Paul Schultz, "Options and the Bubble," *Journal of Finance*, 61, 2006, pages 2071-2102.

[66] The short interest for the NYSE is based on the short interest for all NYSE index members as reported by Bloomberg L.P.

pricing data obtained from Bloomberg L.P., I investigated whether put-call parity held for CBI's common stock during the Class Period.[67]  When put-call parity holds, the share price satisfies the equilibrium relationship stated in Equation 4, and it may be concluded that short selling is not being restricted.  I matched calls and puts based on their exercise prices and expiration dates.  I took the average of the best last bid and best last ask quotes to estimate the prices of the calls and puts.  For the price of a share of CBI's common stock, I used the last traded price for that security.  Dividends were set equal to the expected dividends to be received during the life of the option.[68]  The dividends and the exercise price were discounted using interpolated yields on risk-free securities obtained from Bloomberg L.P.  To improve the quality of the data, I deleted options with fewer than six calendar days to maturity or greater than 180 calendar days to maturity and options with a price less than $0.375.[69]

81.   After applying these filters, I was left with 35,104 pairs and a total of 1,611,885 put option and call option contracts.  I calculated the put-call parity violation for each of these pairs using the following equation:

$$Put\text{-}Call\ Parity\ Violation = \frac{[S_0 - C + P - PV(X) - PV(Dividend)]}{S_0} \qquad (Equation\ 5)$$

Exhibit 15 shows the results of the put-call parity violation test for CBI's common stock on a monthly basis between November 2013 and June 2015.

82.   Although the OptionMetrics database can be considered one of the best publicly available databases for options pricing data, some researchers have found that the option prices from the

---

[67] Option market makers generally change their bid and ask quotes each time the underlying stock price changes. Consequently, there are bid and ask quotes regardless of the number of options contracts traded each day.  Bid and ask quotes come from the NBBO (National Best Bid and Offer) data.

[68] For purposes of my calculations, I set the expected dividends to be equal to the actual dividends received during the life of the option.

[69] These filters were applied in Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22, 2009, page 1960.

database have the potential to exaggerate the frequency of put-call parity violations.[70] Even after considering the potential for a higher frequency of put-call parity violations from the pricing data, I found that the average put-call parity violation for CBI's common stock and options during the Class Period was only 0.16%. (*See* Exhibit 15.) The average CBI put-call parity violation is well within standard ranges published in academic research. The authors of "Failure is an Option: Impediments to Short Selling and Option Prices" found that the average put-call parity violation for 4.5 million pairs traded during 1998 and 1999 was 0.36% and that the standard deviation was 1.79%.[71] Thus, the range between minus one standard deviation and plus one standard deviation extends from -1.43% to 2.15%. None of the average monthly put-call parity violations for CBI's common stock during the Class Period falls outside this range.

83.   Additionally, the authors of "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets" analyzed 80,614 option pairs between July 1999 and November 2001.[72] They measured put-call parity violations by calculating the ratio $R = 100\ln(S/S^*)$, where $S$ is the stock price and $S^*$ is the price predicted by put and call option prices. The average $R$ for their sample was 0.30. The average $R$ for the CBI's common stock pairs is 0.16. (*See* Exhibit 16.) The interquartile range for this ratio (25th percentile to the 75th percentile) in the aforementioned study extends from -0.16 to 0.65.[73] The average $R$ of 0.16 for CBI's common stock is well within this range.

84.   The test results reported in Exhibits 15 and 16 show that the put-call parity relationship held

---

[70] Battalio, Robert, and Paul Schultz, "Options and the Bubble," *Journal of Finance*, 61, 2006, page 2086.
[71] Evans, Richard B., Christopher C. Geczy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22, 2009, pages 1955-1980.
[72] Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics*, 74, 2004, pages 305-342.
[73] *Id.*, page 316.

for CBI's common stock throughout the Class Period. I have seen no evidence that short sale constraints or any other restrictions impaired the market efficiency of CBI's common stock during the Class Period.

85. I also examined the average absolute value of put-call parity violations, which was 0.51% for the "Failure is an Option" method and 0.51 for the "R" method for CBI's common stock. (*See* Exhibits 15 and 16.) These values are also well within the respective ranges in the aforementioned studies, and thus, these results are consistent with the market for CBI's common stock and the market for call options and put options written on CBI's common stock being efficient during the Class Period.

86. I also examined put-call parity for those options that were trading "near the money."[74] These options had exercise prices near the price per share of CBI's common stock. The test results for this sub-sample are consistent with the test results for the overall sample. The average put-call parity violation was 0.16% for the "Failure is an Option" method, which is well within the respective ranges in the aforementioned studies, and the average put-call parity violation was 0.16 for the "R" method, which is also well within the respective ranges. (*See* Exhibits 15 and 16.) These test results are consistent with market efficiency for CBI's common stock during the Class Period.

87. The fact that the put-call parity relationship held closely during the Class Period suggests that CBI's common stock price fairly reflected its intrinsic value, based on the publicly available information about CBI, as would be expected in an efficient market.[75] This is further evidence

---

[74] The sample was restricted to those pairs for which $-0.1 < \ln (S_0/\text{Exercise Price}) < 0.1$. This filter is discussed in Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics*, 74, 2004, page 340.

[75] Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics*, 74, 2004, pages 305-342, and Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22, 2009, pages 1955-1980.

33

that the market for CBI's common stock was efficient during the Class Period.

### ii.   Random Walk Tests

88.   Common stock returns follow what is known as a random walk in an efficient market.[76] Stock prices in an efficient market bounce around from moment to moment much like bubbles in a glass of soft drink; that is, when stock returns follow a random walk, stock price movements are independent from moment to moment. Accordingly, the returns on the stock each day are identically distributed. The pattern of stock prices is stable in the sense that the expected return and volatility do not change over time. Consequently, the company's share price does not change in a predictable manner from one moment to the next, and investors cannot use past stock price movements to predict the next day's stock price movement.[77]

89.   I performed two types of tests, parametric tests and non-parametric tests, to examine whether the random walk hypothesis could be rejected for CBI's common stock during the Class Period. If share prices follow a random walk, stock price movements are independent from one day to the next; there is no serial correlation evident in the stock's daily returns. Testing the random walk hypothesis involves testing a stock's returns for serial correlation by investigating whether there is any evidence that stock price movements one day are systematically related to (i.e., correlated with) stock price movements on one or more subsequent days in a discernible pattern. If there is no evidence of serial correlation, then the random walk hypothesis cannot be rejected for the particular stock and the time period tested. Likewise, the hypothesis that the stock trades in an efficient market also cannot be rejected, at least for the period tested.

---

[76] Fama, Eugene, "The Behavior of Stock Prices," *Journal of Business*, 38, 1965, pages 34-105.
[77] Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, Modern Portfolio Theory and Investment Analysis, 6th ed., John Wiley & Sons, Inc., Hoboken, NJ, 2003, page 405.

90.   Parametric tests examine whether there is any serial correlation evident in day-to-day stock returns.[78] Parametric tests make certain assumptions about the stock returns that are inconsistent with actual stock returns. For example, the conventional regression test makes the assumption that the errors around the fitted regression line are normally distributed. The normal probability distribution allows for outcomes between negative and positive infinity.[79] However, stock returns are bounded below by returns of -100%, since stock prices cannot fall below zero. Consequently, the basic assumption underlying the conventional regression test does not strictly fit the data, even though it is usually a reasonable approximation. On the other hand, non-parametric tests are distribution-free and thus may be considered more appropriate when performing random walk tests to examine market efficiency.[80] In an abundance of caution, I ran both types of tests.

### a. Non-Parametric Tests

91.   I ran two non-parametric statistical sign tests, the *McNemar Test* and the *Wilcoxon Signed-rank Test*, to investigate whether the returns on CBI's common share prices followed a random walk during the Class Period. There is an extensive financial literature on the use of non-parametric sign tests to examine evidence of a random walk in stock returns.[81] As I have noted, in an efficient market, the stock price follows a random walk. Consequently, the returns on successive days are independent of one another, and the probability of an increase in price and

---

[78] Fama, Eugene F. and Kenneth R. French, "Permanent and Temporary Components of Stock Prices," *Journal of Political Economy*, 96, 1988, pages 246-273. When serial correlation is present, day-to-day stock price movements are not independent, but instead, are systematically related in some manner.

[79] There is an extensive academic literature that furnishes evidence that stock returns are not normally distributed. One of the most often cited papers in this literature is Fama, Eugene, "The Behavior of Stock Prices," *Journal of Business*, 38, 1965, pages 34-105.

[80] One drawback of the non-parametric tests I performed is that the tests can only detect 1-day lag serial correlation. Therefore, I also performed parametric tests to confirm the results of the non-parametric tests and to test for the existence of serial correlation lags of up to five days.

[81] For a survey of this literature, *see* Dufour, Jean-Marie, Y. Lepage, and H. Zeidan, "Nonparametric Testing for Time Series: A Bibliography," *Canadian Journal of Statistics*, 10, 1982, pages 1-38.

the probability of a decrease in price should be equal and independent of past returns.

However, as pointed out by Professor Eugene Fama in his seminal paper on the behavior of

stock prices:

> Now in fact we can probably never hope to find a time series [of stock prices] that is
> characterized by *perfect* independence. Thus, strictly speaking, the random walk theory
> cannot be a completely accurate description of reality. For practical purposes, however,
> we may be willing to accept the independence assumption of the model as long as the
> dependence in the series of successive price changes is not above some 'minimum
> acceptable' level.[82]

92. The *McNemar Test* is used to determine whether there is an equal probability between two

events: (a) a positive return today is followed by a negative return tomorrow and (b) a negative

return today is followed by a positive return tomorrow.[83] In an efficient market where stock

prices exhibit a random walk, the probabilities of both events happening should be equal. As

shown in Panel A of Exhibit 17, during the Class Period, there are 107 observations where a

positive stock price return one day is followed by a negative return the next day and 106

observations where a negative return one day is followed by a positive return the next day. In

this case, there appears to be an equal probability of a positive return followed by a negative

return and a negative return followed by a positive return. The *McNemar Test* statistic is

0.0000 with a p-value of 1.0000 for CBI's common stock during the Class Period. The p-value

indicates a lack of statistical significance. Therefore, the null hypothesis that the probabilities

of a positive (negative) return one day followed by a negative (positive) return the next day are

equal cannot be rejected. Simply, an investor cannot profit on one day solely by knowing the

return of CBI's common stock the previous day.

---

[82] Fama, Eugene, "The Behavior of Stock Prices," *Journal of Business*, 38, 1965, page 35.

[83] Mittsdorffer, R., and J. Diederich, "Prediction of First-Day Returns of Initial Public Offering in the US Stock Market Using Rule Extraction from Support Vector Machines," *Studies in Computational Intelligence* (SCI), 80, 2008, pages 185–203; and Dufour, Jean-Marie, Y. Lepage, and H. Zeidan, "Nonparametric Testing for Time Series: A Bibliography," *Canadian Journal of Statistics*, 10, 1982, pages 1–38.

93.  The second non-parametric random walk test I performed is the *Wilcoxon Signed-rank Test*.[84] It examines whether there is an equal probability that a positive (negative) return one day is followed by a negative (positive) return the next day.  This test is different from the *McNemar Test* because it accounts for both the direction and the magnitude of the return changes.  The median difference between consecutive daily returns should be zero in a random-walk time series.  As shown in Panel B of Exhibit 17, during the Class Period, the *Wilcoxon Signed-rank Test* t-statistic is 0.1069, and the p-value is 0.9148, which is again far from indicating statistical significance, when I test CBI's common stock.  Therefore, the null hypothesis that the median difference in consecutive daily returns is zero cannot be rejected.  In other words, an investor cannot profit on one day solely by knowing the return on CBI's common stock the previous day.

94.  The results of the non-parametric tests of the random walk hypothesis are consistent with a random walk time series for the prices of CBI's common stock during the Class Period.  Both sets of test results support the hypothesis that CBI's common stock traded in an efficient market during the Class Period.

### b.  Parametric Tests

95.  The time series of CBI's common stock returns should not exhibit any serial correlation in an efficient market, whether it is serial correlation with a one-day lag (which the non-parametric tests are designed to detect) or lags longer than one day (which I investigate using a parametric test).  In addition to the two non-parametric tests I just described, I also ran two sets of parametric tests, regression tests for serial correlation between the returns and prior day returns

---

[84] Luger, Richard, "Exact Non-Parametric Tests for a Random Walk with Unknown Drift Under Conditional Heteroscedasticity," Research Department, Bank of Canada, pages 2–3; and Campbell, B., and Jean-Marie Dufour, "Exact Nonparametric Orthogonality and Random Walk Tests," *Review of Economics and Statistics*, 77, February 1995, pages 1–16.

on CBI's common stock and the *Portmanteau Test (Q-Test)*, to examine further whether there is any serial correlation evident in CBI's common stock returns during the Class Period. For each set of tests, I examined both the raw returns and the excess returns estimated from the event study model I discussed previously.

96.    In performing the serial-correlation tests, I first regressed CBI's common stock raw returns on the prior day raw returns. Next, I regressed CBI's common stock excess returns on the prior day excess returns. The p-values for the tests for both the raw returns and the excess returns indicate lack of statistical significance at the 10% level. Therefore, the tests do not indicate the presence of any statistically significant serial correlation for either the raw returns or the excess returns during the Class Period. (*See* Exhibit 18, Panel A.)

97.    The test results are consistent with an efficient market for CBI's common stock during the Class Period; both test results (based on raw returns and also based on excess returns) indicate that the pattern of returns for CBI's common stock is consistent with a random walk during the Class Period.

98.    In addition, I performed the *Portmanteau Test (Q-Test)*, which examines whether there is any serial correlation between CBI's common stock returns and the prior daily returns with lags between one day and five days. Using both CBI's common stock raw returns and excess returns, I found that the p-values in the tests do not indicate statistical significance at the 10% level for any of the one-day to five-day lags during the Class Period. (*See* Exhibit 18, Panel B.) Thus, these test results do not support the hypothesis of serial correlation between returns with lags of five or fewer days.

99.    In sum, based on the results of the non-parametric and parametric tests taken collectively, it is my opinion that there is no statistically significant serial correlation evident in CBI's common

38

stock returns during the Class Period. None of the tests conducted has produced evidence of significant serial correlation that would contradict market efficiency for CBI's common stock. Therefore, it is my opinion that the hypothesis that CBI's common stock returns followed a random walk during the Class Period, which would be indicative of an efficient market, cannot be rejected.

## VI.    Methodology for the Calculation of Damages per Share

100. Counsel has also asked me to opine whether the damages per share suffered by class members who purchased shares of CBI's common stock during the Class Period when the fraud-related inflation was removed from the stock price could be calculated on a class-wide basis. Assuming Plaintiffs prove liability, it is my opinion that the damages per share could be calculated on a class-wide basis.

  a. The amount of fraud-related inflation in CBI's stock price on a particular day during the Class Period equals the difference between the actual share price and the price of the stock but for the fraud. The but-for price is the price with all the effects of the fraud removed. When there is more than one fraud disclosure date during the Class Period, the damages calculation assumes that the amount of the inflation per share is a constant dollar amount between two adjacent fraud disclosure dates.

  b. The dollar amount of the inflation in CBI's common stock price that is attributable to the alleged fraud is determined on each disclosure date based on the "net" abnormal return on CBI's common stock attributable to the fraud disclosure. This "net" abnormal return is converted to dollars per share by multiplying the percentage "net" abnormal return on the corrective disclosure date by CBI's closing stock price on the immediately preceding trading day.

39

c. The amount of damages per share for a share purchased on a particular day is equal to the difference between the amount of inflation per share at the time of purchase and the amount of inflation per share at the time of sale. When there are multiple disclosure dates, the damages for a share purchased on a particular day during the Class Period are calculated as the sum of the inflation amounts per share attributable to all subsequent disclosures of the alleged fraud that occur prior to the sale of the share.

d. Thereafter, the 90-day "look-back" provision of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"),[85] which caps the amount of per-share damages when a firm's stock price rebounds within 90 days following the end of the Class Period, can be applied on a per-share basis to all class members who sold on a given date during the "look-back" period. Specifically, when shares are sold within 90 days of the final corrective disclosure date, the PSLRA damages cap equals the difference between the price paid for the shares and the average price during the period that begins on the final corrective disclosure date and ends on the date of sale. When the shares are sold 90 days or more beyond the final corrective disclosure date, the cap equals the difference between the price paid and the average price during the 90 days beginning on the final corrective disclosure date.

101. Every class member's damages per share can be directly calculated utilizing the same methodology discussed herein, which is therefore common to all class members. This class-wide damages model is in accordance with widely used and generally accepted damages methodologies and, in my understanding, the relevant statutes.

---

[85] Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 202 Stat. 737 (1995).

40

**VII.    Conclusions Regarding the Efficiency of the Market for CBI's Common Stock During the Class Period**

102. It is my opinion, based on the results of the tests described in the preceding paragraphs, that the market for CBI's common stock was open, developed, and efficient during the Class Period.

103. This opinion is based on the security's high volume of trading, the large number of securities analysts following CBI coupled with a regular flow of company-specific information, the presence of a large number of market makers, the substantial number of the securities held and traded by institutional investors, CBI's eligibility to file registration statements on Form S-3, the demonstrable cause-and-effect relationship between the release of CBI-specific news and the prompt price reactions of CBI's stock, CBI's large market capitalization and large public float, the fact that the securities traded on the highly liquid NYSE throughout the entire Class Period with reasonably sized bid-ask spreads, the evidence that CBI's share price satisfied put-call parity, which indicates the stable relationship between the prices of CBI's common stock and the prices of call options and put options on CBI's common stock, and evidence that CBI's common stock returns followed a random walk during the Class Period. All analyses I performed overwhelmingly support the hypothesis that the market for CBI's common stock was open, developed, and efficient during the Class Period.

104. My analysis is based on the materials I have reviewed to date. I reserve the right to amend my opinion and file a supplemental report in this matter should I obtain any other significant information that leads me to change any of the opinions expressed in this report. To the extent this matter is adjourned for any reason, I further reserve the right to supplement this report.

41

Executed: February 4, 2019

John D. Finnerty, Ph.D.